# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DEBORAH G. MALLOW IRA SEP INVESTMENT PLAN, individually and derivatively on behalf of CHESAPEAKE ENERGY CORPORATION, | : Civil Action No. 5:12-cv-00436-M : : : |
| Plaintiff, | : |
| v. | : : |
| AUBREY K. MCCLENDON, RICHARD K. DAVIDSON, V. BURNS HARGIS, FRANK A. KEATING, BREENE M. KERR, CHARLES T. MAXWELL, DON L. NICKLES, FREDERICK B. WHITTEMORE, MARCUS C. ROWLAND, MICHAEL A. JOHNSON, and MERRILL A. MILLER, JR., | : : : : : : : : : |
| Defendants, | : : |
| and | : |
| CHESAPEAKE ENERGY CORPORATION, | : : |
| Nominal Defendant. | : |

## PLAINTIFFS' MOTION AND BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND FOR LIMITED EXPEDITED DISCOVERY

| | |
|---|---|
| CHRISTOPHER SNYDER, individually and derivatively on behalf of CHESAPEAKE ENERGY CORPORATION, | : Civil Action No. 5:12-cv-00437-M |
| Plaintiff, | : |
| v. | : |
| AUBREY K. MCCLENDON, RICHARD K. DAVIDSON, V. BURNS HARGIS, FRANK A. KEATING, BREENE M. KERR, CHARLES T. MAXWELL, DON L. NICKLES, FREDERICK B. WHITTEMORE, MARCUS C. ROWLAND, MICHAEL A. JOHNSON, and MERRILL A. MILLER, JR., | : |
| Defendants, | : |
| and | : |
| CHESAPEAKE ENERGY CORPORATION, | : |
| Nominal Defendant. | : |

| | |
|---|---|
| DOLEZAL FAMILY LIMITED PARTNERSHIP, individually and derivatively on behalf of CHESAPEAKE ENERGY CORPORATION, | : Civil Action No. 5:12-cv-00477-M |
| Plaintiff, | : |
| v. | : |
| AUBREY K. MCCLENDON, RICHARD K. DAVIDSON, V. BURNS HARGIS, FRANK A. KEATING, BREENE M. KERR, CHARLES T. MAXWELL, DON L. NICKLES, FREDERICK B. WHITTEMORE, MARCUS C. ROWLAND, MICHAEL A. JOHNSON, and MERRILL A. MILLER, JR., | : |
| Defendants, | : |
| and | : |
| CHESAPEAKE ENERGY CORPORATION, | : |

| | |
|---|---|
| _____ Nominal Defendant. | : |
| BRIAN F. LEONARD, individually and derivatively on behalf of CHESAPEAKE ENERGY CORPORATION, | :   Civil Action No. 5:12-cv-00479-M<br>:<br>:<br>: |
|                            Plaintiff, | :<br>: |
| v. | : |
| AUBREY K. MCCLENDON, RICHARD K. DAVIDSON, V. BURNS HARGIS, FRANK A. KEATING, BREENE M. KERR, CHARLES T. MAXWELL, DON L. NICKLES, FREDERICK B. WHITTEMORE, MARCUS C. ROWLAND, MICHAEL A. JOHNSON, and MERRILL A. MILLER, JR., | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |
|                       Defendants, | :<br>: |
| and | : |
| CHESAPEAKE ENERGY CORPORATION, | :<br>: |
| _____ Nominal Defendant. | : |
| DAVID A. KROLL INC. EMPLOYEES' PROFIT-SHARING PLAN AND TRUST, derivatively on behalf of CHESAPEAKE ENERGY CORPORATION, | :   Civil Action No. 5:12-cv-00493-M<br>:<br>:<br>:<br>:<br>: |
|                            Plaintiff, | :<br>: |
| v. | : |
| AUBREY K. MCCLENDON, RICHARD K. DAVIDSON, V. BURNS HARGIS, FRANK A. KEATING, BREENE M. KERR, CHARLES T. MAXWELL, DON L. NICKLES, FREDERICK B. WHITTEMORE, MARCUS C. ROWLAND, MICHAEL A. JOHNSON, and MERRILL A. MILLER, JR., | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |
|                       Defendants, | :<br>: |
| and | : |
| CHESAPEAKE ENERGY CORPORATION, | :<br>: |

<table>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>Nominal Defendant.</td><td>:</td><td></td></tr>
</table>

|  | |  |
|---|---|---|
|  | : | |
| NORMAN SPIEGEL, individually and derivatively on behalf of CHESAPEAKE ENERGY CORPORATION, | : | Civil Action No. 5:12-cv-00502-M |
|  | : | |
|  | : | |
|  | : | |
| Plaintiff, | : | |
| v. | : | |
|  | : | |
| AUBREY K. MCCLENDON, RICHARD K. DAVIDSON, V. BURNS HARGIS, FRANK A. KEATING, BREENE M. KERR, CHARLES T. MAXWELL, DON L. NICKLES, FREDERICK B. WHITTEMORE, MARCUS C. ROWLAND, MICHAEL A. JOHNSON, and MERRILL A. MILLER, JR., | : | |
|  | : | |
|  | : | |
|  | : | |
|  | : | |
|  | : | |
|  | : | |
|  | : | |
| Defendants, | : | |
| and | : | |
|  | : | |
| CHESAPEAKE ENERGY CORPORATION, | : | |
|  | : | |
| Nominal Defendant. | : | |

iv

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... ii

INTRODUCTION ............................................................................................. 1

STATEMENT OF THE CASE ........................................................................... 3

STATEMENT OF FACTS ................................................................................. 7

ARGUMENT ................................................................................................... 15

    I.     Standard ................................................................................... 15

    II.    Plaintiffs Are Entitled to Preliminary Injunctive Relief ............................ 16

        A.    Plaintiffs Are Likely to Succeed on the Merits .............................. 16

        B.    Irreparable Harm Will Result in the Absence of Injunctive Relief ............................................................................................ 21

        C.    There is No Harm to Defendants in Granting a Preliminary Injunction as the Disclosures Serve the Public Interest .................................................................. 27

        D.    No Bond is Necessary in This Case ................................................ 28

    III.    Expedited Discovery is Appropriate ......................................................... 29

CONCLUSION ............................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*Arnold v. Soc'y for Sav. Bancorp.*,
650 A.2d 1270 (Del. 1994) .......................................................................... 21

*Beard v. Love*,
173 P.3d 796 (Okla.Civ.App.2007) ............................................................. 19

*Berkman v. Rust Craft Greeting Cards, Inc.*,
454 F. Supp. 787 (S.D.N.Y. 1978) .......................................................... 24, 25

*But cf Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273 (7th Cir. 1992) ............................................ 16

*Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004) ...................................................................... 17

*Coquina Oil Corp. v. Transwestern Pipeline Co.*,
825 F.2d 1461 (10th Cir. 1987) ................................................................. 28

*Core Labs, LP v. Spectrum Tracer Serv.*,
2012 WL 1023354 (W.D. Okla. Mar. 27, 2012) ......................................... 27

*Coxcom, Inc. Oklahoma Sec. Schools Athletic Ass'n*,
143 P.3d 525 (Okla. Civ. App. 2006) ........................................................ 22

*Crowe & Dunlevy, P.C. v. Stidham*,
640 F.3d 1140 (10th Cir. 2011) ................................................. 15, 17, 22, 28

*David P. Simonetti Rollover IRA v. Margolis*,
C.A. No. 3694-VCN, 2008 WL 5048692 (Del. Ch. June 27, 2008) ........... 28

*Drilling Co. v. Siegal*,
552 F.3d 1203 (10th Cir. 2009) ................................................... 15, 22, 28

*Elgin Family Co., L.L.C. v. Paralogia Ultra Lounge, L.L.C.*,
2010 WL 1610509 (W.D. Okla. Apr. 20, 2010) ....................................... 28

