## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) DEBORAH G. MALLOW<br>IRA SEP INVESTMENT PLAN,<br>Individually and derivatively on<br>behalf of CHESAPEAKE ENERGY<br>CORPORATION, | )<br>)<br>)<br>)<br>)<br>) | |
| Plaintiff, | )<br>) | |
| v. | )<br>) | Case No. CIV-12-436-M |
| (1) AUBREY K. McCLENDON,<br>(2) RICHARD K. DAVIDSON,<br>(3) KATHLEEN M. EISBRENNER,<br>(4) V. BURNS HARGIS,<br>(5) FRANK KEATING,<br>(6) CHARLES T. MAXWELL,<br>(7) MERRILL A. MILLER, JR.,<br>(8) DON L. NICKLES, and<br>(9) LOU SIMPSON, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| Defendants, | )<br>) | |
| -and- | )<br>) | |
| (10) CHESAPEAKE ENERGY<br>CORPORATION, an Oklahoma<br>Corporation, | )<br>)<br>)<br>) | |
| Nominal Defendant. | ) | |

## DEFENDANTS' RESPONSE BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

FACTS RELEVANT TO THE MOTION .................................................................. 2

I.  The FWPP Was Approved By Chesapeake's Shareholders in 2005 ..................... 2

II.  Although Mr. McClendon Had a Contractual Right to Participate in the FWPP through 2015, He and Chesapeake's Board Have Negotiated an Early Termination ............................................................................................... 2

III.  The Fact That Mr. McClendon Mortgaged His FWPP Well Interests Was Disclosed in Prior Proxies ........................................................................... 3

IV.  The 2012 Proxy Expanded Prior Disclosures Regarding the FWPP and FWPP Financing Transactions .............................................................. 3

V.  The Details of Mr. McClendon's FWPP Loans Have Been Published in Numerous Media Reports ........................................................................ 4

VI.  Chesapeake Issued the 2012 Proxy After SEC Review and Clearance ................ 5

VII.  The Expanded Proxy Was Augmented By Separate Disclosures by Mr. McClendon Regarding His Personal Financial Information ................................... 6

VIII.  Chesapeake's May 11, 2012, 10-Q Provided Still More Information Regarding Plaintiffs' Lawsuits, Which Were Also Widely Covered in the Media ...................................................................................................... 6

IX.  The FWPP Financing Transactions Are Not Up for Vote at the Annual Shareholder Meeting ................................................................................ 7

LEGAL STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF ........................... 8

ARGUMENT .................................................................................................... 8

I.  Plaintiffs Cannot Demonstrate Irreparable Harm ............................................. 8

    A.  Plaintiffs' Claim of Irreparable Harm Is Unsupported and Unsupportable ..................................................................................... 9

    B.  The SEC's Review and Clearance of the 2012 Proxy Further Undercuts Any Claim of Irreparable Harm .............................................. 13

# TABLE OF CONTENTS
### (continued)

**Page**

    C.    Plaintiffs' Delay in Moving for Relief Belies Any Claim of Irreparable Harm and Constitutes an Independent Ground for Denying the Motion .................................................................................. 14

    D.    Plaintiffs Cannot Show Irreparable Harm Because Enjoining the Annual Meeting Would Be Pointless ......................................................... 15

II.    Plaintiffs Have No Likelihood of Success on the Merits ...................................... 16

    A.    Only Claims Concerning the 2012 Proxy Are Relevant to This Motion .................................................................................................. 16

    B.    The Allegedly Undisclosed Facts Are in the Public Domain and Are Widely Known ...................................................................................... 17

    C.    A Proxy Does Not Have to Disclose Details Regarding Personal Transactions That Do Not Involve the Company ...................................... 19

    D.    Chesapeake's Compliance with SEC Rules and the SEC's Clearance of the Proxy Underscore the Absence of Merit in Plaintiffs' Claims ........ 20

    E.    The Section 14(a) Claim Also Fails for Lack of Causation ...................... 21

III.    The Balance of Hardships Weighs Heavily Against an Injunction ....................... 22

IV.    An Injunction Would Not Serve the Public Interest ............................................ 24

V.    Plaintiffs' Unwillingness to Post a Bond Provides Another Reason to Deny the Motion .......................................................................................................... 25

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allred v. Chynoweth*,
  990 F.2d 527 (10th Cir. 1993) ..................................................................... 14

*Beam ex rel. Martha Stewart Living Omnimedia Inc. v. Stewart*,
  833 A.2d 961 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del. 2004) ............................... 19

*Berkman v. Rust Craft Greeting Cards, Inc.*,
  454 F. Supp. 787 (S.D.N.Y. 1978) ............................................................... 11

*Blango v. Thornburgh*,
  942 F.2d 1487 (10th Cir. 1991) ..................................................................... 9

*Bolger v. First State Fin. Servs.*,
  759 F. Supp. 182 (D.N.J. 1991) ........................................................... 15, 22

*Casey's General Stores, Inc. v. Alimentation Couche-Tard, Inc.*,
  2010 WL 3604097 (S.D. Iowa Sept. 8, 2010) ............................................... 24

*Charming Shoppes Inc. v. Crescendo Partners II, L.P.*,
  557 F. Supp. 2d 621 (E.D. Pa. 2008) ........................................................ 12

*Clairdale Enters., Inc. v. C. I. Realty Investors*,
  423 F. Supp. 261 (S.D.N.Y. 1976) ............................................................ 23

*Condec Corp. v. Farley*,
  573 F. Supp. 1382 (S.D.N.Y. 1983) ........................................................... 11

*Core Labs., LP v. Spectrum Tracer Servs., L.L.C.*,
  2012 WL 1023354 (W.D. Okla. Mar. 27, 2012) ..................................... 8, 16

*D & N Fin. Corp. v. RCM Partners Ltd. P'ship*,
  735 F. Supp. 1242 (D. Del. 1990) .............................................................. 24

*Dunn v. Decca Records*,
  120 F. Supp. 1 (S.D.N.Y. 1954) ................................................................ 23

*FMC Corp. v. R. P. Scherer Corp.*,
  545 F. Supp. 318 (D. Del. 1982) ............................................................... 13

*GAF Corp. v. Heyman*, 724 F.2d 727 (2d Cir. 1983) ................................... 12, 21

# TABLE OF AUTHORITIES

(continued)

Page(s)

*Geiger v. Solomon-Grp., Ltd.*,
   933 F. Supp. 1180 (S.D.N.Y. 1996) ............................................................. 21

*Gen. Time Corp. v. Talley Indus., Inc.*,
   403 F.2d 159 (2d Cir. 1968), *cert. denied*, 393 U.S. 1026 (1969)................. 21

*Greater Yellowstone Coalition v. Flowers*,
   321 F.3d 1250 (10th Cir. 2003) ..................................................................... 8

*GTE Corp. v. Williams*,
   731 F.2d 676 (10th Cir. 1984) ................................................................. 8, 14

*Heideman v. S. Salt Lake City*,
   348 F.3d 1182 (10th Cir. 2003) ..................................................................... 8

*Horowitz v. Pownall*,
   616 F. Supp. 250 (D. Md. 1985) .................................................................. 17

*In re Blockbuster Entertainment Corp. S'holders Litig.*,
   1994 WL 89011 (Del. Ch. Mar. 1, 1994) ..................................................... 15

*In re Digital Island Sec. Litig.*,
   223 F. Supp. 2d 546 (D. Del. 2002), *aff'd*, 357 F.3d 322 (3d Cir. 2004) ...................... 21

*In re Donald J. Trump Casino Sec. Litig.-Taj Majal Litig.*,
   793 F. Supp. 543 (D.N.J. 1992), *aff'd*, 7 F.3d 357 (3d Cir. 1993) ............................. 19

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
   272 F. Supp. 2d 243 (S.D.N.Y. 2003) .................................................... 17, 21

*In re MONY Grp., Inc. S'holder Litig.*,
   853 A.2d 661 (Del. Ch. 2004) ......................................................... 12, 17, 18

