**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| | ) |
| **IN RE CHESAPEAKE ENERGY** | ) **Lead Case No. CIV-12-436-M** |
| **CORPORATION 2012** | ) |
| **SHAREHOLDER** | ) **Relating to:** |
| **DERIVATIVE LITIGATION** | ) **All Derivative Actions** |
| | ) |

**VERIFIED AMENDED CONSOLIDATED
<u>SHAREHOLDER DERIVATIVE COMPLAINT</u>**

# TABLE OF CONTENTS

I.   INTRODUCTION ....................................................................................... 4

II.  JURISDICTION AND VENUE .............................................................. 19

   A.  Plaintiffs ........................................................................................... 20

   B.  Nominal Defendant .......................................................................... 20

   C.  Individual Director Defendants ....................................................... 21

III.   FACTUAL ALLEGATIONS .................................................................. 23

   A.  BACKGROUND TO THE RELEVANT PERIOD: ............................... 23
CORPORATE  GOVERANACE REFORM

   B.  BAKCKGROUND TO THE RELEVANT PERIOD: ........................... 30
"LAND GRAB" STRATEGY EFFECT ON COMPANY

   C.  MCCLENDON'S $1.2 BILLION OF RELATED – PARTY FINANCE DEALS
UNCOVERED .......................................................................................... 33

   D.  S&P DOWNGRADE BASED ON CORPORATE GOVERNANCE WEAKNESS,
FEDERAL INVESTIGATIONS & OTHER HARM TO SHAREHOLDERS ............. 43

   E.   BOARD AND COMMITTEE & OVERSIGHT OVER THE FWPP ................... 46

   F.   MCCLENDON'S LOANS FROM COMPANY PARTNERS WERE
MATERIAL, THEY SHOULD HAVE BEEN REVIEWED BY THE AUDIT
COMMITTEE, AND THE LOANS THEMSELVES VIOLATED THE TERMS OF
THE FWPP ............................................................................................. 69

   G.  MCCLENDON RAN A "MASSIVE COMMODITIES HEDGE FUND" OUT OF
THE OFFICE OF THE CEO, WHILE MANAGING THE COMPANY'S $17
BILLION HEDGE FACILITY ....................................................................... 72

   H.  BOARD KNEW OF HERITAGE IN 2009: RATIFIED AND NEVER
DISCLOSED ............................................................................................ 79

   I.   A HUGE CONFLICT OF INTEREST ................................................. 84

   J.   MCCLENDON'S RUNNING HERITAGE OUT OF CHESAPEAKE'S OFFICES
CREATED CONFLICTS THAT MANDATED DISCLOSURE. ............................. 97

K.  MCCLENDON ENGINEERS A "TERMINATION" WITHOUT CAUSE ........ 102

L.  TERMINATION FOR CAUSE OR RETIREMENT ........................................... 109

M.    RESULTS OF AN INTERESTED, CONFLICTED AND NON-
"INDEPENDENT INVESTIGATION" FINDS NOTHING ...................................... 118

N.  LACK OF DISINTEREST AND INDEPENENCE AND CONFLICTS OF
INTEREST MAR INVESTIGATION PROCESS ........................................ 124

O.  HARM TO SHAREHOLDERS & THE COMPANY .......................................... 128

IV.  GENERAL FIDUCIARY DUTIES OF THE DEFENDANTS ........................... 131

V.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION .. 134

VI.  DERIVATIVE ALLEGATIONS ......................................................................... 135

VII.  DEMAND FUTILITY ....................................................................................... 136

VIII.  COUNT ONE:  BREACH OF FIDUCIARY DUTY ............................................ 151

IX.  COUNT TWO:  WASTE OF CORPORATE ASSETS ....................................... 153

X.    COUNT THREE:  RESCISSION OF THE FWPP CONTRACT ........................ 155

XI.    PRAYER FOR RELIEF .................................................................................... 155

XII.  JURY TRIAL DEMANDED .............................................................................. 156

Plaintiffs Jacob Shochat and Norman Spiegel, by their undersigned attorneys, submits this Verified Amended Consolidated Shareholder Derivative Complaint in the name of and on behalf of nominal defendant Chesapeake Energy Corporation ("Chesapeake", the "Company" or the "Corporation") against certain directors and officers of Chesapeake named herein.   Plaintiffs bases their allegations on personal knowledge as to their own acts, and on information and belief as to all other allegations, based on investigation by counsel, including: (a) review and analysis of public filings made by Chesapeake and other persons with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications caused to be disseminated by certain of the Defendants and other persons; (c) review of news articles, shareholder communications, and postings on Chesapeake's websites concerning the Company's public statements; and (d) review of other publicly available information concerning Chesapeake and other persons.

## I.    INTRODUCTION

1.     On April 18, 2012, *Reuters* published an in-depth "Special Report" titled "Chesapeake CEO took $1.1 billion in shrouded personal loans."  This report revealed for the first time that Aubrey McClendon ("McClendon")—who served as Chairman of the Board and Chief Executive Officer of Chesapeake, a domestic natural gas producer that regularly engaged in the exploration and production of natural gas and oil reserve, during the relevant period—had borrowed between $1.1 - $1.3 billion in the prior three years from several of Chesapeake's, "major investor" partners.

2.      The *Reuters* report shocked the market because it revealed the conflicted manner in which McClendon had financed his participation in a unique and unusual corporate incentive called the Founders Well Participation Program ("FWPP") that allowed McClendon to invest up to 2.5% in every well drilled by the Company in any given year in return for up to 2.5% of the revenue generated from each new well.  As *Reuters* discovered, McClendon financed his participation through massive non-recourse personal loans secured by his share of future revenues from drilling operations, which were obtained from a group of Company partners including EIG Global Energy Partners ("EIG"), a private equity firm that had entered into $2.5 billion of very favorable off-balance-sheet loan deals with Chesapeake, and BOK Financial ("BOK"), a financial institution that counts as a board member Defendant Hargis, Chairman of the Audit Committee of the Board of Chesapeake during the relevant period.

3.      The materiality of this report was measured in connection with the impact it had on the price of Chesapeake's shares, which immediately fell from a prior day's close of $19.12 to an intra-day low of $17.17—eviscerating as much as $1.269 billion of the Company's market capitalization.

4.      The reason the market reacted so severely to the *Reuters* report was primarily because, in taking money from Company partners, McClendon had violated a host of Chesapeake's rules and regulations, created hidden conflicts of interest, and breached his fiduciary duties of loyalty, trust and fidelity owed to the Company and its shareholders.  The non-recourse nature of McClendon's FWPP loans evidenced that these loans were: (i) not the result of arms-length negotiations; (ii) not provided on terms

available to other, independent third-parties as required by the terms of the FWPP; and (iii) were nothing more than the misappropriation of corporate opportunity.

5. In addition to the foregoing, these loans breached McClendon's duties to shareholders because they not only placed McClendon in competition with the Company for financing, but they also violated the Company's Compensation Philosophy which justified the FWPP because it purported to place McClendon's interests in line with the interests of the Company and its shareholders. As investors ultimately learned, because the only collateral for McClendon's loans was future revenues from drilling operations and because there were no personal guarantees securing the loans, McClendon's interests were never aligned with shareholders and his use of these loans consistently violated the purpose and intent of the FWPP.

6. The fact that McClendon had used non-recourse loans to mitigate his risks necessarily meant that his interests were no longer aligned with the Company or its shareholders. If the bet on the wells paid off, McClendon would make tens or hundreds of millions of dollars in profits, but if the wells lost money McClendon could simply default on the loan with no threat of personal recourse. Indeed, the fact that McClendon was financing his loans with non-recourse debt only encouraged him to force Chesapeake to leverage itself as far as it could and to take on as much risk as it possibly could.

7. In fact, McClendon caused Chesapeake to embark on a near-reckless and almost unchecked expansion. The result was a huge, over $20 billion funding gap, massive debt obligations, and enormous capital expense costs that far exceeded Chesapeake's ability to raise funds and sell assets. Accordingly, it is not surprising that

Chesapeake was described as being in a state of "financial crisis" by the time McClendon abandoned the Company.

8.     Shareholders were also shocked by learning of the existence of McClendon's loans from Company partners because these loans were never disclosed as Related Party Transactions as was required, and McClendon had never reported them on his annual self-report to the Audit Committee on his Related Party Transaction Review Form.  McClendon's loans also violated the terms of the Company's Code of Conduct, which specifically prohibited Chesapeake employees from taking loans from Company vendors and from abusing a position of trust to extract something of value from Company partners.

9.     In its report, *Reuters* described the existence of McClendon's loans as having created a "Corporate Governance Crisis" and stated that analysts immediately recognized the conflicts of interest and breaches of duty that these loans had created.  In analyzing the specific clauses of the loan agreement, *Reuters* also discovered that a clause in the deals required McClendon "to take all commercially reasonable action" to ensure that other owners and operators of the wells—including Chesapeake—"comply with…covenants and agreements" of the loans.  This clause immediately required McClendon to place the interest of his lenders ahead of the interests of the Company and its shareholders.

10.     Two weeks later, on May 2, 2012, *Reuters* published a follow-up report on Chesapeake that uncovered even more significant breaches of duty and conflicts of interest that had gone undisclosed and unchecked at the highest levels of the Company

for many years.  The *Reuters* story titled, *"CEO Aubrey McClendon ran a $200 million fund that invested in commodities produced by Chesapeake,"* reported that from 2004 to 2008 McClendon had actively managed a hedge fund out of the Company's offices at the same time he was solely responsible for managing Chesapeake's $17 billion hedge facility.  Not only was McClendon's fund open to outside investors, but it also traded in the same commodities that Chesapeake produced and traded in its hedge account.

11.     After analyzing the *Reuters* report, *Forbes* next reported that McClendon's secret trading raised a host of complex conflicts of interest, including: (i) whether McClendon profited off of non-public information about Chesapeake's trades; (ii) whether McClendon was front-running Company trades; and (iii) whether the hedge fund paid rent to Chesapeake for being allowed to operate from a Chesapeake building.  The *Forbes* report also highlighted the fact that, since McClendon and Chesapeake were trading the same commodities, that they could have been counter-parties to the exact same trades.  *Forbes* termed this as a "colossal conflict of interest."

12.     On May 8, 2012, *Reuters* also reported that the Chesapeake Board had apparently known that McClendon was operating his hedge fund unchecked and out of the Company's offices, and that the Board had given its "blessing."  As *Reuters* reported, rather than disclose or foreclose McClendon's fund, the Board acquiesced in a series of contract amendments that made it easier and easier for McClendon to operate his fund within Chesapeake.  That at least was the conclusion drawn by John Coffee, famed contract law professor at Columbia University.

13.     Following the reports of McClendon's secret hedge fund and his billion dollar loans from Company partners, the market reacted very negatively, and harsh criticism of the Company's corporate governance came from the ratings agencies as well as from Chesapeake's institutional investors.   S&P immediately downgraded the Company's credit rating to "BB" from "BB+" and placed its debt on "CreditWatch Negative, with negative implications."   S&P stated that it downgraded the Company because the Board demonstrated, "no effective mechanisms to protect against conflicts of interest," and because of "a significant governance deficiency."   S&P highlighted the Company's massive funding requirements and noted that McClendon was effectively competing with the Company for capital.

14.     Several institutional shareholders who owned large amounts of Chesapeake stock also wrote letters to the Board of Directors of the Company, admonishing them for their breaches of duties and conflicts of interest and recommending the immediate termination of McClendon.   Activist investors Carl Icahn, Southeastern Asset Management, Noster Capital and two Comptrollers from New York all sent letters to the Board.   Carl Icahn wrote that the Board's "irresponsible actions have brought this Company to the edge of the proverbial cliff," and that the Board had been "quick to insulate themselves from accountability to shareholders."   New York City Comptroller John Liu wrote that he had "longstanding concerns with the Board of directors' independence, oversight and accountability."   He also pointed out that defendants Hargis and Davidson, as members of the Audit Committee, should be held "accountable for their costly oversight failures."

15.     While operating his secret hedge fund and while extracting over a billion dollars from Company partners, McClendon clearly breached his fiduciary duties to the Company and its shareholders created conflicts of interest and violated of the Company's Code of Conduct.  In allowing McClendon to operate his secret $200 million hedge fund out of Chesapeake's office and in failing to discover that he had borrowed over a billion dollars to participate in the FWPP, the members of the Board during the relevant period also breached their duties to shareholders.  In addition, each Board member had duties to oversee McClendon's participation in the FWPP pursuant to their duty to enforce Chesapeake's Code of Conduct.

16.     As members of the Audit Committee, defendants Hargis (chair), Davidson and Miller, and as members of the Compensation Committee, defendants Keating (chair), Eisbrenner and Maxwell, each were charged with specific oversight duties over McClendon's' participation in the FWPP.  In addition, the members of the Audit Committee were each also charged with review of Related Party Transactions, including the review of each executives self-reporting requirement pursuant to review of their annual global Conflict of Interest Disclosure Form(s).  Members of the Compensation Committee were also charged with enforcing the Company's Compensation Philosophy.

17.     It was not possible that each Board member, fulfilling his/her specific oversight duties charged by the Committee Charters or Code of Conduct would not have learned about McClendon's loans from Company partners—their duties could not have been fulfilled absent such inquiry. Conversely, it was only because they breached those

duties that the Board claims that it did not know or was justified in not disclosing McClendon's consistent breaches of duty.

18.     First, it is impossible that the Board did not know that by 2010 McClendon lacked the financial assets or creditworthiness to finance his exploding FWPP obligations.  Because McClendon had to elect to participate in the FWPP on an all-or-nothing bases, as he directed the Company to embark on a massive "land-grab" and drilling frenzy after 2008, his FWPP participation costs grew to $457 by 2011.  By 2009, however, the Board knew or was reckless or grossly negligent in not knowing that McClendon did not have the assets or creditworthiness to support such large loans.  In fact, the Board was well aware of McClendon's strained financial condition after the end of 2008, because in 2009 the Board awarded him a massive bonus that included a one-time $75 million "Well Cost Incentive Award," the purpose of which was to bail him out so that he could make his payments under the FWPP through the end of 2009.

19.     While McClendon had started off the year 2008 owning approximately 5% of Chesapeake's stock then-valued at around $2.5 billion, by year end McClendon was forced to sell over 90% of his holdings after leveraging his Chesapeake holdings in a losing bet on the Company's stock price.  In fact, McClendon had liquidated so much of his stock in such a short period of time that during the week of this liquidation Chesapeake shares fell by nearly 40%.  Following his spectacular stock losses in 2008, reports also indicated that McClendon lost hundreds of millions of dollars more in 2009 related to a $2.3 billion bet on natural gas prices.

20.     Throughout the relevant period, the Board was on notice that McClendon had no capacity to finance his participation in the FWPP and had no assets to leverage to fulfill his multi-hundred million dollar commitments.  It was a complete abdication of the specific duties imposed by the Committee Charters and Code of Conduct for the Board not to have inquired where McClendon's financing was coming from after the 2008/09 incentive well participation bail-out payment, and in the face of explosive increases in the size of his obligations.  Any rational investor looking out for his/her own financial interests would have demanded to know McClendon's creditworthiness after 2009, and how he was financing his enormous obligations under the Company's FWPP program.  Also, McClendon had a reporting duty under the yearly related party review requirements of the conflict of interest Disclosure Form and the Audit Committee had a duty to review that Form.  That review too would have presented another opportunity for the Board to request information from McClendon that would have revealed the existence of his FWPP loans.

21.     Analysts at UBS were blunt in stating that, to them, it was patently obvious that the Chesapeake Board had breached its duties to shareholders and the Company by failing to investigate the myriad of red flags that were apparent throughout the relevant period and documented herein.  Specifically, a UBS analysts stated, "prior to the FWPP issues coming to light, the Board had not conducted adequate due diligence."

22.     It was also a breach of duty by the Board to have never disclosed that McClendon was running a hedge fund out of his offices, to never update the Company's purported Risk Disclosures, and to simply change his employment agreements to give

him more latitude to operate secretly, year after year. Because it was a conflict for McClendon to operate this fund when he was managing the Company's $17 billion hedge account, it was a breach of duty for the Board to have learned of this conflict and not caused it to be disclosed. Clearly, the market has proven that the existence of his fund was material and it was information that a rational investor would have wanted to know in making an investment decision and in analyzing the controls and procedures and oversight mechanisms of the Company.

23.     In fact, McClendon's hedge fund activities and source of funding his participation in the FWPP were so significant, that as these events unfolded McClendon was forced to resign from the Company first as Chairman and then as CEO. In fact, only 2 weeks after the first *Reuters* report, on May 1, 2012, McClendon announced he would step down as Chairman of the Board of the Company. The second *Reuters* report, published a day later on May 2, 2012, caused McClendon to orchestrate his full departure, beginning only a month later.

24.     By June of 2012, it appears that McClendon had begun "engineering" his departure from Chesapeake in a manner that classified his departure as a "termination without cause." The termination without cause designation allowed McClendon to collect approximately $35 million in severance payments, as opposed to having to pay back $15 million in claw-back payments if he "retired" or was "terminated for cause." While it is obvious is that the Board could and should have terminated McClendon for cause, or at best let him retire from the Company, instead they conspired and/or acquiesced in allowing McClendon to barter control over the Chesapeake board to

activist investors, Carl Icahn and Southeastern Asset Management in exchange for McClendon getting $50 million in severance.  In connection with their agreement the majority of the Board, including the complete Compensation Committee, absconded with their reputations intact after also not being terminated for cause.

25.    It is obvious that McClendon's demotions and the removal of the Compensation Committee from the Company were evidence of "cause," as there was a clear causal and temporal connection between both of McClendon's demotions, the Compensation Committee fleeing from the Company and the two *Reuters* reports exposing McClendon's improper and undisclosed activities.  McClendon could have been terminated for cause for, in part, the following: (i) for running a hedge fund out of the Company's offices while managing billions of dollars of Chesapeake's hedge positions and while competing with the Company for natural gas commodities trading profits; (ii) by taking loans from Company partners on preferential terms, McClendon violated the terms of the FWPP and Code of Conduct; (iii) for repeatedly failing to disclose material information to the Board;  (iv) the failure to disclose to the Audit Committee the terms of his FWPP loans, and to have these loans vetted for Related Party Transaction review; and (v) failing to disclose on the year end Related Party Transaction Disclosure Form, the existence of over a billion dollars in loans from entities that were entangled in business relationships with Chesapeake.

26.    Thus, while grounds clearly existed that would have allowed for the termination of McClendon for cause, and while he was in fact removed for cause, his termination was allowed to be classified as "a termination without cause" by the Board.

Less rational still, while all public announcements by the Company referred to McClendon's departure as a "retirement," the Board allowed his departure to be classified as a termination without cause, rather than a retirement or termination with cause, costing the Company approximately $50 million—including the waiver of about $15 million in payments otherwise due under the 2009 employment agreement claw-back provision tied to the $75 million special well participation bonus payment.

27.     Moreover, absent McClendon's ability to borrow money on a non-recourse basis from Company partners, McClendon had no ability to continue to participate in the FWPP, which is why it was cancelled as soon as these funding sources were exposed. Add to this the changes in compensation that tied bonuses to performance and the lower salaries and elimination of perks, and McClendon had no option but to leave the Company—either as a retiree or possibly a terminated former CEO.   Sources familiar with Chesapeake stated that matters related to McClendon's compensation were the reason that he ultimately "retired" from the Company.

28.     Not only did the Board waste $50 million by conspiring with McClendon so that he could exit with his unearned severance, but the Board also allowed McClendon to misappropriate over a billion dollars of Company assets.   As the Board was well aware, by 2009 McClendon lacked the financial wherewithal to finance the hundreds of millions of dollars in debt that he could not personally secure.   Thus, McClendon simply misappropriated corporate opportunity and secured over $1 billion in non-recourse loans on preferential terms not available to independent investors.   In the process, however, McClendon: (i) violated the Company's Code of Conduct; (ii) violated the related party

review provisions of the Audit Committee Charter; (iii) violated Chesapeake's stated Compensation Philosophy; (iv) violated the terms of the terms of the FWPP (by securing preferential financing from Company partners); and (v) misappropriated corporate opportunity by securing loans for his personal use, by using the creditworthiness of Chesapeake.

29.    Thus, because McClendon misappropriated the loans from Company partners in violation of the terms of the FWPP and Chesapeake's Code of Conduct, and then used the proceeds to pay for his FWPP obligations, McClendon had effectively misappropriated corporate opportunities to acquire such wells.  Accordingly, McClendon should not be allowed to retain these assets.  Equity demands that McClendon cannot retain the proceeds of loans which constituted the misappropriation of corporate opportunities, or the wells that the loans were used to pay for.  McClendon must return to Chesapeake the wells he acquired in the FWPP after 2009.

30.    In addition to over a billion dollars in waste, in addition to the $50 million in wasted severance payments, McClendon and the Board's breaches of duty and conflicts of interest have caused significant harm to the Company.  The S&P downgrade and the loss of billions of dollars in market capitalization have negatively impacted the Company's ability to raise funds at a time when the Company needed to finance tens of billions of dollars in operating shortfalls.  Investigations announced by the SEC, Internal Revenue Service, Department of Justice and several State Attorney Generals have served as an additional cost for the Company and needlessly distracted senior executives who were forced to respond to information requests, depositions and subpoenas.

31.     Demand upon the Chesapeake Board at the time this action was originally filed to institute this action in the Company's name would have been entirely futile, and is therefore excused.   At the time this action was filed, the Chesapeake Board was comprised of nine individuals, Defendants McClendon, Davidson, Eisbrenner, Hargis, Keating, Maxwell, Miller, Nickles and Simpson.   Each of the Defendants abdicated their responsibilities to Chesapeake and its shareholders and there is significant doubt that these Defendants are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duties.   As such, the Defendants are neither disinterested nor independent, and are not capable of responding adequately to a demand.   Demand is also futile and useless act because the wrongful acts complained of herein show an abdication by Defendants of their fiduciary duties of due care and oversight;   demand is therefore excused.

32.     Demand on the Chesapeake Board would also be futile because, as Carl Icahn stated in his letter, the Board had been "quick to insulate themselves from accountability to shareholders and has expressed no interest in demanding accountability from management."   As evidence of this, the Board created an entirely conflicted and flawed investigation that was designed only to assure that no liability would be assigned. First, the investigation was chaired by Hargis as Chair of the Audit Committee.   This is the same director who was also a director of one of the finance companies exposed for giving loans to McClendon.   Second, Hargis, Davidson and Miller were all members of the Audit Committee which failed at every turn to investigate McClendon's source of financing for his participation in the FWPP.   Third, in the June 2012 shareholder vote

Hargis received only 26% of the vote and was required by the Company's new charter provision to resign immediately. At that point, there was no unbiased, uninterested or non-conflicted reason to not accept Hargis's resignation.

33.    It was also entirely inappropriate for the conflicted Audit Committee to select the Independent Counsel under the circumstances presented, because Independent Counsel was required to be free of any conflicts of interest. Instead, the conflicted members of the Audit Committee selected a counsel that was not financially independent, but rather one that had financial entanglements with Miller that do not appear to have been disclosed or waived.

34.    Having employed counsel that lacked true independence the Board next limited the scope of the investigation so as to virtually guarantee that no liability would be apportioned. The Board limited the scope of the investigation to McClendon's actions alone, instantly absolving themselves of all liability. Then the Board narrowed the scope to review <u>only</u> McClendon's "intentional conduct," thereby absolving him of all liability for reckless and grossly negligent conduct. A reasonable investor looking after his or her own financial interests would never have narrowed the scope of the investigation in a manner that would eliminate liability for all the possible bad actors before the investigation even began.

35.    After having delayed the investigation over a year, by the time the results were announced only Simpson and Miller remained on the Board; McClendon and Davidson and the entire Compensation Committee had already left Chesapeake. When the results were finally announced, no liability was found for any of McClendon's

intentional conduct.  The results simply reflected the statements made a year earlier by the Board which indicated then that they had already decided McClendon had done nothing wrong.  The Board's April 18, 2012 Statement read, in part, as follows:

**Statement by Board:**

> ***The FWPP clearly aligns Mr. McClendon's interest with the Company's***, while the business processes and the foregoing guard against any conflicts of interest arising.  Your other underlying theme in the conflict of interest category is that somehow the loans increase some risk that you perceive of possible conflicts of interest.  The mechanisms discussed above avoid any conflicts of interest in the FWPP, and ***we do not believe Mr. McClendon's financing arrangements have created or increased any risk to the Company over the life of the FWPP*** … ***we believe there are no conflicts of interest arising from the "mere existence of the loans."***

36.   The misconduct of each member of the Board alleged herein was not, and could not have been, the product of a valid or good faith exercise of business judgment. As detailed herein, each of the Board members were directly involved in the misconduct challenged in this action, by virtue of their respective positions on the Board and the Committees thereof.  The members of the Board abdicated their responsibility to oversee the Company's operations and instead directed and encouraged McClendon, in the service of his own personal gain, to engage in illegal and/or improper conduct that rendered the Company's disclosures to shareholders and regulatory agencies deceptively misleading.  The Board's acts and omissions lacked any legitimate business purpose and were not a product of a valid exercise of business judgment.  As such, demand is excused as futile.

## II.   JURISDICTION AND VENUE

37.   This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332.  All Defendants are completely diverse from Plaintiffs and the amount in controversy exceeds $75,000.00.

38.     This Court has personal jurisdiction over each of the Defendants because each of the Defendants is either a corporation conducting business in and maintaining operations in this District, or is an individual who is either present in this District for jurisdiction purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

39.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because (i) one or more of the Defendants either resides in or maintain executive offices here; (ii) a substantial portion of the transactions and wrongs complained of herein occurred here; and (iii) Defendants have received substantial compensation and other transfers of money here by doing business and engaging in activities having an effect here.

A.     **Plaintiffs**

40.     Plaintiff Jacob Shochat is a resident of Mahwah, New Jersey, is presently a shareholder of Chesapeake, and has been a shareholder continuously since October 21, 2011.

41.     Plaintiff Norman Spiegel is a resident of New Jersey, is presently a shareholder of Chesapeake, and has been a shareholder continuously since July 31, 2008.

B.     **Nominal Defendant**

42.     Nominal Defendant Chesapeake Energy Corporation is one of the United States' largest producers of natural gas, and also produces oil, oil derivatives, and other carbon based products.  Chesapeake is an Oklahoma corporation, which maintains its executive offices at 6100 North Western Avenue, Oklahoma City, OK 73118.

### C.   Individual Director Defendants

43.   Defendant Aubrey McClendon has served as Chairman of the Board and Chief Executive Officer ("CEO") of Chesapeake from 1989 until he resigned on April 1, 2013.  McClendon is a citizen of Oklahoma.

44.   Defendant Richard K. Davidson ("Davidson") has served a director of Chesapeake from March of 2006 until he resigned on June 8, 2012.  During the relevant time period, Davidson served on Chesapeake's Audit Committee.  Davidson is a citizen of Florida.

45.   Defendant Kathleen M. Eisbrenner ("Eisbrenner") has served as a director of Chesapeake from December 2010 until she resigned on June 8, 2012.  During the relevant time period, Eisbrenner served as a member of Chesapeake's Compensation Committee.  Eisbrenner is a citizen of Texas.

46.   Defendant V. Burns Hargis ("Hargis") has served as a director of Chesapeake from September 2008 until March 7, 2013, when the Board accepted his resignation.  During the relevant time period, Hargis served as Chairman of Chesapeake's Audit Committee.  Hargis is a citizen of Oklahoma.

47.   Defendant Frank Keating ("Keating") has served as a director of Chesapeake from June 2003 until he resigned on June 8, 2012.  Keating is a citizen of Virginia.

48.   Defendant Charles T. Maxwell ("Maxwell") has served as a director of Chesapeake from 2002 until he retired on June 8, 2012.  During the relevant time period,

Maxwell served on Chesapeake's Compensation Committee.   Maxwell is a citizen of New York.

49.     Defendant Merrill A. "Pete" Miller, Jr. ("Miller") has served as the purported "Lead Independent Director" of Chesapeake since January 2007.   During the relevant time period, Miller also served on Chesapeake's Audit Committee.   Miller is a citizen of Texas.

50.     Defendant Don L. Nickles ("Nickles") has served as a director of Chesapeake from January 2005 he resigned on June 8, 2012.   During the relevant time period, Nickles served as Chairman of Chesapeake's Nominating and Corporate Governance Committee.  Nickles is a citizen of Virginia.

51.     Defendant Louis A. Simpson ("Simpson") has served as a director of Chesapeake from June 2011 until he resigned on May 3, 2013.  Simpson is a citizen of Florida.

52.     The Director Defendants at Chesapeake were among the highest paid directors in any domestic publicly traded company—their pay far exceeded the compensation of their peers at larger companies, such as Exxon Mobile.   Shareholders were willing to pay these premiums to ensure that Chesapeake's directors would protect their interests in the face of a dominating CEO.   Unfortunately, nothing could be futher from what transpired and instead the members of the Board simply misappropriated hundreds of thousands of dollars in compensation and air travel and they did nothing to restrain McClendon.

53.     The charts below evidence the hefty compensation paid to the Director Defendants from 2011 to 2009:

Director Compensation Table for 2011 [Notes omitted]

| Name | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| Kathleen Eisbrenner | 154,583 | 232,773 | 174,449 | 561,805 |
| V. Burns Hargis | 153,500 | 257,771 | 154,194 | 565,465 |
| Frank Keating | 153,500 | 247,772 | 157,960 | 559,232 |
| Charles T. Maxwell | 153,500 | 232,773 | — | 386,273 |
| Merrill A. Miller, Jr. | 150,000 | 267,771 | 154,938 | 572,709 |
| Don Nickles | 153,500 | 247,772 | 168,069 | 569,341 |
| Louis A. Simpson | 93,173 | 525,173 | 29,392 | 647,738 |

The following table sets forth the compensation earned by our non-employee directors in 2010:

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Option Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|
| Richard K. Davidson | $ 146,500 | $ 305,125 | $ — | $ 168,813 | $620,438 |
| Kathleen M. Eisbrenner | 23,083 | 214,100 | — | 11,487 | 248,670 |
| V. Burns Hargis | 146,500 | 305,125 | — | 128,626 | 580,251 |
| Frank Keating | 143,000 | 305,125 | — | 175,318 | 623,443 |
| Charles T. Maxwell | 146,500 | 305,125 | — | 15,401 | 467,026 |
| Merrill A. ("Pete") Miller, Jr. | 139,500 | 305,125 | — | 163,324 | 607,949 |
| Don Nickles | 146,500 | 305,125 | — | 138,691 | 590,316 |

The following table sets forth the compensation earned by our non-employee directors in 2009:

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Option Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|
| Richard K. Davidson | $ 136,000 | $ 287,250 | $ — | $ 142,350 | $565,600 |
| V. Burns Hargis | 136,000 | 287,250 | — | 119,516 | 542,766 |
| Frank Keating(d) | 117,500 | 287,250 | — | 125,988 | 530,738 |
| Breene M. Kerr(e) | 71,500 | — | — | 640,834 | 712,334 |
| Charles T. Maxwell | 129,000 | 287,250 | — | 1,232 | 417,482 |
| Merrill A. Miller, Jr. | 129,000 | 287,250 | — | 107,522 | 523,772 |
| Don Nickles | 136,000 | 287,250 | — | 131,437 | 554,687 |

# III.   FACTUAL ALLEGATIONS

## A.   BACKGROUND TO THE RELEVANT PERIOD: CORPORATE GOVERANACE REFORM

54.   **Prior Derivative Action.**   Just prior to the discovery of the corporate governance firestorm that ignited this litigation, on January 31, 2012, a significant $3

million cash and corporate governance settlement in an action brought against the Board and McClendon in 2009 was approved by Oklahoma District Court Judge, Daniel L. Owens.[1] This lawsuit, filed by several large institutional investors and state pension funds objected to McClendon's $75 million bonus and $112 million in aggregate compensation payments in 2008, at a time when the Company's stock price plummeted along with natural gas prices.