*Emerald Partners v. Berlin*,
726 A.2d 1215 (Del. 1999) ........................................................................ 20

*EnergeticsSys. Corp. v. Advanced Cerametrics, Inc.*,
No. CIV-95-7956, 1996 WL 130991(E.D. Pa. Mar. 15, 1996) ................... 30

*Entertainment Merchants Assoc. v. Henry*,
2006 WL 2927884 (W.D. Okla. Oct. 11, 2006) ......................................... 28

*Entm't Merchants Assoc. v. Henry*,
2006 WL 2927884 (W.D. Okla. Oct. 11, 2006) ............................... 11, 12, 28

*Farhat v. Bd. of County Comm'rs of Stephens County,*
 No. CIV-06-468-R, 2008 WL 441684 (W.D. Okla. Feb. 14, 2008) ............................ 29

*Gantler v. Stephen,*
 965 A.2d 695 (Del. Supr. 2009) ...................................................................................... 21

*Gilmartin v. Adobe Res. Corp.,*
 1992 WL 71510 (Del. Ch. Apr. 6, 1992) ......................................................................... 23

*Greater Yellowstone Coal v. Flowers,*
 321 F.3d 1250 (10th Cir. 2003) ................................................................................. 21, 26

In *American Pacific Corp v. Super Food Services, Inc.*, 1982 WL
 (Del. Ch. Dec. 6, 1982) .................................................................................................... 23

*In re Bank of Am. Corp. Secs,*
 757 F. Supp. 2d 260 (S.D.N.Y. 2010) ............................................................................ 18

*In re infoUSA, Inc. S'holders Litig.,*
 953 A.2d 963 (Del. Ch. 2007) .................................................................................... 19, 20

*In re Lear Corp. S'holder Litig.,*
 926 A.2d 94 (Del. Ch. 2007) ........................................................................................... 18

*In re Netsmart Technologies, Inc. S'holders Litig.,*
 924 A.2d 171 (Del. Ch. 2007) .................................................................................... 21, 23

*In re Pure Resources, Inc. Shareholders Litig.,*
 808 A.2d 421 (De. Ch. 2002) .......................................................................................... 23

*In re The MONY Group Inc. Shareholder Litig.,*
 852 A.2d 9 (Del. Ch. 2004) ............................................................................................. 23

*In re Tyson Foods, Inc.,*
 No. Civ. A. 1106-CC, 2007 WL 2351071 (Del. Ch. Aug. 15, 2007) ...................... 20, 26

*Interscope Records v. Does1-14,*
 No. 07-4107, 2007 WL 2900210 (D. Kan. Oct. 1, 2007) ................................................ 29

*Isbell v. City of Oklahoma City, Oklahoma,*
 2011 WL 6152852 (W.D. Okla. Dec. 12, 2011) .............................................................. 15

*Kahn v. Wien,*
 842 F. Supp. 667 (E.D.N.Y. 1994) .................................................................................. 18

*Kas v. Fin. Gen. Bankshares, Inc.,*
 796 F.2d 508 (D.C. Cir. 1986) ........................................................................................ 18

*Kikumura v. Hurley,*
 242 F.3d 950 (10th Cir. 2001) ......................................................................................... 22

*Little v. Jones,*
 607 F.3d 1245 (10th Cir. 2010) ....................................................................................... 15

*Lone Star Steakhouse & Saloon, Inc., v. Adams,*
  148 F. Supp. 2d 1141 (D. Kan. 2001) .......................................................................... 24

*Malone v. Brincat,*
  722 A.2d 5 (Del. 1998) ............................................................................................ 19, 20

*Marhart, Inc. v. CalMat Co.,*
  Civ. A. No. 11820, 1992 WL 82365 (Del. Ch. Apr. 22, 1992) ................................... 20

*Merrill Lynch, Pierce, Fenner & Smith v. Doe,*
  868 F. Supp. 532 (S.D.N.Y. 1994); *accord Disabled in Action of Pa. v. Se. Pa.
  Transp. Auth.,* 539 F.3d 199 (3d Cir. 2008) ............................................................. 16

*Metro Commc'n Corp BVI v. Advanced Mobilecomm Tech., Inc.,*
  854 A.2d 121 (Del Ch. 2004) ..................................................................................... 20

*Murray v. New York,*
  604 F. Supp. 2d 581 (W.D.N.Y. 2009) ........................................................................ 16

*Nichting v. DPL Inc.,*
  2011 U.S. Dist. LEXIS 76739 (S.D. Ohio July 15, 2011) ............................................ 24

*O'Reilly v. Transworld Healthcare, Inc.,*
  745 A.2d 902 (Del. Ch. 1999) .................................................................................... 21

*ODS Techs., L.P. v. Marshall,*
  832 A.2d 1254 (Del. Ch. 2003) .................................................................................. 23

*QwestCommc'ns Int'l, Inc. v. WorldQuest Networks, Inc.,*
  213 F.R.D. 418 (D. Colo. 2003) .................................................................................. 29

*Semitool, Inc. v. Tokyo Electron Am., Inc.,*
  F.R.D. 273 (N.D. Cal. 2002) ....................................................................................... 29

*Warren v. Century Bankcorporation, Inc.,*
  741 P.2d 846 (Okla. 1987) ......................................................................................... 19

*Wayne Co. Employees' Ret., Sys. v. Corti,*
  954 A. 2d 319 (Del. Ch. 2008) ................................................................................... 23

*Weiss v. Swanson,*
  948 A.2d 433 (Del. Ch. 2008) .................................................................................... 19

*Wells Fargo Bank, N.A. v. Maynahonah,*
  2011 WL 3876519 (W.D. Okla. Sept. 2, 2011) ................................................ 15, 16, 22

*William Exploration Co. v. U.S, Dept of Energy,*
  561 F. Supp 469 (N.D. Okla. 1980) ............................................................................ 21

*Wilson v. Great Am. Indus., Inc.,*
  855 F.2d 987 (2d Cir. 1988) ....................................................................................... 18

*Woolf v. Universal Fidelity Life Ins. Co.,*
  849 P.2d 1093 (Okla. App. 1992) ............................................................................... 19

## Statutes

28 U.S.C. § 2201 ............................................................................................... 15
Section 14(a) of the Exchange Act .................................................................... 17
Section 14(A) of the Exchange Act .................................................................... 4

## Rules

Fed. R. Civ. P. 26(d) ........................................................................................ 29
Fed. R. Civ. P. 26(d)(1) .................................................................................... 29
Fed. R. Civ. P. 26(f) ......................................................................................... 29
Fed. R. Civ. P. 45 ............................................................................................. 29
Fed. R. Civ. P. 65(a) ........................................................................................ 15
Fed. R. Civ. P. 65(c) ........................................................................................ 28

## Other Authorities

11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.1,
    at 139 (2d ed. 1995) ................................................................................... 26

*Reuters* ................................................................................................*passim*

## INTRODUCTION

COME NOW, Plaintiffs Deborah G. Mallow IRA SEP Investment Plan, Christopher Snyder, Dolezal Family Limited Partnership, Brian F. Leonard, David A. Kroll Inc. Employees' Profit-Sharing Plan and Trust, and Norman Spiegel ("Plaintiffs") who move the Court for a limited expedited discovery and a preliminary injunction enjoining the Chesapeake Energy Corporation (the "Company" or " Chesapeake") annual meeting of shareholders presently scheduled for June 8, 2012.  Such injunction is requested to last until the definitive proxy statement filed with the Securities and Exchange Commission ("SEC") and disseminated to shareholders on May 11, 2012 (the "Proxy") is corrected to disclose information which is full and complete and not misleading.  Specifically, such vote should be enjoined until additional disclosures are made: (a) concerning Chesapeake CEO Aubrey K. McClendon's ("McClendon") compensation; and (b) as to the existence, extent and details of McClendon's indebtedness to third parties who have financed McClendon's investment in Company wells, which indebtedness is alleged to present an improper conflict of interest.  These additional disclosures are necessary to permit an informed vote on those matters designated in the Proxy as Voting Items 3, 4, and 5 (described more fully below), and the re-election of defendants Davidson and Hargis as directors of the Board of Directors.