*In re Netsmart Techs., Inc. S'holders Litig.*,
   924 A.2d 171 (Del. Ch. 2007) ...................................................................... 25

*In re Tyson Foods, Inc.*,
   2007 WL 2351071 (Del. Ch. Aug. 15, 2007) ............................................... 12

*Justin Indus., Inc. v. Choctow Secs., L.P.*,
   920 F.2d 262 (5th Cir. 1990) ....................................................................... 12

# TABLE OF AUTHORITIES

(continued)

Page(s)

*Kahn v. Wien*,
  842 F. Supp. 667 (E.D.N.Y. 1994) ............................................................. 18

*Kas v. Financial Gen. Bankshares, Inc.*,
  796 F.2d 508 (D.C. Cir. 1986) ................................................................... 18

*LC Capital Master Funds v. James*,
  990 A.2d 435 (Del. Ch. 2010) ................................................................... 25

*Little v. Jones*,
  607 F.3d 1245 (10th Cir. 2010) ................................................................. 16

*Litwin v. OceanFreight, Inc.*,
  2011 WL 5223022 (S.D.N.Y. Nov. 2, 2011) ............................................. 22

*Mack v. Mishkin*,
  172 F. Supp. 885 (S.D.N.Y. 1959) ............................................................ 13

*McConnell v. Lucht*,
  320 F. Supp. 1162 (S.D.N.Y. 1970) .................................................... 13, 23

*Mercier v. Inter-Tel (Del.), Inc.*,
  929 A.2d 786 (Del. Ch. 2007) ................................................................... 25

*Metro. Taxicab Bd. of Trade v. City of New York*,
  615 F.3d 152 (2d Cir. 2010) ...................................................................... 24

*Mills v. Electric Auto-Lite Co.*,
  396 U.S. 375 (1970) ................................................................................... 22

*Oliver Press Partners, LLC v. Decker*,
  2005 WL 3441364 (Del. Ch. Dec. 6, 2005) .............................................. 14

*ONBANCorp, Inc. v. Holtzman*,
  956 F. Supp. 250 (N.D.N.Y. 1997) ..................................................... 15, 16

*Penn v. San Juan Hosp., Inc.*,
  528 F.2d 1181 (10th Cir. 1975) ................................................................. 16

*Pittiglio v. Mich. Nat'l Corp.*,
  906 F. Supp. 1145 (E.D. Mich. 1995) ....................................................... 17

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Polar Int'l Brokerage Corp. v. Reeve*,
  108 F. Supp. 2d 225 (S.D.N.Y. 2000) .......................................................................... 17

*Rabbani v. Enzo Biochem, Inc.*,
  82 F. Supp. 2d 400 (S.D.N.Y. 2010) ............................................................................ 23

*Sargent v. Genesco, Inc.*,
  352 F. Supp. 66 (M.D. Fla. 1972)................................................................................. 23

*Schrier v. Univ. of Colo.*,
  427 F.3d 1253 (10th Cir. 2005) ...................................................................................... 9

*Seibert v. Sperry Rand Corp.*,
  586 F.2d 949 (2d Cir. 1978) ......................................................................................... 17

*Seinfeld v. Becherer*,
  461 F.3d 365 (3d Cir. 2006) ......................................................................................... 21

*Sherman v. Posner*,
  266 F. Supp. 871 (S.D.N.Y. 1966) ............................................................................... 14

*Sisters of the Precious Blood, Inc. v. Bristol-Myers Co.*,
  431 F. Supp. 385 (S.D.N.Y. 1977) .......................................................................... 16, 22

*Unicorn Fin.-Corp. v. First Union Real Estate & Mortg. Invs.*,
  515 F. Supp. 249 (S.D. Ohio 1981) .............................................................................. 18

*Unicorp Fin. Corp. v. First Union*,
  515 F. Supp. 249 (S.D. Ohio 1981) ......................................................................... 23, 24

*Union Pac. Corp. v. Santa Fe Corp.*,
  1995 WL 54428 (Del. Ch. Jan. 30, 1995)..................................................................... 15

*United States ex rel. Citizen Band Potawatomi Indian
  Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*,
  883 F.2d 886 (10th Cir. 1989) ........................................................................................ 8

*Va. Bankshares, Inc. v. Sandberg*,
  501 U.S. 1083 (1991).................................................................................................... 22

*Van Dusen, Inc. v. APL Ltd. P'Ship*,
  1985 WL 56596 (D. Minn. Sept. 20, 1985)................................................................... 24

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Winter v. National Res. Defense Council, Inc.*,
   555 U.S. 7 (2008)................................................................................................24

## <u>STATUTES</u>

15 U.S.C.
   Section 78n-1(a)............................................................................................. 7
   Section 78n-1(c)............................................................................. 7, 15, 22

17 C.F.R.
   Section 229.404........................................................................................ 19
   Section 240.14a-101 ................................................................................ 19

## <u>RULES</u>

Federal Rules of Civil Procedure
   Rule 65(c)....................................................................................................25

## INTRODUCTION

Plaintiffs' Motion for Preliminary Injunction (the "Motion") is long on rhetoric, but woefully short on substance.  It challenges a proxy statement that was reviewed and cleared by the Securities and Exchange Commission ("SEC") against the backdrop of the same media coverage relied on in the Motion and complaint, and seeks to enjoin Chesapeake Energy Corporation's ("Chesapeake") annual meeting without satisfying any of the prerequisites to obtaining such extraordinary relief -- or even coming close.

Rather than demonstrating that they will suffer irreparable harm absent a preliminary injunction, Plaintiffs **concede** that they have **failed** to do so.  As demonstrated in detail below, that concession is exceedingly well-founded.  The suggestion that shareholders have not been provided sufficient information cannot withstand even superficial scrutiny.  Conversely, disrupting Chesapeake's corporate processes would inflict needless damage on the company and its shareholders.

Shareholders have been provided with a superabundance of information regarding the Founder Well Participation Program ("FWPP") and Mr. McClendon's FWPP financing transactions.  Those detailed disclosures are made both in the 2012 Proxy, and in a separate disclosure by Mr. McClendon that provides personal financial information regarding his FWPP holdings.  Additional details have been disseminated in hundreds of media reports, and the merits of the FWPP and Mr. McClendon's personal financing transactions have been debated throughout the public domain.

The injunction sought in the Motion must also be denied because it has almost nothing to do either with the relief sought in Plaintiffs' complaint, or with the matters that the shareholders will vote on at the annual meeting.  Nor can Plaintiffs demonstrate a likelihood of success on the merits.  Although Plaintiffs do a good job of parroting media criticisms, their assertions that Defendants breached legal duties lack any semblance of merit.

1

## FACTS RELEVANT TO THE MOTION

**I.      The FWPP Was Approved By Chesapeake's Shareholders in 2005.**

The FWPP is a shareholder-approved contract between Mr. McClendon and Chesapeake that permits McClendon to purchase working interests in new wells drilled by the Company.  Nearly 75% of Chesapeake shareholders voted to approve the program on June 10, 2005.  *See* Declaration of James R. Webb in Support of Defendants' Response Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction ("Webb Decl."), Exs. 1 at 3-11, 2 at 3.

As explained in Chesapeake's detailed disclosures before and after the shareholder vote, Mr. McClendon has the right to purchase up to a 2.5% interest in new wells drilled by Chesapeake during each calendar year.  He cannot pick and choose which wells to invest in -- he must invest in all of the wells drilled by Chesapeake during each calendar year, or none of them.  He pays his proportionate share of all acreage and operating costs, and all capital expenditures related to his FWPP interests, to Chesapeake promptly and in full.  *See id.*, Exs. 1 at 6-11, 3 at 3-5, 4 at 3-4, 5 at 3-4, 6 at 3-5, 7 at 5-7, 8 at 4-6.

By its terms -- which were disclosed to shareholders -- the FWPP "does not limit the sale, mortgage, gift or assignment by [Mr. McClendon] of an interest in a Program Well once the interest has been assigned of record by" Chesapeake.  *Id.*, Ex. 1 at 10.