55. In 2008, despite a decline of over 60% in the price of Chesapeake's stock McClendon received total compensation of well over $100 million, including a $75 million one-time special "well cost incentive compensation award" that, after reduction by state and federal withholding taxes, was structured as a net credit against future billings from the Company for well costs owed by McClendon under the FWPP, with a five-year clawback. At the same time, McClendon entered into an agreement with the Company provided for a five year employment commitment, an extension of the non-competition period with respect to certain terminations by the Company, and a reduced stock holding requirement for 2009.

56. Additionally, the Board caused Chesapeake to pay McClendon $12.1 million to purchase his personal art collection of vintage maps. These maps had theretofore been hanging in Chesapeake's corporate offices.

57. A *Fortune* article titled, "*The Two Sides of Aubrey McClendon, America's Most Reckless Billionaire,*" published on October 5, 2011, explained how McClendon's paper loss of approximately $2 billion from betting on Chesapeake stock led to the 2009 bail-out of McClendon by the Chesapeake Board, in part, as follows:

> McClendon's land machine was humming along in July 2008, when oil peaked at $147 a barrel and natural gas at $14 per thousand cubic feet. That summer he did a joint venture with Plains Exploration, valuing some of his

---

[1] In 2008, the Board of the Company consisted of defendants McClendon, Nickles, Davidson, Maxwell, Keating and Miller, in addition to non-defendants and former Board members, Breene M. Kerr (a cousin of McClendon) and Frederick Whittemore.

property in Louisiana's Haynesville Shale at $30,000 an acre—a level unseen before or since. Its stock flying—it would soon hit $70—Chesapeake raised $2 billion in an equity offering.

Ever confident, **McClendon doubled down**: His personal balance sheet resembled Chesapeake's as **he borrowed against his existing holdings to buy another 750,000 shares** in that offering. Lousy timing: By October, as the economy imploded, with energy prices falling in lockstep, Chesapeake's stock price halved, and **McClendon was hit with margin calls. As 30 million of his shares (more than 90% of his holdings) were liquidated, Chesapeake's share price halved yet again, down to $12**…

58.    McClendon's massive stock liquidation in 2008 also contributed to a huge decline in Chesapeake's share price from its all-time high of $74 that year. Chesapeake has since restricted "leveraged" trading in the Company's shares by its executives, in substantial part because Chesapeake's stock fell nearly 40 percent the week McClendon flooded the market with Company stock.[2]   At that time, McClendon issued a public apology to investors but the Company's credibility with many shareholders suffered significantly.

59.    In the derivative action that ensued, following the Board's bail out of McClendon, plaintiffs alleged that the Chesapeake board breached fiduciary duties owed to the Company in connection with their approval of the compensation paid to McClendon in 2008.   On appeal the parties reached a settlement involving material corporate governance reforms plus $3.75 million paid to the plaintiffs' counsel by the Company for fees and expenses.   The principal terms of the Settlement included the following:

   *    **Rescission of the sale of an antique map collection** that occurred in December 2008 between McClendon and the Company, whereby **McClendon paid the Company $12.1 million plus interest** and the Company re-conveyed the map collection to McClendon.

---

[2] At December 31, 2007 McClendon owned and/or controlled over 29.529 million shares or 5.5% of the Company stock issued and outstanding.  A year later, at December 31, 2008, McClendon owned or controlled approximately 502,000 Chesapeake shares, or less than 1% of the Company.

* Adoption and/or implementation of a variety of **corporate governance measures**, including but not limited to measures relating to: (i) retention of an independent compensation consultant; (ii) the provision of recommendations and information to the compensation consultant by Plaintiffs' Counsel; (iii) expansion of duties of the Company's lead independent director; (iv) enhanced communication with shareholders and the maintenance of a vice president position at Chesapeake in accordance therewith; and (v) senior management stock ownership guidelines.

60.     Thus, despite no admission of wrongdoing, this settlement of $3.75 million and material corporate governance reforms served to put the Chesapeake Board on notice that the Company's corporate governance was weak and in need of change and oversight. The 2008 bail-out which included the well cost incentive award, also made the Board aware of McClendon's impaired financial condition and his inability to finance his participation in the FWPP.

61.     **Board Notice of McClendon's Impaired Financial Condition.** McClendon's reckless bet on his highly leveraged Chesapeake stock was not the only massive loss he suffered in late 2008 and early 2009.  It has been reported that, by June 30, 2008, as natural gas and oil prices were peaking and just before the financial crisis, McClendon held a huge "long" position in natural-gas derivatives valued at over $2.3 billion, and held approximately $250 million of oil contracts.[3]  Oil fell by more than 75% between July and December and natural gas futures dropped almost 60%.

62.     Adding even more financial pressure on McClendon was the fact that, at the same time that his personal fortunes were being traded away based on outsized bets on Company shares and natural gas and commodities futures contracts, the costs involved with McClendon's commitment to the FWPP were skyrocketing. When McClendon began participation in the FWPP in 1993 the Company drilled only a couple of dozen

---

[3] The trading information was assembled as part of a CFTC inquiry into derivatives markets and their impact on real-world energy prices. McClendon and Ward were among only a handful of individual investors identified by the CFTC.  Of 300 banks, hedge funds, energy companies and other traders identified in the CFTC survey, only four held larger bullish bets in natural gas.

wells a year.  In 2011, however, McClendon directed Chesapeake to drill 1,700 wells and his participation costs amounted to $457.2 million.

63.     The combination of McClendon losing 90% of his Chesapeake stock previously valued at approximately $2.5 billion, his loss on his $2.3 billion long natural gas bet and rapidly increasing FWPP costs in the hundreds of millions of dollars, made it virtually impossible for McClendon to participate on an all-or-nothing basis in the FWPP after 2009.  Moreover, having bailed out McClendon at the end of 2008 just so he could pay his 2008 and 2009 FWPP obligations, and knowing of the huge increases in drilling costs Chesapeake was experiencing, the Board was well aware that McClendon did not have the available funds or financial wherewithal to pay for his participation in the FWPP after 2009.

64.     **McClendon Fully Leveraged.**  As the Board was well aware, at the same time that McClendon's cost of participating in the FWPP was skyrocketing (as a result of his directing the Company to participate in its land grab strategy), McClendon was leveraged to the point that he had almost no personal liquidity.  Indeed, in June 2012, the *Wall Street Journal* reported, in part, the following:

**Special Report: The lavish and leveraged life of Aubrey McClendon**

* * *

**Although McClendon's net worth is pegged by Forbes at $1.1 billion, he has mortgaged much of what he owns**: the restaurants, the wine, the boats, the homes, proceeds from three accounts at Goldman Sachs, his stake in private companies and his stake in thousands of Chesapeake wells. **The well financing from one backer alone, EIG Global Energy Partners, totals $1.3 billion, according to a person familiar with the deals.**

McClendon has *even mortgaged part of his stake in his beloved Thunder*.

He holds 19 percent of a team valued at $350 million. But twice, McClendon has pledged his share of future proceeds from the Thunder as collateral for loans, from Bank of America in 2009 and Wells Fargo in

2010, according to records reviewed by Reuters. Neither loan has been previously disclosed.

65.     According to the Company's 2013 Proxy, in 2011 Chesapeake was also caused to enter into a 12-year sponsorship agreement for the Thunder basketball team which McClendon and his investors group owned, committing an average annual fee of $3.0 million for advertising, the use of an arena suite and other benefits not available to shareholders of the Company.  In addition to the $3.0 million per year, McClendon and the Board also agreed to a 3% escalation fee, which amounted to a 36% increase by year 12.  The Thunder payments again evidence the Company's weak controls and have been widely criticized by many corporate governance observers.

66.     While the Board has justified the payments as advancing the goodwill of the Company and its support for and involvement with the local community, it is not evident that Chesapeake's corporate image was the primary purpose for the Company's large marketing expense.  In fact, Chesapeake's sponsorship payments and large ticket purchase commitments were critical in enabling McClendon to bring his team from Seattle to Oklahoma.  As stated in a 2007 ESPN report, dated August 23, at the time McClendon and his partners brought the Thunder to Oklahoma, they did not have a developed business plan and would have been "thrilled," if the team would simply "break even."  It is evident that Chesapeake's sponsorship of the Thunder goes a long way towards helping McClendon achieve *his* objective.

67.     **Noster Letter to the Board.**  The 2011 corporate governance settlement related to McClendon's 2008 compensation and the corporate governance deficiencies that existed at the Company at that time were significant "red flags" for investors and for the Board of Directors.  As evidence of this, in a letter to the Board of the Company dated May 12, 2012, a leading fund manager, Pedro de Noronha of Noster Capital stated that McClendon's trading losses related to his margining Chesapeake stock and the Boards subsequent $112 million bail out were negative events that impacted his decision to

invest in the Company.   De Noronha described the "red flags" and the Chesapeake Boards historically weak record of governance, in part, as follows:

> When we first analyzed Chesapeake Energy with the idea of potentially becoming shareholders, *a* **significant red flag** *we discovered was the fact that Mr. McClendon had, in the past, invested in Chesapeake Energy shares using margin debt and that in 2008, after the stock market collapsed, was forced to liquidate more than 90% of his shares to meet margin calls*. And what was the Board's response to this remarkable misuse of personal leverage? An approximate $110 million pay package for the 2008 fiscal year that included:
>
> - $75 million to buy interests in Chesapeake Energy wells
>
> - $20 million stock grant
>
> - $12 million to buy Mr. McClendon's map collection (which he was later forced to repurchase back from the company after losing a lawsuit from Chesapeake Energy shareholders)
>
> - $648,000 for the private use of corporate private jets
>
> - $577,000 for accounting services
>
> - $131,000 for personal engineering support (we are not quite sure what this relates to)
>
> Mr. **McClendon was the 2nd highest paid CEO in America over the past 5 years, with a total compensation package of $303.6 million, a period during which CHK shares lost 23% of their value** (excluding dividends).
>
> On top of the very generous pay package for 2008, during times when most of us (even those who have made the right investment decisions, without the use of leverage) were tightening our belts, the Board went one step further and also agreed to pay $4.7 million to sponsor the NBA's Oklahoma City Thunder during its 2008/2009 season, a team that Mr. McClendon owns a 19.2% stake in. … *This is once again proof that despite the hardships of the economy, the weak market in natural gas prices and the extreme cash needs that Chesapeake Energy faces in the short-term to keep operating as a going concern,* **the Board does not seem to be acting in the best interests of its shareholders. …**

68.     As further evidence of the Company's historically weak corporate governance practices and policies, New York City Comptroller Liu was quoted in the *Wall Street Journal* stating that, "It's becoming clear that the excessive perks and problematic related-party deals that the Company discloses, which have long caused concerns among investors, are only the tip of the iceberg.  But, at this point, it's no longer shocking given the Company's pattern of behavior."

**B.     BAKCKGROUND TO THE RELEVANT PERIOD:**
**"LAND GRAB" STRATEGY EFFECT ON COMPANY**

69.     By 2012, McClendon's leveraged financial condition was not unlike that of Chesapeake.  Under McClendon's direction, Chesapeake had been caused to effectuate what the Company described as a massive "land grab," designed to dominate shale plays around the country by paying above market prices for land in an effort to squeeze out competitors.  From 2008 to the end of 2012, Chesapeake had entered into approximately 600,000 leases covering approximately 9 million acres of land, paying out $9 billion in lease bonuses to landowners and piling on $10 billion in long term debt in the process.  By the third quarter of 2012, Chesapeake's debt had increased 53% over the prior year, and reached $16.2 billion by September.  According to a Company spokesman quoted by *Forbes* in an October 5, 2011 report, "If we lived within our cash flow, we'd miss opportunity."

70.     To pay for this enormous land acquisition Chesapeake was also caused to operate at a loss.  The Company's capital spending far exceeded cash from operations in every single quarter from October 2003 through 1Q:12.  In addition to using enormous amounts of debt, the Company was also caused to engage in massive asset sales, joint venture deals and the sale of future natural gas and oil production.  Since 2008, McClendon also caused the Company to raise more than $10 billion through asset sales and $6 billion in joint venture deals with other major oil and gas companies.  Billions

more were raised through selling stock, as shares outstanding increased 12% per year compared to an industry average of 2%.  By the middle of 2011 the Company's debt to equity ratio was 40%—the highest in its peer group.

71.     Also by late 2011 and early 2012, according to Sanford C. Bernstein & Co. analyst Bob Brackett, quoted by *Forbes*, "Chesapeake's poor credit rating pushe[d] them to turn to unconventional financing."  This included selling off the future proceeds the Company expected to receive from thousands of wells—complex financing deals that allowed Chesapeake to borrow cash without counting it as debt and to repay it later when the wells were drilled.  One such deal with Deutsche Bank and a Swiss investment firm brought Chesapeake more than $1 billion in return for 15 years of future production from 4,000 wells.  These deals, referred to as volumetric production payments ("VPP"), added almost $11.6 billion of additional "off balance sheet debt" to the Company's existing $12 billion in rated on the books debt, according to Moody's Investors Services in April 2012.

72.     Adding more financial pressure on the Company, Chesapeake is generally required, by law, to drill on the land it acquired within 3 to 5 years after acquiring land rights or it could be forced to forfeit such leases.  So, the more land Chesapeake was caused to acquire the more capital it was required to spend up-front; and the more the Company drilled and the more natural gas it produced, the more supply was available and the more pressure it placed on natural gas commodity prices.  Falling natural gas prices had a very significant impact on the Company's finances as well as its share price.  By February 2012, Chesapeake announced that, primarily as a result of falling natural gas prices, it expected that revenues for the year would fall billions short of projected expenses.  The total funding gap estimated by J.P. Morgan in May 2012, for full year 2012 was expected to reach $12.43 billion.

73.     In fact, between the end of 1Q:12 and the end of 2013, Chesapeake estimated it would need as much as $23.1 billion to pay costs and outlays for wells and properties.  Funds from operations during that same time, however, were expected to total

only $8.3 billion.  To cover this gap, the Company was expected to need to raise as much as $20.5 billion.  In a report dated May 1, 2012, analysts at International Strategy & Investment Group in New York, stated that the Company faced a "major financial crisis."

74.    Thus, by 2012 the Board knew that the Company would have to raise tens of billions of dollars each year to cover the cost of Chesapeake's operations and protect its newly-acquired land assets.  To achieve this, the Board intended to conduct asset sales, VPP deals, stock sales and the sale of debt.  With the exception of stock sales, the majority of these deals would involve transactions with Company partners who would either buy assets from Chesapeake or purchase debt.

75.    **Switch to Oil Production.**  As described above, causing Chesapeake to purchase land and drill natural gas wells at a fevered pace only contributed to further depressing the value of natural gas.  Thus, in addition to the massive land-grab charges, by the beginning of 2012, the Company was also being caused to incur huge costs in an effort to switch production and to focus more on drilling for oil.  Amazingly, while Chesapeake's oil output nearly doubled in the third quarter of 2012 from a year earlier, and its average daily production increased 24%, the Company's debt increased 53% in the same year—reaching the staggering sum of $16.2 billion at the end of September.

76.    Chesapeake's cash shortfall and high spending came at a time when revenue from low natural-gas prices was shrinking. Accordingly, Chesapeake drew on its credit lines and took out a high-interest loan, repaying the debt with the proceeds of more than $11 billion in asset sales.  However as the Company was caused to buy more land and spend more on drilling, the Company became totally dependent upon its ability to raise money from its lending partners.  At that time, access to enormous amounts of capital was, therefore, the life-blood of the Company.

### C.   MCCLENDON'S $1.2 BILLION OF RELATED – PARTY FINANCE DEALS UNCOVERED

77.   Thus, it was against this background of the Company having purportedly reformed its corporate governance, McClendon's impaired personal financial condition and the Company's dire need for massive amounts of financing that, on April 18, 2012, *Reuters* published an in-depth "Special Report" titled "Chesapeake CEO took $1.1 billion in shrouded personal loans."   This blockbuster report revealed for the first time that defendant McClendon had borrowed between $1.1 - $1.3 billion in the last three years from at least one of Chesapeake's "major investor" partners, placing only his interest in the Company's wells as security for the loans.[4]   The materiality of this report was obvious given the immediate impact it had on the price of Chesapeake's shares, which fell from a prior day's close of $19.12 to an intra-day low of $17.17—wiping out as much as $1.269 billion of Company market capitalization.

78.   The *Reuters* report shocked the market because it revealed that  McClendon had financed his participation in the FWPP  by borrowing over one billion dollars from Company partners doing material amounts of business with Chesapeake, and by pledging only his stake in the Company's oil and natural gas wells as collateral.   In reporting that McClendon had obtained these massive non-recourse personal loans, *Reuters* discovered that McClendon had borrowed the money primarily from EIG, a private equity firm that had recently entered into $2.5 billion of very favorable off-balance-sheet loan deals with Chesapeake.   *Reuters* reported, in part the following:

> **McClendon's biggest personal lender, EIG, has been a big financer for Chesapeake, too.**
>
> In November, **Chesapeake raised $1.25 billion from a group of investors including EIG** through the sale of "perpetual preferred shares" in a newly formed entity, Chesapeake Utica LLC, which controls about 800,000 acres

---

[4] McClendon participated in the FWPP through entities in which all equity interests were owned solely by McClendon and his immediate family members as approved by the Compensation Committee in accordance with the FWPP, including: Chesapeake Investments LP, Larchmont Resources LLC and Jamestown Resources LLC.

of oil and gas-rich land in Ohio.  The sale offers lucrative terms to EIG investors, paying an annual dividend of 7 percent and royalty interests from oil and gas wells, according to analysts.

On April 9, the company announced **a nearly identical deal to raise another $1.25 billion from EIG** and other investors, in another new subsidiary called CHK Cleveland Tonkawa.

\* \* \*

*The fact that McClendon's largest personal lender received favorable terms on its Chesapeake investments caused some Wall Street analysts to call for more information about McClendon's loans*.

79.    The *Wall Street Journal* reported that McClendon had "borrow[ed] up to $1.4 billion from a private equity firm that has done hundreds of millions of dollars [of business] with [Chesapeake] in the past year."  In fact, EIG was closely tied to both McClendon and Chesapeake.  In February 2011, in a meeting with the New Mexico State Investment Counsel, the state's public investment fund, and EIG's COO, Randall Wade, told the fund that, "EIG had known Chesapeake for more than 25 years and 'provided pre-IPO financing for them in the late 1980's'" and that this ongoing relationship provided opportunities for EIG that were not available to other investors, including forming special purpose vehicles, Larchmont Resources LLC and Jamestown Resources LLC, which were used to sell McClendon's well rights from 2009 - 2012.

80.    EIG's arrangements with McClendon were very profitable for EIG and deprived McClendon of substantially all of his future interest in profits from his FWPP participation; EIG received the entirety of the cash flows from the wells McClendon was participating in, until such time that EIG recouped its investment, plus a 13% realized return.  EIG thereafter would receive 42% of McClendon's profits from the FWPP.

81.    *Reuters* also reported on May 9, 2012, that a Chesapeake subsidiary, CHK Utica LLC, which owns leaseholds on land, issued $750 million in preferred shares to an investment consortium led by EIG, which received a dividend of 7% from Chesapeake and royalty interests from gas produced from Company wells.

82.    In addition to the EIG loans, it appears that McClendon had engaged in deals with other Company partners.  At least one of them, Wells Fargo, had been engaged as a financial advisor on 10 transactions between 2005 and 2012 valued at nearly $9.8 billion.   According to a *Wall Street Journal* report dated April 26, 2012, in 2008 McClendon entered into a 10-year deal whereby Wells Fargo purchased $132.45 million of future production from *his* stakes in several thousand wells through special purpose vehicles.  Wells Fargo also extended a loan to McClendon in 2010.

83.    In addition to EIG and Wells Fargo, it appears that McClendon also raised money from other Company partners—including BOK, an institution that includes defendant Hargis as a board member.  According to the *Wall Street Journal* report this included, in part, the following:

> In 2008 and 2009, documents filed in Oklahoma City listed Mr. McClendon as debtor to both Bank of America Corp. and Goldman Sachs Group Inc., both of which are currently handling the initial public offering of subsidiary Chesapeake Oilfield Services Inc. In the Goldman Sachs filing, Mr. McClendon offered as collateral his wine collection, detailed on 78 pages listing the vintages held in his homes in Minnesota, Michigan, Bermuda and Oklahoma City.
>
> * * *
>
> In other filings from 2008, Mr. McClendon is listed as a debtor to Centaurus Capital LLC, a Houston hedge fund controlled by John Arnold that is involved in oil and natural-gas hedging. **The next year, he borrowed money from George Kaiser**, a Tulsa-based billionaire investor with significant bank and energy holdings. A Chesapeake director, Burns **Hargis, the president of Oklahoma State University, also serves on the board of BOK Financial Corp., which Mr. Kaiser controls with almost 60% of the company's stock**.

84.    Records unearthed by *Reuters* also showed that a bank owned by George Kaiser was also a lender to Chesapeake.  In 2008, a $21 million investment from a Kaiser foundation and financing from an affiliate of Goldman Sachs enabled an enterprise called Argonaut VPP LLC to provide Chesapeake with $412 million. In exchange, Argonaut

received well production in Oklahoma and Arkansas.  A year later, McClendon turned to Kaiser for a personal loan. Documents filed in Oklahoma show that McClendon pledged distributions from two of his personal companies as collateral to Kaiser.

85.    **A "Governance Crisis."**  In its report of May 9, 2012, *Reuters* referred to the secret loans between McClendon and the Company's business partners as having created a "GOVERNANCE CRISIS."   *Reuters* reported that in addition to EIG, Chesapeake relied on a wide range of Company partners to finance its massive debt and operations.  As evidence of this,  *Reuters* reported that:

> **The disclosures have embroiled the company in a corporate-governance crisis...**
>
> **EIG is drawing attention for its central role in financing McClendon's personal borrowings**, which he took on to fund a lucrative perk giving him the right to receive stakes in company wells so long as he shoulders his share of the costs.
>
> The coterie of financial engineers is much wider. It includes executives at Jefferies & Co, chiefly Ralph Eads III, a Houston oil banker and McClendon's fraternity brother at Duke University.
>
> The deals are so big that they require major trading partners and financiers, like Barclays PLC, which handled Glenn Pool. Wall Street's biggest banks, including Deutsche Bank AG,Morgan Stanley, and Wells Fargo & Co, stepped in as both trading partners and lenders, according to court documents and company statements.

All told, *Reuters* reported that the financiers had helped Chesapeake raise approximately $40 billion in financing since 2000.  According to *Reuters*, these Company partners had also used their trading desks to enable the Company to hedge bets on gas prices and interest rates and advised Chesapeake on a host of deals.

86.    **Analyst Reaction.**  The fact that McClendon had pledged over a billion dollars of wells primarily owned by the Company without any disclosure or Board review

or approval, drew the immediate ire of market commentators.  According to more than a dozen academics, analysts and attorneys who reviewed the loan agreements for *Reuters*, the size and nature of the loans also raised concerns about whether McClendon's loans compromised his fiduciary duty to Chesapeake investors.  *Reuters* reported that:

> "If Mr. McClendon has $1 billion in debt through his own companies — companies operating in the same industry as Chesapeake — **he has or could have** a **high degree of risk for conflicts of interest.**  *As in, whose interest will he look out for, his own or Chesapeake's?"* said Joshua Fershee, an associate professor of energy and corporate law at the University of North Dakota.
>
> *       *       *
>
> The loans portend a number of possible problems, the analysts said. **McClendon's biggest lender is simultaneously a major investor in two units of Chesapeake.**  *That connection raises questions about whether Chesapeake's own financing terms could be influenced by its CEO's personal borrowing.*
>
> *       *       *
>
> *Given the size, scope and complicated terms of the loans, their particulars constitute* **important stockholder information** *and therefore* **should be more fully disclosed**, said David F. Larcker, a professor of accounting at Stanford University's Graduate School of Business.
>
> Some shareholders agree.  "***While recognizing (McClendon's) right to privacy, the more information the company releases to shareholders the better - particularly when*** it's such a large amount of money and related to the oil and gas business," said Mike Breard, oil and gas research analyst at Hodges Capital Management in Dallas, which owns Chesapeake shares…

87.     In analyzing the specific clauses of the loan agreement, *Reuters* also discovered that a clause in the deals required McClendon "to take all commercially reasonable action" to ensure that other owners and operators of the wells - including Chesapeake - "comply with…covenants and agreements" of the loans.  While such clauses may be common in energy-finance deals,  it is very rare for the CEO of a major

energy company to be personally subject to one involving the corporation that he runs. This is because an instant conflict of interest is created as soon as the McClendon was placed in a position that required him to influence Chesapeake to act in the best interest of his lenders, rather than the best interests of the Company's shareholders.

88.     Thomas O. Gorman, a partner at law firm Dorsey & Whitney and a former Special Trial Counsel at the SEC, was quoted in the *Reuters* report as stating:

> "***Basically* what you have here is a private transaction that could potentially impact a public company,** depending on the manner in which the clause is interpreted and applied," says.  "That may **create a conflict of interest**."

89.     **Materiality and Disclosure Duty**. *Reuters* also concluded that, as a result of the size and "unusual" nature of these loans and as a result of his borrowing from parties with huge financial interests and billion dollar dealings with Chesapeake, McClendon had a duty to disclose these loans to the Company and to shareholders. *Reuters* stated unequivocally that the academics, attorneys and analysts that it had interviewed stated that these loans should have been fully disclosed to Chesapeake shareholders.  As evidence of this, *Reuters* quoted Joseph Allman, oil and gas industry analyst at JPMorgan in New York, who reviewed the loan agreements, as follows:

> "I think the **company should disclose this information**.  One reason is that the CEO is taking out loans from at least one entity, EIG, which recently provided financing to Chesapeake," said….  "***In the same way that investors want to know the counterparty to significant Chesapeake transactions, they would want to know if one of those firms has significant private dealings with the CEO***."

90.     Disclosure here was especially appropriate given that key aspects of McClendon's loans—the lenders' identities, the interest rates, the exact amount borrowed—remained hidden from shareholders. Despite the material nature of these loan details, McClendon and the Company spokesperson who responded to an advance copy

of the *Reuters* report immediately stated the position of the Board of Directors was that the Board was not obligated to monitor McClendon's personal loans.

91.  **Possible vs Actual Conflict**. When explaining the Board's position in the April 18, 2012 *Reuters* Special Report, Company spokesperson and then General Counsel, Henry Hood acknowledged there could be "some theoretical possibility of a conflict of interest" with the Company and its CEO borrowing from the same lender(s). However, Hood stated that because the Chesapeake Board did not believe there was "an actual conflict of interest" they were not required to make any further disclosures. Moreover, Hood also stated that McClendon's loans were "well disclosed" to shareholders, citing two references in the 2011 Proxy Statement.[5]

92.  The reasons supporting the Board's position and conclusions were explained, in the *Reuters* Special Report, in part, as follows:

> ***Both McClendon and Chesapeake say the loans are purely private transactions that the company has no responsibility to disclose or even to vet. And they disputed the view that the deals could create a conflict of interest.***
>
> **"I do not believe this is material to Chesapeake,"** McClendon said in an email response to questions. "There are no covenants or obligations in my loan documents or mortgages that bind Chesapeake in any way."
>
> Chesapeake general counsel Henry Hood said in a statement that the clause in the loan agreements questioned by analysts - called **"Compliance by Operator"** - is "typical boilerplate language" used in oil and gas mortgages. It requires borrowers to exercise their rights with operators of wells, such as Chesapeake, on behalf of the lender.
>
> **Neither the existence of McClendon's loans nor their terms create the possibility of a conflict of interest**, Hood said, in part because the company has a first lien on McClendon's share of company wells. That

---

[5] *Reuters*, however, disputed the claim that Chesapeake had disclosed McClendon's loans in any meaningful manner, stating that nowhere in Chesapeake's proxy statements or SEC filings did the Company disclose the number, amounts, or terms of McClendon's loans.

would mean Chesapeake gets paid before all other creditors in the event that McClendon defaults on his debt.

"Any **loans are Mr. McClendon's personal business** and not appropriate for review or monitoring by the company or public comment," Hood said.

**The company has many checks to protect against conflicts**, Hood said. Among them: Some of the world's largest energy companies own a share of Chesapeake wells and "monitor the actions of the Company" via well audits, government filings and participation in development plans, Hood said.

\* \* \*

Chesapeake's **board of directors is aware** that McClendon has borrowed against his share of company wells, Hood said, but "the board did not review or approve the transactions." **Nor did the company vet the loan terms for possible conflicts.** *"If there were any conflicts of interest," Hood said, "they would have surfaced by now."*

93.    Company spokesperson Hood also stated that SEC rules related to transactions with third-parties did not apply to McClendon's loans.  According to Hood, Chesapeake said the SEC's related-party rule didn't apply to McClendon's loans—only to his participation in the well plan—because the Chesapeake Board believed the loans "do not constitute a material transaction with Chesapeake or even involve Chesapeake."  The Company adopted this position, despite the fact that the McClendon loans: (i) were made by Company partner entities doing business with Chesapeake; (ii) were negotiated and enacted during the time that McClendon was both Chairman of the Board and CEO; (iii) were granted by at least one entity that was involved in billions of dollars in asset purchases and loan agreements with the Company and a second company whose director, Hargis, served as Chairman of Chesapeake's Audit Committee and served as a member of the Company's Board; (iv) created an immediate duty to subjugate the interests of Chesapeake shareholders to the interests of the lenders who financed McClendon's loans; (v) create liens on Company property, including the wells and ancillary property associated therewith; and (vi) were used entirely to finance McClendon's purchase of

assets from the Company, through a compensation program that was run by, and monitored by two Board committees and the full Chesapeake Board.

94.     Moreover, at least one analyst, Canaccord/Genuity, disputed Hood's claim that the Company had a first lien on McClendon's share of the oil wells he purchased. According to a report published April 18, 2012, "[t]he aforementioned loans are secured by first lien priority on the CEO's 2.5% interest in the wells."  Thus, whether Chesapeake maintained a first lien on McClendon's loans is in dispute.  It is, however, unclear why Chesapeake would have a first lien on well interests purportedly owned by McClendon and paid for by loans he obtained from Company partner lenders.

95.     The effect of McClendon borrowing over $1 billion to finance his participation in the FWPP from Company lending partners placed him in direct competition with Chesapeake for access to capital.  This alone was a material conflict of interest and breach of duty to Company shareholders, violated Chesapeake's Code of Conduct and mandated disclosure.