Entry of the preliminary injunction will preserve the *status quo* until such time as shareholders are given all material information concerning existing compensation agreements, and potential conflicts of interest transactions.  Such information will enable

the shareholders to cast meaningful and informed votes concerning the future compensation agreements of defendant McClendon and others.

Plaintiffs satisfy the legal requirements for obtaining a preliminary injunction of an annual meeting.  First, Plaintiffs are likely to succeed on the merits of their claims. Based on the investigations conducted by Plaintiffs and the almost daily revelations about new and undisclosed financial arrangements concerning McClendon, it becomes increasingly evident that the Chesapeake Board of Directors ("Board") has fallen short of its disclosure obligations under federal and state law.  Second, Plaintiff can demonstrate that irreparable harm will occur should a shareholder vote proceed where there has been inadequate disclosure about McClendon's financial dealings.  Third, the balance of equities favor Plaintiffs, as Defendants will suffer little, if any, harm from a grant of a preliminary injunction.  Such minimal harm (if indeed there is any) is far outweighed by the greater good that will be realized from requiring meaningful disclosures and ensuring an informed vote by Chesapeake stockholders.

For the reasons set forth herein, Plaintiffs respectfully request that the Court enter a preliminary injunction until such time as additional disclosures are made.[1]

## STATEMENT OF THE CASE

The instant application for a preliminary injunction enjoining the Chesapeake Annual Meeting is being brought to prevent irreparable injury. The issues at bar relate to the Founder Well Participation Program ("FWPP"), a controversial perquisite granted to CEO McClendon, which allowed McClendon to take personal stakes of up to 2.5% in Chesapeake's wells in exchange for contributions to their financing. The FWPP has been rife with undisclosed conflicts of interest relating to financial indebtedness undertaken by defendant McClendon; such financing arrangements, which total in excess of $1 billion, actually and potentially conflict with corporate business goals. Such details as are known regarding these disturbing arrangements (which include loans to McClendon from

---

[1]     On May 4, 2012, Plaintiffs provided Defendants with a document request concerning the specific issues raised herein. Exhibit 9   Plaintiffs seek production of such documents and additional limited deposition discovery on an expedited basis. Depositions are sought of McClendon and such director or corporate officer as the parties may agree can testify most knowledgeably about the Board's investigation into McClendon's financial dealings.   Good cause exists for expedited discovery because plaintiffs and the Chesapeake shareholders face irreparable harm as detailed herein.  If Plaintiffs must proceed under the normal discovery deadlines they will not obtain the requested discovery for weeks or months.  Such delay in obtaining the discovery will materially prejudice (if not preclude) plaintiffs' abilities to obtain the relief necessary to protect the shareholders' interests in light of the Proxy deficiencies. Moreover, expedited discovery will allow plaintiffs to establish likelihood of irreparable harm on an evidentiary record.  The requested document discovery includes information concerning the full extent of McClendon's financial interactions with Chesapeake and third-party lenders, including the terms, number, value, and consideration given for the loans.  See infra, pp. 28-29.

financiers also doing business with Chesapeake) have been revealed through dogged investigative reporting. Chesapeake has been forced to reveal some details of these conflicted details, but has withheld considerable material information. The shareholders are entitled to have and to consider this information in advance of a shareholder vote, both under the federal proxy laws and state law.

The above captioned actions were brought in the wake of disturbing revelations by *Reuters* news agency and others. They seek to address the material disclosure violations summarized above, and to ensure that any damages suffered by Chesapeake by reason of these violations are borne by defendant directors McClendon, Richard K. Davidson, V. Burns Hargis, Frank A. Keating, Breene M. Kerr, Charles T. Maxwell, Don L. Nickles, Frederick B. Whittemore, Marcus C. Rowland, Michael A. Johnson, and Merrill A. Miller, Jr., (collectively, the "Individual Defendants") and not by Chesapeake and its innocent shareholders. The complaints variously allege violations of Section 14(A) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 14a-9, which encompass the federal proxy laws, and state law.

The Company's SEC filings, including its proxy statements, are required to detail all related party transactions, and disclose all actual and potential conflicts of interests. The disclosure must be full and complete enough to allow shareholders to understand the nature of the conflict; the parties involved; the manner in which the conflict has affected the Company in the past; and how it may affect the Company in the future. Such disclosures perforce must address the mammoth and conflict-ridden FWPP, and all actual and potential conflicts of interest that have arisen and may potentially arise from

McClendon's participation and loans.  As set forth below, the Individual Defendants failed to disclose material information necessary to allow Chesapeake's shareholders to cast a fully informed vote, which constitutes a breach of the duty of candor and a violation of Section 14(A) of the Exchange Act.

Since 2008, the Board has facilitated McClendon's abuse of the Company by permitting rampant conflicts of interest to go unchecked and undisclosed.  The Board's complicity with McClendon has come at the direct expense of the Company and its shareholders.  In fact, when McClendon was in financial trouble in 2008, in order to assist him, the Board caused the Company to purchase his antique map collection for $12 million and fronted him another $75 million in "out-of-cycle" special compensation so that he would not lose his opportunity to participate in the FWPP.  As if the Board's agreement to purchase its Chairman and CEO's $12 million antique map collection were not abuse enough, both the map collection purchase and the one-time $75 million "bonus" were approved by the Board following a year in which: (i) McClendon had seriously harmed the Company's share price, and thus the shareholders, when he was forced to sell over $500 million of Company stock into a falling market due to a margin call; and (ii) Chesapeake stock was down over 75% from its 2008 high.  Although the one-time bonus and the purchase of the expensive map collection were widely criticized and led to a multitude of lawsuits, the Board has failed to reform McClendon's behavior or its own deficient corporate governance and disclosure procedures.

The most damning examples of the Board's failure have only come to light over the past month.  In recent news reports it was revealed that McClendon is personally

responsible for over $1 billion in debts collateralized by his interests in Chesapeake's gas wells under the FWPP.  McClendon obtained these massive loans from, among others, the private equity firm, EIG Global Energy Partners ("EIG").  These loans represent a blatant conflict of interest as EIG has myriad business dealings with Chesapeake, including purchasing Chesapeake assets and investing in a Chesapeake subsidiary.  The FWPP financing arrangements with EIG and others caused McClendon's interests to impermissibly diverge from those of the Company and its shareholders.  Despite all of this, the Company concealed the existence and details of these conflicts until they were uncovered by the press, and still have not made the disclosures required by law.

The FWPP is a unique compensation plan that does not exist at any other publicly traded energy company.  Under the terms of the FWPP, McClendon, and only McClendon, may acquire a 2.5% interest in every well the Company drills.  In return, McClendon must pay his 2.5% share of the costs associated with those wells.  According to the Board's repeated statements in defense of the FWPP, McClendon's cost obligations are critical to the propriety of the program because it is supposedly through his shouldering of the costs that McClendon's interests align with those of the Company. Unfortunately, however, due to his financing arrangements, McClendon does not bear the same risk as the Company under the FWPP.  In fact, McClendon does not bear any risk. This is because McClendon has used his stake in the wells as collateral for the loans.  As a result, McClendon is using the eventual profits to fund his investment and personally risks nothing.