**II.     Although Mr. McClendon Had a Contractual Right to Participate in the FWPP through 2015, He and Chesapeake's Board Have Negotiated an Early Termination.**

Mr. McClendon had a contractual right to participate in the FWPP through at least December 31, 2015.  *Id.* at 8.  On May 1, 2012, Chesapeake announced that Mr. McClendon had agreed to terminate the FWPP 18 months early and that Mr. McClendon will receive no compensation for agreeing to forego his right to participate in the program in accordance with the terms of his contract.  *Id.*, Ex. 9 at 3.

2

III.    **The Fact That Mr. McClendon Mortgaged His FWPP Well Interests Was Disclosed in Prior Proxies.**

No one attempted to hide the fact that Mr. McClendon used his FWPP interests as collateral in financing transactions.  As one of the articles cited in Plaintiffs' complaint acknowledges, shareholders and analysts "have known for years that McClendon has borrowed against or sold portions of his stakes in Chesapeake wells." *Id.*, Ex. 10 at 3.

Chesapeake's prior proxies explained that Mr. McClendon had entered into "personal financing transactions . . . with respect to certain of his interests in the Company's wells" acquired under the FWPP.  *Id.*, Exs. 6 at 3, 7 at 4, 8 at 3.  They also made clear that "Mr. McClendon's FWPP interests are his personal assets" and that "Chesapeake does not restrict sales, dispositions or financing transactions involving FWPP interests previously assigned by the Company." *Id.*, Exs. 6 at 5, 7 at 6-7, 8 at 6.

The detailed information routinely disclosed in Chesapeake's proxies included the total amount billed to Mr. McClendon in connection with his acquisition of interests under the program, along with the associated operating and marketing costs, the natural gas and oil revenues that he received, the lease operating expenses he paid, the resulting net cash flow before capital expenditures, the capital expenditures he paid, and net cash flow to Mr. McClendon after capital expenditures.  *Id.*, Exs. 3 at 5, 4 at 4, 5 at 4, 6 at 5-6, 7 at 6-7, 8 at 6.

IV.    **The 2012 Proxy Expanded Prior Disclosures Regarding the FWPP and FWPP Financing Transactions.**

Like Chesapeake's prior proxy statements, the 2012 Proxy details the terms and procedures of the FWPP, and Mr. McClendon's right to participate in the program.  *See* Plaintiffs' Ex. 2 at 31.  It sets forth the revenue received from, and well costs paid to, Chesapeake with respect to Mr. McClendon's FWPP interests during the first quarter of 2012 and each of the three years in the period ended December 31, 2011, and discloses that "Mr. McClendon's interests are his personal assets and are separate and distinct from the Company's interest in its oil and gas properties and other assets" and that "[t]he

3

FWPP does not restrict sales, other dispositions or financing transactions involving FWPP interests acquired from the Company." *Id.* at 32.

In **addition**, the 2012 Proxy filed after the SEC review and clearance explains that: (1) "From time to time, Mr. McClendon has sold FWPP interests separately and concurrent with sales by the Company of its interests in the same properties"; (2) "over the life of the FWPP, Mr. McClendon has typically mortgaged his interests acquired under the FWPP with one or more lenders, some of which also have lending, investment or advisory relationships with the Company"; (3) "Mr. McClendon's mortgages with these lenders secure loans used in whole or in part to fund Mr. McClendon's well costs"; (4) "The Company does not extend loans to Mr. McClendon for participation in the FWPP or any other purposes"; (5) "The Company does not review or approve financings of Mr. McClendon's personal assets, including his FWPP interests"; and (6) "the Company has no obligation to repay any loans Mr. McClendon may obtain nor are any of the Company's interests in any assets exposed to such loans or the mortgages securing them." *Id.*

## V. The Details of Mr. McClendon's FWPP Loans Have Been Published in Numerous Media Reports.

The disclosures in Chesapeake's prior proxies have also been elaborated upon in detail throughout the public media. On April 18, 2012, Reuters published a news article reporting that Mr. McClendon had personally borrowed up to $1.1 billion secured by his FWPP interests to pay for his participation in the FWPP. *See* Plaintiffs' Ex. 1. The article acknowledged that the loans are purely private transactions between Mr. McClendon and third parties (EIG Global Energy Partners, Union Bank, and TCW Asset Management) -- not Chesapeake -- and that they do not affect Chesapeake's assets. It nevertheless criticized Chesapeake for not disclosing the size and terms of the loans, or that one of the lenders (EIG) also does business with Chesapeake. Although Reuters speculated that Mr. McClendon's personal loans could "potentially" create a conflict of

4

interest, it (for good reason) failed to identify or present any evidence of an actual conflict.

The Reuters article was followed by a multitude of other media reports disseminating additional information and debating the merits of Mr. McClendon's personal financing arrangements. Among other things, the reports list the identities of the third-party lenders that participated in the financing transactions and describe key terms in the underlying loan documents. They also provide information regarding the transactions that the third-party lenders have separately entered into with Chesapeake. Plaintiffs cited many of the most pejorative reports in their complaint, and in the Motion that followed. *See, e.g.*, *id.*, Exs. 1, 3, 5-7; Compl. ¶¶ 5, 7, 12, 13, 15, 45, 47, 49, 53-59.

## VI.    Chesapeake Issued the 2012 Proxy After SEC Review and Clearance.

On April 20, 2012, Chesapeake filed a preliminary proxy that provided the additional information regarding Mr. McClendon's FWPP interests and financing transactions as summarized above. Webb Decl., Ex. 11. After the Reuters article and myriad of media reports that followed, the SEC notified Chesapeake that it would conduct a review of the proxy. Upon completion of the SEC review, Chesapeake finalized the proxy and issued it to shareholders on May 11, 2012 ("2012 Proxy"). *See* Plaintiffs' Ex. 2.

Although the SEC's review and clearance of the 2012 Proxy occurred against the backdrop of the same media coverage that Plaintiffs rely upon as "support" for their Motion and complaint, the SEC did not require any new or additional disclosures with respect to the FWPP or the FWPP financing transactions. *See* Declaration of Marc D. Rome in Support of Defendants' Response Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction ("Rome Decl."), ¶ 5, Exs. 1-3. Moreover, in prior years the SEC has not hesitated to request additional proxy disclosures regarding the FWPP when it believed such revisions were appropriate. *See* Webb Decl., Exs. 18 at 3-4, 19 at 4-5, 20 at 5-7, 21 at 2-3, 22 at 2-6, 23 at 2-3.

5

## VII.  The Expanded Proxy Was Augmented by Separate Disclosures by Mr. McClendon Regarding His Personal Financial Information.

On April 26, 2012, shareholders were provided with separate and additional disclosures regarding Mr. McClendon's FWPP interests and financing transactions via a filing by Mr. McClendon that disclosed his personal financial information.  *See id.*, Ex. 12.  Mr. McClendon's separate filing disclosed that on December 31, 2011, the aggregate principal amount owed under his personal loans secured by his separately owned FWPP interests was $846 million and that all "of the loans were from third parties and none of them were from Chesapeake or its affiliates."  *Id.* at 3.  The supplemental disclosures also included additional information about the total proved reserves associated with his FWPP holdings, the estimated present value of the future net revenue (pre-tax) of the estimated proved reserves attributable to those holdings (discounted at 9% per year and based on NYMEX strip prices), and the estimated average daily production from his interests.  *Id.* at 3-5.

## VIII.  Chesapeake's May 11, 2012, 10-Q Provided Still More Information Regarding Plaintiffs' Lawsuits, Which Were Also Widely Covered in the Media.

On May 11, 2012, Chesapeake filed its quarterly report for the quarter ended March 31, 2012, on Form 10-Q ("Quarterly Report").  The Quarterly Report disclosed that Plaintiffs have sued Chesapeake and its Board of Directors for "violations of Section 14 of the Securities Exchange Act of 1934 . . . for purported material misstatements in the Company's 2009 and subsequent proxy statements related to Mr. McClendon's participation in the Founder Well Participation Program (FWPP) and breaches of fiduciary duties against the Board for failing to make proper disclosures in the proxy statements."  *Id.*, Ex. 13 at 3.