96.     **McClendon's Supplemental Disclosures.** In response to the demand for additional information regarding McClendon's loans by analysts and market commentators, on April 20, 2012, McClendon himself published a release titled, "*Supplemental Disclosure Regarding Aubrey K. McClendon's Interests in Chesapeake Energy Corporation's Founder Well Participation Program.*"   In this release, McClendon purported to disclose the existence of a total of $846 million in loans, his estimates of proved reserves, average daily production and two numbers with varying discount rates that purported to represent the estimated present value of future net revenue from his FWPP well interests.[6]

---

[6] In this release McClendon reported $852 million as the present value of future net revenue of the *estimated proved reserves* attributable to the FWPP wells $852 million.  McClendon's analysis of *estimated proved developed producing reserves* resulted in the report of $409.6 million.

97.     The purported supplemental disclosure regarding McClendon's interests in the FWPP did nothing to assure investors or the market.  The fact that these disclosures did not identify the Company's partners from whom McClendon borrowed money then or in the past, or how much he had borrowed from the Company's partners, ultimately told investors little more than shareholders could have extrapolated from reading the Company's financial statements, (knowing the amount of McClendon's FWPP participation interest was 2.5% and knowing the number and cost of the wells drilled). The fact that McClendon had disclosed that his three Founder Affiliates had financed their participation in the FWPP was not material to investors, because after his spectacular and well publicized trading losses in 2008 many suspected that McClendon had financed most or all of his FWPP participation. Thus, while investors had thought that McClendon had raised the money necessary to participate in the FWPP they never had any reason to suspect that McClendon did not raise this money independently based on *his* creditworthiness.  Nor did investors know that McClendon had pledged his interest in the wells themselves as the only collateral to his loans, or that he had sold off the future production of the wells in order to finance their acquisitions.

98.     The lack of materiality of McClendon's purported "supplemental disclosures" was reflected by the market's reaction—or lack of it.  On April 25, 2012, shares of the Company closed at $18.31.  The following day, after the purported supplemental disclosure release was published shares of the Company traded down to $17.47 before closing the day at $17.56.  In intra-day trading the following day, April 27, 2013, shares of the Company traded to a low of $16.78.  Share volume increased on both the 26th and 27th as investors expressed their displeasure and voted with their feet (dumping their Chesapeake stock).

99.     The fact that this release was published by McClendon alone, with *his* personal media person listed as the Media Contact and then *filed by Chesapeake* with the SEC pursuant to Schedule 14A was extremely telling.  Despite the Board previously

claiming that McClendon's loans did not involve the Company and were not subject to related party review, suddenly McClendon's supplemental disclosure of his personal investments in the FWPP involved the Company sufficiently that defendants' filed *McClendon's disclosures* with the SEC.  The Company's filing of McClendon's release was entirely proper because, McClendon's investment in the FWPP clearly involved the Company such that actions related thereto—such as financing the wells with money raised from related parties—were material and mandated disclosure.

### D.   S&P DOWNGRADE BASED ON CORPORATE GOVERNANCE WEAKNESS, FEDERAL INVESTIGATIONS & OTHER HARM TO SHAREHOLDERS

100.  **S&P Downgrade.**  On April 26, 2012, about a week after the *Reuters* report, Standard & Poor's made a significant downgrade and cut Chesapeake's debt rating to 'BB' from 'BB+'.  In placing the Company on CreditWatch with "negative implications," S&P repeatedly cited corporate governance deficiencies and conflicts of interest, including in part, the following:

-- **Turmoil resulting from these developments could hamper Chesapeake's ability to meet the massive external funding requirements** stemming from its currently weak operating cash flow and continuing aggressive capital spending.

-- **We are lowering our corporate credit and senior unsecured debt issue ratings on Chesapeake to 'BB'** from 'BB+', and lowering the ratings on two affiliates--Chesapeake Oilfield Operating LLC and Chesapeake Midstream Partners L.P.

-- We are placing all these ratings on **CreditWatch with negative implications.**

101.  S&P explained that its downgrade and CreditWatch placement reflected its view that "recent revelations about personal transactions undertaken by Chesapeake's CEO relating to the Company's unusual FWPP … underscore shortcomings in Chesapeake Energy Corp.'s corporate governance practices."  S&P stated:

Under the FWPP, Chesapeake's CEO, Aubrey McClendon can, before the beginning of each year, elect to take a small (up to 2.5%, subject to certain restrictions) working interest in all of the wells Chesapeake drills during that year. Recent press reports have revealed that Mr. McClendon has obtained loans to fund his investments under the FWPP from third parties (such as EIG Global Energy Partners LLC) who, at the same time, were also significant participants in financing transactions with Chesapeake. Mr. McClendon has also at times sold his interests in certain fields, in conjunction with asset sales by Chesapeake. **We believe these transactions heighten the potential for unmanaged and unmonitored conflicts of interest, or the perception thereof**. Under the terms of the FWPP, there has been **<u>no effective mechanism to protect against conflicts of interest,</u>** in our view. Indeed, Chesapeake has previously stated that the company does not review or approve financings of Mr. McClendon's personal assets, including his FWPP interests. It is our understanding that Mr. McClendon has also been under no obligation to disclose his dealings with third parties which also have lending, investment, or advisory relationships with the company.

Chesapeake today has announced that its board and Mr. McClendon have committed to negotiate the early termination of the FWPP, which otherwise would have expired at the end of 2015. The company also announced that the Board is reviewing financing arrangements between Mr. McClendon (and the entities through which he participates in the FWPP) and any third party that has had a relationship with the company in any capacity. **The board has also confirmed that it did not previously review, approve, or have knowledge of the specific transactions engaged in by Mr. McClendon or the terms of those transactions.**

**In our view this represents <u>a significant governance deficiency</u>.**

102.    S&P also reported that the impact from these negative corporate governance issues and from potential revelations resulting from the board investigation, could hamper Chesapeake's ability to meet the massive external funding requirements stemming from its currently weak operating cash flow and aggressive capital spending. S&P noted that Chesapeake's production was heavily skewed toward natural gas, and natural gas prices were severely depressed at that time.  The S&P downgrade also had the immediate effect of decreasing the Company's creditworthiness and, therefore, necessarily negatively impacting Chesapeake's cost of capital and borrowing.  In fact, the

reduction in rating from BB+ to BB was very material because the Company's previous BB+ rating was S&P's highest grade for speculative investments.  This is significantly better than a BB rating which evidences "major ongoing uncertainties for adverse business, financial and economic conditions."

103.    The S&P report also demonstrated that, because the Company's own capital requirements were so large McClendon was effectively competing with the Company for financing and reducing the Company's capacity to borrow from its lending partners.    S&P highlighted the Company's massive funding gap and funding requirements, in part, as follows:

> **Chesapeake faces very large external funding requirements** to sustain the aggressive planned investment needed to effect its strategic shift. In its investor presentation dated April 17, 2012, Chesapeake gave guidance of total investment of $10.9 billion to $12.4 billion in 2012, and $10.5 billion to $12.3 billion in 2013. … Based on our estimates and price deck assumptions (including natural gas price of $2.00/btu in 2012, $2.75 in 2013, and $3.50 thereafter), we expect Chesapeake's funds from operations to total only $3.4 billion to $3.8 billion in 2012 and $5.4 billion to $5.8 billion in 2013, implying **massive internal funding shortfalls.**

> … Chesapeake is asset rich, and it has been adept at structuring varied and innovative transactions to generate funds, including outright asset sales, formation of joint ventures (JVs), issuance of securities by a royalty trust and by newly formed subsidiaries, and issuances of volumetric production payment (VPP) obligations. However, **Chesapeake's ability to continue executing such transactions on favorable terms depends largely on capital market receptivity.**

104.    **SEC Investigation**.  The shocking nature of the existence of McClendon's loans from Company partners also drew the attention of the SEC, which almost immediately commenced an investigation into McClendon and the Company.  According to Chesapeake's 2012 From 10-K, filed with the SEC on March 1, 2013, on May 2, 2012, Chesapeake and McClendon received notice from the SEC that its Fort Worth Regional

Office had commenced an informal inquiry into, among other things, certain of the facts reported herein. On December 21, 2012, the SEC's Fort Worth Regional Office advised Chesapeake that its inquiry had been upgraded in status to a formal "investigation," and that the SEC had issued subpoenas for information and testimony.[7]

105.    It was also reported on May 1, 2012 that the Internal Revenue Service was reviewing aspects of its FWPP.  According to the Company, the IRS was reviewing "certain issues" in connection with the FWPP as part of its audit of the company's 2008 and 2009 tax returns.

106.    In addition to the distraction and loss of productivity caused as a result of defendants having to spend time and effort complying with the federal regulators inquiries, at that time, Chesapeake also suffered from a loss of goodwill and harm to the reputation of the Company.  As analysts stated, Chesapeake suffered from a "credibility gap," and the perception of a "corporate governance crisis."

107.    The reduction in the Company's debt rating and the placement of Credit Watch Negative for future negative expectations *necessarily* raised the cost of the Company's borrowing.  At the same time, the declining stock price caused as a result of the market learning of defendants' breaches of fiduciary duties and conflicts of interest, impaired the Company's ability to sell equity in the public markets without substantially diluting current shareholders and decimating the price of Company shares.

### E.    BOARD AND COMMITTEE OVERSIGHT OVER THE FWPP

108.    The undisclosed $1.1 billion of loans supplied to McClendon by entities doing business with the Company reveal how McClendon used an unusual corporate incentive as collateral. As described above, the FWPP granted McClendon a 2.5% stake

---

[7] On April 8, 2014, the SEC's advised Chesapeake that it had concluded its investigation and, based on the information it had as of that date, did not intend to recommend an enforcement action by the SEC.  The conclusion of the investigation by the SEC has no bearing on the claims brought herein.

in the profit—and makes him pay 2.5% of the costs—of every well drilled during each year he decides to participate.   According to *Reuters*, Chesapeake is the only large publicly traded energy company to grant its CEO the opportunity to take a direct stake in wells it drills.

109.   The 2011 Proxy describes the purported benefits the FWPP provided to shareholders and the Company, in part, as follows:

> **Founder Well Participation Program.** Because of Mr. McClendon's unique role as co-founder of the Company, he is the only NEO [Named Executive Officer] with the opportunity to participate and invest as a working interest owner in the Company's wells under the Founder Well Participation Program (the "FWPP"). We believe the FWPP fosters and promotes the successful development and execution of the Company's strategic business plan by: (i) retaining and motivating our CEO who co-founded the Company; (ii) **aligning the financial rewards and risks of Mr. McClendon with those of the Company** more effectively and directly than other performance incentive programs maintained by many of the Company's peers; and (iii) imposing on Mr. McClendon the same proportionate costs and risks incurred by the Company in its exploration and production operations. **The Compensation Committee reviews Mr. McClendon's participation in the FWPP on a quarterly basis** and periodically adjusts the acreage costs charged to Mr. McClendon to ensure his reimbursements reflect the Company's recent acreage activities….

110.   In the 2011 Proxy, the FWPP is described in greater detail under "Transactions with Related Persons—Founder Well Participation Program."   The 2011 Proxy states, in part, the following:

> **Founder Well Participation Program**
>
> The FWPP permitted the Company's two co-founders, Mr. McClendon and Tom L. Ward, to participate and invest as working interest owners in new wells drilled by the Company. The FWPP was originally included in the founders' employment agreements entered into in connection with the Company's initial public offering in February 1993. In 2005, the FWPP was documented as a formal plan and approved by shareholders on June 10,

2005.[8] … As discussed in "*Executive Compensation—Compensation Discussion and Analysis—CEO Compensation in 2010—Founder Well Participation Program,* " **the Company believes the FWPP fosters and promotes the development and execution of the Company's business by aligning the interests of the remaining founder and the Company**. Mr. McClendon has continually participated in the FWPP since the Company's initial public offering, except during the five quarters from January 1, 1999 to March 31, 2000.

Under the FWPP, Mr. McClendon may participate in all of the wells spudded by or on behalf of the Company during each calendar year. Prior to the beginning of each year Mr. McClendon must provide written notice to the members of the Compensation Committee of his election to participate in the FWPP and the working interest percentage that he proposes to participate during the year. His working interest percentage may not exceed a 2.5% working interest in a well and is not effective for any well where the Company's working interest after Mr. McClendon's participation election would be reduced to below 12.5%. *Subject to these working interest limitations, **if Mr. McClendon elects to participate in the FWPP, he must participate in all wells spudded by or on behalf of the Company during the given calendar year and cannot elect to participate on a well-by-well basis***. In September 2010, Mr. McClendon elected to participate in the FWPP for the 2011 calendar year at the maximum 2.5% working interest permitted.

111.   McClendon's right to participate in the FWPP during any calendar year terminated on the earlier of: (i) December 31st of such year; (ii) the termination of McClendon's employment by the Company for cause or death; or (iii) the expiration or termination of any and all covenants not to compete subsequent to the termination of McClendon.   Under the FWPP, McClendon could <u>not</u> change his working interest percentage during any calendar year without the prior approval of the Compensation Committee, and he was responsible for paying all joint interest billings immediately on receipt of the Company's invoice and to prepay amounts owed to a third party operator if the Company was required to prepay any such costs.

---

[8] Ward's participation rights terminated on August 10, 2006, following the expiration of his covenant not to compete as a result of his retirement as a director, President and the COO of the Company.  When Ward left Chesapeake in 2006, he retained his stake in the Heritage Fund, a secret $200 million hedge fund that he and McClendon ran out of the office of the Chief Executive of the Company.

112.   **Terms "No Better Than."** Company Proxy statements have historically reported that, "in each case Mr. McClendon's participation in a well will be on <u>no better terms</u> than the terms agreed to by unaffiliated third party participants in connection with the participation in such well or similar wells operated by the Company." (2008 Proxy filed 4/29/08)   While this language was modified in the 2011 Proxy, the underlying substance remained the same and required McClendon to invest on <u>terms no better</u> than those available to independent third parties.   The 2011 Proxy stated, in part:

> [A]mounts paid by Mr. **McClendon in connection with his participation in a well are on <u>no better terms</u> than the terms agreed to by unaffiliated third party participants** in connection with the participation in such well or similar wells operated by the Company.

113.   The following table sets forth the amounts received from or paid to the Company with respect to McClendon's FWPP interests during the first quarter of 2011 and 2013 and each of the five years in the period ended December 31, 2012.   This table demonstrates not only the huge increase in McClendon's obligations under the FWPP after 2008, but also documents that McClendon's cumulative expenditures under the FWPP have significantly exceeded cumulative monthly production revenues, as follows:

| | First Quarter | | | |
| --- | --- | --- | --- | --- |
| | 2013 | 2012 | 2011 | 2010 |
| Natural gas and oil revenues | $   62,929,725 | $   198,859,938 | $   184,270,948 | $   127,064,861 |
| Lease operating expenditures | (14,414,046) | (54,181,910) | (42,457,253) | (26,102,787) |
| Net cash flow | 48,515,679 | 144,678,028 | 141,813,695 | 100,962,074 |
| Capital expenditures | (71,172,577) | (434,263,113) | (457,151,007) | (242,839,086) |
| **Net after capital expenditures** | $   (22,656,898) | $   (289,585,085) | $   (315,337,312) | $   (141,877,012) |

| | First Quarter | | | |
| --- | --- | --- | --- | --- |
| | 2011 | 2010 | 2009 | 2008 |
| Natural gas and oil revenues | $  40,191,374 | $ 127,064,861 | $  87,856,431 | $ 171,513,367 |
| Lease operating expenditures | (8,986,880) | (26,102,787) | (19,481,167) | (22,617,688) |
| Net cash flow | 31,204,494 | 100,962,074 | 68,375,264 | 148,895,679 |
| Capital expenditures | (89,345,128) | (242,839,086) | (184,468,839) | (212,634,566) |
| **Net after capital expenditures** | $ (58,140,634) | $(141,877,012) | $(116,093,575) | $  (63,738,887) |

114.   One of the main reasons that other firms do not adopt similar programs is because a program like the well participation program is highly susceptible to conflicts of

interests, and a diversion to the CEO's attention.  In the oil and gas industry and at Chesapeake particularly these problems were compounded by the Company's primary product natural gas being a highly leveraged asset based on a historically volatile commodity.  According to the Certified Financial Advisor Institute website, section titled Market Integrity Insights, by 2012, Chesapeake and the FWPP "was a powder keg of poor governance and poor risk management waiting to ignite. Shareowners and the Chesapeake board (if they were, in fact, informed of these risks) should have better managed the risks they were taking."

115.    S&P also highlighted the existence of such conflicts and stated that, "under the terms of the FWPP, there has been *no effective mechanism* to protect against conflicts of interest…"  In fact, however, the FWPP and the Company's Charters and Codes of Conduct did contain purported safeguards and oversight procedures by the full Board as well as the Audit Committee and Compensation Committee, and the FWPP was purportedly designed to align McClendon's interests with those of the Company.

116.    Chesapeake was repeatedly caused to state that the FWPP was a uniquely powerful incentive because it aligned McClendon's personal interests with those of the Company.  Since the well participation program did not allow McClendon to select the wells in which to invest, the program was purportedly set up as "an all-or-nothing proposition," so that McClendon's risks would mirror the Company's, and so that McClendon could not cherry-pick only the most profitable wells.  According to Company spokesperson, Michael Kehs, the FWPP aligned McClendon's interests with that of the Company and its shareholders because McClendon had to "eat his own cooking here."

117.    **Related Party Transaction Oversight: Audit Committee.**   The mechanisms that were supposed to protect shareholders from conflicts of interest were purported to have been built into the FWPP itself.  According to the 2011 Proxy, the

FWPP was administered by the Compensation Committee of the Board of Directors and was also overseen by the Audit Committee.  In addition, the full Board, in its sole discretion could also take any action with respect to the FWPP that would otherwise be the responsibility of or delegated to the Compensation Committee, and it also had the authority over the FWPP in order to effect compliance with the Code of Conduct. [9]

118.    Thus, because of the latent conflicts of interest inherent in allowing McClendon to invest alongside the Company in the FWPP deals while he was also Chairman and CEO, Board oversight of the FWPP was critical.   Oversight of McClendon's participation in the FWPP was the responsibility of the Audit Committee, the Compensation Committee, _and_ the entire Board of Directors of the Company.  The Compensation Committee administered and interpreted the FWPP, and the Audit Committee retained responsibility for actions by McClendon that would materially impact his risk, impartiality, allegiances or loyalties as result of his participation therein.

119.    A review of the Charter of the Audit Committee that was in effect during his participation in the FWPP shows both the *general* and *specific* duties related to its charge of oversight over McClendon's participation in the FWPP.  The Charter charged the Audit Committee with the duty to discuss with management and the independent auditor any major issues as to the adequacy of the Corporation's internal controls as well

---

[9] The Board of Directors had the right to terminate the FWPP after December 31, 2015 by providing written notice of termination to McClendon one year before the effective date of such termination.  Shareholder approval was also required for any amendment to the FWPP that increased the maximum working interest percentage applicable to McClendon or any amendment which, in the opinion of counsel to the Company, required shareholder approval under any federal or state law or any regulations or rules promulgated thereunder.

as any special audit steps adopted in light of material control deficiencies, and the adequacy of disclosures about changes in internal control over financial reporting.

120.     Additionally, the 2011 Proxy also charges the Audit Committee with "Oversight of Risk and Legal, Regulatory and Other Compliance Matters."  To comply with these duties, the Charter of the Audit Committee stated that the committee would oversee risk and legal, regulatory and other compliance matters affecting the Corporation, and to "[d]iscuss with senior management: (a) the Corporation's major financial and enterprise risk exposures and the steps management has taken to monitor and control those exposures; (b) the guidelines and policies to govern the process by which risk assessment and risk management are undertaken; and (c) the appropriateness of the Corporation's public disclosures with regard to risk."   This section again charged the Audit Committee with the duty to review insider or affiliated party transactions or courses of dealing and related disclosures in the Company's annual proxy statement.

121.     **Related Party Transactions.**  In addition to the foregoing, the 2011 Proxy required the Audit Committee to review related party transactions: (i) over $100,000; (ii) where the Company is a participant; and (iii) where directors, executive officers and greater than 5% shareholders and their immediate family members have or will have a direct or indirect interest.

122.     Indeed, related party oversight duties over McClendon's participation in the FWPP were specifically granted to the Audit Committee.  The 2011 Proxy stated that the Audit Committee reviews and assesses ongoing relationships with related persons on at least an annual basis to consider whether they continue to be in compliance with the

policy and remain appropriate, specifically *including: McClendon's participation in the FWPP* (the day-to-day oversight of which is mandated to the Compensation Committee).[10] Thus, because the Audit Committee was *already* charged with oversight of the FWPP, it was also required to review and ratify the loans by Company's partners to McClendon, and McClendon was required to disclose those loans and to submit them for review prior to using their proceeds pursuant to the FWPP.

123.    According to the 2011 Proxy, the Audit Committee "approves or ratifies only those transactions that it determines in good faith are in, or are not inconsistent with, the best interests of the Company and its shareholders."  Since it would be impossible to approve or ratify McClendon's participation in the FWPP or determine if his participation was in the best interest of the Company without knowledge of the existence and terms of his loans, they would necessarily be part of a proper Audit Committee review.

124.    The 2011 Proxy also demonstrated that the Audit Committee could not possibly review McClendon's participation in the FWPP without information about the loans he received from Company partners because the Audit Committee took into account factors that included, among other things: (i) the benefits to the Company; (ii) the impact on a director's independence; and (iii) the extent of the related person's interest in the transaction.[11]  Here that would necessarily include a review of loans by Company

---

[10] 2011 Proxy, filed with the SEC on 4/29/11, states: *The Audit Committee reviews and assesses ongoing relationships with a related person on at least an annual basis* to consider whether they continue to be in compliance with the policy and remain appropriate. The Audit Committee has reviewed and pre-approved certain transactions, *including… (iii) Mr. McClendon's participation in the FWPP* (which is overseen by the Compensation Committee).  *This language was stricken from the Company's 2012 Proxy.*

[11] The chairman of the Audit Committee is empowered to act on any related person transaction requiring pre-approval or ratification between meetings of the Audit Committee.

partners that require McClendon to use best efforts to favor lenders; loans backed by collateral that was majority owned by Chesapeake; loans used to finance Company assets; and loans provided by lenders engaged in the purchase and sale of billions of dollars of assets to and from Chesapeake.

125.    In addition to the foregoing, it is also apparent that McClendon's borrowing money from Company partners would, on its face, qualify as a related party transaction within the letter of the Policy on Transactions with Related Persons specified in the 2011 Proxy.   First, the aggregate amount of the indebtedness was well over the $100,000 minimum threshold.   Second, the Company can clearly be seen as a participant.   And, third, an executive officer had an interest in the transaction.

126.    **Board Denials.**   When news of the undisclosed $1.2 billion in loans to McClendon from lenders who were also conducting transactions with Chesapeake became known, the Company stated that the Board had no responsibility for reviewing the loans because they were not, *by definition*, related party loans.   A closer examination of the Company's Policy on Transactions with Related Persons, however, shows that the Board's conclusion is inaccurate and that, because the Audit Committee *already* had the responsibility of overseeing the FWPP (as a transaction with a related person, McClendon), it would also be responsible for approving or ratifying the loan transactions.

127.    The Company denied that it was a "participant in," or had an interest in the transaction, yet, that position is also inconsistent with its Policy on Transactions with Related Persons.   Clearly, the Company was "a participant" in the transaction to the extent that the majority of wells were controlled by the Company.   In addition to that

every well that McClendon invested in he did so as Chairman and CEO of the Company.

Thus, even though McClendon was personally liable for his investments, his participation

in the FWPP was tied to his position(s) at Chesapeake.[12]   Moreover, because

McClendon's investment in the wells was through the FWPP, a program administered by

the Company, Chesapeake was a participant in the transaction and, as such, McClendon's

investment in the FWPP was also subject to the Company's Code of Conduct and its

Related Party Transaction Policies and practices.

128.    During the Relevant Period, defendants Hargis was Chairman of the Audit

Committee and defendants Davidson and Miller constituted its other two members.

129.    **Compensation Committee Oversight of FWPP.**  In part, because of the

significant possibility that the FWPP could result in material conflicts of interest if not

managed and overseen properly by the Board, in addition to the Audit Committee, the

Compensation Committee was primarily charged with oversight of the FWPP.

According to its Charter, the primary purpose of the Compensation Committee is to

"establish and monitor the Corporation's Compensation system," including the FWPP.

130.    The Charter of the Compensation Committee contained specific areas of

responsibility, including setting executive compensation and overseeing McClendon's

participation in the FWPP.  The Charter stated, in part, the following:

- The Committee's basic objective is to develop an executive compensation
  system that is competitive with the Corporation's peers and encourages
  both short-term and long-term performance in a manner beneficial to the

---

[12]  Just because the investment may have been personal to him, McClendon's participation in the FWPP was <u>not</u> an independent investment outside the Company, and his ability to invest in the wells would <u>not</u> have existed, and did not exist, absent his employment at Chesapeake.

Corporation and its operations. In achieving these objectives, the Committee will have the following responsibilities:

- o  Establish compensation policies that effectively attract, retain and motivate executive officers to successfully lead and manage the Corporation;

- o  Review and approve corporate goals and objectives relevant to CEO compensation, evaluate the CEO's performance in light of those goals and objectives, and set the CEO's compensation level based on this evaluation;

- o  ***Review, evaluate and approve all compensation of directors and executive officers, including salary adjustments, bonuses, stock awards, stock option grants, perquisites and other benefits***;

- o  Review, evaluate and make recommendations to the Board with respect to the approval of the employment agreements of executive officers;

- o  Prepare the report required by the rules of the SEC to be included in the Corporation's annual proxy statement; and

- o  **Review compliance with and make recommendations to the Board regarding the participation of the CEO in accordance with the Founder Well Participation Program.**

131.    During the Relevant Period, defendant Keating was Chairman of the Compensation Committee and defendants Eisbrenner and Maxwell constituted its other two members. While McClendon was not a member of the Compensation Committee, the 2011 Proxy reports that that he "generally attend[ed]" Compensation Committee meetings and participated in discussions, but did not vote or participate on the acceptance or approval of the report with respect to his compensation. Despite the fact that McClendon did not participate in the review of his recommended base salary adjustments, cash bonus and restricted stock awards, the 2011 Proxy indicated that

McClendon himself prepared the recommendation to the Compensation Committee, regarding his own compensation each year.[13]

132.    The Compensation Committee was also charged with achieving the goals of the Company's Compensation Design and Philosophy.  According to the 2011 Proxy, the primary goals were reflected in the purpose and intent of forming the FWPP (and as stated therein), and were purported to :

- **align the interests of the [Named Executive Officers] with the interests of our shareholders** by basing a significant majority of each NEO's total compensation on individual and corporate performance; and

- encourage both a short-term and long-term focus, while **discouraging excessive risk taking.**

133.    **Chesapeake's Code of Conduct**.  In addition to the specific duties charged to the Audit Committee and the Compensation Committee, oversight and management of McClendon's participation in the FWPP was also charged to the full Board through the Company's Code of Conduct which was the duty of each Board member to enforce.

134.    The Code of Conduct specifically prohibited employees of the Company from usurping Corporate Opportunities that were developed through the use of Chesapeake's resources, as follows:

> **You may not personally take or yourself opportunities that are developed through the use of Company resources, information or position**; use Company property, information or position for personal gain, **or compete with the Company**.   You have a ***duty to the Company to advance its legitimate interests when the opportunity to do so arises***.

---

[13] McClendon's participation on the Compensation Committee and especially his ability to recommend his own compensation are more evidence of very weak corporate governance, albeit disclosed, and further evidences McClendon's dominance over the other Board members.

135.     The Code of Conduct also specifically prohibited employees from engaging in Transactions with Vendors of the Company, as follows:

> ***You are** prohibited from engaging in activities with vendors that promote your personal interests ahead of the interests of the Company or otherwise create a conflict of interest*:
>
> <u>Soliciting or accepting… loans from a vendor</u>;

136.     The Code of Conduct also required Company employees to deal fairly in good faith with Chesapeake's business partners and to not take advantage or abuse of that employee's power over such partners.  In this regard, the Code of Conduct stated:

> You shall deal fairly and in good faith with the Company, the Company's customers, shareholders, employees, suppliers, regulators, business partners, competitors and others.  **You shall not take unfair advantage of any of them through** misappropriation, concealment, abuse of privilege or confidential information, misrepresentation, fraudulent behavior or **any other unfair dealing practice**…
>
> * * *
>
> **Conversion to personal use of** cash, securities, supplies or **any other Company assets**[.]

137.     In addition to the foregoing, whether McClendon's borrowing over a billion dollars on a non-secured basis from lenders who were simultaneously engaged in multi-billion dollar asset purchases and lending agreements with Chesapeake was an "actual conflict" or merely presented "potential" or "apparent" conflicts of interest was immaterial, and all were prohibited under the Company's Code of Conduct.  The Code of Conduct had clear and specific policies regarding "Conflicts of Interest," which prohibited conflicts, potential conflicts and even the appearance of conflicts, as follows:

> ***All directors, officers and employees of the Company must avoid situations that create** a conflict of interest* **or the appearance or potential** *for a conflict of interest.*  A conflict of interest exists when your personal interests are either **in conflict with the Company's interests or interfere with your ability to perform your duties** to the Company or responsibilities at work…

Specific situations that could be considered conflicts of interest include:

\* \* \*

**Holding a financial interest in a competitor or a company that does business with the Company and you could personally affect that business.**

138.      If *"holding a financial interest in a … company that does business with [Chesapeake]"* is a conflict of interest, than a company that does business with Chesapeake holding a financial interest in the Company's CEO when he could personally affect that business is also a conflict.  Accordingly, that would include McClendon owing such companies hundreds of millions of dollars—where such companies effectively owned his debt.  Whether their ownership of McClendon's debt  would be considered a "financial interest" is immaterial, however, given the other dictates which specifically prohibited McClendon's taking loans from vendors and Company lenders.

139.      **Reporting Requirements.**   In addition to the foregoing, Chesapeake's Code of Conduct also imposed reporting requirements even for potential conflicts of interest.  The Code states that, "[i]t is the Company's policy to identify and acknowledge in writing (in an employment agreement in the case of officers) certain relationships… and the terms thereof, that are acceptable to the Company but that might otherwise appear to represent a conflict of interest."   To comply with this policy, on at least an annual basis, employees of Chesapeake were required to complete a Conflict of Interest Disclosure Form to identify and acknowledge relationships that "may constitute a conflict of interest."   Any failure to fully and truthfully answer all questions on the form can result in disciplinary action, up to and including termination.