On April 18, 2012, the initial revelations concerning McClendon's FWPP loans were reported by *Reuters*. In response, Chesapeake shares declined 5.5% that day alone. On April 19, 2012, in response to the *Reuters* article, Chesapeake's General Counsel reported that the Board was "***fully aware*** of the existence of Mr. McClendon's financing transactions." (Emphasis added). Subsequently, on April 26, 2012, the Board completely reversed itself and stated that it "did not review, approve or have knowledge of the specific transactions engaged in by Mr. McClendon or the terms of those transactions." It is not clear how these two statements can be reconciled, but in light of the rapidly growing scandal, it seems likely that the Board initially admitted the truth and then attempted to change its position once it realized that its initial position was inculpatory. Nearly every day sees a new report revealing one of McClendon's various schemes for twisting the Company's assets to his own benefit.[2]

In until the recent revelations regarding McClendon loans he participated in the FWPP with no risk, and the Company permitted the use a compensation structure that failed to align the interests of the CEO with the interests of the Company and shareholders.[3] The Board's continued refusal to disclose McClendon's financial conflicts

---

[2]     For example, on May 2, 2012, after Plaintiffs' complaints were filed, *Reuters* reported that McClendon has been running a hedge fund out of Chesapeake's corporate address that traded in natural gas. Then, on, May 8, 2012, *Reuters* reported that, in fact, the Board had given McClendon permission to run a side business trading in commodities in his employment agreement.

[3]     The Individual Defendants announced on April 26, 2012 that Chesapeake would not extend the FWPP with McClendon beyond its present 10-year term ending December 15, 2015. It was subsequently announced that McClendon would reduce the remaining 42 months left to his participation by 18 months.

and all of the ways in which it has secretly agreed to permit him to use his position at the Company for his own personal gain, have caused and continue to cause irreparable harm to the Company.

## STATEMENT OF FACTS

Chesapeake is one of the largest independent natural gas producers in the United States.  The Company focuses on the discovery, acquisition, and development of natural gas reserves onshore in the United States, east of the Rocky Mountains.  The Company's longtime Chairman of the Board and Chief Executive Officer ("CEO"), McClendon co-founded the Company in 1989.[4]

By 2008, McClendon had purchased tens of millions of shares of Chesapeake stock by relying largely on margin accounts to acquire the shares.  ¶49, Ex. 1.[5]  Through purchasing via margin, McClendon was able to acquire his Chesapeake shares without paying full price for them.  During the depths of the financial crisis in the fall of 2008, Chesapeake's stock price dropped substantially.  As a result, McClendon was forced to sell millions of shares of his Chesapeake stock for $569 million in order to cover margin calls.  *Id.*  McClendon flooded the market with his stock sales, and the price of the Company's stock ultimately fell by nearly another 40%.  *Id.*

---

[4]     On or about May 1, 2012, the Company announced that McClendon would no longer be Chesapeake's Chairman after a replacement was found, but would remain as CEO. McClendon continues to hold both titles.

[5]     Unless otherwise indicated, citations to the Complaint refer to 12-cv-00493, *David A. Kroll Inc. Employees' Profit-Sharing Plan and Trust, et al.* References to the Verified Complaint filed by Plaintiff on  May 2, 2012 shall appear in the following format: "¶__ or ¶¶__."

In the aftermath of these margin calls, McClendon's personal finances were in disarray.  However, the Board showed its loyalty to McClendon by causing the Company to purchase his antique map collection for $12 million, and authorizing a one-time payment to him of $75 million as an "out of cycle" bonus at the end of 2008 in order for him to continue his participation in the FWPP.  *Id.*, *See* Ex. 1.

The Company has consistently asserted that the FWPP "fosters and promotes the development and execution of the Company's business" by: (a) retaining and motivating the principal executive officers who founded the Company; (b) aligning the financial rewards and risks of the FWPP with the Company more effectively than overriding royalty, carried interest or other performance incentive programs maintained by many of the Company's peers; and (c) imposing on the FWPP the same risk incurred by the Company in its core operations**.** ¶ 41, Ex. 2.  However, undisclosed was that the fundamental justification for the FWPP has been violated for at least the last three years by McClendon's financing scheme through which he used his access to the Company's creditors for his own personal benefit and bore none of the risks that the Company and its shareholders were forced to bear.  Both McClendon and the Board clearly had a duty to disclose these facts, and their material implications, and failed to do so.

On April 18, 2012, the Board's and McClendon's lack of due candor was finally exposed when *Reuters* published an article entitled "Chesapeake CEO Took Out $1.1 Billion in Unreported Loans" (the "*Reuters* Article") which revealed that McClendon has borrowed as much as $1.1 billion over the last three years against his stake in the Company's wells. ¶¶45, 47, 49, Ex. 1.  These enormous loans were used to finance

9

McClendon's obligations under the FWPP.   On this news, the Company's stock fell to a close of $18.06 per share on April 18, 2012, down from a close of $19.12 on April 17, 2012, or a one-day decline of over 5.5%. ¶50.   The decline continued with a closing price of $17.44 on April 20, 2012.   The stock has since further declined to less than $15 per share.

As Chesapeake has grown, McClendon's obligations for well costs under the FWPP have grown as well.   In 1994, the first full year during which the FWPP was in place, the Company drilled 18 wells. ¶15, Ex. 3.   Presently, the Company drills more than 1,000 wells per year.  *Id*.   As a result, the costs incurred by McClendon's 2.5% stake have increased by the same degree.   As was reported by *Reuters*, to fund his portion of the costs under the FWPP, McClendon has entered into a series of financing agreements under which his interests in the wells acts as collateral for the funds necessary to pay the costs of the wells. ¶41, *See* Ex. 1.

The structure of McClendon's FWPP financing agreements has relieved him of any of the risk borne by the Company and its shareholders.   For example, under the agreement with EIG, EIG receives 100% of a well's revenue until it has obtained a 13% return on its investment. Ex. 3.   Beyond that point, EIG receives 42% of the revenue from the well in perpetuity and McClendon retains the remainder.  *Id*.   If a well does not generate any revenue, McClendon loses only his worthless stake in the well.   The Company, by contrast, would lose its share of the costs it expended.   In addition, McClendon's participation in the FWPP is being funded by loans with many of the same

10

lenders that provide financing to the Company.  As a result, McClendon's risks and interests are not aligned with those of the Company.

Not all of McClendon's lenders have been disclosed.  However, according to *Reuters*, EIG is McClendon's largest creditor. ¶49.  EIG is a private equity firm that has also been engaged in business with the Company.  *Id.*  Among other things, EIG has purchased interests in Company assets worth potentially billions of dollars.  *Id.*  In November 2011, Chesapeake raised $1.25 billion from a group of investors including EIG through the sale of "perpetual preferred shares" in Chesapeake Utica LLC.  *Id.*, Ex. 1.  The terms of the preferred stock sale were lucrative for EIG: the shares paid an annual dividend of 7% and royalty interests from oil and gas wells.  *Id.*  As a result, Chesapeake was selling EIG hundreds of millions of dollars in assets on very favorable terms while McClendon and entities he controlled were obtaining more than $1 billion in financing from EIG.  On April 9, 2012, the Company announced another similar deal to raise an additional $1.25 billion from EIG and other investors.  *Id.*, Ex.1.  Defendants failed to disclose these conflicts of interest.

When faced with the allegations contained in the April 18, 2012 *Reuters* article, Defendants took the unusual step of releasing a statement to rebut the article.  In the statement, issued April 19, 2012, Defendants took the position that the transactions were fully disclosed to shareholders based on vague references to McClendon's financings contained in the Company's Proxy Statement filed on May 12, 2011 (the "2011 Proxy").  In response to growing media frenzy over McClendon's loans, Chesapeake's General Counsel, Henry J. Hood, stated (¶51, Ex. 4):

The Board of Directors is fully aware of the existence of Mr. McClendon's financing transactions and the fact that these occur is disclosed in the proxy. Additionally, the total amount of his cost obligations and revenue attributable to the FWPP for each year are detailed in the proxy. The FWPP fully aligns the interests of Mr. McClendon with the company and the Board of Directors supports this program as does the majority of its shareholders.