After the Motion was filed on May 15, 2012, dozens of media outlets reported on the lawsuits and the fact that Plaintiffs are attempting to enjoin the June 8, 2012 annual meeting.  *See, e.g.*, *id.*, Exs. 14-16.  The media reports quoted from the various assertions made in the Motion.

**IX.   The FWPP Financing Transactions Are Not Up for Vote at the Annual Shareholder Meeting.**

Neither the FWPP nor Mr. McClendon's financing transactions is the subject of any vote at the annual meeting.  Nor do any of the matters on the ballot have anything to do with Mr. McClendon's personal loans.  The only items that **even arguably** have some theoretical connection to the Motion and complaint are:

*Re-election of Messrs. Davidson and Hargis as directors*:  Their re-election is uncontested; no one has nominated a competing slate of candidates.  *See* Plaintiffs' Ex. 2 at 23.

*Say-On-Pay vote*: Pursuant to the Dodd-Frank Act, shareholders are entitled to vote up or down on the compensation paid to executives.  *Id.* at 57; 15 U.S.C. § 78n-1(a).  This vote is advisory only and does not bind the corporation.  15 U.S.C. § 78n-1(c).  Nor does it have any connection to Mr. McClendon's personal loans.

*Amendment to Long Term Incentive Plan ("LTIP")*: The LTIP is an equity-based incentive compensation plan that has nothing to do with the FWPP.  *See* Plaintiffs' Ex. 2 at 57-61.  Chesapeake grants restricted stock to employees upon joining Chesapeake and semi-annually thereafter.  *Id.* at 57.  More than 13,000 employees are eligible to participate in the LTIP.  *Id.* at 59.  The number of participants has increased by 500% since the LTIP was adopted in 2005, and the Board is asking shareholders to approve an increase to the number of shares of common stock available for award under the LTIP.  *Id.* at 57.  The LTIP has nothing to do with Mr. McClendon's FWPP financing transactions.

*Annual Incentive Plan*: Shareholders are asked to approve Chesapeake's new cash-based bonus program that uses pre-established performance goals to determine bonuses.  *Id.* at 62-64.  The Incentive Plan is wholly unrelated to Mr. McClendon's personal financing transactions.

OHSUSA:750789669.2

## LEGAL STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF

"A preliminary injunction is an extraordinary remedy; it is the exception rather than the rule." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984).

"To obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harms that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007). It is the movant's burden to establish each of these four factors. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188-89 (10th Cir. 2003).

Because a preliminary injunction "constitutes drastic relief to be provided with caution," an injunction "should be granted only in cases where the necessity for it is clearly established." *United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888-89 (10th Cir. 1989). The movant's "right to relief must be clear and unequivocal." *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003).

As demonstrated in detail below, the Motion does not come close to discharging Plaintiffs' heavy burden on **any** element.

## ARGUMENT

### I.     Plaintiffs Cannot Demonstrate Irreparable Harm.

As this Court has noted, "the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Core Labs., LP v. Spectrum Tracer Servs., L.L.C.*, 2012 WL 1023354, at *2 (W.D. Okla. Mar. 27, 2012) (Miles-Lagrange, C.J.) (internal quotation marks omitted).

The Tenth Circuit has emphasized that "to constitute irreparable harm, an injury

must be certain, great, actual and not theoretical.  [M]erely serious or substantial harm is not irreparable harm.  [T]he party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005) (internal quotation marks and citations omitted).

Plaintiffs' Motion falls far short of satisfying these exacting standards.  Indeed, the Motion concedes that glaring deficiency by stating that Plaintiffs need expedited discovery "**to establish** likelihood of irreparable harm."  Motion at 3, n.3 (emphasis added).  Needless to say, Plaintiffs are not entitled to obtain the "drastic relief" sought in the Motion by telling the Court that they do not meet the "single most important prerequisite."  That admission **alone** justifies denial of the Motion.  *See, e.g.*, *Blango v. Thornburgh*, 942 F.2d 1487, 1493 (10th Cir. 1991).  While further analysis is unnecessary, it confirms that Plaintiffs' admission is extraordinarily well-founded.

### A.   Plaintiffs' Claim of Irreparable Harm Is Unsupported and Unsupportable.

Plaintiffs assert that "[a]bsent Court intervention, Chesapeake and its shareholders will suffer irreparable harm based on Defendants' misconduct in the form of an uninformed shareholder vote."  Motion at 23.  The premise of this pronouncement -- that shareholders lack information regarding Mr. McClendon's personal financing arrangements with respect to his FWPP interests -- is plainly false.  It is flatly contradicted by the fulsome disclosures made on the face of the Motion and complaint, Chesapeake's 2012 Proxy, Mr. McClendon's supplemental disclosures of personal financial information, and a multitude of media reports disclosing the details of Mr. McClendon's personal loans and the FWPP.

As explained at pages 3-4 above, the 2012 Proxy contains a cornucopia of detailed and expanded information regarding the FWPP.  It discloses the revenue received from, and well costs paid to, Chesapeake in connection with Mr. McClendon's FWPP holdings

9

during the first quarter of 2012, and in each of the three years in the period ended December 31, 2011.  *See* Plaintiffs' Ex. 2 at 32.  The 2012 Proxy further informs shareholders that:

- "Mr. McClendon's interests are his personal assets and are separate and distinct from the Company's interest in its oil and gas properties and other assets";
- "The FWPP does not restrict sales, other dispositions or financing transactions involving FWPP interests acquired from the Company";
- "From time to time, Mr. McClendon has sold FWPP interests separately and concurrent with sales by the Company of its interests in the same properties";
- "over the life of the FWPP, Mr. McClendon has typically mortgaged his interests acquired under the FWPP with one or more lenders, some of which also have lending, investment or advisory relationships with the Company";
- "Mr. McClendon's mortgages with these lenders secure loans used in whole or in part to fund Mr. McClendon's well costs";
- "The Company does not extend loans to Mr. McClendon for participation in the FWPP or any other purposes";
- "The Company does not review or approve financings of Mr. McClendon's personal assets, including his FWPP interests"; and
- "the Company has no obligation to repay any loans Mr. McClendon may obtain nor are any of the Company's interests in any assets exposed to such loans or the mortgages securing them."

*Id.*

Those exacting disclosures were supplemented by personal financial information provided by Mr. McClendon in a separate filing.  The personal financial information provided by Mr. McClendon disclosed that on December 31, 2011, the aggregate principal amount that he owed under loans secured by his FWPP interests was $846 million, and that all "of the loans were from third parties and none of them were from Chesapeake or its affiliates."  Webb Decl., Ex. 12 at 3.  Mr. McClendon's separate supplement provided further detailed information regarding the total proved reserves associated with his FWPP holdings, the estimated present value of the future net revenue

(pre-tax) of the estimated proved reserves attributable to his FWPP interests, and the estimated average daily production from his interests. *Id.* at 3-5.

In addition, Chesapeake's Quarterly Report disclosed and discussed the fact that Plaintiffs have filed lawsuits alleging "violations of Section 14 of the Securities Exchange Act of 1934 . . . for purported material misstatements in the Company's 2009 and subsequent proxy statements related to Mr. McClendon's participation in the Founder Well Participation Program (FWPP) and breaches of fiduciary duties against the Board for failing to make proper disclosures in the proxy statements." *Id.*, Ex. 13 at 3.

Above and beyond the copious information provided by Chesapeake and Mr. McClendon, there have been literally hundreds of news reports that identify Mr. McClendon's third-party lenders and key terms of the underlying loan documents and the transactions that the lenders on the FWPP financing transactions have separately entered into with Chesapeake. The reports also added a good deal of opinion and commentary on the implications of the transactions. *See, e.g.*, Plaintiffs' Exs. 1, 3, 5-7.

Even Plaintiffs' attempt to enjoin the annual meeting -- and the allegations purportedly supporting that attempt -- have been widely publicized. *See, e.g.*, Webb Decl. Exs. 14-16. That publicity further eviscerates any attempt to show irreparable harm. *See, e.g.*, *Condec Corp. v. Farley*, 573 F. Supp. 1382, 1385-87 (S.D.N.Y. 1983) (denying preliminary injunction to enjoin proxy contest where public filing disclosed plaintiff's allegations).