140.      **Conflicts Obvious to Analysts.**   Analysts following and familiar with the Company immediately realized the material impact of McClendon purchasing billions of dollars of Chesapeake's assets with money raised from Company partners, and immediately concluded that these loans raised conflicts of interest and, at a minimum, the

appearance of conflicts of interest and the potential for conflicts of interest.  As evidence

of the foregoing, analysts stated the following:

- ***Given the magnitude of these private financial dealings***, **it seems reasonable Chesapeake would disclose** *them* though there does not appear to be any SEC requirement… That said, ***the* perception of a conflict is *understandable especially given the lenders to Mr. McClendon include material investors in two recently completed preferred share placements in Chesapeake-owned subsidiaries***. This ***financing revelation has unfortunately and understandably increased the 5-10% discount we attribute to corporate governance concerns*** *in addition to a capitalization instability discount of -30%....* (Canaccord/Genuity: If I had a Billion Dollars; CEO Borrowing in Focus Again; 4/18/12)

- Recently Chesapeake and Mr.  McClendon have come under pressure due ***to concerns the FWPP and Mr. McClendon's financing of his interests were in conflict with Chesapeake shareholders***. (RBC Capital Markets. 4/26/12)

- The conflicts are too numerous to list.  But here are some big ones.  ***First, because McClendon puts up no money it is in his interest to drill as many wells as possible.  Chesapeake, on the other hand has to judiciously allocate capital to only the best prospects.***  This is highlighted as Chesapeake has been rapidly shedding assets to reduce a heavy debt burden as cash flow is hampered by depressed natural gas prices.  Consider this next shareholder rip-off.  ***Chesapeake says McClendon pays a pro-rated 2.5% of the geologic and engineering work that went into the wells they drill.  But that doesn't mean he pays 2.5% of the entire company's engineering costs and overhead expenses for its lavish corporate campus.   Additionally, Chesapeake spends billions acquiring drilling leases only to spend deca-millions more to vet for the best drilling locations.  McClendon piggybacks free on all this.*** (Forbes 4/23/12)

141.     On May 12, 2012, Pedro de Noronha, managing partner and portfolio

manager at Noster Capital, a leading hedge fund based in the United Kingdom sent an

"Open Letter" to the Chesapeake Board which pointed out the myriad conflicts of interest

and breaches of fiduciary duty related to the McClendon FWPP loans, in part, as follows:

> ***The company has stated that it does not believe the personal use of such leverage linked to the FWPP (nor the fact that one of the funds that personally lent money to Mr. McClendon later participated in a company***

*bond offering) created a conflict of interest, but <u>yet the market seems to disagree</u>, as the company's shares have fallen 23% since that news was made public, even though the price of NYMEX natural gas has actually risen by 29% during that same time frame*. We believe that CEOs of public companies need to remain focused on their fiduciary duty at all times, and *the use of such substantial personal indebtedness can pressure them to act in ways that <u>are in conflict to the goal of creating substantial value for shareholders over the long-term</u>,* not to mention the emotional distress that having such personal liabilities must cause.

\* \* \*

The Board of any public company is there to keep the executive team in check and to make sure that shareholders' and other stakeholders' interests are being well represented. **Having failed to terminate Mr. McClendon after recently learning the full extent of the personal liabilities that he incurred in order to fund his participation in the FWPP, and after last Friday's news that there were a further $1.4 billion of previously undisclosed off balance sheet liabilities, <u>we have lost trust in the Board</u>.**
…

Investors are probably selling Chesapeake Energy's shares because of their **lost confidence in Mr. McClendon, in his ability to lead the company** given the scale and nature of his financial liabilities and because, in their view**, the Board has failed to look after their own interests**.

142.     There is no question that McClendon violated his duties to the Company and engaged in conflicts of interest by borrowing over $1 billion from Chesapeake partners, and that the members of the Audit Committee and Compensation Committee abdicated their duties by not knowing, or by recklessly disregarding, the source of McClendon's financing.  The fact that McClendon arranged this financing on a non-recourse basis when he lacked the financial wherewithal or creditworthiness to justify such massive loans demonstrated that they were granted on a preferential basis and not on terms available to unaffiliated third-party participants.  The fact that McClendon's participation costs were skyrocketing from $63.738 million in 2008 to $141.877 million

in 2010 made it impossible for the Board not to inquire where McClendon was obtaining financing to effect his election to participate in the FWPP on an all-or-nothing basis. This was necessarily true given that the Board had bailed out McClendon in 2008 so that he was able to pay for his participation in 2008 and 2009 with a special $75 million well participation bonus payment that was paid to him by Chesapeake.

143.    It was also not genuine for the Board to say that McClendon's loans from Company partners were not related party loans subject to review because: (i) McClendon purchased his interests in these wells through a program operated and regulated by Chesapeake; (ii) the Audit Committee and Compensation Committee and the full Board of the Company were responsible for oversight of the FWPP and such oversight could not have been complete without investigating the source of McClendon's massive loan financing; (iii) McClendon participated in the FWPP by virtue of his employment at Chesapeake and in line with the Company's purported compensation philosophy, and this necessitated oversight by the Compensation Committee; (iv) Chesapeake at all times was the counter-party in the asset sales to McClendon through both his and the Company's participation in the FWPP; (v) all loans were backed by collateral primarily owned by Chesapeake; and (vi) it was a clear violation of the Code of Conduct for McClendon to borrow money from vendors, or to use his position of control over Chesapeake to misappropriate corporate opportunities.

144.    **Other Safeguards: "Skin in the Game" Compensation Philosophy.** Guarding against conflicts by aligning McClendon's interests with the interests of the Company and its shareholders was another critical component of the investor safeguards

designed into the FWPP. McClendon's personal risk was supposed to parallel the risk of the Company, which would then purportedly act to prevent him from taking excessive risks—as the Company's risk would rise, so purportedly would McClendon's. The Company's 2009 Proxy statement explained the Boards rational for awarding McClendon the 2008 special bonus in terms of the alignment of interests that existed as a result of McClendon's FWPP participation.

145.    The Company's 2009 Proxy statement explained the Boards rational for awarding McClendon the 2008 special bonus in terms of the alignment of interests that existed as a result of McClendon's FWPP participation:

> The Compensation Committee further determined that an award to Mr. McClendon in the form of a drilling credit not only rewarded him for his role in the Company's successful 2008 transactions, but also served to align his economic interests with those of the Company. Under the terms of the employment agreement, Mr. McClendon and his affiliates are required to use the FWPP Credit to invest in the Company's drilling program in accordance with the FWPP, **thereby exposing him to the same risks and benefits that accrue to the Company from its drilling program**. Mr. McClendon's use of the FWPP Credit was also structured to match the form and deferred timing of a significant portion of the drilling credits received by the Company as part of the joint venture trans-actions. **In addition, by making the FWPP Credit award to Mr. McClendon subject to a clawback, the Compensation Committee provided a simple and direct incentive to Mr. McClendon to remain with the Company for at least the next five years,** which corresponds to the development of the properties covered by the various joint venture transactions. ***Because of other entrepreneurial opportunities that exist in the industry and Mr. McClendon's reduced Company stock holdings, the Compensation Committee focused on providing a retention incentive to Mr. McClendon that the Compensation Committee believed would be effective for multiple years*** without issuing substantial equity awards at stock prices the Compensation Committee viewed as depressed.

146. Similarly, the purpose and goals of the FWPP were reiterated in the Company's 2011 Proxy statement, in part, as follows:

> Founder Well Participation Program. Because of Mr. McClendon's unique role as co-founder of the Company, he is the only [Named Executive Officer] with the opportunity to participate and invest as a working interest owner in the Company's wells under the Founder Well Participation Program (the "FWPP"). We believe the FWPP fosters and promotes the successful development and execution of the Company's strategic business plan by: (i) retaining and motivating our CEO who co-founded the Company; (ii) aligning the financial rewards and risks of Mr. McClendon with those of the Company more effectively and directly than other performance incentive programs maintained by many of the Company's peers; and (iii) imposing on Mr. McClendon the same proportionate costs and risks incurred by the Company in its exploration and production operations. The Compensation Committee reviews Mr. McClendon's participation in the FWPP on a quarterly basis and periodically adjusts the acreage costs charged to Mr. McClendon to ensure his reimbursements reflect the Company's recent acreage activities

147. **No Skin in Game.** In fact, however, as investors ultimately learned, because the only collateral for the loans given to McClendon by parties related to and with material financial entanglements with Chesapeake was future revenues from drilling operations, and because there were no personal guarantees securing the loans, McClendon never had "skin in the game," and his use of these loans consistently violated the purpose and intent of the FWPP. Thus, because the related party loans given to McClendon were non-recourse loans, and since McClendon had no personal risk in not repaying them if the collateral proved valueless, he had no financial stake in the operations at all—except for a potential profit.

148. The fact that McClendon had used non-recourse loans to mitigate his risks shows that his interests were no longer aligned with the Company's or its shareholders.

If the bet on the wells paid off, McClendon would make tens or hundreds of millions of dollars in profits, but if the wells lost money, McClendon could simply default on the loan with no personal recourse.  First, this was a clear violation of the Company's stated Compensation Philosophy.  Second, in order for the Compensation Committee to enforce and maintain this purported Philosophy, the Committee would necessarily have discovered the existence of McClendon's loans from Company partners.  Finally, the fact that McClendon was financing his loans with non-recourse debt, only encouraged him to force Chesapeake to leverage itself as far as it could and to take on as much risk as it possibly could because if the experiment failed, McClendon could simply walk away as he had done after he suffered multi-billion dollar stock trading losses in 2008 and massive commodity trading losses in 2009.

149.    And this is exactly what transpired in the end.   Accordingly, it is not surprising that Chesapeake was described as being in a state of "financial crisis" by the time McClendon abandoned the Company.

150.    In describing the conflicts inherent in McClendon having interests not aligned with the Company and its shareholders at the same time that he was Chairman and CEO of Chesapeake, *Forbes* columnist Christopher Hellman stated that:

> **The crux of the issue is that Aubrey has no skin in the game…..no personal equity and no personal liability.**   Forget all this bantering whether McClendon's interests are aligned with shareholders.   That's tertiary.  Aubrey effectively has an option for which he has paid not a dime. So when dust settles, **if Aubrey makes $1 billion on this deal then that is money that rightfully belongs to shareholders**.  Now, suppose Aubrey borrowed his $1.1 billion but he signed a personal guarantee for $300 million.  Then it can be at least weakly argued that McClendon has taken a risk and perhaps is entitled to whatever profit comes his way.  Through my

viewer however, the whole arrangement is simply a pitiful example of corrupt corporate governance. **Has the word fiduciary any consideration in the Chesapeake boardroom? Apparently not.** What right has Aubrey to effectively "skim" 2.5% off the revenue of this company? I won't hold you in suspense….NONE.

151.    **Evidence of the Preferential Nature of McClendon's Loans**. In addition to the fact that the non-recourse nature of McClendon's loans meant that his interests were not aligned with the Company and that his risks were not the same as the Company's, McClendon's loans were granted on a preferential basis. The fact that McClendon had lost $2 billion of his personal fortune in 2008 betting on Chesapeake's stock, and probably hundreds of millions more on his 2009 massive long natural gas commodities futures position, made it impossible for him to obtain conventional financing at the levels he needed to fulfill his participation in the FWPP from independent parties who were not looking to purchase billions of dollars of assets from Chesapeake or finance billions of dollars of Company debt. The non-recourse nature of these loans only serves to underscore McClendon's lack of creditworthiness and the preferential nature of the loans he extracted from Company partners.

152.    In reality there was only one reason that the loans to McClendon were on a non-recourse and unsecured basis and that was because, at the time they were granted from 2009 to 2011. Thus, any attempt to aollateralize the loans would have exposed his beleaguered financial condition. Had McClendon Personally collateralized the billion plus dollars of loans, he would have had to produce a schedule of assets as he had previously done when he pledged his 2000 bottle wine collection to Goldman Sachs. During the relecant period this was *not possible* and producing such a schedule would have exposed the true nature of these loans.

153.    The non-recourse nature of McClendon's FWPP loans serves to evidence of McClandon's lack of finanacial stability or credit-worthiness, and is also evidence that these loans were :  (i) not the result of arms-length negotiations; (ii) they were not

provided on terms available to other, independent third-parties as was required by the FWPP; and (iii) they were nothing more than the misappropriation of corporate opportunity.  Clearly these loans, on their face,  evidence that they were not the product of an arms-length negotiation and were not provided on terms available to independent third parties, because the loans were secured by nothing more than the underlying assets—which were highly speculative in nature and which did not provide sufficient collateral to cover the principal amounts.

154.    **FWPP Terminated**.  The fact that McClendon voluntarily terminated his participation in the FWPP as soon as his secret sources of financing were belatedly exposed by *Reuters* is also evidence that McClendon could not continue to participate in the FWPP absent his ability to secure preferential financing.  Thus, on April 26, 2012, in the same release that stated that the Board was "generally aware" of McClendon's raising money from Company partners to finance his participation in the FWPP, the Board announced that it would not extend the FWPP beyond its expiration in 2015.  This release also stated that the Board and McClendon had committed to negotiate an early termination of the FWPP, in part, as follows:

> Chesapeake Energy Corporation (NYSE:CHK) today announced that its Board of Directors has determined that it does not intend to extend the company's Founder Well Participation Program (FWPP) with its chief executive officer, Aubrey K. McClendon, beyond its present 10-year term ending December 31, 2015. The Board of Directors and Mr. McClendon have committed to negotiate the early termination of the FWPP and the amendment to Mr. McClendon's employment agreement necessary to effectuate the early termination…

155.     After only three working days, on May 1, 2012, defendants published a release that announced that the Board and McClendon had agreed to the early termination of the FWPP.[14]  This release stated, in part, the following:

> Chesapeake Energy Corporation (NYSE:CHK) today announced that its Board of Directors has renegotiated the terms of the company's Founder Well Participation Program (FWPP) with Chairman and Chief Executive Officer Aubrey K. McClendon to provide for the early termination of the FWPP on June 30, 2014, 18 months before the end of its current term on December 31, 2015. ***Mr. McClendon will receive no compensation of any kind in connection with the early termination of the FWPP.***
>
> The FWPP, which was approved by shareholders for a 10-year term in 2005, in conjunction with Mr. McClendon's employment agreement with the company, provides Mr. McClendon a contractual right to participate and invest as a working interest owner (with up to a 2.5% working interest) in new wells drilled on the company's leasehold. ***Mr. McClendon has agreed to forego such contractual right 18 months early without compensation***.

156.     After 2008, the only asset McClendon had that he could leverage to secure the hundreds of millions or billion dollars he needed to continue his participation in the FWPP was his ability to sell billions of dollars in Company assets and to direct Chesapeake's massive borrowing.  McClendon was able to leverage his position over the Company as its then Chairman and CEO and he took loans from Company partners at the same time these partners were spending billions of dollars to purchase Company assets or they were lending billions of dollars to the Company to finance its huge operating gap.  Thus, not only were these loans provided on a preferential basis because McClendon did not have the creditworthiness or liquidity to qualify for them, but McClendon was actually competing with the Company to obtain these loans from the same lending partners that Chesapeake was attempting to get funding.

---

[14] This release also announced that McClendon would be replaced as Chairman of the Board by an independent, Non-Executive Chairman in the near future.  McClendon relinquished the position of Chairman and continued as Chief Executive Officer.

157.   It was not a coincidence that McClendon terminated his participation in the FWPP almost as soon as it was discovered that he had borrowed money from associates of Chesapeake who were engaged in billion dollar asset purchase and debt financing.

**F.   MCCLENDON'S LOANS FROM COMPANY PARTNERS WERE MATERIAL, THEY SHOULD HAVE BEEN REVIEWED BY THE AUDIT COMMITTEE, AND THE LOANS THEMSELVES VIOLATED THE TERMS OF THE FWPP**

158.   **Board "Fully Aware."**   When the *Reuters* report was published, and immediately following the decline in the price of Chesapeake stock caused as a direct result of the market learning that McClendon had financed over a billion dollars of his Company well purchases with money he raised from Company partners, defendants immediately went on the offensive and fired off a press release, through the Company's General Counsel, Henry Hood, that both defended the FWPP and McClendon's financing of his participation therein.   This release reported that the Board was, **"fully aware"** of McClendon's financing transactions.   This release, published on April 18, 2012, stated in part the following:

> OKLAHOMA CITY--(BUSINESS WIRE)--Chesapeake Energy Corporation General Counsel Henry J. Hood issued the following statement in response to recently published media reports: "The Founders Well Participation Program (FWPP) has been in place since the company's founding and was reapproved by shareholders by a wide margin in 2005. *The terms and procedures for the program are clear and detailed in every proxy for all shareholders to see*. Mr. **McClendon's interests and Chesapeake's are completely aligned**. In addition, there are numerous third-party participants in the company's wells, including some of the largest energy companies in the world, that monitor the actions of the company through a number of processes, including well audits, reporting, governmental filings and hearings, participation in development plans and marketing of production. **The suggestion of any conflicts of interest is unfounded."**

> Hood also added, "**The Board of Directors is <u>fully aware</u> of the existence of Mr. McClendon's financing transactions** and the fact that these occur

is disclosed in the proxy. Additionally, the total amount of his cost obligations and revenue attributable to the FWPP for each year are detailed in the proxy. ***The FWPP fully aligns the interests of Mr. McClendon with the company** and the Board of Directors supports this program as does the majority of its shareholders.*"

159.    **Board Only "Generally Aware."**  Days later, however, on April 26, 2012, the Board backtracked on its prior statement that it was "fully aware" of McClendon's billion dollars of loans from Company partners, and issued a release that stated that the Board was only  "generally aware" thereof.  This release stated, in part, the following:

> Chesapeake also wishes to clarify a statement appearing in its April 18, 2012 press release captioned "Chesapeake Energy Corporation General Counsel Henry J. Hood Issues Statement." **The statement that "the Board of Directors is fully aware of the existence of Mr. McClendon's financing transactions" was intended to convey the fact that the Board of Directors is generally aware that Mr. McClendon used interests acquired through his participation in the FWPP as security in personal financing transactions**. <u>The Board of Directors did not review, approve or have knowledge of the specific transactions engaged in by Mr. McClendon or the terms of those transactions.</u>

160.    In the April 26, 2012 release the Board expressed its position that it was only generally aware that McClendon had pledged his interests in the FWPP to raise money.  This, however, says nothing as to whether the Board knew or was fully aware or was generally aware or blissfully unaware that McClendon had borrowed over $1 billion from lenders with material business entanglements with Chesapeake.  From their general statement that they did not review these loans, it could be inferred that the Board was recklessly, or grossly-negligently unaware.

161.    Regardless of what manner the Board abdicated its duty to inquire how McClendon was financing his ever escalating participation in the FWPP at a time when the Board knew or should have known or recklessly disregarded that McClendon lacked

the financial wherewithal to support his FWPP commitment, it is clear that investors and market commentators considered the existence of these loans to be material, and required disclosure. According to a May 21, 2012 *Bloomberg* report, Michael Garland, the executive director of governance for the New York City Comptroller, who controls pension funds that own 1.9 million Chesapeake shares stated, "[The Board] had an obligation to make themselves full aware, to review and disclose these transactions… The Board has repeatedly failed to exercise independent oversight… [And now] They're circling the wagons."

162.     Moreover, the related-party nature of McClendon's FWPP loans was material to investors because it appears, to at least one analyst, that McClendon may have been borrowing against his interest in the future capacity of those wells, which were to be drilled in 2013 and 2014 just to finance this acquisition. This theory was postulated by Sterne Agee in a report published on May 14, 2012, in part, as follows:

> The decision to end [the FWPP] in June 2014, combined with reports that McClendon's personal loans outstanding are well above $1.1 billion, lead us to believe McClendon may be borrowing against his interest in Chesapeake's wells to be drilled in 2013 and 2014, which is the likely reason why the plan is scheduled to remain in place for another two years.

163.     Thus, not only did McClendon use the money he raised from Company partners to finance his FWPP obligations, but he then likely turned around and leveraged the future revenues from those wells just to pay for their acquisition. If McClendon had also sold the expected future revenues of the wells that he had purchased with funds received from Company partners, that would also have been material and would have wanted to be known by rational investors, because the existence of these loans as well as

the additional leverage attached thereto could have had an impact on key decisions made by McClendon concerning the Company's future asset purchases and asset sales.

### G.   MCCLENDON RAN A "MASSIVE COMMODITIES HEDGE FUND" OUT OF THE OFFICE OF THE CEO, WHILE MANAGING THE COMPANY'S $17 BILLION HEDGE FACILITY

164.   On May 2, 2012, *Reuters* published a follow-up in-depth report on Chesapeake that uncovered even more significant breaches of duty and conflicts of interest that had gone undisclosed and unchecked at the highest levels of the Company for many years.  The *Reuters* story that day titled, "*CEO Aubrey McClendon ran a $200 million fund that invested in commodities produced by Chesapeake.*"  The subtitle read, "MOONLIGHTING CEO: McClendon co-owned and was actively involved in a private hedge fund at the same time he ran Chesapeake Energy. 'Strict codes' ban such dealing at most rivals, says one risk-manager consultant."

165.   *Reuters* second Special Report described the situation, in part, as follows:

> Behind the scenes, a Reuters investigation has found, **McClendon also ran a lucrative business on the side: a $200 million hedge fund that traded in the same commodities Chesapeake produce.** … [F]or at least four years, **from 2004 to 2008, McClendon's attention extended well beyond his job at Chesapeake.**

166.   It was obvious from the *Reuters* report that McClendon was not a passive investor in this fund but rather actively ran the fund from the office of the Chairman while purportedly running Chesapeake.  As evidence of this, *Reuters* reported, in part, the following:

> During that time, said a veteran trader who helped run McClendon's private hedge fund, the Chesapeake executive **engaged in "near daily" communications and "exhaustive" calls to help direct the fund's trading**.
>
> The fund, Heritage Management Company LLC, was started by McClendon and Chesapeake co-founder Tom Ward. The hedge fund listed Chesapeake's headquarters in Oklahoma City as its mailing address,

documents show. … The fund also earned McClendon and Ward management fees and a cut of profits from outside investors.

* * *

**A search of Chesapeake's public filings turned up no disclosure of McClendon's hedge fund, Heritage**. …

**A Heritage telephone number listed in several business directories was answered "Chesapeake Energy"** by a person who said she hadn't heard of the fund…

**Heritage also shared at least one employee with Chesapeake:** John D. Garrison. Garrison, an accountant listed as executive business manager for Chesapeake Energy in federal election campaign donation filings and as a Chesapeake employee since 2004, handled the hedge fund's bookkeeping, Cirino said. The arrangement is not illegal.

***Business directories including Dun & Bradstreet also list Garrison as Heritage's chief financial officer***. Garrison declined to comment when a reporter visited his home near Oklahoma City.

167.     The *Reuters* report showed that Heritage was never designed to be, nor was it ever, a passive investment vehicle for McClendon and Ward.  To the contrary, *Reuters* reported that when the fund was started in 2004, McClendon and Ward invested a total of $40 million of their own cash and "insisted on full ownership and involvement in the fund's trading strategy." Heritage's former head trader and risk officer was also quoted as stating, "[t]hat they were in charge was made very clear."  Moreover, after 2007, it appears that McClendon was even more involved with the trading and management of Heritage because after that time, the fund's traders quit after they were denied equity in the fund.  According to *Reuters*, "the executives weren't ready to cede control… and the traders left to open their own shop."

168.     **Market Stunned.** Experts on energy trading, corporate governance and commodity-market regulation said they were stunned by the revelations contained in the second *Reuters* report.   Quoted therein were several experts who expressed their amazement, as follows:

> "**An executive's first responsibility is to shareholders** and the betterment of their investment," said <u>Carl Holland, who ran the trading-compliance department at former U.S. oil major Texaco</u>. "**Personal trading in the commodity around which the CEO's business is based would be a clear no. We would never have tolerated that, ever.**"

> <u>Thomas Mulholland, a risk-management consultant to oil and gas producers for Golden Energy Services in St Louis</u>, said such matters are "taken very seriously by energy companies, and there are strict codes against it. **Even if there is just a whiff of impropriety,**" he said, "**it can be enough to lead to a termination.**"

> The commodities markets are less regulated than equity markets, where corporate executives are prohibited from trading stock in their own companies based on undisclosed financial information. In commodities markets, insider trading isn't illegal unless price manipulation can be proven.

> Nonetheless, **personal dealing in energy markets is typically forbidden by oil and gas companies for a variety of reasons**.

> In Chesapeake's case, **McClendon would have been aware of major decisions that could affect natural gas prices before that information became public. Accounting for 5 percent of U.S. natural gas production, Chesapeake holds tremendous sway over markets.** On January 23, the company announced sharp output curbs in response to low prices. In response, U.S. natural gas futures surged by 8 percent the same day.

> "If the company needs to make an operating decision which might move the market against the CEO's positions, there's **a risk that will influence the decision-making at the top of the company**," said <u>Jeff Harris, former chief economist at the market's U.S. regulator, the Commodity Futures Trading Commission, and now professor of finance at Syracuse University</u>.

169.    Analyzing the facts of the *Reuters* Special Report, the following day, May 2, 2012, *Forbes* published its own report titled, "*McClendon's Secret Hedge Fund Appears to Violate His Fiduciary Duty to Chesapeake*," which stated, in part:

> No mincing words. From the looks of it, **this secret hedge fund appears to be a violation of their fiduciary duty to Chesapeake**. "Fiduciary duty" is a term you hear a lot, but what does it mean? You can learn more than you ever wanted to know from Lyman Johnson and David Millon's "Recalling Why Corporate Officers Are Fiduciaries" in the William & Mary Law Review. (I read it so you don't have to.)

> In it they write:

>> One cornerstone fiduciary duty owed by officers is a duty of loyalty, which requires the agent to act solely for the benefit of the corporate principal. There are many aspects to the agent's duty of loyalty. These include: not acting adversely to the principal without consent; not acting on behalf of one with interests adverse to the principal without consent; not competing with the principal; not wrongly appropriating a corporate opportunity; providing an accounting to the principal for profits; and not using or wrongly communicating confidential information. Moreover, as with the duty of loyalty for directors, an officer's duty may include not only a "non-betrayal" dimension, but also a more affirmative "devotion" aspect. This would require an officer to advance the well-being of the company, not simply refrain from harming it.

> **A lot of that explication seems to apply to Ward and McClendon's Heritage   Management Company hedge fund.** *The fund was not disclosed to shareholders. Its operation was not undertaken for the benefit of shareholders. Its profits were neither shared with shareholders nor disclosed to shareholders*. Why not?

170.    The *Forbes* report noted that McClendon's secret trading raised the possibility of a host of complex conflicts of interest, including: (i) whether McClendon profited off of non-public information about Chesapeake's trades; (ii) whether McClendon was front-running Company trades; and (iii) whether the fund paid rent to Chesapeake for being allowed to operate from a Chesapeake building. The *Forbes* report

also refuted the explanation offered by defendants, that because McClendon only took long positions and that the Company generally hedged by taking short positions, that there was no chance of conflict. *Forbes* explained the substantial conflict that did exist:

> The company naturally says there was nothing improper going on and has assured me that McClendon and Ward only ever took long positions on natural gas. That is, they only bet that the price would go up. The company, on the other hand, being naturally long on gas (very, very long), would only have reason to enter into what's effectively short positions.
>
> **I'm not sure it matters what the hedge fund's positions were**. But let's assume that indeed the hedge fund was always long. Given that the company's positions are always net short, could this mean that **McClendon and Ward might have been acting as counterparties to their company's own hedging** (even if through an intermediary)? That would be **a colossal conflict of interest.**
>
> It's one thing for McClendon and Ward to exclude Chesapeake shareholders from their private investments in restaurants or real estate or NBA basketball (they joined up to buy the Seattle SuperSonics and turn them into the Oklahoma City Thunder). But **when a business opportunity involves natural gas, and the opportunity is pursued from within Chesapeake's offices, it seems like shareholders have been cheated**.
>
>                  * * *
>
> These men may have founded Chesapeake Energy, but once they took the company public it was no longer theirs but the shareholders. As directors and officers of the company they owed their shareholders a fiduciary duty to look out for their interests first. That's why **shareholders gave them millions of dollars a year in salary and that sweetheart perk known as the Founders Well Participation Program. That should have been enough**.

171.    The *Reuters* report also demonstrated other conflicts that potentially existed as a result of McClendon operating a $200 million personal fund while simultaneously managing billions of dollars in Company hedging instruments, and how this created unique opportunities for abuse and additional risks for investors.  The *Reuters* report stated the following:

**Another potential problem is known as "front-running."** That's when a trader buys or sells a commodity in advance of a client's or his company's orders. In theory, McClendon's first-hand knowledge of Chesapeake's own plans to trade would enable him to profit by trading ahead of Chesapeake - **a move that could raise costs for the company.**

"*Advance knowledge of Chesapeake's activities could be perceived as having insight into the movement of commodities prices, which certainly raises* **conflict-of-interest issues** *as well as* **ethical issues** about the ability to enrich himself on non-public information," said Tim Rezvan, oil and gas industry analyst at Sterne Agee in New York.

172.    It appears that McClendon and the Board realized the serious conflicts that existed in allowing the Chairman and CEO of a company that had the ability to change market prices with its own hedging activities to trade simultaneously for his own account in the market for the commodities that the company produces, and McClendon had previously lied to keep this information from the public; *Reuters* reported that, "[w]hen *Reuters* asked McClendon last year whether he traded for himself in energy markets, McClendon said: "*No, no, no. I'm part of Chesapeake's hedging committee.*"

173.    In addition to the universally negative reaction by the investment community, on May 2, 2012, it was reported that Senator Bill Nelson, of Florida, had requested that the Justice Department investigate McClendon for potential fraud, price manipulation and conflicts of interest.   Thus, while the Company had not engaged in hedging activities in 2012, as natural gas prices were trading near 10-year lows and falling, this investigation would focus on prior years when natural gas prices were experiencing periods of high volatility and when Chesapeake used the futures market to "lock in" high prices for the gas it sold.   Between 2006 and 2011, Chesapeake reported $8.4 billion in realized hedging gains.

174.    Experts quoted by *Reuters*, such as Elizabeth Nowicki, a Law professor at Tulane University, who has written extensively on corporate governance, as well as analyst Tim Rezvan, immediately concluded that the disclosure of McClendon running a

hedge fund out of the Chairman and CEO's office at Chesapeake was material and should have been disclosed.  As evidence of this, *Reuters* reported  the following:

> "If correct," Rezvan said, **"these disclosures would be even more alarming than the personal loans."**

> A securities law professor said the very existence of the hedge fund could prompt a securities investigation.

> "I would argue, and I think the SEC would argue, that **the failure to disclose that you are engaging in this kind of conduct can constitute a securities fraud problem**," said Elizabeth Nowicki, a professor at Tulane University. She said a failure by McClendon and Ward to disclose their fund to Chesapeake's shareholders may constitute a **"material omission"** that could draw SEC scrutiny.

> **"A reasonable investor would want to know that the CEO could be in a situation where he's betting against the interests of the company personally**," Nowicki said. "**That, it seems to me, is a slam dunk**."

175.    Remarkably, according to *Reuters*, after posting positive returns in 2004 and 2005, McClendon and Ward opened the hedge fund to outside investors while operating the fund out of McClendon's offices at Chesapeake "charging outside investors a management fee equal to 2 percent of assets and pocketing 20 percent of the fund's profits."