Mr. Hood's comments were met with disbelief.  In fact, as reported by *Forbes* in an article entitled 'Chesapeake Energy: CEO McClendon Serves Himself First, "[y]ou have to wonder whether Chesapeake Energy's Board of Directors and General Counsel Henry Hood have been overcome by fumes.  The Company's response to inquiries from Thomson Reuters' special investigation by Brian Grow and Anna Drive is not only disingenuous, it is borderline delusional."  ¶531, Ex. 5. The Board quickly backtracked on its statement and on April 26, 2012, claiming that "it did not review, approve or have knowledge of the specific transactions engaged in my Mr. McClendon or the terms of those transactions".

Chesapeake has a market capitalization of approximately $9.5 billion and a debt load of approximately $10 billion.[6] To make end's meet, the Board has become a forced seller in a falling market, as it attempts to bridge a multi-billion dollar shortfall by selling some of Chesapeake's most valuable assets.  ¶49.  Among the potential buyers for such assets are private equity firms such as EIG, which has already purchased some Company assets and, as discussed previously, lends money to McClendon to finance his participation in the FWPP.  While this is obviously not the best time for Chesapeake to be a seller, the Board effectively has no choice. In addition, the Company is continuing with its drilling expansion.  Largely as a result of McClendon's loan scheme, an anticipated upgrade of the Company's credit rating is now in question.  ¶59, Ex. 6.  Currently, Moody's Investor Services ("Moody's") rates Company senior unsecured debt Ba2 and Standard & Poor's ("S&P") rates the debt at BB+.  *Id.*[7]  These sub-investment grade ratings substantially increase the Company's borrowing costs.  Accordingly, Defendants' failure to fully disclose the extent of defendant McClendon's conflicts stands as an

---

[6]    On May 11, 2012, Chesapeake's share price dropped 13.8% to $14.81, a loss of more than $1 billion in stock market value, after the Company disclosed that it might be force to delay plans to sell assets to fund its operations (if such delay is need to stay in compliance with loan covenants).  After the market closed on May 11, 2012 it was reported that the Company was forced to take an additional loan of $3 billion from Goldman Sachs and Jefferies. Exhibit 8.  Even before the latest scandal, Chesapeake has paid as much as a 9.5% interest rate on debt securities.

[7]    On May 9, 2012, Moody's lowered the Company's outlook to negative. http://online.wsj.com/article/BT-CO-20120509-716610.html  ("McClendon's influence over the company's risk appetite and growth objectives are reflected in Chesapeake's aggressive financial policies, as well as its complicated corporate structure.").

impediment to the Company's efforts to improve creditworthiness in a market that values transparency.

Consistent with Defendants' prior practices, the 2012 Proxy fails to disclose material information relating to McClendon's financial entanglements and their impact upon the Company and its shareholders.   The Individual Defendants have failed and continue to fail to disclose material information regarding Defendant McClendon's loans. Defendants have refused to provide adequate disclosure concerning the number, amounts and terms of defendant McClendon's loans.   Given the size and complicated terms of the loans, the details of these transactions are material information for shareholders to have in evaluating the Company and in casting an informed vote.   Except for adding a sentence that the Company is reviewing "the financing arrangements between Mr. McClendon (and the entities through which he participated in the FWPP) and any third party that has had or may have a relationship with the Company in any capacity," the Proxy is silent regarding EIG and any other third parties' financial arrangements with McClendon, FWPP and the Company.   *See* Ex. 4.   In fact, EIG is never even mentioned in the Proxy. Given that the Board was aware of the FWPP and McClendon's transactions, and in light of its fiduciary obligations to Chesapeake's shareholders, it knew or should have know that McClendon's financial transactions presented conflicts of interest that have already harmed the Company and will likely cause further harm.   In addition, the Board knew or should have known that the FWPP did not align McClendon's interests with the Company's but rather created a conflict of interest.   Almost every day there are new stories about additional schemes by McClendon for using the Company and its assets to

14

his own benefit (Ex. 7), yet the Board decided to stay silent and disseminated a Proxy woefully inadequate and void of the disclosures necessary to inform shareholders of material facts necessary to cast an informed vote.

The Proxy seeks shareholder approval on a number of voting items.  In addition to seeking an affirmative vote on the reelection of certain board members as discussed herein, it also seeks shareholder approval of three items specially related to executive compensation.  Item 3 seeks shareholder advisory approval for executive compensation. Item 4 seeks shareholder approval to amendment to the Company's Long Term Incentive Plan to increase the number of shares of common stock which would be available for awards under the incentive plan.  Item 5 seeks shareholder approval for the 2012 annual cash based incentive plan.  Each of these items, like the FWPP compensation program, is administered by the Company's Compensation Committee, consisting of defendants Keating (Chair), Eisbrenner and Maxwell.  These defendants were required to inform themselves of, among other material facts, the nature and extent of McClendon's financing scheme in connection with the FWPP, the conflicts of interest and harm caused therefrom.  As set forth herein, the Chesapeake shareholders are being asked to cast to a vote on these compensation Items, which include defendant McClendon's executive compensation agreements, without all the necessary material detailed information to make an informed decision.

## ARGUMENT

### I.   Standard

In order to obtain a preliminary injunction pursuant to Fed. R. Civ. P. 65(a), a party must show four factors: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest. *Crowe & Dunlevy, P.C. v. Stidham,* 640 F.3d 1140, 1154 (10th Cir. 2011); *Little v. Jones,* 607 F.3d 1245, 1251 (10th Cir. 2010). *See also Isbell v. City of Oklahoma City, Oklahoma*, 2011 WL 6152852, at * 2 (W.D. Okla. Dec. 12, 2011); *Wells Fargo Bank, N.A. v. Maynahonah*, 2011 WL 3876519, at * 1 (W.D. Okla. Sept. 2, 2011).

> Preliminary declaratory relief also is available to Plaintiffs from this Court. Given the ability of the Court to issue a final declaratory judgment under 28 U.S.C. § 2201, which is equitable in nature, this Court also has the power to issue such provisional equitable relief when it is necessary based on the urgency of the situation, the irreparable harm that would otherwise occur, and the remaining factors which courts consider when granting provisional injunctive relief.   Some courts have indeed acknowledged that temporary or preliminary declaratory relief is available to litigants as a provisional remedy.

*Merrill Lynch, Pierce, Fenner & Smith v. Doe,* 868 F. Supp. 532, 536 (S.D.N.Y. 1994); *accord Disabled in Action of Pa. v. Se. Pa. Transp. Auth.,* 539 F.3d 199, 215 (3d Cir. 2008) (explaining that the state transportation authority could "obtain[] preliminary declaratory relief to ensure ADA compliance prior to commencing alterations"). *But cf Original Great Am. Chocolate Chip Cookie Co. v. River Valley*

*Cookies, Ltd.,* 970 F.2d 273, 276 (7th Cir. 1992).   Courts condition preliminary

declaratory relief upon the same four-part standard outlined above that is applied to

requests for preliminary injunctions. *See, e.g., Merrill Lynch,* 868 F. Supp. at 535-40

(granting a motion for such relief); *Murray v. New York,* 604 F. Supp. 2d 581, 587-

88 (W.D.N.Y. 2009).

## II.   Plaintiffs Are Entitled to Preliminary Injunctive Relief

As is hereafter set forth, Plaintiffs satisfy all conditions warranting preliminary

injunctive and declaratory relief.

### A.   Plaintiffs Are Likely to Succeed on the Merits

To demonstrate a substantial likelihood of success on the merits of its claims, a

plaintiff is "required to present a prima facie case showing a reasonable probability that

[it] will ultimately be entitled to the relief sought."  *Wells Fargo Bank, N.A.*, 2011 WL

3876519, at *14.  A plaintiff does this by "showing that questions going to the merits are

so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and

deserving of more deliberate investigation." *Crowe & Dunlevy*, 609 F. Supp. 2d at

1224 (citations omitted).