Under well-settled law, the superabundance of information disclosed by Chesapeake, Mr. McClendon and the public media is fatal to Plaintiffs' assertions across the board.[1] "The materiality of an omission in a proxy statement is determined by taking

---

[1]   The cases that Plaintiffs primarily rely upon to argue irreparable harm are completely inapposite. In *Berkman v. Rust Craft Greeting Cards, Inc.*, 454 F. Supp. 787 (S.D.N.Y. 1978), four members of the board learned that the Company's financial advisor had secretly purchased the Company's debt, which was convertible into common stock at a below market price, and did not share this information with the other directors, which led to this *known* and *actual* conflict of interest going undisclosed in the proxy. Putting aside

into account all information in the public domain and facts reasonably available to the public to be used by shareholders in interpreting the information in the proxy sent to them." *Justin Indus., Inc. v. Choctow Secs., L.P.*, 920 F.2d 262, 267 (5th Cir. 1990) (internal quotation marks omitted). Accordingly, "[p]roxy statements need not disclose 'facts known or reasonably available to the stockholders,'" and there can be no irreparable harm in failing to include such facts in a proxy. *In re MONY Grp., Inc. S'holder Litig.*, 853 A.2d 661, 683 (Del. Ch. 2004). None of the information Plaintiffs claim should have been added to the 2012 Proxy could possibly be deemed material when viewed in the context of the information that is in the public domain and readily available to Chesapeake's shareholders.

*MONY* denied a preliminary injunction motion based on public information that pales in comparison to the information described above. Numerous other decisions have refused to enjoin annual meetings or order further disclosures based on small fractions of the information in the public domain in this case.[2]

As demonstrated above, the fact that the information that Plaintiffs seek is in the public domain -- from a multitude of sources -- is beyond legitimate dispute. Accordingly, the fact that Chesapeake and Mr. McClendon have not disclosed all of the information in the public domain would be unavailing **even if** such information were

---

the fact that Plaintiffs have not established that Mr. McClendon's **personal** loans from third-party lenders constitute an actual conflict of interest, all material information regarding his lending arrangements have been disclosed to shareholders. The other case Plaintiffs rely upon, *In re Tyson Foods, Inc.*, 2007 WL 2351071 (Del. Ch. Aug. 15, 2007), is equally irrelevant, as it involved allegations "that defendants intentionally and deceptively channeled corporate profits to chosen executives." *Id.* at *4.

[2]  *See, e.g.*, *GAF Corp. v. Heyman*, 724 F.2d 727, 729 (2d Cir. 1983) ("The 'total mix' of information available at the time of the election also included the many news stories"); *Charming Shoppes Inc. v. Crescendo Partners II, L.P.*, 557 F. Supp. 2d 621, 628-29 (E.D. Pa. 2008) ("There is no reason to require [defendants] to amend their proxy at this point -- the disputed information is already available to shareholders through the parties' SEC filings and the preliminary injunction hearing that was open to the public. . . . This adds to the picture of the quality of the 'total mix' of information available to shareholders. Therefore, I deny Charming Shoppes' motion for preliminary injunction").

OHSUSA:750789669.2

otherwise material (and it is not).[3]

Chesapeake's shareholders have themselves acknowledged the volume of publicly available information about the FWPP, and have added still more information that is in the public domain and readily available.  For example, in a May 17, 2012, letter to Chesapeake's other shareholders, one of the company's largest stockholders recommended that all shareholders should withhold their votes for director nominees Mr. Davidson and Mr. Hargis due to the facts "reported by the press or by the Company" regarding Mr. McClendon's loans "secured by his stake in Chesapeake's oil and gas wells, including from firms doing business with Chesapeake."  Webb Decl., Ex. 17 at 2.

**B.      The SEC's Review And Clearance of the 2012 Proxy Further Undercuts Any Claim of Irreparable Harm.**

Given the detailed disclosures regarding the FWPP loans set forth in the 2012 Proxy, it is hardly surprising that, after completing its review, the SEC cleared the Proxy without requiring revisions or additional disclosures.  *See* Rome Decl., ¶ 5, Exs. 1-3.  The SEC's review and clearance of the 2012 Proxy provide an additional independent reason to deny the requested injunction:   "[T]he fact that [Chesapeake's] proxy material[s] passed muster before the SEC . . . is of some importance on the issue of injunctive relief." *McConnell v. Lucht*, 320 F. Supp. 1162, 1166 (S.D.N.Y. 1970).   *See also Mack v. Mishkin*, 172 F. Supp. 885, 888 (S.D.N.Y. 1959) (denying motion to enjoin annual meeting, noting that "the fact that the staff of the [SEC] has presumably approved the

---

[3]     Another reason why Plaintiffs cannot show irreparable harm is that, in the unlikely event the Court "were to find that [Chesapeake's] proxy materials were materially false and misleading it [c]ould simply set aside the vote and order a new contest." *FMC Corp. v. R. P. Scherer Corp.*, 545 F. Supp. 318, 322 (D. Del. 1982).  Unlike the plaintiffs in the cases cited in the Motion, (Motion at 23-24), Plaintiffs here "are not attempting to enjoin a merger or other corporate activity which would require the Court to 'unscramble the eggs' if preliminary injunctive relief were erroneously withheld."  *Id.* at 323; *see also Clairdale Enters., Inc. v. C. I. Realty Investors*, 423 F. Supp. 261, 264 (S.D.N.Y. 1976) ("if plaintiff hereafter demonstrates that the proxies were unlawfully obtained and utilized, the results of the annual meeting may then be set aside, the proxies resolicited and a new vote held.").

OHSUSA:750789669.2

issuance of the material must be given some weight").[4]

### C. Plaintiffs' Delay in Moving for Relief Belies Any Claim of Irreparable Harm and Constitutes an Independent Ground for Denying the Motion.

Because preliminary injunctions seek extraordinary remedies predicated upon urgent need for speedy action, delay in seeking the remedy undermines any claim of irreparable harm, and provides another ground for denying an injunction, including on the basis of laches.  As the Tenth Circuit has held, unreasonable delay alone "may justify denial of a preliminary injunction."  *GTE*, 731 F.2d at 678.  "[E]quity aids the vigilant, not those who slumber on their rights."  *Allred v. Chynoweth*, 990 F.2d 527, 536 n.6 (10th Cir. 1993).

Plaintiffs filed this lawsuit on April 19, 2012 (*see* Case No. CIV-12-436-R), and they have known the contents of the 2012 Proxy and the date of the annual meeting since April 20, 2012, when Chesapeake's proxy materials became publicly available.  *See* Webb Decl., Ex. 11 at 4-8.  Plaintiffs and their counsel are now mounting an eleventh-hour attempt to disrupt the meeting with no pretense of an explanation why they waited so long to do so.

If Plaintiffs actually believed the 2012 Proxy was materially misleading, and that without an injunction they would suffer irreparable harm, it was incumbent on them to take timely action -- not sit on their hands.  Their failure to do so belies any claim of irreparable harm and provides yet another reason to deny the Motion.[5]

---

[4]   "[T]he action, or inaction, as the case may be, of the Commission is to be accorded some weight where, as in our case, the information which forms the basis for an injunctive motion previously has been brought to the attention of the Commission and the Commission has presumably approved issuance of the material.  'In an area where the primary power of protection of investors is vested in the Commission, their failure to take a stronger position is of some weight, particularly on a motion of this sort for preliminary relief.'"  *Sherman v. Posner*, 266 F. Supp. 871, 874 (S.D.N.Y. 1966).