176.    According to *Reuters*, Heritage continued operations through 2008 and into 2009.  *Reuters* reported that the fund returned all of the money from external investors by 2008 and ceased operations in 2009.  What happened next to McClendon's commodity-trading ventures is unclear but this much is known, by June 30, 2008 - as natural gas and oil prices were peaking, and just before the financial crisis - McClendon and Ward both held huge identical "long" positions in natural-gas derivatives, valued at over $2.3 billion each, and McClendon also held approximately $250 million of oil contracts, according to confidential trading data disclosed in 2011.  *Oil fell by more than __75 percent__ between July and December and natural gas futures dropped almost __60 percent__.*

### H.   BOARD KNEW OF HERITAGE IN 2009: RATIFIED AND NEVER DISCLOSED

177.    At the time the existence of Heritage first became known to investors, *Reuters* reported that it was still "unclear" whether McClendon received permission from Chesapeake's Board to run a hedge fund and actively trade in the commodities markets for himself, or whether his trading continued. At that time, Chesapeake and McClendon's personal spokesman declined to comment.

178.    **Board "Blessing."** On May 8, 2012, however, *Reuters* published another "Exclusive" report on Chesapeake in which it reported that the Board had learned about McClendon running a hedge fund out of Chesapeake's offices in 2009 and had given its "blessing," despite never disclosing the existence thereof or the risks created thereby. The *Reuters* report, titled "After McClendon's trades Chesapeake Board gave blessing" stated, in part, the following:

> In its latest employment contract with CEO Aubrey McClendon, **Chesapeake Energy Corp gave him permission to trade commodities for himself after he already had begun doing so**.

> Giving the CEO explicit license to play the markets represented an extraordinary incentive that enhanced one of corporate America's most generous compensation plans and reinforced the unique treatment afforded to McClendon by Chesapeake.

> **Oil and gas producers say they typically prohibit such trading by executives because of the potential for conflicts of interest**. Indeed, Reuters found that McClendon, 52, was granted greater leeway to participate in external ventures than were his top lieutenants.

> The 2009 contract did, however, limit McClendon in at least one way: Months after his personal hedge fund shut down, the agreement explicitly banned McClendon from taking an active role in any hedge fund.

> ***The contract raises new questions about what Chesapeake board members knew of McClendon's personal investments, and whether his***

**dealings might be at odds with his fiduciary responsibilities** as head of
the second-largest natural gas producer in the United States.

179.    McClendon's 2009 employment contract, which extended for five years
was reportedly the first to include a specific mention of hedge funds or commodity
market investments, as part of a new sub-section governing the types of investments
McClendon could pursue; it also said that McClendon was allowed to trade a range of
financial instruments such as commodities.  It also stated that McClendon could put cash
into a "passive investment entity," including a hedge fund, provided it "does not actively
engage in (exploration and production) activities," and "for which the executive does not
directly or indirectly provide input, advice or management."

180.    *Reuters* reported that the reasons the Chesapeake Board granted the
changes remained unclear, however, the revisions indicated that the Board was aware of
McClendon's personal hedge fund by 2009 and worried that such a side business might
run afoul of shareholders, according to legal experts who reviewed McClendon's current
and prior contracts.   While Chesapeake's Board hadn't admitted whether it knew about
Heritage or whether it vetted the hedge fund's trading for any conflicts, legal experts have
concluded that the Board was probably acting in reaction to facts that they knew, but
which were never disclosed.  "In 2004, they had a contract that was not nearly as long,
not nearly as precise," said John Coffee, a contract law professor at Columbia University.
"It looks like the board learned something over the years and was increasingly beginning
to restrict his activities," Coffee said of McClendon.

181.    As further evidence that the Board was aware of McClendon's trading
activities by 2009, *Reuters* analyzed McClendon's current and prior employment
agreements and their many revisions.   Thereafter, *Reuters* concluded, in part, the
following:

> Reuters reviewed McClendon's employment contracts with Chesapeake,
> filed with securities regulators, since 1997. In that time, the contracts have
> been revised or amended about a dozen times, for a variety of reasons.

* * *

One example of the changes comes in a section of the contract called "outside activities." **Initially, that section imposed a blanket ban on McClendon serving as an officer, general partner or member of an outside enterprise**. It did not differentiate between public or private firms.

In July 2001, that ban was relaxed. The new contract said he could become a "general partner or member of any corporation, partnership, company or firm," so long as the activity was a "passive investment" that involved "minimal" time. It barred him from any role in a "public" company.

*In July 2005, shortly after Heritage was established, the contract was again revised. The new contract said he could not "engage in activities which require such substantial services"* that McClendon would be "unable to perform the duties assigned to the Executive in accordance with this Agreement." *It also said he could not "serve as an officer or director of any publicly held entity" but made no other mention of external management roles.*

That text remains in place in the last contract, which took effect March 1, 2009. *The new text addressing commodity trading and hedge funds also has been in place since then.*

McClendon's contract gives him more latitude for outside ventures than his subordinates are allowed.

Chesapeake's contracts with at least four other senior executives say the executives may not "engage in other business activities independent of" Chesapeake. They specifically ban the executives from serving "as a general partner, officer, executive, director or member of any corporation, partnership, company or firm."

182.    Moreover, McClendon's Third Amended and Restatement Employment Agreement, which took effect in January 2004 ("2004 Employment Agreement") provided that McClendon was "employed on a full-time basis," and that he would use "best efforts and due diligence to assist the Company in achieving the most profitable operation of the Company and the Company's affiliated entities consistent with developing and maintaining a quality business operation."  This or substantially similar

language was contained in each of McClendon's employment agreements effective from 2004 through 2008.

183.    The 2004 Employment Agreement also prohibited defendant McClendon from engaging in business independent of his employment by the Company that requires "any substantial portion" of his time, except that he could be involved in "passive investments" as a partner or member of an enterprise if doing so would not violate the terms of employment and "require only a minimal portion" of his time.  McClendon and the Board amended the 2004 Employment Agreement in 2005.  This revised agreement included similar language, but changed the prohibition against side activities requiring "any substantial portion" of time to only prohibit McClendon from engaging in activities that "require such substantial services" of McClendon that he would be "unable to perform the duties" assigned to him under the agreement.

184.    The 2005 amendment also eliminated the language restricting participation in "passive investments."  Instead, it generally provided that McClendon would not be "restricted from maintaining or making investments, or engaging in other businesses, enterprises or civic functions" if doing so would not violate the other restrictions on McClendon's activities.   This pattern of employment agreement modifications demonstrates that the Board had agreed to change these provisions because they were aware, or should have been aware, that McClendon was spending more and more time and was devoting more and more effort to managing Heritage.  There was no reason to modify his employment agreements absent McClendon's desire to participate in Heritage and to run his hedge fund from his offices at Chesapeake.

185.    Defendant McClendon's use of Chesapeake's resources to run Heritage appears to be consistent with the terms of his employment agreement—further indicating that the Board was well aware of McClendon's hedge fund activities.  Amendments to McClendon's employment agreements between 2004 and 2008, relating to use of Chesapeake staff, highlight other discussions between McClendon and the Board that

foreseeably would have prompted members of the Board to inquire into the nature of McClendon's personal business activities. Consistent with *Reuters*'s finding that Heritage and Chesapeake shared an accountant, McClendon's 2004 Employment Agreement provided that McClendon could, free of charge, "utilize the Company's office space, computer facilities and personnel to provide accounting services, records maintenance and tax advice and tax return preparation for the Executive's … personal business investments and activities."

186.     These terms changed slightly in July 2005, at which point McClendon was required to reimburse the Company for one-half of 50% of the salaries and bonuses of employees who were primarily engaged in providing support services other than secretarial or general administrative services to McClendon for his personal and business activities.  In January 1, 2007, McClendon's employment agreement was amended to require that he reimburse the Company for 100% of salaries and bonuses.  McClendon's 2008 Employment Agreement required McClendon to cover even more direct and indirect costs relating to the employees who provided services to McClendon outside his duties as Chairman and CEO of Chesapeake.

187.     Further accommodations by the Board with regard to defendant McClendon's employment agreements confirm the Board was aware of Heritage. McClendon's 2004 Employment Agreement provided that McClendon could be involved with "passive investments" as a partner or member of another enterprise to the extent it would not violate the terms of employment or require only a "minimal portion" of his time. The agreement also provided that McClendon could not engage in activities that required "any substantial portion" of time.  But the year after McClendon and Ward formed Heritage, McClendon and the Board agree to amend McClendon's employment agreement to eliminate the time restriction on "passive investments" and the general restriction on activities that would require "any substantial portion" of time.

188.    Instead, from July 2005 through at least 2008, McClendon's employment agreements provided that he could not engage in activities that would "require such substantial services" of McClendon that he was "unable to perform the duties" assigned under the agreement. By eliminating express restrictions on McClendon's ability to engage in time-consuming activities (namely with regard to investments), the Board enabled McClendon to spend more and more time on his hedge fund.  In negotiating these new terms and overseeing and monitoring McClendon as was required by the Committee Charters and Code of Conduct to ensure compliance therewith, the Board necessarily must have known about McClendon's activities with Heritage, or the Board was reckless or grossly negligent in not knowing.

189.    Finally, because defendant McClendon's active involvement with Heritage presented conflicts of interest between McClendon and the Company, the Code of Conduct at the time required McClendon to report the conflicts of interest to the Company, and required the Board to eliminate or mitigate such conflicts.

## I.    A HUGE CONFLICT OF INTEREST

190.    Market commentators were quick to realize the substantial conflicts of interest inherent in McClendon's secret hedge fund, and the significant undisclosed risks that such an arrangement caused shareholders.  As evidence of this, on May 3, 2012, the Certified Financial Advisors Institute published a report on Chesapeake titled, "*Chesapeake Energy: Investors Fume over Pattern of Poor Corporate Governance*," which stated in part the following:

> It gets better (or worse, if you are a shareowner or Aubrey McClendon). It was revealed yesterday in another Reuters report (kudos to Reuters on this ongoing story) that Mr. McClendon secretly ran a $200 million hedge fund from 2004 – 2008 that specialized in the commodities Chesapeake produces. That this created **a huge conflict of interest** for Mr. McClendon would have enraged me as a shareholder, but I never would have known — **none of this was ever disclosed to shareowners.**

191.    **Noster Capital LLP Letter to Board**.   On May 12, 2012, Pedro de Noronha, managing partner and portfolio manager at Noster Capital, a leading hedge fund based in the United Kingdom sent an "Open Letter" to the Chesapeake Board in which he demanded the immediate termination of McClendon for cause.  In addition to stating that CEOs at other public companies had been removed for far lesser infractions, his letter also stated, in part, the following:

> Noster Capital can sympathize with the fact that some members of the Board may have been unaware of the amount of personal financing that Mr. McClendon had linked to his Founder Well Participation Program ("FWPP"), **although good corporate governance should have mandated that the Chief Executive Officer of a company whom you oversee reports to you any and all material information that could conflict his personal interests with those of Chesapeake Energy's shareholders**.

> Once the news of Mr. McClendon's $1.1 billion debt was made public, the **Board lost significant credibility** with investors by claiming initially that you were fully aware of these financing arrangements, only to moderate your stance eight days later by retracting the Company Counsel's prior statement, claiming that "*The Board of Directors did not review, approve or have knowledge of the specific transactions engaged in by Mr. McClendon or the terms of those transactions.*" In our opinion, **the final insult came when the "punishment" for Mr. McClendon's substantial use of personal leverage (news that has led to a formal SEC inquiry) was simply to strip him of the company's Chairmanship and to terminate the FWPP earlier than originally anticipated. <u>We are sorry to say but a truly independent Board would have terminated its Chief Executive Officer on the spot for a far lesser infraction, especially given Mr. McClendon's historical use of leverage.</u>**

> \* \* \*

> **Our proposal is for the Board to <u>immediately terminate Mr. McClendon</u>** and to retain him as an unpaid consultant for an indefinite period in order to help negotiate the asset sales that are currently being evaluated and to give the necessary guidance to a new professional management team that needs to be put in place. In this instance, and despite ceasing to be remunerated by Chesapeake Energy, Mr. ***McClendon's interests would remain very well aligned with those of***

*shareholders, as he still needs the company to be successful in order to repay the $1.1 billion which he owes against the wells that he has acquired under the FWPP.*

192.    The Noster Capital letter to the Chesapeake Board demanding the termination of McClendon for cause continued as follows:

> We urge you, *as members of the Board of Directors of Chesapeake Energy, to take immediate action. Not only to prove that you are truly independent, but to defend the interests of Chesapeake Energy's minority shareholders - which after all, is the fiduciary mandate you have.*

193.    **Activist Investor Carl Icahn's Letter to the Board.**  The letter by famed activist investor Carl Icahn to the Board of Chesapeake was even more critical of the extreme breakdown of corporate governance and the allowance of unresolved conflicts of interest that had gone unchecked at the Company.  Carl Icahn's letter to the Chesapeake Board dated May 25, 2012, stated in substantial part, the following:

> The past several weeks have proved a difficult time for shareholders of Chesapeake Energy. **The basic function of a board is to oversee management and to hold it accountable. We believe the board has failed this duty in a dramatic fashion.** Rather than act as a source of stability and provide assurance to shareholders**, this board has led the company through a highly publicized spate of corporate governance breakdowns while amassing an astounding $16 billion funding gap, which we believe has contributed to the share price decline of over 55% from the 52-week high**.
>
> **We are not alone in criticizing this board**. Shareholders have filed lawsuits, withhold campaigns and have otherwise voiced disapproval and all three major proxy advisory firms (i.e., ISS, Glass, Lewis and Egan-Jones) have advised shareholders to withhold votes from directors at the 2012 annual meeting. **Chesapeake shareholders will benefit neither from a constant stream of negative news reflecting upon the companies troubled past, nor from a half hearted attempt by the board to make the minimum possible number of changes to skate by for one more year**. <u>**The board must not only find a way to eliminate the enormous funding gap, but also the more substantial creditability gap.**</u>

We recently had dinner with Aubrey McClendon to suggest a manner by which that credibility gap might be filled. The company has publicly identified several actions including reduced spending and asset sales which will relieve some of the funding gap, yet the board still seems to miss the point. We believe that a management team and a business plan without strong oversight and accountability is doomed to fail. Accordingly, at that dinner we asked Aubrey to consider direct shareholder representation on the board. ***The next day we were informed that the board refused to even consider this request prior to the selection of a chairman of their choosing.* We believe that this response was completely disingenuous and illogical. *Why is appointing a new chairman, sometime out in the future, an excuse for putting off considering whether to have shareholders, the true owners of the company, have immediate representation on this very flawed board in this very fluid situation***?

The board has recently announced that it is going to select a new Chairman and separate the Chairmanship and CEO roles. While this is certainly a step in the right direction, ***appointing a new Chairman in the manner that Chesapeake is doing, does not exactly elevate corporate governance to the "gold standard" as the board would have shareholders believe, instead* it is woefully inadequate in both process and substance. *Having the current board select a new chairman without shareholder approval and without allowing for shareholder representation is akin to asking the fox, who has plundered the hen house, to choose another fox to assist it in standing guard over the remaining hens***.

***To engender any meaningful credibility among shareholders, corporate governance reforms cannot, in our view, be* led by directors whose irresponsible actions have brought this company to the edge of the proverbial cliff.** Accordingly, we propose that at least 4 of the current directors (other than Louis Simpson) should be immediately replaced by two persons designated by us and two persons designated by another large shareholder such as Southeastern Asset Management, the company's largest shareholder. In our opinion, only when these changes are effectuated will the board be truly independent and more importantly will investors come to believe that promises made will be promises kept; when a capital plan is agreed upon it will be maintained, not diverged from as it has in the past.

\* \* \*

***What is important is that this pernicious funding gap, which we believe this board has created, must be filled***. The board must bite the bullet, come up with a realistic plan and stick to it. In our opinion, shareholder

representation, especially on this board, is needed to make this happen. A new chairman alone, appointed by this board, will not accomplish this objective.

**It seems to us that the board has been quick to insulate themselves from accountability to shareholders and has expressed no interest in demanding accountability from management**. A new plan and good intentions are insufficient to close the gap between asset value and stock price. We must have a board whose primary concern is enhancing the value of shareholders, a board that has the strength to hold management accountable, and the willingness to be held accountable themselves. In our view, only a board that has these attributes can enhance the value of this company.

We, as one of your largest shareholders, wish only the best for this great company and do not wish to bring about any additional distractions, however, we believe that without a strong board to demand accountability there is a significant chance that the value destruction shareholders have seen in the past few weeks may become irreparable. *We cannot stand idly by and allow this to happen. Therefore, if you continue to arbitrarily refuse the request we have made for shareholder representation, we, as activists, will immediately take whatever "actions" we feel are necessary to protect the value of this company*.

194.    **NYC Comptroller Liu Letter to the Board**.    Similar to Carl Icahn's letter, on May 17, 2012, John C. Liu, the Comptroller of the City of New York also wrote a letter to the Chesapeake Board on behalf of the 1.9 million shares that were then held by the New York pension funds that Liu was responsible for managing.   Like Carl Icahn's letter, Comptroller Liu's letter also criticized the Board for lack of corporate governance and for allowing conflicts of interest to go unchecked and for the breaches of duty by the Company's directors.   Comptroller Liu stated the following:

On behalf of the New York City Pension Funds (NYC Funds**), I urge you to vote WITHHOLD on director nominees Richard K. Davidson and V. Burns Hargis …**

**Revelations since mid-April of substantial, previously undisclosed liabilities, transactions and conflicts of interest** involving Chesapeake and its CEO have heightened our concerns and **fueled a 27 percent decline in its share price.** Shareowners urgently need new directors who are willing and able to exercise strong, independent oversight of Aubrey



McClendon, a willful CEO with a penchant for risk. Among the revelations reported in the press or by the company itself:

> Mr. McClendon received over $1 billion in previously undisclosed loans in the last three years secured by his stake in Chesapeake's oil and gas wells, including from firms doing business with Chesapeake; the board was "generally aware" of the loans, but neither reviewed nor approved them (Reuters, 4/18/12; Chesapeake, 4/26/12).May 17, 2012

> The Securities and Exchange Commission (SEC) opened an informal inquiry into the Founders Well Participation Plan (FWPP), which allows Mr. McClendon to invest in company wells, and the Internal Revenue Service is also looking into this unusual plan (Chesapeake, 5/4/12 Form 8K; 5/11/12 proxy statement).

> Mr. McClendon reportedly ran a $200 million hedge fund from 2004 to 2008 that traded in the same commodities that Chesapeake produces (Reuters, 5/2/12). …

> Chesapeake reportedly has $1.4 billion in off-balance-sheet debt in the form of volumetric production payments (VPPs), which are essentially debt that is repaid in fuel rather than cash; prior to the report, most analysts had estimated the total VPP liabilities at less than $600 million (Wall Street Journal, 5/10/12).

195.     Comptroller Liu's letter continued:

***These recent revelations are particularly troubling given that Chesapeake's directors have faced high shareowner opposition votes and litigation in recent years for approving related-party transactions with the CEO, as well as for awarding excessive CEO compensation and perquisites despite long-term underperformance and being unresponsive to shareowner concerns***. These are also among concerns that my Office raised in a March 2011 meeting with Chesapeake's lead independent director.

In addition to the FWPP referenced above, for example, the company engages in multi-million dollar deals with the professional basketball team in which Mr. McClendon owns 19.2 percent. According to its 2012 proxy statement, Chesapeake paid $4.8 million last year under long-term agreements covering license and naming rights and sponsorship, and an additional $4.6 million to purchase regular season and playoff tickets.

**Moreover, governance reforms at Chesapeake have often occurred only in response to litigation or a crisis.** To settle shareowner litigation, for example, Mr. McClendon agreed last November to repay the company the $12.1 million it paid to buy his antique map collection in 2008. The board also agreed to make changes in the company's executive pay in a last minute attempt to head off high opposition votes against Mr. McClendon and the board's say-on-pay proposal at last year's annual meeting.

The board's overdue decisions in recent weeks to name an independent chairman, a reform we requested in January 2011, and not to extend the FWPP beyond its present 10-year term ending December 31, 2015, must be viewed in this context. While positive steps, they are **inadequate and taken under duress, underscoring the need for the strong accountability mechanism** that the proposed proxy access bylaw would provide.

196.     New York City Comptroller Liu's critique of McClendon and the Board contained in his letter were consistent with comments he made later to the *Wall Street Journal*: "It's becoming clear that the excessive perks and problematic related-party deals that the Company discloses, which have long caused concerns among investors, are only the tip of the iceberg.  But, at this point, it's no longer shocking given the Company's pattern of behavior."

197.     Because of the staggered board and because only Davidson and Hargis were standing for election, Comptroller Liu advised Company shareholders to vote against them both—in part as a proxy against the entire Board as a result of its corporate governance failures, breaches of duty and allowing severe conflicts to go unchecked. Comptroller Liu advocated:

Directors *Davidson and Hargis, the only directors standing for election in 2012, are both members of the audit committee that is responsible for reviewing and approving insider or affiliated party transactions*; overseeing the integrity of the company's financial statements; *and overseeing the company's enterprise risk management program*. We believe recent revelations regarding previously undisclosed transactions, and the resulting 27% decline in the company's share price, *demonstrate the audit committee's costly failure to act in the best interests of shareowners. We are particularly disturbed by the audit committee's*

*failure to review, approve or disclose Mr. McClendon's personal loans secured by company wells, either in connection with the loans themselves or with the transactions between Chesapeake and the investment firms that provided the loans*. Regardless of the fact that the FWPP was approved by shareowners, we have long been concerned that Mr. McClendon's ability to invest in company wells is an excessive perquisite that creates potential conflicts of interest. Specifically, his investment time horizon, risk appetite and liquidity needs may conflict with those of the company. *The recent disclosure that he has $846 million (as of 12/31/11) in previously undisclosed loans provided by investment firms that also finance the company, and secured by his interest in the company's wells, creates additional, potential conflicts.*

According to an April 18, 2012 statement by Chesapeake's general counsel, the board was "fully aware of the existence of Mr. McClendon's financing transactions." In a clarifying release on April 26, however, the company backtracked and said the prior statement that the board was "fully aware" of the loans was intended to convey the fact that the board was "generally aware" that he used his interests in company wells as security in personal financing transactions. The April 26 release also said the board "did not review, approve or have knowledge of the specific transactions."

In our view, *the distinction between fully and generally aware is irrelevant; if the board was generally aware of the loans, the audit committee had an obligation to become fully aware and to act accordingly*.

198.    Comptroller Liu could not be more clear in his indictment of defendants Davidson and Hargis and his desire to hold the Audit Committee accountable:

**Holding directors Davidson and Hargis accountable for their costly oversight failures as members of the audit committee** *is a critical first step*. But restoring independence to Chesapeake's boardroom and creating sustainable value for its shareowners will also require an infusion of qualified, genuinely independent replacements. The proposed proxy access bylaw provides a mechanism to hold directors' feet to the fire by enabling substantial, long-term owners to nominate the genuinely independent directors the board needs. …

**Holding directors Davidson and Hargis accountable for their costly oversight failures is a critical first step**. Proxy access is the necessary next step that will help to restore independence and accountability to Chesapeake's boardroom and create sustainable value for its shareowners.

199.    **NYS Comptroller Di Napoli's Letter to the Board.**   A letter to the Chesapeake Board from Thomas Di Napoli, the Comptroller of New York State, dated May 29, 2012, also called for the heads of defendants Hargis and Davidson.  Di Napoli called defendants *Hargis and Davidson "members of Board committees that have failed shareholders."*  Comptroller Di Napoli's letter continued, as follows:

> I urge you to WITHHOLD your votes from directors V. Burns Hargis and Richard K. Davidson at Chesapeake's annual meeting of stockholders on Friday June 8, 2012. …
>
> The New York State Common Retirement Fund (the "Fund"), of which I am Trustee, is a substantial long-term shareholder of Chesapeake Energy Corporation ("Chesapeake" or the "Company").  For several years, I have engaged Chesapeake on a number of issues, including board independence and executive compensation, but to no avail.  Like you, **I am pained to watch our investment free-fall as shares plummet to lows not seen even during the recent financial crisis.  The Company has lost over $1.49 billion in market capitalization** since April 18...
>
> **Chesapeake continues to be perilously overleveraged.**  On May 1, when it reported its First Quarter 2012 results, the Company indicated that it could run out of cash by the end of next year.  On May 15, the Company announced it had secured a $4.0 billion unsecured loan that has an effective yield of 14 percent.  While the loan might provide the Company with "breathing room" as it works towards executing an ambitious asset sale plan over the next few quarters, it is clear that negative free cash flow is expected for 2012 and 2013.  (See Barclay's Research Report, Updated Liquidity Analysis, May 17, 2012).  **Chesapeake is in a difficult position financially and is therefore a motivated seller of assets; a factor that will work against it should gas prices continue to fall.**
>
> Chesapeake's falling share price and current financial condition are reason enough to WITHHOLD votes from the entire Board of Directors (the "Board").  However, since only two directors are up for re-election this year, **our withhold votes against V. Burns Hargis and Richard K. Davidson should be viewed as a proxy for the performance of the entire Board.**
>
> **Hargis and Davidson Are Members of Board Committees That Have Failed Shareholders**

Mr. Hargis has served on Chesapeake's Board since 2008 and is Chairman of Chesapeake's Audit Committee.  Mr. Davidson has served on the Board since 2006 and serves on the Board's Audit and Compensation Committees.

***The Audit Committee is charged with overseeing the integrity of the Company's financial statements and disclosure, compliance with legal and regulatory requirements, the Company's internal audit function and the Company's enterprise risk management program.  The revelations of the past months serve to underline the Audit Committee's failure***:

In the last three years, CEO Aubrey McClendon received over $1 billion in previously undisclosed loans secured by his stake in Chesapeake's oil and gas wells.  The biggest loans were obtained from EIG Global Energy Holdings, which also serves as a major financier for the Company itself.  **At the same time Chesapeake was selling off assets to one firm, Mr. McClendon was taking loans from the same firm**. These loans and inter-relationships were disclosed by the Company only after an exposé appeared in the press.  ***Though the board was "generally aware" of the loans, it did not review, approve or disclose them to investors until after the appearance of the exposé***.  ("After McClendon's Trades, Chesapeake Board Gave Blessing," Reuters, May 8, 2012; Chesapeake Form 8K, April 26, 2012; "Board Turns on Chesapeake's CEO," The Wall Street Journal, April 26, 2012).

Chesapeake reportedly has $1.4 billion of previously unreported liabilities that relate to ten "volumetric production payments" ("VPPs"), which are essentially debts, with payments made in fuel rather than in cash.  Although Chesapeake has previously made representations about how much cash VPPs made available to the Company, it had never provided details about the costs to fulfill the contracts. ***The Wall Street Journal has suggested that these costs will be far larger than analysts had previously estimated based on the Company's previous disclosures***.  ("Costly Liabilities Lurk for Gas Giant," The Wall Street Journal, May 10, 2012).

***For too long, CEO McClendon has been allowed to dominate the Board and the Board has failed to perform its critical role in overseeing the Company on behalf of its shareholders***.  Even while promising to replace him as Chairman someday, the Board has allowed Mr. McClendon to continue to serve in this role while it claims that the Nominating and Corporate Governance Committee is searching for candidates to replace him. ***As members of the Audit Committee, directors Hargis and Davidson***

*should be held accountable for the Board's significant failings in its oversight responsibilities. …*

In my view, **there needs to be an evaluation of the entire Board's competence and performance, including an assessment of whether the current directors have the necessary skills and attributes to continue to oversee the Company**. ***This evaluation should be done both internally, by the Company, and by an independent third party***. The Company's largest shareholder, in a letter dated May 7, 2012 and filed with the SEC, has publicly suggested that the Company should be "open to any offers to acquire the whole company." Now more than ever, shareholders need to be assured that the Board has the requisite independence and skills to evaluate any offer that might be received.

**A fundamental restructuring of the Company's Board of Directors is essential if the Board is to regain the trust of stakeholders and regulators.** The Board, which holds Chesapeake's future in its hands, must be held accountable to the Company's shareholders, and must protect the long-term interests of the Company instead of promoting parochial interests of maintaining incumbent control.

200.     In the Fall of 2012, New York City Comptroller Liu also published the *New York City Pension Funds Postseason Report on 2012 Shareowner Initiatives*, which again stated that McClendon's substantial, previously unreported related-party transactions were the main reason that his office recommended Withhold Votes as to defendants Hargis and Davidson. In the *Fall Report,* Comptroller Liu stated, in part, the following:

The NYC Funds opposed the only two directors – Richard Davidson and V. Burns Hargis – standing for election at Chesapeake Energy, both of whom sat on the audit committee, following revelations of substantial, previously unreported related-party transactions involving the CEO that the board had neither reviewed nor approved. The campaign added to pressure from two investment firms that ultimately secured four seats on the board. Despite positive last-minute governance and board changes, ***shareowners cast 73 percent and 74 percent of their votes, respectively, against directors Davidson and Hargis, the highest opposition vote against directors in an uncontested election at an S&P 500 company***; the board accepted Mr. Davidson's resignation but rejected Mr. Hargis's resignation.

201.   The immediate actions taken by the Board, however, evidence its intention to do nothing to hold the members of the Audit Committee or any member of the Board, including defendant McClendon, Hargis, Davidson and Miller, liable for their improper conduct and breaches of fiduciary duties.   As evidence of this, on May 23, 2012 the Board caused Chesapeake to publish a reply letter to New York City Comptroller Liu, signed by McClendon as Chairman and CEO and by Miller as Lead Independent Director, which defended the performance of defendants Davidson and Hargis. Demonstrating the Boards intention to excuse all of the Board members for their breaches of fiduciary duty and conflicts of interest, this release stated, in part, the following:

> Chesapeake's Board is comprised of independent, highly qualified and accomplished professionals who have the skills and experience necessary to serve on our Board. Specifically, our two directors standing for election at this year's annual meeting, Richard K. Davidson and V. Burns Hargis, have served on our Board for six and three years, respectively. Both are highly credentialed professionals who bring to the Board financial, operational and legal expertise that benefits the Board, Chesapeake as a corporation, and its shareholders.

> Mr. Davidson's distinguished career in the railroad industry spanned nearly 50 years. He spent the vast majority of his career working for Union Pacific Corporation, one of America's leading transportation companies, where he served as Chief Executive Officer for nine years and as Chairman of the Board of Directors for over ten years before retiring in 2007. Mr. Davidson is currently a member of the board of advisors of HCI Equity Partners, a private equity firm headquartered in Washington, D.C., and the board of Impala Asset Management, LLC, an investment fund headquartered in New Haven, Connecticut….

> Mr. Hargis currently serves as the president of Oklahoma State University (OSU) and the OSU System, a comprehensive land-grant institution with 35,000 students and 7,400 employees. Prior to becoming the 18th president of OSU, Mr. Hargis was Vice Chairman of Bank of Oklahoma, N.A., and BOK Financial Corporation, a financial holding company based in Tulsa, Oklahoma, from 1997 to 2008. He currently serves as a director of both entities…

Mr. Davidson and Mr. Hargis, together with the entire Chesapeake Board, have been taking important actions to benefit our shareholders, and the Board remains focused on and committed to further serving the interests of shareholders in the years ahead.