Plaintiffs are likely to succeed on the merits of this Action, due to Defendants'

incomplete and materially false and misleading statements and omissions in connection

with the FWPP and McClendon's financing of same.  As detailed above and in the

Complaint, Defendants have repeatedly failed to disclose the existence and details of

McClendon's financing agreements for his stakes in wells under the FWPP and the

divergence of his and the Company's interests that was caused by those agreements. Defendants take the position that the financing arrangements were sufficiently disclosed to shareholders because of two vague references to the loans in the 2011 Proxy. These so-called disclosures were simply not sufficient because they failed to convey the material risks the financing arrangements caused to the Company. Furthermore, Defendants still have not revealed, or caused McClendon to reveal, the identities of McClendon's lenders, the size of each obligation, or their terms. Therefore, Defendants have violated their fiduciary duties and are likely to be held liable.

Proxy disclosures are governed by Section 14(a) of the Exchange Act. "Section 14(a) liability attaches to all parties who negligently execute a proxy statement, and pursuant to § 20(a) of the Exchange Act, any person 'who directly or indirectly, controls any person' who negligently executes a proxy statement." *Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp.,* 394 F.3d 126, 168 (3d Cir. 2004). *Accord, In re Bank of Am. Corp. Secs,* 757 F. Supp. 2d 260, 321 (S.D.N.Y. 2010) ("[A] Section 14(a) plaintiff need only establish that a misleading statement was a consequence of 'at worst negligence by the issuer…. a proxy solicitation that contains a misleading misrepresentation or omission violates the section even if the issuer believed in perfect good faith that there was nothing misleading in the proxy materials.'") (citations omitted).

 "[T]he failure to disclose even potential conflicts of interest may be actionable under federal securities law, independent of whether the undisclosed facts might also support a claim for an actual breach of fiduciary duty under state law." *Kahn v. Wien,* 842 F. Supp. 667, 677 (E.D.N.Y. 1994) (citing *Wilson v. Great Am. Indus., Inc.,* 855 F.2d

987, 993-94 (2d Cir. 1988) (finding material omission where proxy statement failed to disclose several significant and longstanding relationships between the directors of two merging companies). Therefore:

> [p]otential conflicts of interest, such as where a corporate director has a personal stake in a corporate decision or has a special relationship with a party whose interests may be adverse to those of the shareholders, must be disclosed so that shareholders are alerted to the possible impairment of the director's judgment and know to put the director's recommendations in perspective.

*Kahn*, 842 F. Supp. at 677-78 (citing *Kas v. Fin. Gen. Bankshares, Inc*., 796 F.2d 508, 513 (D.C. Cir. 1986)). In *In re Lear Corp. S'holder Litig.,* 926 A.2d 94, 114-115 (Del. Ch. 2007), the court enjoined the merger vote pending further disclosures regarding a conflict of interest, as CEO's personal compensation interests may have affected his judgment in negotiating a going private deal. The court found that the CEO's interest were not aligned with those of unaffiliated shareholders as he sought to benefit more from the deal by cashing in on his retirement package, a move the Board facilitated.

The rule is the same under state law. When directors of a corporation communicate with shareholders, the "shareholders are entitled to honest communication from directors, given with complete candor and in good faith." *In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 990 (Del. Ch. 2007); *see Weiss v. Swanson,* 948 A.2d 433, 442 (Del. Ch. 2008) (recognizing that "shareholders have a right to the full, unvarnished truth"). *Malone v. Brincat*, 722 A.2d 5, 10, 11 (Del. 1998).[8]

---

[8]     The Oklahoma Corporations Act is based on the Delaware Corporations Act. *Beard v. Love,* 173 P.3d 796, 802 (Okla. Civ. App. 2007) (applying Delaware fiduciary duty principles to challenged conduct of majority shareholder of Oklahoma corporation) (citing *Woolf v. Universal Fidelity Life Ins. Co*., 849 P.2d 1093, 1095 (Okla. App. 1992)).

"Communications that depart from this expectation, particularly where it can be shown that the directors involved issued their communication with the knowledge that it was deceptive or incomplete, violate the fiduciary duties that protect shareholders.  Such violations are sufficient to subject directors to liability in a derivative claim." *infoUSA*, 953 A.2d at 990.

It is black-letter law that "[w]henever directors communicate publicly or directly with shareholders about the corporation's affairs, with or without a request for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith and loyalty." *Malone*, 722 A.2d at 10 ("It follows *a fortiori* that when directors communicate publicly or directly with shareholders about corporate matters the *sine qua non* of directors' fiduciary duty to shareholders is honesty"); *Emerald Partners v. Berlin*, 726 A.2d 1215, 1223 (Del. 1999) (directors are obligated "to provide a balanced, truthful account of all matters disclosed in… communications with shareholders"); *In re Tyson Foods, Inc.*, No. Civ. A. 1106-CC, 2007 WL 2351071, at *3 (Del. Ch. Aug. 15, 2007) (when "directors communicate with shareholders, they also must do so with **complete candor**") (emphasis in original).  Critically, when directors make disclosures to shareholders, "the information must be stated truthfully and candidly" – they cannot issue "half-true" or incomplete disclosures.  *See, e.g., Metro*

---

 Thus, in a shareholder derivative action brought under Oklahoma law, "decisions of the Delaware Courts are very persuasive." *Id.*  In the absence of Oklahoma authority, Oklahoma courts may consult decisions from the courts of Delaware (and other jurisdictions) concerning derivative actions. *Id., see also Warren v. Century Bankcorporation, Inc*., 741 P.2d 846, 849 (Okla. 1987).

*Commc'n Corp BVI v. Advanced Mobilecomm Tech., Inc.* 854 A.2d 121, 130 (Del Ch. 2004)*; Malone*, 722 A.2d at 10; *Emerald Partners*, 726 A.2d at 1223.

Defendants failed to disclose the existence of McClendon's financing arrangements, the identities of the lenders, the size of the obligations, or their terms, or the fact that the arrangements caused McClendon's interests to diverge from the Company's. In so doing, Defendants concealed from Chesapeake shareholders that McClendon was abusing his relationship with the Company's creditors for his own financial benefit, and that McClendon was violating the intent of the FWPP because he was incurring none of the risk undertaken by the Company. As a result, Plaintiffs are likely to succeed on the merits of their federal and state disclosure claims. *See, e.g., infoUSA,* 953 A.2d at 990; *Ryan*, 918 A.2d at 358.

Additionally, the substantial likelihood that Plaintiffs will prevail on the merits of their claims in this action is further heightened because Plaintiffs' claims are, in part, based on Defendants' incomplete and misleading disclosures in the Proxy. Directors and officers are duty-bound to make accurate and fair representations whenever they solicit shareholder action, *i.e.,* a shareholder vote. *Arnold v. Soc'y for Sav. Bancorp.*, 650 A.2d 1270, 1277 (Del. 1994); *Ryan*, 918 A.2d at 358. This obligation attaches to representations issued by directors and officers in proxy statements, which (like the Proxy here) are made in contemplation of stockholder action. *Gantler v. Stephen*, 965 A.2d 695, 710 (Del. Supr. 2009) (fiduciary duty "attaches to proxy statements and other disclosures in contemplation of stockholder action."); *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 916 (Del. Ch. 1999); *Arnold*, 650 A.2d at 1277. Significantly, and as

discussed further below, directors' and officers' misrepresentations made in connection with solicitation of shareholder action threaten irreparable harm.  *See In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 207 (Del. Ch. 2007).  Accordingly, under these circumstances, Plaintiffs are likely to succeed on the merits of their claims.