[5]   *See, e.g.*, *Oliver Press Partners, LLC v. Decker*, 2005 WL 3441364, at *1 (Del. Ch. Dec. 6, 2005) (denying motion to delay annual meeting where proxy was available for over a month but plaintiff did not move until 3 weeks before the meeting); *Union Pac. Corp. v. Santa Fe Corp.*, 1995 WL 54428, at *3 (Del. Ch. Jan. 30, 1995) (denying motion where plaintiffs were in a position to request injunctive relief a month before shareholder

**D.      Plaintiffs Cannot Show Irreparable Harm Because Enjoining the Annual Meeting Would Be Pointless.**

Preliminary injunctions are not available to grant relief that would be ineffective or irrelevant.   The Motion should be denied because enjoining the annual meeting and issuing still more disclosures would serve no useful purpose.   Accordingly, Plaintiffs could not possibly suffer irreparable harm if the relief sought in the Motion were denied. No one has nominated a competing slate of candidates, and the two directors up for election are unopposed.   None of the other ballot measures has any arguable connection to Mr. McClendon's personal loans.

If Plaintiffs' "request for relief were to be granted, the . . . election would be enjoined, new supplemental proxy statements would be issued, and a new election would be held, all for the purpose of what must inevitably be the same electoral results. Granting [] injunctive relief in this case would truly be an exercise of futility." *Bolger v. First State Fin. Servs.*, 759 F. Supp. 182, 192 (D.N.J. 1991).   As the cases demonstrate, Plaintiffs' "reliance on the fact that [two] directors must stand for reelection at the [2012] meeting is simply too attenuated to meet the test for irreparable harm . . . [because] the directors will be unopposed." *ONBANCorp, Inc. v. Holtzman*, 956 F. Supp. 250, 256 (N.D.N.Y. 1997).

Plaintiffs' claim that they need additional disclosures to cast an informed "Say-On-Pay vote regarding executive compensation" (Motion at 26) suffers from the same defect.   Say-On-Pay votes are non-binding and purely advisory.   15 U.S.C. § 78n-1(c). When a proposal is non-binding, a proxy solicitation cannot result in, "or have the tendency to threaten or cause [a] plaintiff any irreparable harm sufficient to warrant injunctive relief." *Sisters of the Precious Blood, Inc. v. Bristol-Myers Co.*, 431 F. Supp. 385, 386-87 (S.D.N.Y. 1977).   Nor do the Say-On-Pay votes have any connection to the

---

meeting but did not do so); *In re Blockbuster Entertainment Corp. S'holders Litig.*, 1994 WL 89011, at *1 (Del. Ch. Mar. 1, 1994) ("plaintiffs' failure to bring on their application for injunctive relief [to delay shareholder meeting] in a timely fashion constitutes laches").

FWPP loans.

Plaintiffs' suggestion that they will be irreparably harmed in connection with the vote to approve the LTIP and annual cash-based bonus plan is equally unfounded.  The plan has nothing whatsoever to do with the FWPP or Mr. McClendon's financing transactions.  *See, e.g.*, *ONBANCorp*, 956 F. Supp. at 256 (no irreparable harm where plaintiff "has not identified any particular proposal to be voted on at the meeting that arguably could be tainted by" the alleged undisclosed facts).

**II.     Plaintiffs Have No Likelihood of Success on the Merits.**

Plaintiffs' inability to demonstrate irreparable harm is dispositive, without further analysis.  *See, e.g.*, *Core Labs.*, 2012 WL 1023354, at *3 n.1.  The Motion is, in any event, afflicted with other equally fatal defects, including a patent inability to demonstrate a substantial likelihood that Plaintiffs will succeed on the merits of their Section 14(a) and breach of fiduciary duty claims.

**A.     Only Claims Concerning the 2012 Proxy Are Relevant to This Motion.**

Only claims based on allegations of misleading disclosures in the 2012 Proxy are relevant to the Motion.  It is fundamental that a party moving for injunctive relief "must establish 'a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint.'"  *Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010); *Penn v. San Juan Hosp., Inc.*, 528 F.2d 1181, 1185 (10th Cir. 1975).

Neither the injury claimed in the Motion (an "uninformed shareholder vote" in connection with Chesapeake's annual meeting on June 8, 2012), nor the relief sought (an injunction of the meeting pending "correction" of the 2012 Proxy), bears any relation to Plaintiffs' assertions that other proxy statements issued in connection with past annual meetings were misleading.  Accordingly, the only claims that matter for purposes of the Motion are those that both (1) are asserted in the complaint and (2) relate to disclosures made in the 2012 Proxy.

16

**B.    The Allegedly Undisclosed Facts Are in the Public Domain and Are Widely Known.**

Putting aside the question of whether Chesapeake is otherwise obligated to disclose the facts that Plaintiffs say should be disclosed (as explained below, it is not), Plaintiffs' disclosure claims fail as a matter of law because a proxy statement "need not disclose 'facts known or reasonably available to the stockholders.'"  *MONY*, 853 A.2d at 683; *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978).

Accordingly, "Plaintiffs may not state a claim for failure to disclose information that 'was widely disseminated in the media.'"  *Pittiglio v. Mich. Nat'l Corp.*, 906 F. Supp. 1145, 1154 (E.D. Mich. 1995).  *See, e.g.*, *Horowitz v. Pownall*, 616 F. Supp. 250, 253 (D. Md. 1985) (dismissing § 14 claim because "the omissions of which plaintiff complains were widely disclosed elsewhere, in the press and in Martin Marietta's SEC filings"); *Polar Int'l Brokerage Corp. v. Reeve*, 108 F. Supp. 2d 225, 245 (S.D.N.Y. 2000) (dismissing § 14 claim; defendants were not required to amend proxy in order to disclose information "that was widely reported in the media").

As discussed in detail at pages 3-6 above, the 2012 Proxy, supplemental materials filed by Mr. McClendon, and the Quarterly Report, disclosed a host of information regarding the FWPP and FWPP financing transactions.  Plaintiffs' repeated citation of the media reports in their Motion and complaint both confirms that the information they claim should have been added to the 2012 Proxy was already widely disseminated, and adds a new reason to deny the Motion.  *See, e.g.*, *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 251 (S.D.N.Y. 2003) (dismissing disclosure claims where "Plaintiff's own Complaint demonstrates that information concerning" the allegedly omitted fact "was publicly available"); *Pittiglio*, 906 F. Supp. at 1150 (dismissing proxy claims where "Plaintiffs themselves have cited press articles which describe" the allegedly omitted information).  The fact that one of Chesapeake's major shareholders sent a public letter to all shareholders urging them to withhold their votes from the directors up for re-election based on "revelations reported by the press or

17

by the Company" adds an exclamation point.  Webb Decl., Ex. 17 at 2.

Despite the wealth of information already available to them and other shareholders, Plaintiffs criticize the 2012 Proxy because it purportedly fails to disclose the "potential conflicts of interest" purportedly created by Mr. McClendon's financing arrangements.  *See* Motion at 18-19.  Significantly, the myriad of speculative news reports and advocacy letter sent to shareholders all refer to **possible** conflicts of interest that **might** arise from Mr. McClendon's financing arrangements.  *See, e.g.*, *MONY*, 853 A.2d at 683 (denying preliminary injunction because "information relating to the possible divergent interests of the ORAN holders from the MONY stockholders was both available publicly and communicated to the MONY stockholders").

The 2012 Proxy explicitly discloses the fact that "some of [Mr. McClendon's lenders] also have lending, investment or advisory relationships with the Company." Plaintiffs' Ex. 2 at 32.  Chesapeake plainly was not required to use the phrase "potential conflict of interest."  *See, e.g.*, *Kas v. Financial Gen. Bankshares, Inc.*, 796 F.2d 508, 517 (D.C. Cir. 1986) ("Nor can the proxy statement be faulted because it never uses the actual phrase 'potential conflict of interest.'").  Companies "need not label or editorialize" on disclosed facts, *id.*, or "expressly verbalize . . . adverse inferences from those facts." *Kahn v. Wien*, 842 F. Supp. 667, 676 (E.D.N.Y. 1994) (cited by Plaintiffs, Motion at 18-19).  *See, e.g.*, *Unicorn Fin.-Corp. v. First Union Real Estate & Mortg. Invs.*, 515 F. Supp. 249, 261 (S.D. Ohio 1981) (proxies "do not mislead a shareholder because they fail to state an interpretation . . . the defendants do not share").