202.    **Audit Committee "Independent" Investigation**.    This release also affirmed that the same Audit Committee that had stewarded Chesapeake to the corporate governance disaster it then found itself, was in charge of conducting the purported "independent" review into McClendon—but not the Board itself—for breaches of fiduciary duty, waste and fostering conflicts of interest.  Moreover, the Committee had *already* retained "independent counsel."  The May 23, 2012 release stated:

> ***The Board is also conducting a thorough review, through the Audit Committee and its independent counsel, to determine whether there are any conflicts with the Company arising from the financing arrangements between Mr. McClendon (and the entities through which he participates in the FWPP) and any third party that has had or may have a relationship with the Company in any capacity.***

203.    **Compensation Reduced.**  In a hasty attempt to stave off investor revolt, on May 18, 2012, just weeks before the June 8, 2012 shareholder Proxy vote, the Company all but admitted that its directors and CEO's compensation was wildly out of line with Chesapeake's performance and took steps to reduce the compensation paid to outside directors by 20%, and to reduce McClendon's CEO compensation for 2011.[15]  Under the new Board compensation arrangement, outside directors would receive total annual compensation of $350,000, comprised of a $100,000 cash component and a $250,000 equity component. The elimination of fractionally owned aircraft for travel by outside directors was also imposed.  This long over-due reduction in Board compensation was also evidence of the Boards' overpayments over the course of many prior years.

204.    **Voting Results.**  In fact, however, the Board's last minute concessions did little to effect the results of the May 2012 proxy vote, and regardless of the Board's

---

[15] NYC Comptroller Liu referred to these changes by the Board as "last minute," in advance of the much contested re-election of defendants Hargis and Davidson. (NYC Funds, 2012 Fall Report)

confidence in defendants Hargis and Davidson the shareholder vote revealed the market's true confidence in the Audit Committee Chairman (Hargis) and one of the other two Audit Committee members (Davidson.)   The preliminary results of the annual shareholder meeting, published in a release issued by the Company on June 8, 2012, revealed that defendant Hargis only received 26% of the shareholder vote and defendant Davidson faired only marginally better, receiving only 27% of the vote.   Shareholders' cast 73 percent and 74 percent of their votes, respectively, against Davidson and Hargis; the highest opposition vote against directors in an uncontested election at an S&P 500 Company (*Report by NYC Pension Funds*, Fall 2012).

205.   **Resignations by Hargis & Davidson.**   According to the Company's new majority voting bylaw then adopted in the June 2012, the shareholder vote required defendants Hargis and Davidson to tender their resignations.   According to a release dated June 4, 2012, the resolution that majority voting was required in director elections would be (and was) applied immediately upon ratification.   Remarkably, however, the Board did not immediately accept the resignations of Hargis and Davidson but instead sated that the Board would merely "review the resignations in due course."

### J.   MCCLENDON'S RUNNING HERITAGE OUT OF CHESAPEAKE'S OFFICES CREATED CONFLICTS THAT MANDATED DISCLOSURE.

206.   **Code of Conduct.**   After *Reuters* reported on the existence of Heritage, defendants were quick to state that there was no conflict of interest with McClendon running a $200 million hedge fund with outside investors out of his offices at Chesapeake, and that any conflict was only a potential conflict or aberration.   In fact, however, whether the conflict was real or potential, or actual or apparent is immaterial and each was prohibited under the Company's Code of Conduct.   The Code of Conduct had a clear and specific policy regarding "Conflicts of Interest," which stated:

> All directors, officers and employees of the Company **must avoid situations that create a conflict of interest or the appearance or potential for a conflict of interest**.  A conflict of interest exists when your personal interests are either in conflict with the Company's interests or interfere with your ability to perform your duties to the Company or responsibilities at work…
>
> Specific situations that could be considered conflicts of interest include:
>
> * * *
>
> Holding a financial interest in a competitor or a company that does business with the Company and you could personally affect that business.

207.    Clearly, McClendon's running Heritage out of Chesapeake's offices qualifed as a "conflict" and as an "appearance of conflict" and as a "potential for a conflict."   Moreover, the fact that Heritage traded the same natural gas and oil commodities futures evidences that Heritage was a competitor of the Company and it also evidences that Heritage did business with the Company.  This was especially true given that McClendon ran Heritage at the time when he was actively managing Chesapeake's $17 billion hedging facility and during the time when Chesapeake primarily took short positions (hedges) and, while Heritage took long positions (speculation), rendering Heritage a possible counterparty on Chesapeake's trades.  McClendon's running Heritage at the same time he ran Chesapeake's hedging facility demonstrated that he could "personally affect that business."

208.    Analysts at Trefis confirmed these conclusions and highlighted the potential conflicts inherent in McClendon running a hedge fund out of his offices at the same time he managed the Company's $17 billion hedge fund facility.  Trefis concluded, that there were certainly "potential for conflicts of interest."

209.    Thus, not only was McClendon's running Heritage out of Chesapeake's offices material to investors but it was also something that was required to be disclosed according to the Company's SEC reporting requirements and its Code of Conduct.

Chesapeake's Code of Conduct imposed reporting requirements even for potential conflicts of interest.  The Code states that "[i]t is the Company's policy to identify and acknowledge in writing (in an employment agreement in the case of officers) certain relationships… and the terms thereof, that are acceptable to the Company but that might otherwise appear to represent a conflict of interest."  To comply with this policy, on at least an annual basis, employees of Chesapeake were required to complete a Conflict of Interest Disclosure Form to identify and acknowledge relationships that "may constitute a conflict of interest."  Also according to the Code, any failure to fully and truthfully answer all questions on the Conflict of Interest Disclosure Form can result in disciplinary action, up to and including termination.

210.    The Company's Code of Conduct further reinforced the conflict disclosure duties and stated that, "in accordance with the Company's internal control procedures, you are *required* to properly document and report all business and financial transaction *honestly, completely and accurately*."  The Company's internal Controls and Procedures were further specified in Chesapeake's 2011 Form 10-K, filed with the SEC on or about February 29, 2012, which stated:

> **We maintain disclosure Controls and procedures designed to ensure that information required to be disclosed by Chesapeake in reports filed or submitted by it under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms**. As of December 31, 2011, we carried out an evaluation, under the supervision and with the participation of Chesapeake management, including Chesapeake's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of Chesapeake's disclosure controls and procedures pursuant to Securities Exchange Act Rule 13a-15(b). Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective as of December 31, 2011, to ensure that information required to be disclosed by Chesapeake is accumulated and communicated to Chesapeake management, including Chesapeake's Chief

Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

211.    The 2011 Form 10-K, filed with the SEC, February 29, 2012, also contained a Certification by defendant McClendon which further delineated the Company's disclosure controls and procedures, as follows:

### CERTIFICATION

I, **Aubrey K. McClendon**, certify that:

1.    I have reviewed this annual report on Form 10-K of Chesapeake Energy Corporation;

2.    **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under such statements were made, not misleading with respect to the period covered by this report**;

*   *   *

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

*   *   *

    (c)    evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation[.]

212.     **2013 Form 10-K Risk Disclosure Acknowledgement**.    While the Company never disclosed the risks and conflicts and potential conflicts and apparent conflicts associated with McClendon running Heritage out of his office while simultaneously managing the Company's $17 billion hedging facility, or the risks associated with McClendon's financing his participation in the FWPP with money raised from lenders with financial entanglements with Chesapeake, in the end, Chesapeake was caused to disclose the risk of loss and costs associated with Defendants' failures to disclose!  The Company's 2013 Form 10-K, filed with the SEC on February 27, 2014 added the following Risk Disclosure:

> **There are significant costs associated with pending legal and governmental proceedings, and the ultimate outcome of these matters is uncertain.**
>
> The Company and current and former directors and officers are the subject of a number of shareholder lawsuits, and there are ongoing governmental and regulatory investigations and inquiries. The Company cannot predict the outcome or impact of these pending matters, but the lawsuits could result in judgments against the Company and directors and officers named as defendants and there could be one or more enforcement actions in respect of the governmental investigations. For example, we could be exposed to enforcement or other actions with respect to the continuing SEC investigation into certain disclosure, accounting and financial reporting matters. Our legal expenses increased in 2013 and 2012 compared to 2011 due primarily to defending the shareholder lawsuits, responding to governmental investigations and inquiries, and conducting the Board's review of certain matters involving our former Chief Executive Officer, and such expenses in the future may be significant. In addition, attention to these matters by members of our senior management has been required, reducing the time they have available to devote to managing the Company's business. In other litigation, the Company is defending against claims by royalty owners alleging that we used below-market prices, made improper deductions, used improper measurement techniques and/or entered into arrangements with affiliates that resulted in underpayment of royalties in connection with the production and sale of natural gas and NGL. Adverse results in pending cases would cause our obligations to royalty owners to increase and would negatively impact our future results of operations.

213.    The explicit letters written by, Noester Asset Management, Carl Icahn, Southeastern Asset Management, the Comptroller of the City of New York and the Comptroller of the State of New York document the breaches of fiduciary duty and conflicts of interest by the Chesapeake Board.  The Board's defense of Hargis and Davidson, however, indicated only that the demand on the Board to take action against these defendants was and continues to be futile.  The Board at the time this action was filed would not assign any liability to individual Board members for breaches of duty related to: (i) the failure to supervise the office of the Chief Executive and Chairman of the Board; (ii) the failure to investigate the existence of Heritage prior to 2009, despite the fact that the Board had at least a constructive knowledge that McClendon was engaged in some type of trading operation, as each successive contract was modified to provide him more trading latitude; (iii) the failure to investigate not being a reasonable or disinterested act of an independent Board; and (iv) the failure to disclose risks and critical control deficiencies.

214.    The materiality of McClendon's undisclosed hedge fund was evidenced by both the analysts and investors' public reactions, and by the decline in the market capitalization of the Company evidenced by its then declining stock price.

### K.    MCCLENDON ENGINEERS A "TERMINATION" WITHOUT CAUSE

215.    As soon as *Reuters* disclosed McClendon's related-party loans from Company partners, the Board removed him as Chairman pending only the selection of a non-executive nominee to replace him.  At the same time, executive compensation was lowered and significant changes were made to the manner in which executives would be compensated—including an emphasis on performance—which resulted in McClendon getting a zero bonus that year.  Then, because McClendon had no hope of being able to finance his obligations in the FWPP without loans from Company partners—which were

clearly unavailable after that point for a variety of reasons, including that the loans violated the terms of the FWPP itself—the FWPP was terminated.

216.     With no real opportunity to make the hundreds of millions of dollars a year that he had previously extracted from Chesapeake and which his crony Board had previously rubber-stamped, and with no ability to continue to fund his FWPP obligations (which were then terminated), McClendon next took steps to engineer his departure from the Company with huge unearned severance payments and without paying back millions of dollars in claw backs due under his 2008 employment contract well participation incentive award's early retirement provision.  McClendon accomplished this by trading Board seats for severance pay, and by allowing the majority of the Board to escape without any liability or repercussions for their continuous breaches of fiduciary duty, and with cash and their reputations intact—a substantial bonus under the circumstances.

217.     Thus, rather than put the whole Board up for election at the same time and allow for a shareholder vote on new directors, the Board went ahead with the elections of Hargis and Davidson only.  At the same time, McClendon negotiated in private with Carl Icahn and Southeastern Asset Management, the Company's largest shareholders who then owned 7.6 percent and 13.9 percent of Chesapeake's outstanding shares, respectively, and with them, hand-picked 4 new replacement directors (who then ratified the non-executive chairman that McClendon and the Board had previously selected *without* a shareholder vote).  In exchange for their acquiescence, the 4 replaced Board members were allowed to escape liability for their breaches of duty and for their allowing billions of dollars in corporate waste through the misappropriation of corporate opportunity and conversion of Company assets by McClendon.

218.     These directors—3 of whom comprised the entire Compensation Committee—were able to "retire" from the Board and to collect their final payments for the first half of 2012 (the period during which the members of the Compensation Committee should have been investigating the Board's ruinous conduct).  Most

importantly, it allowed these Board members to escape termination "for cause" and to leave not only with cash payments, but also with their reputations intact.  Moreover, in exchange for allowing Carl Icahn and Southeastern Asset Management (who collectively owned only 20% of the shares of the Company outstanding), to add 4 directors to the 9 member Board – in conjunction with the 2011 Southeastern Asset Management proxy already on the Board – the activist investors were able to gain complete control over the Company.  After ceding control and after having again hand picked the replacement directors, McClendon was able to avoid termination for cause (and even a "retirement" designation) and was able to reap over $50 million in unearned severance payments.  Carl Icahn and Southeastern Asset Mangement added 4 directors to the 9 member Board, allowing the activist investors to gain complete control over the Company.  After ceding control and after having again hand picked the replacement directors, McClendon was able to avoid termination for cause and was able to reap over $50 million in unearned.

219.    It is difficult or impossible to explain why McClendon's retirement was classified as a "termination without cause" and why the Company paid him $35 million instead of collecting the $15 million he owed Chesapeake.  Simply designating McClendon's termination as a "retirement" would have resulted in McClendon having to _pay_ the Company $15 million due to the claw-back penalty for early retirement under the special well participation bonus in his 2009 employment agreement, and it would also have cost McClendon an additional $35 million in unearned severance payments that an early "retirement" or a "termination for cause" would not have afforded him.

220.    **Abdication of Fiduciary Duties**.  After having caused or allowed the Board to engage in a myriad of fiduciary breaches and conflicts of interest, defendants Davidson, Eisbrenner, Keating and Nickles also breached the duties owed to shareholders of Chesapeake by abandoning their positions before the delayed results of the Board investigation were complete.  These directors who had reaped millions in fees, bonuses and free airfare year after year, owed more to Company shareholders than simply

abdicating responsibility for a purportedly "independent" investigation to defendant Hargis, and then doing nothing more to expose the breaches of fiduciary duty by the entire Board and to root out the conflicts of interest that plagued the Company. Turning the investigation over to a director who was neither disinterested nor independent and abandoning the Company months before the belated results of that report were published, do not meet the standards of duty owed to Chesapeake and its outside shareholders.

221.     Moreover, it was highly inappropriate and a breach of their duties to the Company and its shareholders for these Defendants to abandon Chesapeake while the investigation was ongoing and prior to the publication of the results of that report. It was even more inappropriate given that defendants Eisbrenner, Nickles and Keating (Chairman) constituted the entire Compensation Committee during the relevant period. This is the same Compensation Committee that was responsible for the day-to-day oversight of McClendon's participation in the FWPP and the same Committee that would have best known of McClendon's lack of financial stability and creditworthiness throughout the relevant period. Apart from acquiescing in McClendon's attempt to trade Board seats for severance payments, the Board had no reason to announce they were leaving Chesapeake days before the 2012 Proxy election only to formally announce their retirement days after the Proxy Vote—at which time it was too late for shareholders to vote to ratify them.

222.     In fact, the Board itself noted the inappropriateness of quitting the Board before its "independent" investigation was complete, because it refused to accept the resignation of defendant Hargis when he tried to retire before the report was complete. Remarkably, the reason that the Board gave for refusing Hargis' resignation was that they required him to complete the investigation prior to the Board being willing to accept his resignation. The Board considered this so significant that Hargis complete the purported "independent" investigation before he was allowed to resign, even though the Company's

reconstituted bylaws demanded his resignation after that they returned his resignation, receiving only 25 percent of the votes in the 2012 annual shareholder election.

223.    The June 21, 2012 release caused to be issued by the Company explained that, "the Board had declined to accept [Hargis'] resignation, at this time, to permit completion of the previously announced review of the financing arrangements between [defendant] McClendon (and entities through which he participates in the Founder Well Participation Program) and any third party the he has or had or may have a relationship with the Company in any capacity." Defendant Hargis continued to lead this review, but was replaced as Chairman of the Audit Committee.   The release stated that the Board would consider Hargis resignation, "upon completion of the review."

224.    Yet, seeing the opportunity to abandon Chesapeake with no liability and with hundreds of thousands of dollars more, defendants Davidson, Eisbrenner, Keating and Nickles abdicated their duties to remain on the Board and to assure that the purported "independent" investigation was complete in its scope, and accurate in its conclusions—a report which only the Board was allowed to review. At a minimum, an independent committee should have been created to assure that the selection of new Board members by McClendon and the activist investors was in no way conditioned upon McClendon's termination status or severance payments.

225.    **Board Replaced**.   Thus, almost immediately after allowing defendant Davidson, as a member of the Audit Committee to select the purported independent outside counsel to assist in the investigation into McClendon, the Board accepted his resignation—along with the resignations or retirement of 4 other Board members.   The replacement of defendants Davidson, Eisbrenner, Keating, Nickels and Maxwell represented a complete capitulation by McClendon and the Board to Carl Icahn and Southeastern Asset Management.   In agreement with McClendon, Southeastern Asset Management was allowed to select 3 new directors and Icahn was allowed to select 1.

The new directors then ratified the prior selection of the new Board Chairman which McClendon and the Board had appointed without shareholder approval.

226.     While the investigation into McClendon was only in its infancy at that time, the resignation of Hargis was not accepted and he was required to continue "investigating" McClendon.   This was remarkable in light of the fact that: (i) the investigation had just started and no harm would have come from appointing a truly independent and disinterested Board member to lead this critical investigation; (ii) 2 of the Audit Committee members responsible for selecting the purported independent outside counsel to help conduct this investigation had received no confidence votes and had tendered their resignations; and (iii) Hargis's and the Audit Committee had exhibited past breaches of fiduciary duty and blatant conflicts of interest, and had personal stakes in the outcome.

227.     **Hegemony Over Chesapeake Board.**  In reality, the replacement of 4 new Board members by Carl Icahn and Southeastern Asset Management gave these activist investors, who combined to own only 21% of Chesapeake's shares outstanding, complete hegemony over the Board.[16]  The 5th of 9 Board members beholden to Southeastern Asset Management was Lou Simpson.   When Lou Simpson accepted the invitation to join the Chesapeake Board,  in a release dated January 24, 2011, McClendon stated that Simpson was another Southeastern Asset Management proxy:

> Aubrey K. McClendon said of Mr. Simpson's intention to join Chesapeake's Board of Directors, "In recent conversations with our largest shareholder, Southeastern Asset Management of Memphis, Tennessee, Lou's name surfaced as a potential addition to our Board upon Fred Whitmore's retirement this coming June. I had met Lou previously and now our Board has met him as well and we are extremely honored to have Lou accept the invitation to join Chesapeake's board.

---

[16] Had Carl Icahn and Southeastern Asset Management been able to acquire the shares necessary to gain enough votes to acquire this level of control over the Board by purchasing additional voting shares, they would have had to purchase stock costing more than an additional $2.0 billion.

228.   **2013 Benefits Chart.**   Despite obviously terminating Davidson, Keating, Nickels and Eisbrenner for cause in a public firing, their departures too were classified in the Company's release as a mass resignation.   By classifying their termination for cause as a "resignation" or "retirement," however, they were still allowed to collect lavish stock and cash and bonus compensation for 2012.   The table below, notes omitted, was reproduced from data contained in Chesapeake's 2013 Proxy statement and shows the compensation paid to the "old" Chesapeake Board for 2012, as follows:

| Name | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| Merrill A. Miller, Jr. | 100,000 | 285,024 | 51,852 | 436,876 |
| Louis A. Simpson | 100,000 | 265,035 | 30,670 | 395,705 |
| Richard K. Davidson | 87,500 | 116,679 | 79,095 | 283,274 |
| Kathleen Eisbrenner | 87,500 | 116,679 | 47,119 | 251,298 |
| V. Burns Hargis | 100,000 | 275,028 | 52,060 | 427,088 |

229.   A review of the facts presented herein indicates that the Board's actions were not the acts of independent Board members exercising their fiduciary duties owed to the Company and its shareholders.   First, there was no rational explanation as to why the Board would allow Hargis, Davidson and Miller to conduct the purported "independent" investigation when none of them were free of conflicts of interest or disinterested in the outcome of that report.   Second, there was no rational explanation as to why the Board would demand that Hargis continue this investigation after he and Davidson had received a 75% no confidence vote in the 2012 proxy election and after their resignations were required to be tendered pursuant to the Company's amended charter.   Third, knowing that Hargis and Davidson and the entire Board had lost all investor confidence, there was no rational reason for waiting until after the 2012 election on June 8, 2012, to announce that the Board would be reconstituted when, on June 4, 2012, the Board announced that McClendon, Icahn and Southeastern Asset Management were *already* negotiating for, and had *already* agreed, to replace 4 directors in a manner that would give the activist

investors total control over the Company.  Even with a non-classified board, the majority of the Chesapeake Board would not stand for reelection for another full year.

230.     There was, however, one rational explanation that explains why these actions were allowed. In exchange for Carl Icahn and Southeastern Asset Management gaining control over the Board with only a total of 20% stock ownership, and in exchange for allowing the majority of the Board to flee with their reputations primarily intact and after not being routed from the Company for cause, McClendon was allowed to engineer his own removal from the Company not for cause or even as a retirement, but as a *termination without cause*. The facts favor these conclusions.

231.     Moreover, even the *appearance* of this type of *quid pro quo* arrangement was highly inappropriate under these circumstances which existed at that time and constituted a breach of the Board's duties to the Company and its shareholders.  The Company's Code of Conduct clearly states that conflicts of interest as well as potential conflicts and the appearance of conflicts are all prohibited.  It was highly inappropriate and clearly created the appearance of conflict of interest and a breach of duty for : (i) the Board to allow McClendon to hand-pick 4 Board members with investors without the appointment of a special nominating committee or any independent oversight; (ii) allowing the replaced Board members to resign before the results of the investigation were completed and to escape liability for their breaches of duties; and (iii) allowing McClendon to engineer his own departure without cause.

## L.     TERMINATION FOR CAUSE OR RETIREMENT

232.     **McClendon Quits.**  As if on cue, McClendon announced his retirement on January 29, 2013—a full month *before* Hargis reported the results of the "independent" investigation, yet while prematurely exonerating himself from all wrong-doing.  That day, the Company issued a release that stated, in part, the following:

OKLAHOMA CITY--(BUSINESS WIRE)--Jan. 29, 2013-- Chesapeake Energy Corporation (NYSE:CHK) today announced that its Co-founder, Chief Executive Officer and President, Aubrey K. McClendon, has **agreed to retire** from the company on April 1, 2013 and will continue to serve as Chief Executive Officer until his successor is appointed. Mr. McClendon, 53, has served as Chesapeake's Chief Executive Officer since the inception of the company in 1989 and served as Chairman of the Board from its founding until 2012.

Aubrey K. McClendon, Chesapeake's Chief Executive Officer, said: "…While I have certain **philosophical differences with the new Board**, I look forward to working collaboratively with the company and the Board to provide a smooth transition to new leadership for the company."

T**he Board expects to release the results of its previously announced review** of the financing arrangements, and other matters, between Mr. McClendon (and the entities through which he participates in the Founder Well Participation Program) and any third party that has had or may have a relationship with the company in any capacity, in its earnings announcement scheduled for release before market open on February 21, 2013. **The Board's extensive review to date has not revealed improper conduct by Mr. McClendon**. *The Board and Mr. McClendon's decision to commence a search for a new leader is not related to the Board's pending review of his financing arrangements and other matters.*

\* \* \*

**Mr. McClendon will resign from the Board of Directors** at the time his successor is appointed and will receive his full compensation and other benefits to which he is entitled in accordance with the terms of his employment agreement. Mr. McClendon will continue to be an important partner with the company given his stock ownership as well as his interests in certain of the company's wells in connection with **the Founder Well Participation Program, which will terminate on June 30, 2014**.

233.    Despite the fact that the January 29, 2013 release materially misrepresented the reasons for McClendon's departure, and the nature thereof, the fact he was leaving under any circumstances was welcome news to investors—Chesapeake's stock surged almost 10% to $20.69 per share in aftermarket trading, after closing at $18.97.

234.    In fact, it was patently obvious to everyone except McClendon and the Chesapeake Board that McClendon's philosophical differences were that it was

foreseeable that he could no longer obtain tens or hundreds of millions of dollars per year in compensation from the Company's reconstituted board.   Moreover, because the compensation changes and termination of the FWPP were direct results of the events subject to Board review, it was also untrue that McClendon 's departure was related to "independent" events.

235.   As suspected, the "philosophical difference" with the Board cited by McClendon was that the Board reduced his compensation so that he would no longer be able to reap outlandish bonus awards that would be proposed by McClendon and rubber-stamped by his conflicted Board.  Moreover, because McClendon could no longer borrow money from related parties, the FWPP was ending.   This was confirmed by a source familiar with the Board and quoted by *Reuters* on February 20, 2013, as follows:

> **As the board tried to rein in capital spending and salary, McClendon resisted, a situation that created tension and eventually ended in the executive's departur**e, according to a source familiar with the board.

236.   McClendon's departure from Chesapeake was a *direct result* of *Reuters*'s exposing his billion dollars in related party loans and his private hedge fund activities within Chesapeake.   Even prior to the announcement that he was leaving, however, analyst and market commentators alike stated that McClendon should have been *terminated for cause*, as early as April 2012.  Thus, on May 3, 2012, after analysts at Sterne Agee analyzed the shocking *Reuters*'s reports, the Sterne Agee analysts concluded that McClendon could be removed as CEO of Chesapeake for cause, stating, "[w]e believe that this news could ultimately result in McClendon's removal as CEO, and we note Wednesday night's news that Florida Senator Bill Nelson is seeking a Justice Department probe into the matter as a sign of the severity of the issue."

237.   On January 20, 2013, *24/7WallSt.com* noted that at any other Company McClendon would have been fired six months earlier and that, given the totality of the facts and circumstances surrounding his departure from Chesapeake, his severance

payments "looks and smells like an outrageous package," and that the Company's shares continued to trade at distressed levels due to the "Aubrey Discount" in the shares. *27/7 Wall St.com* also stated that the 6% increase in the intra-day price of Chesapeake shares immediately following the announcement of the departure of McClendon from the Executive suite and the Board room, demonstrated the market's belief that *McClendon was being fired*. "When a stock rises upon a CEO retirement of resignation, Wall St and Main Street are *smart enough to know what a firing is*."

238.    Business news website, *The Motley Fool*, also made a forceful case for terminating McClendon for cause as early as May 2, 2012:

> McClendon, the CEO of natural gas giant Chesapeake Energy**,** was making headlines *again* today as Reuters revealed that he was running a $200 million commodities hedge fund. This follows on the heels of a Reuters report last month detailing more than $1 billion in loans that McClendon took out against the stakes he owns in Chesapeake wells.
>
> In response to the previous Reuters expose, Chesapeake stripped McClendon of his chairmanship and agreed to end the Founders Well Participation Program -- the cozy deal at the center of McClendon's $1 billion borrowing spree -- early. Originally, the FWPP was scheduled to run through 2015, but it will now end in June 2014.
>
> **But these steps aren't enough. There's only one solution to the problem: Aubrey McClendon needs to go. Now.**
>
> \* \* \*
>
> But perhaps the bigger concern that few are talking about, is what this all means for the way that McClendon has been running Chesapeake. For one, **a CEO's attention should be fixed on the company that he's supposedly leading -- not the smaller, personal well-ownership empire he's building or the hedge fund he's apparently running**. Furthermore, almost everything coming out about McClendon underscores his sweet-tooth for gambling. A great piece from Jeff Goodell in *Rolling Stone* back in March speaks to this. Shareholders or potential shareholders should be sure to read that, but, in short, Goodell's conclusion is that **McClendon's**

**gambling streak has definitely shown up in Chesapeake's business approach**.

Many investors have held onto the hope that the promise of natural gas would trump the **poor governance and CEO excesses** at Chesapeake. That has looked like a bad gamble to me for years, but today it looks downright scary.

That is, unless McClendon is replaced and a new regime is brought into this company.

239.    *The Motley Fool* also argued that the other members of the Board, including defendants Davidson, Hargis, Nickles, Keating and Miller should also have been immediately terminated, also for cause:

Public companies aren't structured so that the CEO can run the show. Sure, McClendon wielded a considerable amount of power when he was both CEO and chairman, but in a properly functioning company, the board of directors should be keeping a wild-child CEO in check.

That didn't happen at Chesapeake. In fact, as I see it, almost the exact opposite happened as the board catered to McClendon's needs, co-signed his desires, and bailed him out when he got in tight spots. And maybe it shouldn't be too surprising -- *the environment in the boardroom seems like a pretty cozy one when* on average *board members are being compensated to the tune of $533,000 and getting use of the company's private jet.*

**So, not only does McClendon need to go, but so does most of the board.**

Richard **Davidson**, Burns **Hargis**, Don **Nickles**, Frank **Keating**, and Pete **Miller** have all been on the board for more than a couple of years and have obviously done little to rein in McClendon in exchange for their princely directors' compensation…

240.    The *Reuters* May 2, 2012 Special Report quoted Thomas Mulholland, a risk-management consultant to oil and gas producers for Golden Energy Services in St. Louis, who stated that many energy companies have "strict codes" against corporate executives trading in the same or similar commodities to that it produces or has a commercial interest. According to Mr. Mulholland, "even if there is just a whiff of

impropriety… it can be enough to lead to a termination."  If the test is "just a whiff of impropriety" than there is little question McClendon should have been fired for cause.

241.    Moreover, the Company's 2012 Form 10-K, filed with the SEC on March 4, 2013, stated repeatedly that McClendon was "retiring" from the Company:

> Aubrey K. McClendon, 53, has served as Chief Executive Officer since co-founding the Company in 1989 and President since June 2012. Mr. McClendon previously served as Chairman of the Board from 1989 to June 2012. Mr. McClendon served as a director of the general partner of Access Midstream Partners, L.P. (NYSE:ACMP), formerly Chesapeake Midstream Partners, L.P., from January 2010 to June 2012. **On January 29, 2013, Mr. McClendon agreed to <u>retire</u> from the Company, effective no later than April 1, 2013**.
>
> *  *  *
>
> On January 29, 2013, Aubrey K. McClendon, our President, Chief Executive Officer (CEO) and a director, **agreed with the Board of Directors to <u>retire</u> from the Company.**
> *  *  *
>
> **On January 29, 2013, the Company announced that Mr. McClendon had agreed to <u>retire</u> from the Company on the earlier to occur of April 1, 2013** or the time at which his successor is appointed. Mr. McClendon's participation rights under the FWPP are expected to continue through the expiration of the FWPP on June 30, 2014, and the incentive award clawback applicable to 2013 will not apply. See Note 21 for additional information on the terms of his separation from the Company.