**B.      Irreparable Harm Will Result In the Absence of Injunctive Relief**

A plaintiff satisfies the irreparable harm requirement for the issuance of preliminary injunctive and declaratory relief by demonstrating "a significant risk" of harm "that cannot be compensated after the fact by monetary damages."  *Greater Yellowstone Coal v. Flowers,* 321 F.3d 1250, 1258 (10th Cir. 2003); *William Exploration Co. v. U.S, Dept of Energy*, 561 F. Supp 469 (N.D. Okla. 1980) ("Irreparable injury is the sine qua non for the grant of preliminary relief").  "A plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Kikumura v. Hurley,* 242 F.3d 950, 963 (10th Cir. 2001); *Wells Fargo Bank*, 2011 WL 3876519, at *11 (quoting *RoDa Drilling Co. v. Siegal,*  552 F.3d 1203, 1210 (10th Cir. 2009) ("A movant satisfies the irreparable harm requirement by demonstrating 'a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.'"); *Crowe  & Dunlevy,  P.C.,*  609  F.  Supp. 2d at  1222  (same)).  A plaintiff who can show a significant risk of irreparable harm has demonstrated that the harm is not speculative

and will be held to have satisfied his burden. *Crowe & Dunlevy, P.C,* 609 F. Supp. 2d at 1222 (citation omitted).

Absent Court intervention, Chesapeake and its shareholders will suffer irreparable harm based on Defendants' misconduct in the form of an uninformed shareholder vote. The Proxy solicits shareholders to vote to reelect two directors, Defendants Davidson and Hargis. Plaintiffs are entitled to full and complete disclosure regarding what those directors knew about the transactions with McClendon and when they knew about them. Providing complete disclosure to the shareholders is the only way the shareholders are able to determine whether those directors are actually fulfilling their fiduciary duties to the Company. "By issuing an injunction requiring additional disclosure, the court gives stockholders the choice to think for themselves on full information, thereby vindicating their rights as stockholders to make important voting and remedial decisions based on their own economic self-interest." *Netsmart,* 924 A.2d at 207.

Vindication of the right to cast an informed vote "requires a specific remedy such as an injunction, rather than a substitutionary remedy such as damages." *Gilmartin v. Adobe Res. Corp*., 1992 WL 71510, at *14 (Del. Ch. Apr. 6, 1992). *Wayne Co. Employees' Ret., Sys. v. Corti*, 954 A. 2d 319, 329 (Del. Ch. 2008) ("A preliminary injunction motion is, however, the appropriate mechanism by which to challenge alleged disclosure violations."). Courts have found that a threat of irreparable injury exists when shareholders may make important voting decision on

inadequate or misleading disclosures. *See Netsmart*, 924 A.2d at 207; *In re The MONY Group Inc. S'holder Litig*., 852 A.2d 9, 32 (Del. Ch. 2004); *In re Pure Resources, Inc. S'holders Litig.,* 808 A.2d 421, 452 (De. Ch. 2002). Thus "the harm to shareholders in the form of a misinformed vote is alone sufficient to justify the imposition of an injunction." *ODS Techs., L.P. v. Marshall*, 832 A.2d 1254, 1263 (Del. Ch. 2003).

Where the shareholders have received inadequate information, courts have enjoined annual shareholder meetings. In *American Pacific Corp v. Super Food Services, Inc.*, plaintiff announced its opposition to proposed amendments relating to ant-takeover amendments under Delaware law. 1982 WL, at * 2 (Del. Ch. Dec. 6, 1982). The company issued supplemental information that the plaintiff believed to be inaccurate and incomplete. The court enjoined the annual meeting noting that "staying the meeting at this juncture preserves Plaintiffs' right to a full and fair proxy contest. Defendants will suffer the inconveniences and expenses of another try but [the Court finds] that insignificant when compared to Plaintiffs' right to this proxy contest." *Id*. at * 5. *See also Berkman v. Rust Craft Greeting Cards, Inc.,* 454 F. Supp. 787, 794 (S.D.N.Y. 1978) (annual meeting enjoined where some directors knew of a conflict of interest regarding company's financial advisory firm but wrongfully did not share it with other directors).

The same reasoning has been applied by the federal courts in cases involving inadequate disclosures. *See Nichting v. DPL Inc.,* 2011 U.S. Dist. LEXIS 76739, 16-18

(S.D. Ohio July 15, 2011); *Lone Star Steakhouse & Saloon, Inc., v. Adams,* 148 F. Supp. 2d 1141, 1150 (D. Kan. 2001) ("Monetary damages cannot restore the right of shareholders to effectively exercise their corporate suffrage rights. Nor can post-vote relief be considered an effective remedy").

Among other things, the Proxy solicits shareholder votes to re-elect two members to the Board, Davidson and Hargis, and to approve an amendment to the Company's Long Term Incentive Plan to increase the number of shares of common stock which would be available for awards under the incentive plan, and the 2012 annual cash based incentive plan. None of these votes should be permitted to occur without full disclosure of all relevant and material information the shareholders. With respect to the elections of Davidson and Hargis, the shareholders must be in possession of all relevant information about McClendon's FWPP financing schemes in order to determine whether these two Defendants merit re-election to the Board. These two Defendants knew or should have known of the financing schemes and took no action to prevent them. However, it is clear from the procession of revelations since April 18, 2012 concerning the extent of McClendon's byzantine financing arrangements, and the corresponding decrease of Chesapeake's share price, that McClendon's schemes should have been fully disclosed. Thus, the shareholders must know the details of the schemes in order to evaluate the sufficiency of Davidson's and Hargis's discharge of their fiduciary duties.

In *Berkman v. Rust Craft Greeting Cards, Inc.,* 454 F. Supp. 787, 791-792 (S.D.N.Y. 1978), the Court enjoined the proxy solicitation and annual meeting enjoined where some directors knew of a conflict of interest regarding the company's financial

25

advisory firm but wrongfully didn't share it with other directors.  At issue was whether the directors' misconduct should be disclosed. The Court stated:

> The shareholders, in turn, are, in all probability, entitled to know that certain candidates for reelection may well have breached their fiduciary obligations. Any reasonable shareholder would consider important the "track" record of a director whom he is asked to reelect. More likely than not, *the failure to disclose a known conflict of interest would be regarded as a significant blot on such a track record,* especially since the conflict centered upon the question of stock evaluation, a matter of direct importance to the shareholders.

At the 2012 meeting of Chesapeake shareholders, there will additionally be a say-on-pay vote regarding executive compensation. The issue of appropriate compensation cannot be separated from the issues surrounding the FWPP.  Because the FWPP is a unique compensation system and serious questions have been raised over the sufficiency of the Company's disclosures concerning it, Company shareholders must be provided with all relevant material information about it and about McClendon's financing schemes.  *See Tyson Foods,* 2007 WL 2351071, at *4, n. 18 (stating that "less than forthright disclosure" about executive compensation is inappropriate, that "[s]ophism and guile on this subject does not serve shareholder interests," and that "[w]hen directors speak out about their own compensation, or that of company managers, shareholders have a right to the full, unvarnished truth.")  Clearly, there can be no serious doubt that Chesapeake shareholders need to be fully informed of any aspects of the FWPP, or McClendon's conduct related to same, that could cause McClendon's interests to diverge from their own.   This information is material to the deliberation of reasonable shareholders and must be disclosed.

In determining whether a plaintiff has made the requisite showing, the court must further assess "whether such harm is likely to occur before the district court rules on the merits." *Greater Yellowstone Coalition,* 321 F.3d at 1260. "Perhaps the single most important requisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.1, at 139 (2d ed. 1995); *see also Core Labs, LP v. Spectrum Tracer Serv.*, 2012 WL 1023354, at *2 (W.D. Okla. Mar. 27, 2012). Here, the irreparable harm will certainly come before this Court can rule on the merits of Plaintiffs' Complaints. The annual shareholder meeting is presently scheduled for June 8, 2012. Therefore, absent the granting of the preliminary injunction, a trial on the merits would be long after the scheduled annual meeting.