The bottom line is that there is no **conceivable** basis for any claim that Chesapeake's shareholders have been deprived of material information, and the failure to adopt the pejorative spin imparted in the Motion and complaint does not render the Proxy materially misleading.  Plaintiffs thus have **no** likelihood, much less a substantial likelihood, of succeeding on the merits of their disclosure claims for that reason alone.

### C.     A Proxy Does Not Have to Disclose Details Regarding Personal Transactions That Do Not Involve the Company.

Although Plaintiffs' claims fail because the information they seek (and much more) has already been disclosed, they are fatally deficient for an even more basic reason:  Under settled law, companies and their directors are not required to monitor and disclose the details of a CEO's personal financing arrangements.  That is true even when the CEO is closely identified with the company, as in the case of Donald Trump or Martha Stewart.

None of the loans in any of the FWPP financing transactions was obtained from Chesapeake.   Plaintiffs do not even attempt to contest that indisputable fact.  Accordingly, the Motion's argument (at 4) that "SEC filings, including proxy statements, are required to detail all related party transactions" is simply irrelevant rhetoric.

Item 404(a) of Reg. S-K, the "related party" disclosure rule under Schedule 14A -- the SEC regulation governing the scope of proxy disclosures -- has no application here because Mr. McClendon's loans were obtained from third parties, not Chesapeake or any of its affiliates.  *See* Webb Decl., Ex. 12 at 3.  The loans do not constitute any claim on the company and are collateralized by Mr. McClendon's personal property -- not property owned by Chesapeake.  *See* Plaintiffs' Ex. 2 at 32; 17 C.F.R. § 240.14a-101, Schedule 14A, Item 7(b) (incorporating 17 C.F.R. § 229.404, Item 404(a)).

**No** court has **ever** held that companies or directors have a duty to disclose the type of information that Plaintiffs claim must be disclosed here.  The law, in fact, is **exactly the opposite**.  *See, e.g.*, *In re Donald J. Trump Casino Sec. Litig.-Taj Majal Litig.*, 793 F. Supp. 543, 564-65 (D.N.J. 1992), *aff'd*, 7 F.3d 357 (3d Cir. 1993); *Beam ex rel. Martha Stewart Living Omnimedia Inc. v. Stewart*, 833 A.2d 961, 971 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del. 2004).

The plaintiffs in *Trump* alleged violations of the federal securities laws because the company's prospectus stated that Donald Trump "has sufficient financial resources to perform his obligations" under a personal guarantee that he made regarding the

19

completion of the construction project being underwritten by the bond issuance, but failed to disclose that Trump's personal financial condition was less than stable. 793 F. Supp. at 564. The court forcefully rejected that assertion because, **as a matter of law**, **defendants had no duty to disclose the personal financial condition of Trump or how** **he intended to use his personal capital**. It explicitly held that such facts "are beyond the bounds of management's responsibility to disclose." *Id.* at 565 (emphasis added).

Similarly, the plaintiffs in *Beam* claimed the board of directors of Martha Stewart Living Omnimedia, Inc. ("MSO") breached their fiduciary duties by "failing to ensure that Stewart would not conduct her personal, financial, and legal affairs in a manner that would harm the Company, its intellectual property, or its business." 833 A.2d at 971. In rejecting that argument, the court emphasized that **the board had** "**no duty to monitor** Stewart's *personal* affairs" even if it had reason to suspect she had engaged in wrongdoing, because "regardless of Stewart's importance to MSO, she is not the corporation." *Id.* at 971-72 (second emphasis in original). The opinion further noted that "**it is neither legitimate nor feasible" to impose such an obligation on boards of** **directors**. *Id.* at 971 (emphasis added).

Mr. McClendon's FWPP holdings are his personal property. His personal financing arrangements are with third parties, not Chesapeake. Accordingly, Chesapeake's directors had no duty to monitor, review or approve the FWPP financings, and had no duty to disclose the "details" of such transactions. Nor would it be feasible to impose such an obligation. Plaintiffs' suggestions to the contrary are, again, empty rhetoric

### D. Chesapeake's Compliance with SEC Rules and the SEC's Clearance of the Proxy Underscore the Absence of Merit in Plaintiffs' Claims.

"Schedule 14A is persuasive authority as to the required scope of disclosure in proxy materials," *Seinfeld v. Becherer*, 461 F.3d 365, 369 (3d Cir. 2006), as the regulation "provides [courts] with the Commission's expert view of the types of

OHSUSA:750789669.2

[information] . . . that are most likely to be matters of concerns to shareholders in a proxy contest," *GAF*, 724 F.2d at 739.

It is telling -- but not surprising -- that Plaintiffs make no attempt to identify any rule under Schedule 14A that mandates the types of disclosures they seek.  No such rule exists.  Even the highly critical Reuters article upon which Plaintiffs rely concedes that the SEC's rules regarding "related party transactions" do not require the disclosure of details regarding Mr. McClendon's personal financing arrangements.  *See* Plaintiffs' Ex. 1 at 5.

The absence of any SEC rule providing for the disclosure of any of the information Plaintiffs claim must be disclosed underscores the extent to which Plaintiffs must overreach, "because it reflects the SEC's expert view that such disclosure **is not required**."  *Geiger v. Solomon-Grp., Ltd.*, 933 F. Supp. 1180, 1187-88 (S.D.N.Y. 1996) (emphasis added).[6]

The fact that the SEC reviewed and cleared the 2012 Proxy with full awareness of the ongoing controversy surrounding Mr. McClendon's financing arrangements deals another powerful blow to Plaintiffs' position.  *See, e.g.*, *Gen. Time Corp. v. Talley Indus., Inc.*, 403 F.2d 159, 163 (2d Cir. 1968), *cert. denied*, 393 U.S. 1026 (1969).  It reflects the SEC's expert view that the disclosures Plaintiffs advocate were not required.

### E.      The Section 14(a) Claim Also Fails for Lack of Causation.

Plaintiffs' Section 14(a) claim also fails as a matter of law for lack of causation.  Plaintiffs cannot demonstrate that the 2012 Proxy forms "an essential link to the accomplishment of the" election of Messrs. Davidson and Hargis as directors, or the

---

[6]     *Accord In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546 (D. Del. 2002), *aff'd*, 357 F.3d 322 (3d Cir. 2004) (dismissing § 14(e) claim, finding it significant that no portion of the applicable SEC rules required the disclosure advocated by plaintiffs); *Merrill Lynch*, 272 F. Supp. 2d at 249 (dismissing securities fraud claims, and finding it significant that, despite the SEC's extensive disclosure rules, "no statute or rule requires the type of disclosure Plaintiff advocates").

approval of Mr. McClendon's executive compensation.  Such a connection is a necessary element under Section 14(a).  *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 385 (1970).

A proxy solicitation is an "essential link" in the accomplishment of a proposed corporate action when the minority shareholders hold sufficient shares to affect the outcome of the vote.  *See Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1107-08 (1991).  No such link exists here.

As explained at page 15 above, the re-election of Messrs. Davidson and Hargis is assured.  The court in *Bolger v. First State Fin. Servs.*, 759 F. Supp. 182 (D.N.J. 1991), denied a motion to enjoin an annual meeting in **identical** circumstances, holding:

> Even if the Proxy Statement and Supplemental Proxy Statement contain misstatements or omissions within the meaning of Rule 14a–9, the proposed slate of directors would ultimately be elected even if the relief sought by the Plaintiffs were to be granted.  Thus, the Plaintiffs have failed to prove a causal link between any alleged material misrepresentations or omissions and the election of the proposed slate of directors.

*Id.* at 198.  *See also Litwin v. OceanFreight, Inc.*, 2011 WL 5223022, at *9 (S.D.N.Y. Nov. 2, 2011) (declining to enjoin shareholder meeting to vote on merger, where outcome of shareholder vote was a foregone conclusion).