242.    But while these public announcements by the Company referred to McClendon's departure as a "retirement," the Board allowed his departure to be classified as a termination without cause.  Note 21 of the 2012 Form 10-K titled Subsequent Events, however, contradicted these statements and instead stated that McClendon's "retirement" was actually a *termination without cause*:

> On January 29, 2013, we announced that Aubrey K. McClendon, our President, Chief Executive Officer (CEO) and a director, agreed to retire from the Company. Mr. McClendon will continue to serve as President,

CEO and a director until the earlier of April 1, 2013 or the time at which his successor is appointed. Mr. **McClendon's departure from the Company will be treated as <u>a termination without cause</u> under his employment agreement.**

243.     By classifying McClendon's removal from the Company not as a "retirement" or a "termination *for* cause," but rather a "termination *without* cause," McClendon received almost $34.9 million in severance payments, accelerated equity compensation and other benefits, according to the Company's 2013 Proxy, as opposed to having to *pay* $15 million as an early retirement claw-back under the 2008 well participation award and/or his 2009 Employment Agreement.  The table below provides estimates of the compensation and benefits that would have been payable under each of the above described arrangements (Retirement vs Termination Without Cause), if such termination events had been triggered as of December 31, 2012:

| Executive Benefits and Payments Upon Separation | Termination without Cause | Retirement |
|---|---|---|
| **Compensation:** | | |
| Cash Severance | $    7,803,000 | — |
| Potential 2008 Well Cost Incentive Award Clawback | — | $    (15,000,000) |
| **Acceleration of Equity-based Compensation:** | | |
| Restricted Stock Awards | 19,504,152 | — |
| PSU Awards | 4,879,135 | — |
| Deferred Comp Plan Matching | 629,533 | — |
| **Benefits and Perquisites:** | | |
| Benefit Continuation | 1,044,544 | — |
| Accrued Vacation Pay | 78,596 | 78,596 |
| Personal Travel on Fractionally Owned Company Aircraft | 1,000,000 | — |
| **TOTAL** | $    34,938,960 | $    (14,921,404) |

[notes omitted]

244.     The disparity between McClendon being terminated from the Company without cause and simply having McClendon retire was approximately $50,000,000.  A large part of that disparity was that, under the terms of his 2009 employment agreement, if McClendon retired from the Company prior to December 31, 2013, after his retirement

McClendon would have been required to pay to the Company an amount equal to the original $75 million amount of his 2008 "well cost incentive award" multiplied by a percentage equal to the number of full calendar months remaining between his termination date and December 31, 2013 divided by 60 months—which equaled $15 million at 12/31/12.

245.     The fact that McClendon provided any explanation as to why he was leaving the Company (*i.e.*, "philosophical differences with the Board"), only underscores that it was *his decision* to leave Chesapeake and that, at best, he was retiring and not being terminated without cause.  The reality, however, is that McClendon could have been terminated for cause and a truly independent Board would not have given him a $50 million going away present to thank him for destroying the value of the Company's shares and its reputation, and for saddling the Company with millions of dollars in costs and expenses related to its embroilment in protracted federal investigations and law suits by investors and regulators.  An independent and disinterested Board would also not have allowed McClendon to abscond with over a billion dollars of Company assets misappropriated by improperly obtaining loans from Company partners which were nothing more than the theft of corporate opportunity and a violation of the FWPP and the Company's Code of Conduct.

246.     McClendon's demotions from the Company were also further evidence of cause.  Immediately following the first *Reuters* report exposing his loans from Company partners McClendon was removed from the Chairmanship of the Board.  Then, immediately following the second *Reuters* report, that documented his prior Heritage activities within Chesapeake, McClendon was removed from his position as CEO.  Accordingly, there was a clear causal and temporal connection between both of these demotions and the reports of McClendon's improper and undisclosed activities.  Thus, while grounds clearly existed that would have allowed for the termination of McClendon

for cause, and while he was in fact removed for cause, his termination was allowed to be classified as a termination without cause by the Chesapeake Board.

247.    Had McClendon been Terminated for Cause, not only would the Company have had no obligation to provide him any further payments or benefits after the Termination Date, other than any paid time off accrued through that date, but the Company would also have been entitled to the $15 million claw-back payment.  Evidence that McClendon could or should have been terminated for cause is found in the Company's Employment Agreement which defines "cause," as follows:

(i)     the willful and continued failure of the Executive to perform substantially the Executive's duties with the Company or one of its affiliates (other than any such failure resulting from incapacity due to physical or mental illness), after a written demand for substantial performance is delivered to the Executive by the Board or the Chief Executive Officer of the Company which specifically identifies the manner in which the Board or Chief Executive Officer believes that the Executive has not substantially performed the Executive's duties, or

(ii)    the willful engaging by the Executive in illegal conduct or gross misconduct which is materially and demonstrably injurious to the Company.  For purposes of this provision, no act, or failure to act, on the part of the Executive shall be considered "willful" unless it is done, or omitted to be done, by the Executive in bad faith or without reasonable belief that the Executive's action or omission was in the best interests of the Company.  Any act, or failure to act, based upon authority given pursuant to a resolution duly adopted by the Board or upon the instructions of the Chief Executive Officer or based upon the advice of counsel for the Company shall be conclusively presumed to be done, or omitted to be done, by the Executive in good faith and in the best interests of the Company.

248.    McClendon could have been terminated for cause include, in part, the following: (i) for running a hedge fund out of the Company's offices while managing billions of dollars of Chesapeake's hedge positions and while competing with the Company for natural gas commodities trading profits; (ii) by taking loans from Company

partners on preferential terms, McClendon violated the terms of the FWPP and Code of Conduct; (iii) for repeatedly failing to disclose material information to the Board;  (iv) the failure to disclose to the Audit Committee the terms of his FWPP loans, and to have these loans vetted for Related Party Transaction review; and (v) failing to disclose on the year end Related Party Disclosure Form, the existence of over a billion dollars in loans from entities that were entangled in business relationships with Chesapeake.

249.    Not only did the Board waste $50 million by conspiring with McClendon so that he could exit with his unearned severance, but they also allowed McClendon to misappropriate over a billion dollars of Company assets.  As the Board was well aware, by 2009 McClendon lacked the financial wherewithal to finance the hundreds of millions of dollars in debt that he could not personally secure.   McClendon simply misappropriated corporate opportunity and obtained over $1 billion in non-recourse loans on preferential terms not available to independent investors.  Thus, because McClendon misappropriated the loans from Company partners to pay for his FWPP obligations, and had effectively misappropriated corporate opportunities to acquire such wells, *McClendon should not be allowed to retain these assets*.  Equity demands that McClendon cannot retain the proceeds of misappropriated corporate opportunities, or the wells that such loans were used to pay for.[17]

### M.    RESULTS OF AN INTERESTED, CONFLICTED AND NON-"INDEPENDENT INVESTIGATION" FINDS NOTHING

250.    On January 7, 2013, the Board announced a series of considerable corporate governance reforms, including the elimination of staggered boards, the adoption of new proxy access measures and the adoption of performance-based executive pay standards that would result in McClendon earning no bonus in 2012.  Following the announcement

---

[17] Equity demands that McClendon cannot retain he proceeds of misappropriated corporate opportunities, or the weels that such loans were used to pay for.

of these corporate governance changes, *Fox Business News* interviewed Mark Hanson, an oil analyst at Morning-star, who stated that the market considered these changes less significant than the outcome of Hargis' "independent" investigation into the FWPP and McClendon's personal loans from related parties (as well as the 2013 outlook).

251.     In fact, the Morningstar analyst was correct and the market again voiced its displeasure with the scope, and breadth of this initial report—which still did not include the results of the Audit Committee's investigation report.  On January 7, 2013, shares of the Company closed at $17.62 per share.  The following trading day, January 8, 2013, shares of Chesapeake closed at $16.88, a decline of over 4%.  This one day decline again wiped out over $481 million of Chesapeake's market capitalization.

252.     As indicated by analyst Hanson, even the significant corporate governance changes made at Chesapeake were viewed by the market as less important than the outcome of the "independent" investigation, because investors expected that report to provide more specific explanations as to the full responsibility and liability for McClendon's undisclosed related party FWPP financing, and for allowing and/or ratifying McClendon operating Heritage out of the Company's offices without making the proper disclosures and without properly informing the Board.  While making general changes such as de-classifying the Board certainly helped the Company achieve independence, at that time investors were looking for specific, qualitative structural changes that corrected the defective process, controls, procedures and run-away conflicts of interest and breaches of duty that were allowed to exist and go unchecked at Chesapeake.  Investors were also looking for the report to attribute liability for tens, or hundreds or possibly billions of dollars for corporate wrongdoing, breach of duty and waste of corporate assets.

253.     Another legal commentator, Glass Lewis, said the corporate government changes were significant for Chesapeake which was "long recognized as having a puppet

board."[18]   Glass Lewis also pointed out that the results of the related party loan transaction and hedge fund investigation continued to be of the highest importance to investors, as follows:

> While such steps represent an appropriate (albeit delayed) response to shareholder concerns over the past several years, Chesapeake still faces considerable legal challenges. **Absent from any recent filings is new information regarding the audit committee's internal investigation into Mr. McClendon's financing arrangements with any entity that is (or was at any time) affiliated with Chesapeake Energy.** Rather, Chesapeake discloses in its most recent Form 10-Q that in addition to the audit committee investigation and related SEC inquiry, it also received inquiries from other governmental and regulatory agencies concerning such matters and is responding to such inquires. These matters are sure to receive closer shareholder scrutiny as the company prepares for its next annual meeting.

254.    **Investigation Results Finally Announced**.   On February 20, 2013, after almost a full year, the results of Hargis' investigation was completed and announced. Remarkably, the conclusion was that, after a review of alleged conflicts of interest and other matters involving the *CEO only*, the Board did not find any <u>intentional</u> misconduct by McClendon.  In part, this release stated the following:

> Chesapeake Energy Corporation today announced that its Board of Directors has received the results of its previously announced review of the financing arrangements between co-founder, Chief Executive Officer and President, Aubrey K. McClendon (and the entities through which he participates in the Founder Well Participation Program ("FWPP")) and third parties identified as having a financial relationship with the company, as well as other matters. The review, which was led by the Audit Committee of the Board, with the assistance of independent counsel retained by the independent members of the Board in April 2012, has been substantially completed. In connection with the review, millions of pages of documents were collected and reviewed and more than 50 interviews of Chesapeake and third-party personnel were conducted.

255.    The release described the limited scope of the Hargis investigation:

---

[18] Glass, Lewis & Co. is a leading provider of governance services to institutional investors and corporations through its research, proxy vote management and technology platforms. *See* http://www.glasslewis.com.

Among the transactions reviewed were the 2008-2012 financing arrangements between EIG Global Energy Partners ("EIG") and affiliates of Mr. McClendon regarding financing of his participation in the FWPP, as well as the preferred stock investments by EIG in CHK Utica, L.L.C. and CHK Cleveland-Tonkawa, L.L.C. **The review of the financing arrangements did not reveal any improper benefit to Mr. McClendon or increased cost to the company as a result of the overlap in the financial relationships**.

The review also covered:

1. **other relationships in which both Mr. McClendon and the company conducted business with the same financial institutions;**

2. **the trading activities of the Heritage Hedge Fund (co-founded by Mr. McClendon) through 2007, when the Heritage Hedge Fund ceased operations; and**

3. **other matters, including issues regarding administration of the FWPP, and a 1998 loan to Mr. McClendon by then Board member Frederick B. Whittemore.**

**Based on the documents reviewed and interviews conducted, <u>no intentional misconduct by Mr. McClendon or any of the company's management</u> was found by the Board concerning these relationships and/or these transactions and issues.**

256.    The same day these results were announced, *Reuters* reported that the Audit Committee Report did <u>*not*</u> resolve the issues at the Company, according to authorities and analysts familiar with the facts.   According to *Reuters*, a review of the process demonstrated only that it lacked transparency as "[t]he Company did not say how it reached its conclusions and did not release a full report of its investigation, and state and federal investigations of the Company continue."

257.    The results of this report did not, ultimately, surprise investors because these results were telegraphed to the market on 1/29/13, the day McClendon announced his retirement from Chesapeake and when he stated that the investigation had determined that he was not culpable or liable for any intentional misconduct.   Accordingly, the

market had almost no reaction to the publication of the purported results of this report. Accordingly, between February 19 and 21, 2013, there was no material change in the price of Chesapeake shares over the course of three days of trading.

258.    Almost immediately after producing the results of his purported "independent" investigation, defendant Hargis again sought to resign from the Company. Wasting no more time, on March 7, 2013, the Company announced that it had accepted Hargis's resignation, effective immediately.

259.    The Company's 2013 Proxy, filed with the SEC on May 3, 2013, also reported on the results of the Board's purported "independent" investigation:

> On February 20, 2013, we announced that our Board of Directors had received the results of its previously announced review of the financing arrangements between Mr. McClendon (and the entities through which he participates in the Founder Well Participation Program, or FWPP) and third parties identified as having a financial relationship with us, as well as other matters. The review, which was led by the Audit Committee of the Board with the assistance of independent counsel retained by the independent members of the Board in April 2012, has been completed. In connection with the review, millions of pages of documents were collected and reviewed and more than 50 interviews of Chesapeake and third-party personnel were conducted.
>
> Over the life of the FWPP, Mr. McClendon has typically mortgaged his interests acquired under the FWPP with one or more lenders, some of which also have lending, investment or advisory relationships with the Company. Mr. McClendon's mortgages with these lenders secure loans used in whole or in part to fund FWPP well costs. See *Transactions with Related Persons—Founder Well Participation Program"* . The review of the financing arrangements did not reveal any improper benefit to Mr. McClendon or increased cost to the Company as a result of the overlap in the financial relationships. The review also covered other relationships in which both Mr. McClendon and the Company conducted business with the same financial institutions, issues regarding administration of the FWPP and other matters. Based on the documents reviewed and interviews conducted, no intentional misconduct by Mr. McClendon or any of the Company's management was found by the Board concerning these relationships and/or these transactions and issues.

260.    The results of this investigation were predictable because the report was the result of a conflicted and non-independent process that was designed to and which did result in the exoneration of all interested parties.  First, the investigation was given over to parties who had a direct interest in the outcome.  Defendant Hargis was forced to conduct this investigation when he was a director at one of the companies who had lent McClendon the money that was the source of the investigation.  Then, Hargis and Davidson rubber-stamp an outside counsel who was supposed to direct the investigation and he is an attorney with material entanglements with defendant Miller who had, and has, continued to represent entities Miller owns or controls in other litigation (*see infra*).

261.    In addition to the conflicts of interest and breaches in fiduciary duties tied to the process by which the investigation commenced, the scope of the investigation was also purposefully designed to avoid determining liability or culpability.  Rather than investigate the failures of the Board in relation to McClendon's breaches of duty and conflicts of interest, Hargis, Davidson, and Miller, with the cooperation of the full Board, purposefully focused the investigation on McClendon only.  Also, rather than discover the full range of culpable conduct, including knowledgeable or reckless or grossly negligent conduct, shareholders ultimately learned that the scope of the report was limited to "intentional" conduct only.

262.    The report was mystifying in its limited scope and as well as in its lack of transparency.  After almost a year waiting for the results of this investigation, the Audit Committee and the Board did not make the report available and it did not disclose the rational for any of its limited conclusions.  Moreover, no explanation was provided to support the conclusion that McClendon's obtaining over $1 billion in non-recourse lending when he lacked assets to support the loan, was not an *"improper benefit"* as defined by the Company's Code of Conduct and the terms of the FWPP.

263.    There was also no transparency as to whether the Board had analyzed Heritage's trading records as compared to Chesapeake's trading records from 2005

through 2009.  There was no discussion of whether Board requested or reviewed trading records prior to 2009, to determine if Heritage had engaged in front-running or other trading on Chesapeake's confidential information, or conducted an insider trading review.

### N.   LACK OF DISINTEREST AND INDEPENENCE AND CONFLICTS OF INTEREST MAR INVESTIGATION PROCESS

264.     In addition to allowing conflicted and interested directors to oversee the independent investigation, these directors were allowed to select outside counsel that stood in a conflicted position because he had significant business ties and financial entanglements with defendant Miller, such that it was highly inappropriate that this outside counsel was chosen.  On June 20, 2012, *Bloomberg* reported on the process and procedure by which the purportedly independent outside counsel was hired by the Board and it documented the significant entanglements between that investigator and defendant Miller.  *Bloomberg* reported, in part, the following:

> **Miller**, the chief executive of Houston-based National Oilwell Varco Inc., has remained as lead outside director on Chesapeake's board. He **recommended that his colleagues hire Weinstock to handle the McClendon loan probe**….
>
> **Weinstock's Mission**
>
> The board asked [Craig] Weinstock [a Houston-based attorney with Locke Lord LLP] to review McClendon's dealings with lenders with which the natural-gas company does business, including EIG Global Energy Partners LLC, a private-equity firm that arranged a $1 billion credit line for the CEO.

265.     Despite the Boards obligation to investigate, vet and hire an independent third party to conduct an investigation into the conflicts of interest and breaches of fiduciary duties in connection with McClendon's secret related-party loans and his prior hedge fund activities, it appears that the other members of the Audit Committee, Davidson and Hargis, simply rubber-stamped Miller's nominee.  While Mr. Weinstock

had conducted similar reviews at other companies, and while his reputation appears very good, especially in this niche-type practice, it is not clear that Davidson or Hargis conducted any research or considered any other candidates for this position.

266. Nor is it clear that Davidson or Hargis, as the other members of the Audit Committee, or any other member of the Board was aware of the prior or ongoing financial entanglements that existed between Miller and companies he owned or controlled and Mr. Weinstock, much less waived such conflicts. *Bloomberg* documented these financial entanglements as follows:

> Miller recommended hiring Weinstock because the lawyer **has been handling** a federal probe into allegations of sanctions violations involving Miller's National Oilwell Varco, a drilling equipment maker, and its Ameron International Corp. unit, the person said. The probe's focus is dealings involving Iran, the person said.
>
> **Subpoena**
>
> National Oilwell Varco said **in a February regulatory filing** that they had received grand jury subpoenas and inquiries from federal agencies, including the U.S. Justice Department and the U.S. Treasury's Office of Foreign Assets Control about their "compliance with export trade laws and regulations."
>
> The company said it had "conducted our own review of this matter" without naming Weinstock or his firm or saying that the matter involved its Iranian operations. It said **it was "negotiating a potential resolution with the agencies."**
>
> National Oilwell Varco acquired Pasadena, California-based Ameron **last year in a $772 million transaction. Weinstock's law firm represented the drilling-supply company in the deal**, according to the *American Lawyer Magazine,* a trade publication.

267. **Investigation Drags into 2013: Comptroller Liu Points to Obvious Conflicts**. As December 2012 came to an end, the purported investigation into McClendon and the Board still was *not* complete. Despite the abandonment of the

majority of the Board in late June 2012 and despite the fact that Southeastern Asset Management had implored the Company to wrap up the investigation within "weeks not months" at that time, the results of this investigation were significantly delayed. A half-year after that defendant Hargis had yet to issue his report. On December 30, 2012 the *Wall Street Journal* reported that a Company spokesperson had stated only that the review was still on-going.

268. The long delay in producing the results of what should have been a few month investigation only served to reinforce the perception that extreme conflicts of interest existed in allowing Hargis to conduct what was supposed to have been an "independent" review. Certainly, this was the conclusion of NYC Comptroller Liu who was again quoted by the *Journal,* as follows:

> Some shareholders have expressed impatience with the probe. **New York City's Office of the Comptroller**, which manages pension funds owning 1.6 million Chesapeake shares, **said it was concerned that the inquiry was headed by V. Burns Hargis, who, as chairman of the board's audit committee, had been the board's point person supervising Mr. McClendon's transactions related to Chesapeake**.
>
> **"He is, in effect, overseeing an investigation into conduct for which he had oversight responsibility, and that's a conflict**," said Assistant Comptroller Michael Garland. "The fact that we've yet to see the results of that investigation exacerbates our concerns."
>
>                \* \* \*
>
> A person close to the board said that the investigation is likely to conclude in mid-January and is unlikely to result in the ouster of Mr. McClendon. He stepped down as Chesapeake's chairman in June but remains CEO and continues to serve on Chesapeake's board.

269. Again it is inexplicable why Hargis would be required to conduct the investigation after he was given an overwhelming vote of no confidence by the Company's shareholders and after he was required by that vote to tender his resignation. Forcing Hargis to conduct a year-long investigation that began only one month prior to

his tendering his resignation is not the action of an independent Board which was not interested in the outcome of the investigation.  In fact, out of all the members of the Board, Hargis was probably the most interested in the outcome of the results because he was a member of the board of BOK, one of the Company's lending partners who purportedly lent money to McClendon so that he could participate in the FWPP.  It is also difficult to understand why Davidson would be charged with selecting the outside investigator when he too had tendered his resignation after the June 2012 proxy vote.

270.    The lack of transparency of the results of the purported investigation report again serves to underscore that this investigation was not designed to discover the truth of what had occurred, but rather to obscure the events and assure that liability and culpability would not be assigned.  After waiting a full year for these results, a reasonable investor had the right to know the identification of all related parties and the full scope of McClendon's loans.  A reasonable investor would have wanted to know how the break-down in corporate governance allowed McClendon to first run a hedge fund for 5 years out of the Company's corporate offices, and then to borrow over a billion dollars from Company partners without the Board detecting either on a timely basis.  The results of this investigation provided no insight into any breach of duty or conflict of interest of any Board member.

271.    At the end of this purported investigation shareholders did not even learn if McClendon was continuing to use funds he had raised from Company partners to finance his participation in the FWPP until its termination date at the end of June 2014.   In fact, no explanation was provided in the Report that gave any insight into the source and

genesis of McClendon's funding agreements.  What shareholders did learn, however, was that every Board member at the Company owed shareholders a duty to investigate the inappropriate conduct at Chesapeake and that duty extended well beyond simply delegating and ultimately abdicating responsibility to defendant Hargis.

### O.    HARM TO SHAREHOLDERS & THE COMPANY

272.    **Harm to Shareholders and the Company**.  After it was announced that McClendon would step down as the Company's Chairman, shares of Chesapeake rallied 7%.  However, following the second *Reuters* report, shares collapsed for the second time, on huge trading volume.  As evidence of this, on May 1, 2012, the day before the second *Reuters* report was published, shares of the Company closed trading at $19.60, after trading as high as $20.63 that day.  The following day, over 155 million shares traded before Chesapeake closed the day at $16.74 per share—a one day decline of 15% and a reduction of over $1.861 billion in Chesapeake's market capitalization.

273.    According to *Reuters*, May 2, 2012, the largest decline in more than 3 years in the price of Chesapeake shares came as McClendon stated he was "deeply sorry" for the turmoil caused by his personal finances.  In a conference call earlier that day, it was reported that McClendon said, "I am deeply sorry for all the distractions of the past two weeks.  Through all of this I've learned that there was a desire for more information regarding the FWWP program." McClendon's apology did nothing to address the sum or substance of the conflicts of interest or breaches of fiduciary duty at Chesapeake, and his attempt to sweep the issue under his desk only served to anger investors and to drive the price of Chesapeake stock lower.  In conjunction with the S&P ratings downgrade from BB+ to BB, the significant loss in Chesapeake's market capitalization necessarily served to further increase Chesapeake's cost of capital.

274.    The reduction in the Company's debt rating and the placement of Credit Watch Negative for future negative expectations *necessarily* raised the cost of the

Company's borrowing.  At the same time, the declining stock price caused as a result of the market learning of defendants' breaches of fiduciary duties and conflicts of interest, impaired the Company's ability to sell equity in the public markets without substantially diluting current shareholders and decimating the price of Company shares.

275.    As further evidence of the true cost of the Company's inability to sell equity as a result of the issues raised herein, on October 24, 2014, Chesapeake was ultimately forced to withdraw its plans for an initial public offering of Chesapeake Oilfield Services.  That company, which was formed by Chesapeake in 2011, filed for an IPO of up to $863 million in April 2012.  However, because of the crisis of corporate governance at that time, the IPO had to be postponed.  Then, because Chesapeake was next caused to begin an asset liquidation program that curtailed drilling operations the need for "oilfield services" declined and the Company was not able to sell this once valuable asset.  The inability to conduct the Initial Public Offering of Chesapeake Oilfield Services was a direct result of the harm to Chesapeake caused by McClendon and the Board.

276.    Not only did the Board waste $50 million by conspiring with McClendon so that he could exit with his unearned severance, but they also allowed McClendon to misappropriate over a billion dollars of Company assets.  As the Board was well aware, by 2009 McClendon lacked the financial wherewithal to finance the hundreds of millions of dollars in debt that he could not personally secure.  Thus, McClendon simply misappropriated corporate opportunities and secured over $1 billion in non-recourse loans on preferential terms.  In the process, however, McClendon: (i) violated the Company's Code of Conduct; (ii) violated the related party review provisions of the Audit Committee Charter; (iii) violated Chesapeake's stated Compensation Philosophy; (iv) violated the terms of the terms of the FWPP (by securing preferential financing from Company partners); and (v) misappropriated corporate opportunity by securing loans for his personal use, by using the creditworthiness of Chesapeake.

277.     Thus, because McClendon misappropriated the loans from Company partners and used the proceeds to pay for his FWPP obligations, he had effectively misappropriated corporate opportunities to acquire such wells.  Accordingly, McClendon should not be allowed to retain these assets.  *Equity demands that McClendon cannot retain the proceeds of loans which constituted the misappropriated results of corporate opportunities, or the wells that the loans were used to pay for.*  McClendon must return to Chesapeake the wells he acquired in the FWPP after 2009.

278.     In addition to the distraction and loss of productivity caused as a result of defendants having to spend time and effort complying with the state and federal regulators' inquiries, at that time, Chesapeake also suffered from a loss of goodwill and harm to the reputation of the Company.  As analysts stated, Chesapeake suffered from a "credibility gap," and the perception of a "corporate governance crisis" and its stock price suffered from what was then known as an "Aubrey Discount," a play on the more common expression of a "Liars' Discount."

279.     The shocking nature of the existence of McClendon's loans from Company partners also drew the attention of the SEC which almost immediately commenced an investigation into McClendon and the Company.  In addition to the SEC, it was also reported that the Internal Revenue Service had also begun an investigation into Chesapeake regarding "certain issues" in connection with Chesapeake's Founder Well Participation Program as part of its audit of the company's 2008 and 2009 tax returns.  In addition to the foregoing, on May 2, 2012,  Senator Bill Nelson requested that the U.S. Justice Department investigate McClendon for potential fraud and conflicts of interest, which investigation is also believed to be an ongoing distraction.

## IV.   GENERAL FIDUCIARY DUTIES OF THE DEFENDANTS

280.   The Defendants had stringent fiduciary obligations to Chesapeake and its shareholders.

281.   By reason of their positions as officers, directors and/or fiduciaries of Chesapeake and because of their ability to control the business and corporate affairs of Chesapeake, the Defendants owed Chesapeake and its shareholders fiduciary obligations of loyalty, good faith, due care, disclosure, candor, and oversight, and were and are required to use their utmost ability to control and manage Chesapeake in a fair, just, honest and equitable manner.   The Defendants were and are required to act in furtherance of the best interests of Chesapeake and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

282.   Each director and officer of the Company owes to Chesapeake and its shareholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and to uphold the highest obligations of fair dealing.   In addition, as officers and/or directors of a publicly held company, the Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company.

283.   The Defendants, because of their positions of control and authority as directors and/or officers of Chesapeake, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.   Because of their advisory,

executive, managerial and directorial positions with Chesapeake, each of the Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Chesapeake and its assets.

284.    At all times relevant hereto, each of the Defendants was the agent of each of the other Defendants and of Chesapeake, and was at all times acting within the course and scope of such agency.   To discharge their duties, the officers and directors of Chesapeake were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the operational affairs of the Company. By virtue of such duties, the officers and directors of Chesapeake were required to, among other things:

    a.   conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the Company's value;

    b.   properly and accurately guide shareholders and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

c.  ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations;

d.  ensure that there were sufficient checks and balances in Chesapeake's accounting and finance functions, and related functions, to prevent accounting irregularities, internal control problems, and/or overstatement of revenue and/or income;

e.  ensure that no inaccurate financial information about Chesapeake was released to the public that would tend to artificially inflate Chesapeake's stock, and that would thus cause corresponding or greater harm to the Company's value when the truth was revealed; and

f.  ensure that no usurpation of corporate opportunities took place by Company insiders and directors, and that the Company's interests were placed before those of any individual director.

285.   Each of the Defendants, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, due care, disclosure, candor, and oversight in the management and administration of the affairs of the Company.   The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Chesapeake, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders.   The Defendants were aware, or should have been aware, that those violations, absences of good faith, and the reckless disregard of

duties posed a risk of serious injury to the Company.  The conduct of the Defendants who were also officers and/or directors of the Company during the Relevant Period have been ratified by the remaining Defendants.

286.    Because of their positions with the Company, and their access to material non-public information available to them but not to the public, Chesapeake, through the Defendants, knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  As a result of Defendants' illegal actions and course of conduct during the Relevant Period, the Company is now subject to multiple shareholder lawsuits that allege violations of both federal and state law.  As a result, Chesapeake has expended, and will continue to expend, significant sums of money.

## V.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

287.    In committing the wrongful acts alleged herein, the Defendants have pursued, or joined in the pursuit of, a common course of conduct.  They have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Defendants also aided and abetted, and/or assisted, each other in breach of their respective duties.

288.    During all times pertinent hereto, the Defendants collectively and individually initiated a course of conduct that was designed to and did:  (i) conceal that Defendant McClendon had taken out $1.1 billion in loans secured upon wells which were jointly operated with Chesapeake; and (ii) conceal that Defendant McClendon was borrowing funds from entities that also lent funds to Chesapeake.

289.    The purpose and effect of the Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Defendants' violations of state law, including breaches of fiduciary duty and abuse of control; and to conceal adverse information concerning the Company's true financial position.

290.    The Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by purposefully or recklessly releasing improper statements on the Company's behalf.   Because the actions described herein occurred under the Board's authority, each of the Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

291.   Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.   In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VI.    DERIVATIVE ALLEGATIONS

292.    Plaintiffs brings this action derivatively in the right and for the benefit of Chesapeake to redress injuries suffered, and to be suffered, by Chesapeake as a direct result of the violations of state law, including breaches of fiduciary duty and abuse of control, as well as the aiding and abetting thereof, by Defendants.

293.    Chesapeake is named as a nominal defendant in this case solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court it would not otherwise have.   Plaintiffs are and were shareholders of Chesapeake at the time of the transgressions complained of herein.   Plaintiffs will adequately and fairly represent the interests of Chesapeake and its shareholders in enforcing and prosecuting their rights.

Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

294.   The wrongful acts complained of herein subject, and will continue to subject, Chesapeake to harm because the adverse consequences of the actions are still in effect and ongoing.

295.   The wrongful acts complained of herein were unlawfully concealed from Chesapeake's shareholders.

## VII.   DEMAND FUTILITY

296.   Demand upon the Chesapeake Board to institute this action in the Company's name would be entirely futile, and is therefore excused.

297.   The Chesapeake Board at the time this action was filed was comprised of nine individuals, Defendants McClendon, Davidson, Eisbrenner, Hargis, Keating, Maxwell, Miller, Nickles and Simpson. Each of the Defendants participated in an abnegation of their responsibilities to Chesapeake and its shareholders and there is significant doubt that these Defendants are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duties. As such, the Defendants are neither disinterested nor independent, and are not capable of responding adequately to a demand. Demand is also futile and useless act because the wrongful acts complained of herein show an abdication by Defendants of their fiduciary duties of due care and oversight. Demand is therefore excused.

298.   Plaintiffs have not made any demand on shareholders of Chesapeake because such demand would be similarly futile. As a widely-held public company, Chesapeake has millions of shares outstanding; identifying and making demands on the hundreds of thousands, if not millions, of shareholders who own these shares would be impossible for Plaintiffs, both as a matter of practical reality and in terms of financial cost.

299.    The misconduct of each member of the Board alleged herein was not, and could not have been, the product of a valid or good faith exercise of business judgment.