### C.  There Is No Harm to Defendants in Granting a Preliminary Injunction as the Disclosure Serves the Public Interest

While the Company is exposed to serious harm in the absence of a preliminary injunction, such an order would have little effect on Defendants. A preliminary injunction would serve the public interest by compelling Defendants to fulfill their legal duties.

The relief sought herein requires the Board to supplement the 2012 Proxy by fully detailing the existence, extent, and terms of McClendon's FWPP financing schemes and the identities of his creditors. The disclosures must be full and complete to allow

shareholders to understand the nature of the conflict; the parties involved; the manner in which the conflict has affected the Company in the past; and how it may affect the Company in the future.   In light of the Board's statement that it is "fully aware" of the schemes, it cannot argue that such a disclosure would be burdensome.   If these disclosures do not occur before the annual shareholders meeting, scheduled for June 8, 2012, the Company will be irreparably harmed.   Courts have stated that "balancing the equities between (a) ordering full and complete disclosure to enable stockholders to make an informed decision, and (b) a short delay required to allow additional disclosure is a fairly simple task." *David P. Simonetti Rollover IRA v. Margolis,* C.A. No. 3694-VCN, 2008 WL 5048692, at *14 (Del. Ch. June 27, 2008).

### D.   <u>No Bond Is Necessary in This Case</u>

The Court has discretion to dispense with a bond requirement in this case. Fed. R. Civ. P. 65(c) addresses the provision of security as a condition precedent to the granting of a preliminary injunction.   *Elgin Family Co., L.L.C. v. Paralogia Ultra Lounge, L.L.C.*, 2010 WL 1610509, at * 2 (W.D. Okla. Apr. 20, 2010); *Entertainment Merchants Assoc. v. Henry*, 2006 WL 2927884, at *4 (W.D. Okla. Oct. 11, 2006).   However, a court has discretion to require only a nominal bond or no bond at all.   *See Coquina Oil Corp. v. Transwestern Pipeline Co.,* 825 F.2d 1461, 1462 (10th Cir. 1987) (internal quotation marks omitted); *RoDa Drilling,* 552 F.3d at 1215 (noting that courts are given latitude in making bond decisions and have "wide discretion" in deciding whether to require security); *Entm't Merchants Assoc.*

28

*v. Henry*, 2006 WL 2927884, at *4 (W.D. Okla. Oct. 11, 2006).   In *Crowe &*
*Dunlevy,* for example, the district court dismissed the bond requirement  because  the
"injunction  will  not  result  in  any  harm  to  Defendant,"  who would not be injured
"by refraining to exercise authority" over the plaintiff.   609 F. Supp. 2d  at  1226.
Similarly, as is set forth in Wright*, § 2954, at 292-93:  "Indeed, it has been held
that  the  court  may  dispense  with  security  altogether  if  the  grant  of  an  injunction
carries no risk of monetary loss to the defendant."

Under  the  facts  and  circumstances  in  this  case,  there  is  no  reasonable
possibility  that  Defendants  will  suffer  any  monetary  damages  as  a  result  of
postponing  the  annual  shareholder  meeting.   The  Court,  therefore,  should
dispense  with  the  requirement  of  the  bond  or,  at  most,  require  only  a  nominal bond
from Plaintiffs.

III.   **Expedited Discovery is Appropriate**

Fed. R. Civ. P. 26(d)(1) permits parties to conduct discovery prior to conferring
under Fed. R. Civ. P. 26(f) "when authorized by these rules, by stipulation, or by court
order."   Fed. R. Civ. P. 26(d) gives the Court wide discretion to manage the discovery
process, and the Court may grant expedited discovery when good cause is shown. *Qwest*
*Commc'ns Int'l, Inc. v. WorldQuest Networks, Inc.,* 213 F.R.D. 418, 419 (D. Colo. 2003);
*accord Farhat v. Bd. of County Comm'rs of Stephens County,* No. CIV-06-468-R, 2008
WL 441684, at *4 (W.D. Okla. Feb. 14, 2008). "Good cause may be found where the
need for expedited discovery, in consideration of the administration of justice, outweighs

the prejudice to the responding party." *Semitool, Inc. v. Tokyo Electron Am., Inc.,* F.R.D. 273, 276 (N.D. Cal. 2002). This good cause standard also is applied to requests to serve nonparty subpoenas under Fed. R. Civ. P. 45. *See, e.g., Interscope Records v. Does 1-14,* No. 07-4107, 2007 WL 2900210, at *1 (D. Kan. Oct. 1, 2007) (finding good cause existed to warrant nonparty discovery, as plaintiffs sought "very specific information regarding a certain group of likely readily identifiable people").

It follows that "[t]he good cause standard may be satisfied where a party seeks a preliminary injunction." *Qwest Commc'ns Int'l,* 213 F.R.D. at 419; *see also Energetics Sys. Corp. v. Advanced Cerametrics, Inc.,* No. CIV-95-7956, 1996 WL 130991, at *2 (E.D. Pa. Mar. 15, 1996) (granting expedited discovery related to the subject matter and focus of the preliminary injunction hearing).

Based on the showing above, Plaintiffs ask that the documents requested be produced no later than May 21, 2012, and that the depositions of Mr. McClendon and that of an officer or director who can testify most knowledgeable as to the Company's knowledge of McClendon's financial dealings requested be scheduled no later than May 25, 2012, and May 29, 2012 for Plaintiffs' post discovery submission and defendants' brief in opposition to this Motion and a hearing on this Motion to be set at such time as the Court deems most appropriate.

## CONCLUSION

Plaintiffs respectfully request that this Court grant an Order: enjoining Chesapeake's annual meeting of shareholders presently scheduled for June 8, 2012 until

the Proxy is corrected to contain information which is full and complete and not misleading concerning McClendon's compensation and third-party financing arrangements.

May 14, 2012 _____

**HOLLŌWAY, BETHEA & OSENBAURG, PLLC**


**s/ Kenyatta R. Bethea**
Kenyatta R. Bethea OBA #18650
3035 N.W. 63rd Suite 102N
Oklahoma City, OK 73116
Phone: (405) 246-0600
Fax (405) 810-4080
*Proposed Liaison Counsel for Plaintiffs*


And


**LOVELL STEWART HALEBIAN JACOBSON LLP**
John Halebian
317 Madison Avenue, 21st Floor
New York, NY 10017
Phone: (212) 500-5010
*Attorneys for Deborah G. Mallow IRA SEP Investment Plan and Proposed Co-Lead Counsel for Plaintiffs*


And


**ABBEY SPANIER RODD & ABRAMS, LLP**
Nancy Kaboolian
Stephanie Amin-Giwner
212 East 39th Street
New York, New York 10016
Phone: (212) 889-3700
*Attorneys for Plaintiff Christopher Snyder and Proposed Co-Lead Counsel for Plaintiffs*


And

**HARWOOD FEFFER LLP**
ROBERT I. HARWOOD
MATTHEW M. HOUSTON
488 Madison Avenue
New York, NY 10022
Phone: (212) 935-7400
Facsimile:  (212) 753-3630
*Attorneys for Plaintiff Dolezal Family Limited*
*Partnership and David A. Kroll Inc Employees' Profit-*
*Sharing Plan and Trust and Proposed Co-Lead*
*Counsel for Plaintiffs*

And

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
Richard Lockridge
Gregg Fishbein
100 Washington Avenue S, Suite 2200
Minneapolis, MN 55401
Phone: (612) 596-4044
*Attorneys for Plaintiff Brian L. Leonard*

Additional Plaintiffs' Counsel

Laurence D. Paskowitz
**PASKOWITZ & ASSOCIATES**
60 East 42nd Street, 46th Floor
New York, New York 10016
Phone:  (212) 685-0969

Roy L. Jacobs
**ROY JACOBS & ASSOCIATES**
60 East 42nd Street, 46th Floor
New York, New York 10165
Phone:  (212) 867-1156