Nor can Plaintiffs satisfy the "essential link" requirement with respect to the "Say-On-Pay" vote on Mr. McClendon's compensation.  The vote is purely advisory and non-binding on Chesapeake.  15 U.S.C. § 78n-1(c).  Accordingly, Plaintiffs cannot show that the solicitation of proxies is an "essential link" to the approval of Mr. McClendon's compensation.  *See, e.g.*, *Bristol-Myers*, 431 F. Supp. at 386-87 (dismissing Section 14(a) claim where proposal that was subject to shareholder approval was advisory only).

## III.   The Balance of Hardships Weighs Heavily Against an Injunction.

Chesapeake has an obvious interest in going forward with its annual meeting. Corporations and their shareholders "are entitled to expect that their governing processes

will proceed without judicial interference except in clear cases of abuse.  The public interest is best served by allowing the [meeting] to go forward."  *Unicorp Fin. Corp. v. First Union*, 515 F. Supp. 249, 263 (S.D. Ohio 1981).

Although the failure to satisfy any of the other elements is fatal, Plaintiffs' request for an injunction must also be denied because the Motion does not come close to establishing that the balance of hardships weighs in their favor.  As explained in detail at pages 8-16 above, Plaintiffs will suffer **no** harm absent an injunction.

By contrast, enjoining the Annual Meeting would immediately cause substantial damage to the corporation and its shareholders as a whole.  *See, e.g.*, *Clairdale*, 423 F. Supp. at 264 ("injunctions against shareholders' meetings can cause undue interference with the conduct of corporate affairs"); *McConnell*, 320 F. Supp. at 1166 ("halting the meeting will unduly and without cause interfere with the proper conduct of corporate affairs to the corporation's injury"); *Dunn v. Decca Records*, 120 F. Supp. 1, 2 (S.D.N.Y. 1954) (if the annual meeting were delayed, "[c]onfusion, anxiety and uncertainty would result as well as substantial expense to the company").

At a minimum, the Company's "expense in preparing for its annual meeting would be lost" and a new shareholder meeting would have to be called, forcing the Company to incur additional expense to prepare and issue revised proxy materials.  *Rabbani v. Enzo Biochem, Inc.*, 682 F. Supp. 2d 400, 416 (S.D.N.Y. 2010).  Plaintiffs have not shown that they are entitled to impose any such financial or administrative burdens on the company. *See, e.g.*, *Sargent v. Genesco, Inc.*, 352 F. Supp. 66, 74 (M.D. Fla. 1972).

More important, enjoining the annual meeting, even for a short time, would cause uncertainty that could adversely affect market perceptions.  *See, e.g.*, *Clairdale*, 423 F. Supp. at 264-65.  The harm that would be sustained by Chesapeake, and those holding company stock, if Plaintiffs' Motion were granted far outweighs any theoretical harm to Plaintiffs if it is denied.

OHSUSA:750789669.2

## IV.     An Injunction Would Not Serve the Public Interest.

The Supreme Court has stressed that "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of an injunction." *Winter v. National Res. Defense Council, Inc.*, 555 U.S. 7, 24 (2008) (internal quotation marks omitted); *see also id.* at 26 (criticizing the district court for granting an injunction with only a "cursory" discussion of the public interest requirement).   Plaintiffs bear the burden of demonstrating that "the public's interest weighs in favor of granting an injunction." *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010) (citation omitted).   Except for pronouncing that "[a] preliminary injunction would serve the public interest by compelling Defendants to fulfill their legal duties" (Motion at 27), Plaintiffs simply ignore this requirement.

The injunction Plaintiffs seek clearly would harm Chesapeake and its shareholders -- not advance the public interest.  "The public interest is best served by allowing [the meeting] to go forward." *Unicorp*, 515 F. Supp. at 263.  "[T]here is no public purpose in requiring further disclosure when that is not mandated by law." *Casey's General Stores, Inc. v. Alimentation Couche-Tard, Inc.*, 2010 WL 3604097, at *10 (S.D. Iowa Sept. 8, 2010).  When "compliance with the disclosure requirements is at least colorable, [any] public interest in disclosure is offset by the drastic nature of injunctive relief in general." *Van Dusen, Inc. v. APL Ltd. P'Ship*, 1985 WL 56596, at *7 (D. Minn. Sept. 20, 1985). *See also D & N Fin. Corp. v. RCM Partners Ltd. P'ship*, 735 F. Supp. 1242, 1253 (D. Del. 1990) (enjoining the annual meeting would harm the public interest where plaintiff had no reasonable probability of success).

Chesapeake's disclosures go well beyond legal requirements.  There is no "public interest nor a need for [additional] information" when "both the market and the SEC have already been apprised of the material facts associated with" Mr. McClendon's FWPP financing arrangements. *Plessey Co. plc v. Gen. Elec. Co. plc*, 628 F. Supp. 477, 501 (D.

Del. 1986).

## V.   Plaintiffs' Unwillingness to Post a Bond Provides Another Reason to Deny The Motion.

A court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c). Although a bond is not required if the grant of an injunction carries no risk of monetary loss to the defendant, the Motion's proclamation (at 4) that "there is no reasonable possibility that Defendants will suffer any monetary damages as a result of postponing the annual shareholder meeting" is dead wrong.

Chesapeake -- and others -- would unquestionably suffer monetary damages as a result of postponing the meeting.  Aside from the costs associated with preparing for a new meeting, enjoining the annual meeting would create market uncertainty that would damage the company's shareholders.  Plaintiffs' position regarding the need for a bond thus provides still another reason to deny the Motion.[7]

## CONCLUSION

Plaintiffs' Motion fails to satisfy any of the prerequisites to obtaining extraordinary relief via an injunction, and should be denied.

---

[7]   *See, e.g., Mercier v. Inter-Tel (Del.), Inc.*, 929 A.2d 786, 821 n.90 (Del. Ch. 2007) ("[I]t is certainly relevant to a judge deciding whether to issue an injunction that the plaintiff offers no protection to other investors if the powerful remedy he seeks was wrongly granted and caused them harm."); *LC Capital Master Funds v. James*, 990 A.2d 435, 439 (Del. Ch. 2010) (denying injunction where plaintiffs were "unwilling to post a full injunction bond"); *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 209 (Del. Ch. 2007) ("It would be hubristic for [the court] to take that kind of risk for the [] stockholders, [when] the plaintiffs have not volunteered to back up their demand with a full bond.").

OHSUSA:750789669.2

Dated:  May 23, 2012                  ORRICK, HERRINGTON & SUTCLIFFE LLP


       */s/ Robert P. Varian*

Robert P. Varian
Admitted *Pro Hac Vice*
California Bar #107459
ORRICK, HERRINGTON &
SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: (415) 773-5700
Facsimile: (415) 773-5759
rvarian@orrick.com

-AND-

James R. Webb, OBA #16548
Spencer F. Smith, OBA #20430
McAfee & Taft A Professional Corporation
Tenth Floor, Two Leadership Square
211 N. Robinson
Oklahoma City, OK  73102
Telephone:   (405) 235-9621
Facsimile:    (405) 235-0439
jim.webb@mcafeetaft.com
spencer.smith@mcafeetaft.com

*Attorneys for Defendants, Aubrey K. McClendon, Richard K. Davidson, Kathleen M. Eisbrenner, V. Burns Hargis, Frank Keating, Charles T. Maxwell, Merrill A. Miller, Jr., Don L. Nickles, Lou Simpson, and Nominal Defendant, Chesapeake Energy Corporation*

26

## CERTIFICATE OF SERVICE

I, Robert P. Varian, hereby certify that on the 23rd day of May, 2012, I electronically transmitted the attached to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Kenyatta R. Bethea
kbethea@hbolaw.com, cgreen@hbolaw.com, tpacione@hbolaw.com

The following non-ECF registered attorneys were served by U.S. Mail:

John Halebian
Lovell Stuart Halebian LLP
317 Madison Avenue
21st Floor
New York, NY 10022

Roy L. Jacobs
Roy Jacobs & Associates
60 East 42nd Street, 46th Floor
New York, NY 10165

_____*/s/ Robert P. Varian*_____

OHSUSA:750789669.2