300.    As detailed above, the Directors were directly involved in the misconduct challenged in this action, by virtue of their respective positions on the Board and the Committees thereof.  The members of the Board abdicated their responsibility to oversee the Company's operations and instead directed and encouraged McClendon, in the service of his own personal gain, to engage in illegal and/or improper conduct.  The Board's acts and omissions lacked any legitimate business purpose and were not a product of a valid exercise of business judgment.  As such, demand is excused as futile.

301.    **Futility as to Defendant McClendon**.  Almost every analyst and observer who was familiar with the facts presented herein concluded that McClendon breached his duties and had placed his own interests in conflict with those of the Company and its shareholders by first, running a $200 million hedge fund out of Chesapeake's offices while simultaneously managing the Company's $17 billion hedge position and, second, then obtaining over a billion dollars in undisclosed and unreview loans from Company partners.

302.    The undisclosed loans that McClendon secured from Company partners, including EIG and BOK, totaling over one billion dollars constituted a breach of duty and conflict of interest because these loans: (i) violated the terms of the FWPP because they were given to McClendon on terms that were not otherwise available to independent third parties investing in Chesapeake wells; (ii) violated several provisions of the Code of Conduct, first and foremost, the prohibition against taking personal loans from vendors, and also for taking personal advantage of his corporate position and having a competitor hold an interest in his assets; and (iii) violated the Company's reporting requirements because McClendon failed to self-report on his yearly Related Party Disclosure Form, and he did not submit the loans for Related Party Review by the Audit Committee

(despite the fact that he used the loans to participate in the Company's FWPP program to purchase assets from Chesapeake in a manner that necessarily involved the Company).

303.   In addition to using undisclosed and unscured loans from Company partners to finance his participation in the FWPP after 2009, McClendon breached his duties by running a secret $200 million dollar hedge fund from the Executive Suite at the Company, and did so at the same time when he was solely responsible for $17 billion of Chesapeake's hedge facility.   While this alone presented a shocking conflict of interest (as evidenced by the universal market reaction and the letters to the board from Carl Icahn, Southeastern Asset Management and the two Comptrollers from New York), the failure to disclose that this had occurred or to update the Company's Risk Disclosures continued this breach of duty and conflict of interest until it was finally disclosed by *Reuters*, in May 2012.

304.   Demand on Defendant McClendon is also futile because he has not and will not unilaterally surrender the over one billion dollars in well assets that he has misappropriated from Chesapeake.   At the time McClendon secured his financing from Company partners, he lacked the financial wherewithal and creditworthiness to obtain such loans alone.   McClendon had lost almost all of his personal fortune betting on Company shares and falling commodity prices in 2008 and 2009 and the only reason his loans were non-recourse was that, by 2012, there was no recourse possible against McClendon because the loan sizes dwarfed his personal liquidity.   Since McClendon usurped Corporate opportunities and traded on Chesapeake's goodwill and credit rating to secure his preferential loans, those loans should *never* have been granted to him.   If the loans should not have been granted, or if they were actually loans that should have been made to the Company, then McClendon should not have been able to purchase the wells from the Company.

305.   Thus, demand is futile because demand here requires McClendon to return his interests in the FWPP to Chesapeake, or in the alternative to make restitution to

Chesapeake's shareholders for the difference in cost between the price that the Company sold the wells to McClendon and the price that Chesapeake could have sold the wells to independent parties.  McClendon did not acquire his wells at full cost because he did not reimburse Chesapeake for its over-head in supplying the infra-structure to supply all the services that went into drilling oil from the wells McClendon had invested in.  These costs were never included in the FWPP.  Also, passive investors (such as McClendon, unless he was being credited for actively investing in the wells as a result of his participation as CEO of Chesapeake), typically paid a participation cost that exceeded production costs by an industry standard of approximately 10%.  However, because McClendon had already leveraged the future of his participation in the wells so far that in all practicality it would be impossible for him to return his interests, this too demonstrated that demand is futile as to McClendon

306.   Demand is also futile as to McClendon because to fulfill the demand to bring the action requested herein would force him to return almost $35 million in unearned severance payments and to pay the Company an additional $15 million in claw-backs under his 2009 Employment Agreement and 2008 well participation bonus.

307.   After having breached his duties to the Company and its shareholders by engineering his departure from Chesapeake so that he could obtain a "termination without cause" designation, which then entitled him to severance and no claw-back, and by facilitating the premature departure of the entire Compensation Committee, that also allowed them to leave the Company without being terminated for cause, it is futile to demand McClendon take the actions requested herein.  Having purposefully avoided ratification of a new independent board by shareholders in the 2012 shareholder elections and, instead, having turned control of the Board over to Carl Icahn and Southeastern Asset Management in exchange for his severance payment and waiver of the claw-back, McClendon will not now take any action to expose that arrangement or any of his other self-motivated, illegal and improper conduct that has harmed Chesapeake and its

shareholders, decimated its market capitalization, hurt its credit rating and impacted its cost of borrowing, while allowing him to personally benefit from the Board's waste of more than a billion dollars in Company assets.

308.   **Futility as to Hargis**.   Demand as to defendant Hargis would also be futile and is therefore excused under the facts presented herein.   Defendant Hargis breached his duties as Charmin of the Audit Committee of the Board because he never sought to investigate McClendon's financing to support his participation in the FWPP despite knowing or recklessly disregarding that McClendon did not have the liquidity, creditworthiness or assets to support the massive FWPP obligation after the Company was caused to bail him out in 2009.   As Chairman of the Audit Committee Hargis breached his duty to oversee McClendon's participation in the FWPP and to question McClendon yearly when he presented his Related Party Disclosure Form to that Committee.   As Chairman of the Audit Committee Hargis had primary responsibility for overseeing and implementing the Company's Related Party Disclosure Form policies.

309.   In addition to the specific oversight duties placed upon Hargis as Chairman of the Audit Committee to oversee McClendon's participation in the FWPP, the general duties specified by the Charter of the Audit Committee and the Related Party Discolsure Form policies, made it impossible for Hargis to have fulfilled these other specified duties without also discovering that McClendon had funded his participation in the FWPP with loans obtained from Company partners, and while competing with Chesapeake for financing.

310.   Moreover, an even larger conflict of interest and breach of duty was the fact that Hargis serves as a member of the board of directors of another company, BOK, which does significant finance business with Chesapeake, but which was also one of the entities revealed to be making secret loans to McClendon to fund his participation in the FWPP.   This breach of duty and conflict of interest should never have been ignored. However, that is exactly what occurred as Hargis was ultimately named to head the

Board's investigation into McClendon's breaches of duty and conflicts of interest. Hargis continued to breach his duties to the Company and shareholders by accepting this position and for agreeing to head the investigation.

311.    In leading the Company's investigation, Hargis further breached his duties to the Company and its shareholders by allowing for the appointment of outside counsel who was not independent or disinterested, but who had significant business entanglements with defendant Miller.  There is no evidence that Hargis was aware of the conflicts that existed or whether any conflicts were waived, and there is also no evidence that Hargis did anything more than rubber-stamp Miller's selection.

312.    As a result of the foregoing breaches of duty and conflicts of interest, it is futile to make a demand on defendant Hargis because for him to take the actions requested herein would expose him to liability for his knowing, reckless and grossly-negligent derelictions of duties.  Hargis breached his duties under the Charter of the Audit Committee and the Related Party Transaction Review policies.  Through his position in BOK, Hargis participated in secretly funding McClendon so he could participate in the FWPP after 2009.  Hargis also breached his duties to shareholders and wasted millions of dollars and over a year's time, by agreeing to lead the Company's investigation which was marred by conflicts of interest and defective processes.

313.    In addition to the foregoing, Hargis will also not take the action requested here, because since March 2008, he has served as President of Oklahoma State University and he counted on McClendon and the Chesapeake Board to donate millions of dollars of Company money to O.S.U.  It has been reported that, Chesapeake had caused to donate more than $10 million to O.S.U. by May 2012.  Chesapeake has also helped fund a new business school at O.S.U., a natural-gas training center, an endowment faculty chair, student scholarships and tickets to sporting events.  Defendant Hargis will take no action against his former Board members that could subject them, or himself, to liability and

that could result in the new Chesapeake board not providing O.S.U. with the millions of dollars it had previously committed.

314.   **Futility as to Davidson**.  Demand as to defendant Davidson would also be futile and is therefore excused under the facts presented herein.  Defendant Davidson breached his duties as a member of the Audit Committee of the Board because he never sought to investigate McClendon's financing to support his participation in the FWPP despite knowing or recklessly disregarding that McClendon did not have the liquidity, creditworthiness or assets to support the massive FWPP obligation after the Company was caused to bail him out in 2009.  As a member of the Audit Committee, Davidson breached his duty to oversee McClendon's participation in the FWPP and to question McClendon yearly when he presented his Related Party Disclosure Form to that Committee.  As a member of the Audit Committee Davidson had primary responsibility for overseeing and implementing the Company's Related Party Disclosure Form policies.

315.   In addition to the specific oversight duties placed upon Davidson as a member of the Audit Committee to oversee McClendon's participation in the FWPP, the general duties specified by the Charter of the Audit Committee and the Related Party Disclosure Form policies, made it impossible for Davidson to have fulfilled these other specified duties without also discovering that McClendon had funded his participation in the FWPP with loans obtained from Company partners, obtained while competing with Chesapeake for financing.

316.   Davidson continued to breach his duties to the Company and shareholders by allowing for the appointment of outside counsel who was not independent or disinterested, but who had significant business entanglements with defendant Miller.  In selecting Miller's proxy, there is no evidence that Davidson was aware of the conflicts that existed or whether any conflicts were waived, and there is also no evidence that Davidson did anything more than rubber-stamp Miller's selection.

317.   Defendant Davidson also has significant financial entanglements with defendants McClendon and Nickles that prevent them from taking any action against the other.   According to a Schedule 13D filing made by Chesapeake Midstream Partners, L.P. and dated 12/29/11, defendants McClendon, Nickles and Davidson are all Common Unit holders.   This report states that Davidson owned 53,127 units and McClendon owned 53,700 units and Nickles owned 1,400 units.   On June 8, 2012, at the same time McClendon was trading Board seats for his severance payments and negotiating with Carl Icahn and Southeastern Asset Management, Chesapeake Midstream Partners was sold to Global Infrastructure Partners for $2.0 billion.

318.   Defendant Davidson also breached his duties to the Company and its shareholders by allowing McClendon to engineer his departure from the Company on terms that traded control over Chesapeake to two hedge fund investors for no consideration, other than allowing McClendon to obtain $50 million in unearned severance benefits.

319.   As a result of the foregoing breaches of duty and conflicts of interest, it is futile to make a demand on defendant Davidson because to take the actions requested herein would expose him to liability for his knowing, reckless and grossly-negligent derelictions of his duties.   Davidson breached his duties under the Charter of the Audit Committee and the Related Party Disclosure Form policies and he abandoned the Company in a manner that created an additional $50 million in corporate waste, and he also allowed McClendon to abscond with over a billion dollars of well assets that rightfully belong to the Company.

320.   **Futility as to Miller**.   Defendant Miller was the third member of the Audit Committee and suffers from the conflicts identical to those of defendant Davidson as a result thereof.   In addition, Miller further breached his duty so shareholders by knowingly proposing a special counsel for the Company's investigation of McClendon that had financial entanglements with him through other companies that Miller controlled.   If

Miller failed to disclose these conflicts of interest and did not seek to obtain a waiver, the evidence of which is lacking, he also breached his duties to the Company and its shareholders by allowing this conflict of interest to exist and go unreported.

321.   In addition to the foregoing, defendant Miller will take no action against his former Board members because they were substantially responsible for allowing more than $343 million in Company contracts, from 1Q:09 to 1Q:12, to go to National Oilwell Varco, Inc., a drilling equipment maker headed by Miller.   The hundreds of millions of dollars in Company contracts to Varco accounted for almost 1% of that company's gross revenues during 2009 and 2011.   After having provided so much business to Varco, defendant Miller will take no action against his former Board members.

322.   In addition to the foregoing, defendant Miller is the only director of the 9 original Board members sued herein, who is still a member of the Chesapeake Board.   In exchange for allowing McClendon to receive his unearned severance and for allowing the other Board members to abandon the Company, and after supporting the new board members hand-picked by McClendon, Icahn and Southeastern Asset Management, Miller was rewarded with the Chairmanship of the Compensation Committee.   The elevation of Miller to this position forever guaranteed that there would be no further investigation into McClendon and the Board's breaches of duty and conflicts of interest, and he will not now take the action requested herein.

323.   **Futility as to Keating, Maxwell and Eisbrenner.**   Demand on defendants Keating, Maxwell and Eisbrenner would also be futile and is therefore excused as to each of them under the facts presented herein.   Defendant Keating, Maxwell and Eisbrenner were each members of the Compensation Committee (with Keating the Chairman) and each breached his/her duties as a member of that Committee.   Having engineered the 2008 bail-out of McClendon by providing a one-time bonus payment of $75 million, all of which was applied to McClendon's FWPP obligations, and knowing of his spectacular trading losses in 2008 and 2009, it was not possible that these Board members could

fulfill their duties under the Compensation Committee Charter and the Company's Code of Conduct, without discovering or recklessly disregarding McClendon's related-party financing deals to support his participation in the FWPP.  After 2009, Keating, Maxwell and Eisbrenner knew or were reckless in not knowing that McClendon did not have the assets, liquidity or creditworthiness to obtain the financing necessary to meet his exploding FWPP commitments and massive FWPP obligations.

324.   As members of the Compensation Committee defendants Keating, Maxwell and Eisbrenner breached their duties to monitor the day-to-day operations of McClendon's participation in the FWPP.   It was their obligation to investigate McClendon's source of financing and to question McClendon yearly when he opted to renew his FWPP participation and named his election criteria and presented this to the Compensation Committee.  As members of the Compensation Committee charged with allowing McClendon to make hundreds of millions or billions of dollars in investments in Company developed wells alongside the Company, it was derelict of them not to inquire into McClendon's source of funding.  After bailing McClendon out in 2009 so he could pay his commitment in that year, any reasonable investor diligently protecting their own interests would have wanted to know where McClendon was suddenly getting such large amounts of funding.

325.   In addition to the specific oversight duties placed upon Keating, Maxwell and Eisbrenner as members of the Compensation Committee charged with the oversight of  McClendon's participation in the FWPP, the general duties specified by the Charter of the Compensation Committee also charged them with assuring that McClendon's compensation was consistent with Chesapeake's stated Compensation Philosophy.  It would not have been possible for Keating, Maxwell and Eisbrenner to have fulfilled the duty to assure that McClendon's participation in the FWPP was on terms that aligned his interests with the interests of the Company and its shareholders without also discovering

that McClendon had funded his participation in the FWPP with loans obtained from Company partners while competing with Chesapeake for financing.

326.    Keating, Maxwell and Eisbrenner continued to breach their duties to the Company and shareholders by failing to report that McClendon had ran a $200 million hedge fund out of the Chief Executive offices.  Rather than disclose that McClendon had been allowed to trade the same commodities for his own account as he traded for the Company while managing its $17 billion hedge account, the Compensation Committee merely adopted changes in McClendon's various Employment Agreements that facilitated his secret trading.  The failure to disclose the existence of McClendon's fund and the failure to adopt risk disclosures and controls and procedures further evidences the breach of duty by Keating, Maxwell and Eisbrenner, and it is futher evidences why making a demand upon them to bring the action requested herein would be futile.

327.    Defendants Keating, Maxwell and Eisbrenner also breached their duties to the Company and its shareholders by allowing McClendon to engineer his departure from the Company on terms that traded control over Chesapeake to two hedge fund investors for no consideration, other than allowing McClendon to obtain $50 million in unearned severance benefits.   It was completely inappropriate for the entire Compensation Committee of the Board to abdicate their positions with no shareholder vote or independent oversight, and prior to such time that the Audit Committee Report was complete.

328.    Defendant Keating is also incapable of objectively considering a demand because of significant ties with defendant McClendon through their active roles in the Republican Party.  Defendant McClendon contributed directly to the House campaign of defendant Keating's wife.

329.    As a result of the foregoing breaches of duty and conflicts of interest, it is futile to make a demand on defendant Keating, Maxwell and Eisbrenner because to take the actions requested herein would expose them each to liability for their knowing,

reckless and grossly-negligent derelictions of his duties.  Defendants Keating, Maxwell and Eisbrenner breached their duties under the Charter of the Compensation Committee and Chesapeake's Code of Conduct and adorned the Company in a manner that created an additional $50 million in corporate waste, and they also allowed McClendon to abscond with over a billion dollars of assets that rightfully belong to the Company.

330.  **Futility as to Nickels and Simpson**.  Demand as to defendants Nickles and Simpson would also be futile and is therefore, excused under the facts presented herein. Defendant Nickles and Simpson breached their duties to the Company and its shareholders by allowing McClendon to engineer his departure from Chesapeake on terms that traded control over Chesapeake to two hedge fund investors for no consideration, other than allowing McClendon to obtain $50 million in unearned severance benefits.

331.  As a result of the foregoing breaches of duty and conflicts of interest, it is futile to make a demand on defendants Nickles and Simpson because to take the actions requested herein would expose them to liability for their knowing, reckless and grossly-negligent derelictions of their duties.  Nickels and Simpson breached their duties under the Company's Code of Conduct and they abandoned the Company in a manner that created an additional $50 million in corporate waste.  Defendants Nickles and Simpson also allowed McClendon to abscond with over a billion dollars of assets that rightfully belong to the Company.

332.  Defendant Nickles also has significant financial entanglements with defendants McClendon and Davidson that prevent them from taking any action against the other.  According to a Schedule 13D filing made by Chesapeake Midstream Partners, L.P., defendants McClendon, Nickles and Davidson were all Common Unit holders. This report states that Davidson owned 53,127 units and McClendon owned 53,700 units and Nickles owned 1,400 units.  On June 8, 2012, at the same time McClendon was trading Board seats for his severance payments and negotiating with Carl Icahn and

Southeastern Asset Management, Chesapeake Midstream Partners was sold to Global Infrastructure Partners for $2.0 billion.

333.   Also, as a proxy of Southeastern Asset Management, defendant Simpson will take no action that would expose any *quid pro quo* that allowed the activist investors to gain control over Chesapeake with the only consideration given being the $50 million in severance payments and waiver of claw-backs that were ultimately paid for by the Company.   For this reason too, defendant Simpson will not take the actions requested herein and accordingly, demand on Simpson is also futile and excused.

334.   **Further Reasons Why Demand is Excused.**   For the reasons cited above, each of the members of the Board of Directors was neither independent nor disinterested in the outcome of this litigation and cannot properly and with objectivity evaluate a demand to take the action requested herein.   There is ample evidence to show that the Chesapeake Board did nothing to restrain McClendon from placing his self-interest before the interests of the Company and its shareholders and from stopping him from taking advantage of Chesapeake and its shareholders.   What makes the performance of the Chesapeake board even more egregious is how well they were paid to purportedly watch out for the interests of the Company and its shareholders.   As investors ultimately learned, their overpayment was just another symptom of a very sick company.

335.   Excluding McClendon, directors in 2011 earned an average of $533,163, according to *Bloomberg* calculations—more than twice the $288,958 annual average of directors at Exxon Mobil Corporation, which is 40 times larger than Chesapeake in size. The reported cost of non-cash or stock compensation to directors, including the jet travel, alone was $1.09 million in 2011.   Thus, even after cutting their own pay by 20%, Chesapeake directors continued to be steeply paid, with rewards approximately 34 percent higher than the average $260,752 in compensation received last year by board members at 15 other exploration and production companies on the Standard & Poor's 500 Index, according to *Bloomberg*.   Only 3 of the 16 companies, Apache Corp. (APA),

Anadarko Petroleum Corp. (APC) and EOG Resources Inc. (EOG), paid more to their board members in 2011, according to *Bloomberg*.

336.    Cutting pay by 20% and removing the expensive perk of charter jet service reduced director pay significantly.  This pay reduction, however, was evidence that the Chesapeake Board had been over-paid for years and that in exchange for their excessive compensation, Chesapeake and its shareholders did not get what they paid for, but rather, such payments were just largess bestowed by defendant McClendon to assure the Board's loyalty to him alone.  As a result of the lavish compensation McClendon bestowed on *his* Board, they have never moved to restrain McClendon in any way, they acquiesced in his running a hedge fund out of the CEO offices and they repeatedly changed his Employment Agreements to make it easier to manage Heritage from within Chesapeake and, they never even disclosed this to shareholders even after it was obvious to them. After years, and millions of dollars in excess payments to members of the Chesapeake Board to have them look the other way while McClendon breached duties and violated conflict of interest rules at Chesapeake, these directors have time-and-again evidenced that they will not take the action requested herein.

337.    The fact that all of the members of the Chesapeake Board did not immediately terminate McClendon for cause in May 2012 but instead allowed him to abandon the Company as a termination without cause, that they waived any claim to the $15 million in claw-backs for McClendon's early departure and that they let McClendon leave with more than a billion dollars in well assets that were paid for with loans obtained from Company partners, is further evidence that no member of the Chesapeake Board will take the action requested herein.  Accordingly, any demand on the Board to take the action requested herein to recover the $50 million in unearned severance paid to McClendon and to recover the billion dollars in well assets that were misappropriated is futile and should be excused.

338.   In addition to all of the other evidence that proves demand is futile and excused, and that the Board had demonstrated its commitment to protect the interests of McClendon over the interests of the Company and its shareholders, shortly after the April 18, 2012 disclosure the Chesapeake's Board issued the following statement:

The Founders Well Participation Program (FWPP) has been in place since the company's founding and was reapproved by shareholders by a wide margin in 2005.  The terms and procedures for the program are clear and detailed in every proxy for all shareholders to see.   Mr. McClendon's interests and Chesapeake's are completely aligned.   In addition, there are numerous third-party participants in the company's wells, including some of the largest energy companies in the world, that monitor the actions of the company through a number of processes, including well audits, reporting, governmental filings and hearings, participation in development plans and marketing of production.   The suggestion of any conflicts of interest is unfounded.

***The Board of Directors is fully aware of the existence of Mr. McClendon's financing transactions*** and the fact that these occur is disclosed in the proxy.   Additionally, the total amount of his cost obligations and revenue attributable to the FWPP for each year are detailed in the proxy.   The Founders Well Participation Program fully aligns the interests of Mr. McClendon with the company and the Board of Directors supports this program as does the majority of its shareholders.

We do not believe any conflicts of interest exist, but if any arise there are numerous mechanisms to counteract any such conflict, including the following:

**1. Mr. McClendon has to participate in every well the Company drills (subject to certain deminimis interests) and pays for the cost of the wells in accordance with the shareholder approved procedure.**

**2. The Board of Directors oversees the administration of the program through a reporting process developed over two decades, and the specific program level details are disclosed to the shareholders annually in the proxy.**

**3. There are numerous third-party participants in the Company's wells, including some of the largest energy companies in the world, that**

**monitor the actions of the Company through a number of processes, including well audits, reporting, governmental filings and hearings, participation in development plans and marketing of production. In fact, in most of the Company's current plays there is a sophisticated and large international joint venture partner with full-time representatives on the Company's premises who monitor every process and action.**

**4. The Company drills more than 2,000 wells each year, which requires multiple teams of employees (over 13,000 corporately at present) and numerous complex planning processes, all of which minimize the ability of any one person to influence actions on any single well or any large development program due to the inherent business realities, contract requirements, joint venture requirements, government requirements, reporting obligations, and the mechanical issues and lead times surrounding such development projects.**

***The FWPP clearly aligns Mr. McClendon's interest with the Company's***, while the business processes and the foregoing guard against any conflicts of interest arising. Your other underlying theme in the conflict of interest category is that somehow the loans increase some risk that you perceive of possible conflicts of interest. The mechanisms discussed above avoid any conflicts of interest in the FWPP, and ***we do not believe Mr. McClendon's financing arrangements have created or increased any risk to the Company over the life of the FWPP… we believe there are no conflicts of interest arising from the "mere existence of the loans."*** Loans secured by oil and properties are standard in the industry, and even Chesapeake has substantial loans and obligations that are secured or supported by oil and properties. As a result we do not believe the "mere existence of the loans" changes Mr. McClendon's alignment with the Company.

339.    Demand on the nine members of the Board is thus futile; the Defendants all face a substantial likelihood of liability.  Accordingly, demand is thus excused.

## VIII.   COUNT ONE:  BREACH OF FIDUCIARY DUTY

340.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

341.   Each of these Defendants owed and/or owes Chesapeake fiduciary obligations.   By reason of their fiduciary relationships, Defendants owed and/or owe Chesapeake the highest obligation of loyalty, good faith, due care, oversight, fair dealing, and candor.

342.   These Defendants, and each of them, violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, and candor.

343.   Each of these Defendants had actual or constructive knowledge that they had caused the Company to incur significant risk by violating government regulations, and failed to conduct the proper oversight of Chesapeake's relations with Defendant McClendon.   Among the wrongdoings elucidated herein, the Defendants wrongfully:   (i) allowed and concealed that Defendant McClendon had taken out $1.1 billion in loans from entities that also lent funds to Chesapeake secured upon wells which were jointly operated with Chesapeake, usurping the Company's financing opportunities; (ii) allowed and concealed that Defendant McClendon ran a secret $200 million dollar hedge fund from the Executive Suite at the Company, and did so at the same time when he was solely responsible for $17 billion of Chesapeake's hedge facility; (iii) allowed Defendant McClendon to be "terminated without cause" instead of with cause in exchange for letting 20% investors in the Company to take over the Board, resulting in McClendon receiving $50 million in improper severance benefits; (iv) not accepting Hargis's resignation after he failed to receive enough votes from shareholders as provided by the Company's bylaws; (v) forcing defendant Hargis to conduct a flawed "investigation" in only McClendon's purported intentional misconduct, advised by a conflicted outside

counsel; (vi) waiting a year to report the results of the "investigation," without disclosing to shareholders any of the specific details of the review or conclusions thereof; and (vii) resigned or retired themselves instead of being terminated with cause, reaping improper stock and bonus compensation for 2012.   These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

344.   Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving Chesapeake

345.   As a direct and proximate result of the Defendants' failure to perform their fiduciary obligations, has sustained and will sustain significant damages, as alleged herein.   As a result of the misconduct alleged herein, these Defendants are liable to the Company.

## IX.    COUNT TWO:  WASTE OF CORPORATE ASSETS

346.   Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

347.   Defendants had a duty to the Company and its shareholders to prudently supervise, manage, and control the operations, business, and internal financial accounting of the Company.   Defendants, however, by their actions, and by engaging in the wrongdoing alleged herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the finances and business of the Company in a manner consistent with the duties imposed upon them by law.

348.   Defendants wasted Corporate assets by, among the other reasons elucidated above:  (i) allowing McClendon to retain title to the over one billion dollars in well assets that were misappropriated from Chesapeake; (ii) pricing McClendon participants in the FWPP below the price that Chesapeake could have sold the wells to independent parties; (iii) allowing McClendon to receive almost $35 million in unearned severance payments; and (iv) forfeiting the $15 million in claw-backs under his 2009 Employment Agreement and 2008 well participation bonus.

349.   During the course of the discharge of their duties, the Defendants were aware of the unreasonable risks and losses associated with their misconduct and the waste of their assets by engaging in these actions. Nevertheless, the Defendants caused the Company to engage in the scheme described herein which they knew had an unreasonable risk of financial damage to the Company, thus breaching their duties to the Company. As a result, Defendants grossly mismanaged the Company and wasted its assets, thereby causing damage to the Company.

## X.   COUNT THREE:  RESCISSION OF THE FWPP CONTRACT

350.   Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

351.   A director may not appropriate for his own use a business opportunity that in equity and fairness belongs to the corporation.

352.   Defendant McClendon's financial dealings with various lenders have allowed McClendon to misappropriate over a billion dollars of Company assets.  As the Board was well aware, by 2009 McClendon lacked the financial wherewithal to finance

the hundreds of millions of dollars in debt that he could not personally secure.  Thus, McClendon simply misappropriated corporate opportunities and secured over $1 billion in non-recourse loans on preferential terms.

353.   Thus, because McClendon misappropriated the loans from Company partners and used the proceeds to pay for his FWPP obligations, he had effectively misappropriated corporate opportunities to acquire such wells.  Accordingly, McClendon should not be allowed to retain these assets.  Equity demands that McClendon cannot retain the proceeds of loans which constituted the misappropriated results of corporate opportunities, or the wells that the loans were used to pay for.  McClendon must return to Chesapeake the wells he acquired in the FWPP after 2009.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demands judgment as follows:

A.    Against all of Defendants and in favor of Chesapeake for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties.

B.    Against Defendant McClendon and in favor of Chesapeake for the amount of damages sustained by the Company as a result of his breach of fiduciary duties, and usurpation of corporate opportunities, including recession of: (i) the over one billion dollars in well assets that he has misappropriated from Chesapeake; (ii) the difference in cost between the price that the Company sold the wells to McClendon and the price that Chesapeake could have sold the wells to independent parties; (iii) the almost $35 million

McClendon received in unearned severance payments; and (iv) the $15 million in claw-backs under his 2009 Employment Agreement and 2008 well participation bonus.

C.    Directing Chesapeake to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions and amendments to the By-Laws and Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies.

D.    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses pursuant to both common law and the antitrust laws of the United States;

E.    And such other relief as this Court deems just and proper.

## XII.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Date: February 12, 2015          **KAHN SWICK & FOTI, LLC**

By: */s/ Melinda A. Nicholson*_____
Lewis S. Kahn (admitted *pro hac vice*)
lewis.kahn@ksfcounsel.com
Melinda A. Nicholson (admitted *pro hac vice*)
melinda.nicholson@ksfcounsel.com
206 Covington Street
Madisonville, Louisiana  70447
Telephone:  (504) 455-1400
Fax:  (504) 455-1498

*Lead Counsel for Plaintiffs*

**STRONG, MARTIN & ASSOCIATES, PLLC.**
Don S. Strong, OBA No. 13874
dss@strongmartin.com
G. Stephen Martin, OBA No. 17091
gsm@strongmartin.com
3500 South Boulevard Building C Suite 38
Edmond, Oklahoma 73013
Telephone: (405) 604-7500
Facsimile: (405) 604-7503

*Liaison Counsel for Plaintiffs*

## **VERIFICATION**

I, Jacob Shochat, hereby verify that I am a shareholder of Chesapeake Energy Incorporated (the "Company") and am ready, willing, and able to pursue this action in hopes of improving the Company and recovering damages for the Company caused by Defendants' conduct. I have reviewed the Allegations in the Amended Consolidated Shareholder Derivative Complaint, and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate, and complete. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason I believe them to be true. Having received a copy of this Amended Consolidated Shareholder Derivative Complaint, and having reviewed it with my counsel, I hereby authorize its filing.

_____
Jacob Shochat

Date: _2/11/2015_____

## **VERIFICATION**

    I, Norman Spiegel, hereby verify that I am a shareholder of Chesapeake Energy Incorporated (the "Company") and am ready, willing, and able to pursue this action in hopes of improving the Company and recovering damages for the Company caused by Defendants' conduct. I have reviewed the Allegations in the Amended Consolidated Shareholder Derivative Complaint, and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate, and complete.  As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason I believe them to be true.  Having received a copy of this Amended Consolidated Shareholder Derivative Complaint, and having reviewed it with my counsel, I hereby authorize its filing.

Norman Spiegel

Date: 1/15/15