**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **IN RE CHESAPEAKE ENERGY CORPORATION 2012 SHAREHOLDER DERIVATIVE LITIGATION** | **Lead Case No. CIV-12-436-M**<br><br>**Relating To: All Derivative Actions** |

**CHESAPEAKE ENERGY CORPORATION'S MOTION TO
DISMISS DERIVATIVE COMPLAINT PURSUANT TO FED. R.
CIV. P. 23.1 AND BRIEF IN SUPPORT THEREOF**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 2

I.  THIS ACTION IS A TAG-ALONG TO *WEINSTEIN* ........................................... 2

II.  PLAINTIFFS STAYED THIS CASE PENDING RESOLUTION OF
*WEINSTEIN* ................................................................................................... 3

III.  CHESAPEAKE'S BOARD OF DIRECTORS IS OVERHAULED IN
JUNE 2012 ...................................................................................................... 3

IV.  *WEINSTEIN* IS DISMISSED AND PLAINTIFFS REQUEST ANOTHER
STAY ............................................................................................................... 4

V.  OKLAHOMA COURTS HAVE ALREADY REJECTED THE SAME
INDEPENDENCE ALLEGATIONS AGAINST THE OUTSIDE
DIRECTORS ..................................................................................................... 5

THE LEGAL RULES GOVERNING DERIVATIVE LAWSUITS ............................... 6

I.  THE DEMAND REQUIREMENT AND RULE 23.1'S PLEADING
REQUIREMENTS .............................................................................................. 6

II.  THE LEGAL REQUIREMENTS FOR EXCUSING DEMAND .......................... 7

   A.  The *Rales* Tests For Demand Futility ......................................... 8

   B.  Whether Demand Was Futile Must Be Determined As Of The Date
The Original Complaints Were Filed ............................................ 9

   C.  Demand Cannot Be Excused Merely Because The Directors Are
Being Sued, Or On the Basis Of Superficial Entanglements ...................... 9

   D.  To Allege A Substantial Likelihood Of Liability, Plaintiffs Must
Overcome The "Exculpatory" Provision Of The Company's Charter ....... 10

   E.  Plaintiffs Must Demonstrate Demand Futility Based On The
Original Complaints ................................................................. 11

ARGUMENT ...................................................................................................... 13

I.  WEINSTEIN EFFECTIVELY DISPOSES OF PLAINTIFFS' CLAIMS ........... 13

   A.  The Claims Asserted In The Original Complaints Mirror Claims
Dismissed In *Weinstein* ......................................................... 14

      1.  Courts Routinely Dismiss Tag-Along Actions In The
Circumstances Presented Here ...................................... 19

## TABLE OF CONTENTS
### (continued)

**Page**

2.     The *Weinstein* Adjudication Eviscerates Plaintiffs' Attempt To Excuse A Demand On The Outside Directors ........................... 20

II.   PLAINTIFFS FAIL TO SATISFY THE REQUIREMENTS FOR ALLEGING A DERIVATIVE CLAIM ............................................................ 24

    A.    This Case Must Be Dismissed Because the Original Complaints Were Not Well Pleaded As Derivative Actions ......................................... 24

    B.    This Case Must Also Be Dismissed Because the Original Complaints Did Not Allege Demand Futility ................................................................ 26

        1.     The Original Complaints Fail To Allege That Any Outside Director Faces Any Threat Of Liability Based On Alleged Disclosure Violations ...................................................................... 28

        2.     The Original Complaints Fail To Allege That Any Outside Director Faces Any Threat of Liability Based On An Alleged Failure to Monitor McClendon's Personal Activities ..................... 31

        3.     The Original Complaints Allege Nothing That Demonstrates That The Outside Directors Lacked Independence ......................... 34

III.   THE AMENDED COMPLAINT UNDERSCORES PLAINTIFFS' FAILURE TO PLEAD DEMAND FUTILITY ................................................. 39

CONCLUSION ............................................................................................................ 40

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*In re Accuray, Inc. S'holder Deriv. Litig.*,
  757 F. Supp. 2d 919 (N.D. Cal. 2010) ................................................................. 25, 29

*In re Affymetrix Deriv. Litig.*,
  2008 WL 5050147 (N.D. Cal. Mar. 31, 2008)............................................................ 26

*In re Am. Apparel, Inc. S'holder Deriv. Litig.*,
  2012 WL 9506072 (C.D. Cal. July 31, 2012)............................................................. 26

*In re Am. Int'l Grp., Inc. Deriv. Litig.*,
  700 F. Supp. 2d 419 (S.D.N.Y. 2010), *aff'd*, 415 F. App'x 285 (2d Cir.
  2011) ....................................................................................................................... 27

*In re Bank of N.Y. Deriv. Litig.*,
  320 F.3d 291 (2d Cir. 2003).................................................................................... 25

*In re Bank of N.Y. Mellon Corp. Transactions Litig.*,
  991 F. Supp. 2d 457 (S.D.N.Y. 2013)...................................................................... 29

*Belova v. Sharp*,
  2008 WL 700961 (D. Or. Mar. 13, 2008) ................................................................. 26

*Blasband v. Rales*,
  971 F.2d 1034 (3d Cir. 1992).................................................................................... 10

*Brody v. Chem. Bank*,
  517 F.2d 932 (2d Cir. 1975)...................................................................................... 13

*Campbell v. Weihe Yu*,
  --- F. Supp. 2d ---, 2014 WL 2599856 (S.D.N.Y. June 10, 2014) .............................. 29

*In re Capital One Deriv. S'holder Litig.*,
  952 F. Supp. 2d 770 (E.D. Va. 2013) ....................................................................... 25

*In re Computer Sciences Corp. Deriv. Litig.*,
  2007 WL 1321715 (C.D. Cal. Mar. 26, 2007)............................................................ 26

*DiLorenzo v. Norton*,
  2009 WL 2381327 (D.D.C. July 31, 2009)................................................................. 25

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*In re Discovery Labs. Deriv. Litig.*,
    242 F.R.D. 333 (E.D. Pa. 2007) .................................................................................. 21

*Ferre v. McGrath*,
    2007 WL 1180650 (S.D.N.Y. Feb. 16, 2007) ........................................................ 7, 19

*Fink v. Weill*,
    2005 WL 2298224 (S.D.N.Y. Sept. 19, 2005) ............................................................ 36

*In re Groupon Deriv. Litig.*,
    882 F. Supp. 2d 1043 (N.D. Ill. 2012) .................................................................... 3, 19

*Hawaii Laborers Pension Fund v. Farrell*,
    2007 WL 5255035 (C.D. Cal. Aug. 23, 2007) ........................................................... 25

*In re Hecla Min. Co. Deriv. Litig.*,
    2014 WL 689036 (D. Idaho Feb. 20, 2014) ............................................................... 29

*In re HP Deriv. Litig.*,
    2012 WL 4468423 (N.D. Cal. Sept. 25, 2012) ......................................................... 29

*In re IAC/InterActiveCorp Sec. Litig.*,
    478 F. Supp. 2d 574 (S.D.N.Y. 2007) ...................................................................... 21

*Jones v. Jenkins*,
    503 F. Supp. 2d 1325 (D. Ariz. 2007) ...................................................................... 20

*In re JP Morgan Chase & Co. Deriv. Litig.*,
    2014 WL 1297824 (S.D.N.Y. Mar. 31, 2014) ....................................................... 7, 29

*Kamen v. Kemper Fin. Servs., Inc.*,
    500 U.S. 90 (1991) ...................................................................................................... 7

*La. Mun. Police Emps. Ret. Sys. v. Wynn*,
    2014 WL 994616 (D. Nev. Mar. 13, 2014) ............................................................... 36

*La. Mun. Police Ret. Sys. v. Pandit*,
    2009 WL 2902587 (S.D.N.Y. Sept. 10, 2009) ........................................................... 30

*Lewis v. Chiles*,
    719 F.2d 1044 (9th Cir. 1983) ................................................................................... 25

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Lewis v. Graves*,
701 F.2d 245 (2d Cir. 1983) ......................................................................... 9

*Lou v. Belzberg*,
728 F. Supp. 1010 (S.D.N.Y. 1990) ............................................................ 12

*In re Maxim Integrated Prods., Inc. Deriv. Litig.*,
2007 WL 2745805 (N.D. Cal. July 25, 2007) ............................................. 26

*In re Merck & Co. Deriv. & "ERISA" Litig.*,
2006 WL 1228595 (D.N.J. May 5, 2006), *rev'd on other grounds*, 493
F.2d 393 (3d Cir. 2007) .......................................................................... 9, 40

*In re Nyfix, Inc. Deriv. Litig.*,
567 F. Supp. 2d 306 (D. Conn. 2008) ................................................... 12, 26

*Parker v. Riggio*,
2012 WL 3240837 (S.D.N.Y. Aug. 6, 2012) .............................................. 36

*Pirelli Armstrong Tire Corp. Ret. Med. Benefits Trust v. Raines*,
534 F.3d 779 (D.C. Cir. 2008) ...................................................................... 7

*Playford v. Lowder*,
635 F. Supp. 2d 1303 (M.D. Ala. 2009) ..................................................... 30

*Rosenblum v. Sharer*,
2008 WL 9396534 (C.D. Cal. July 28, 2008) ............................................. 19

*In re Sagent Tech., Inc. Deriv. Litig.*,
278 F. Supp. 2d 1079 (N.D. Cal. 2003) ...................................................... 26

*In re SAIC Inc. Deriv. Litig.*,
948 F. Supp. 2d 366 (S.D.N.Y. 2013) ......................................................... 33

*Scimeca v. Kim*,
2007 WL 7087065 (D. Ariz. Aug. 29, 2007) .............................................. 25

*Smith v. Stevens*,
957 F. Supp. 2d 466 (S.D.N.Y. 2013) ......................................................... 26

*Strong v. Taylor*,
877 F. Supp. 2d 433 (E.D. La. 2012) .......................................................... 29

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Swanson v. Weil*,
  2012 WL 4442795 (D. Colo. Sept. 26, 2012) .................................................................. 7

*Talley v. Mann*,
  2012 WL 946990 (C.D. Cal. Feb. 14, 2012).................................................................. 34

*Travis v. Mittelstaedt*,
  2008 WL 755842 (E.D. Cal. Mar. 19, 2008) ............................................................... 25

*In re Verisign, Inc. Deriv. Litig.*,
  531 F. Supp. 2d 1173 (N.D. Cal. 2007) ....................................................................... 25

*Weinstein v. McClendon*,
  2013 WL 1457718 (W.D. Okla. April 10, 2013)...................................................*passim*

*Weinstein v. McClendon*,
  757 F.3d 1110 (10th Cir. 2014) ..................................................................................... 5

**State Cases**

*In re Affiliated Computer Sciences, Inc. Shareholders Litig.*,
  2009 WL 296078 (Del. Ch. Feb. 6, 2009) .................................................................... 12

*Aronson v. Lewis*,
  473 A.2d 805 (Del. 1984) ............................................................................................... 9

*Baca v. Insight Enterprises, Inc.*,
  2010 WL 22219715 (Del. Ch. June 3, 2010).............................................................. 19

*Beam v. Stewart*,
  833 A.2d 961 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del. 2004)......................... 31, 32

*Beam v. Stewart*,
  845 A.2d 1040 (Del. 2004) ......................................................................... 8, 9, 10, 32

*Beard v. Love*,
  173 P.3d 796 (Okla. Civ. App. 2007) ............................................................................ 7

*Braddock v. Zimmerman*,
  906 A.2d 776 (Del. 2006) ...................................................................................*passim*

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Brudno v. Wise*,
   2003 WL 1874750 (Del. Ch. Apr. 1, 2003) ................................. 19

*Canadian Commercial Workers Indus. Pension Plan v. Alden*,
   2006 WL 456786 (Del. Ch. Feb. 22, 2006) ........................... 31, 32

*In re Caremark Int'l Inc. Deriv. Litig.*,
   698 A.2d 959 (Del. Ch. 1996) ................................................ 33

*In re Chesapeake S'holders Deriv. Litig.*,
   2011 WL 11066091 (Okla. Civ. App. Aug. 26, 2011) ............. 5, 7

*In re China Automotive, Inc. Deriv. Litig.*,
   2013 WL 4672059 (Del. Ch. Aug. 30, 2013) ........................... 34

*In re Citigroup Inc. S'holder Deriv. Litig.*,
   964 A.2d 106 (Del. Ch. 2009) .......................................... *passim*

*David B. Shaev Profit Sharing Account v. Armstrong*,
   2006 WL 391931 (Del. Ch. Feb. 13, 2006) ............................. 31

*DiRienzo v. Lichtenstein*,
   2013 WL 5503034 (Del. Ch. Sept. 30, 2013) .......................... 34

*Egleston v. McClendon*,
   318 P.3d 210 (Okla. Civ. App. 2013) ...................................... 7

*Freedman v. Adams*,
   2012 WL 1345638 (Del. Ch. Mar. 30, 2012), *aff'd*, 58 A.3d 414 (Del.
   2013) ................................................................................... 35

*Guttman v. Huang*,
   823 A.2d 492 (Del. Ch. 2003) ................................................ 20

*In re J.P. Morgan Chase & Co. S'holder Litig.*,
   906 A.2d 808 (Del. Ch. 2005), *aff'd*, 906 A.2d 766 (Del. 2005) ................................. 37

*Jacobs v. Young*,
   2004 WL 1728521 (Del. Ch. Aug. 2, 2004), *aff'd*, 867 A.2d 902 (Del.
   2005) ......................................................................... 35, 37, 38

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Kaplan v. Wyatt*,
499 A.2d 1184 (Del. 1985) ................................................... 37

*Khanna v. McMinn*,
2006 WL 1388744 (Del. Ch. May 9, 2006) ................................................... 38

*Kurtz v. Clark*,
290 P.3d 779 (Okla. Civ. App. 2012) ........................................... 7

*La. Mun. Police Ret. Sys. v. McClendon*,
307 P.3d 393 (Okla. Civ. App. 2013) ......................................... 6

*Levine v. Smith*,
591 A.2d 194 (Del. 1991) .................................................. 8

*MCG Capital Corp. v. Maginn*,
2010 WL 1782271 (Del. Ch. May 5, 2010) ................................................ 35

*McPadden v. Sidhu*,
964 A.2d 1262 (Del. Ch. 2008) ....................................... 11, 28, 31

*In re MFW S'holders Litig.*,
67 A.3d 496 (Del. Ch. 2013) .................................................. 34, 36

*Norfolk Cnty. Ret. Sys. v. Jos. A. Bank Clothiers, Inc.*,
2009 WL 353746 (Del. Ch. Feb. 12, 2009) .............................. 21

*Production Res. Grp., L.L.C. v. NCT Grp., Inc.*,
863 A.2d 772 (Del. Ch. 2004) ......................................... 31

*Rales v. Blasband*,
634 A.2d 927 (Del. 1993) ............................................... 8, 27

*In re Sanchez Energy Deriv. Litig.*,
2014 WL 6673895 (Del. Ch. Nov. 25, 2014) ........................ 35, 36

*South v. Baker*,
62 A.3d 1 (Del. Ch. 2012) .................................................. 34

*Stone v. Ritter*,
911 A.2d 362 (Del. 2006) ................................................... 33

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Wood v. Baum*,
   953 A.2d 136 (Del. 2008) ........................................................................ 11, 22, 29, 30

**State Statutes**

8 Del. C. § 102(b)(7) ................................................................................................ 11, 28

18 Okla. Stat. § 1006(B)(7) ............................................................................................ 11

18 Okla. Stat. § 1027(A) ................................................................................................... 6

**Rules**

Fed. R. Civ. P. 23.1 ................................................................................................. *passim*

**Other Authorities**

Stephen A. Radin, *The Business Judgment Rule* (6th ed. 2009) ................................... 9, 10

## INTRODUCTION

This lawsuit is a misconceived attempt to repackage claims that have already been dismissed by this Court, and to usurp the authority of Chesapeake's board of directors to make decisions regarding litigation claims that belong to the corporation. As the Court will no doubt recall, in the Spring of 2012, Chesapeake encountered a media storm focused on the Company's Founders Well Participation Program ("FWPP") – pursuant to which Aubrey McClendon purchased small *pro rata* interests in wells drilled by Chesapeake – and personal loans that McClendon used to finance his FWPP interests.

Members of the plaintiffs' shareholder bar quickly filed a securities class action based on those events. Other shareholder attorneys filed nine "tag-along" derivative cases based on the same events. The securities class action, *Weinstein v. McClendon, et al.*, Case No. CIV-12-465-M, was assigned to this Court, and the derivative actions were assigned or transferred to the Court as related cases thereafter. After consolidation, Plaintiffs' counsel stayed the tag-along actions pending a final adjudication of *Weinstein* because the ability to pursue the cases would effectively be determined by the outcome of the motion to dismiss the *Weinstein* Complaint.

After the *Weinstein* dismissal was affirmed on appeal, lead Plaintiff Jacob Shochat declined to dismiss the tag-along cases, and filed a greatly expanded amended complaint in an attempt to evade the impact of the *Weinstein* adjudication. Plaintiffs' counsel thereafter added Normal Spiegel as an additional Plaintiff.

As is demonstrated below, the Amended Complaint must be dismissed based on the *Weinstein* adjudication, and because Plaintiffs lack standing to assert claims that

belong to Chesapeake.  The composition of Chesapeake's board changed dramatically in the years following the filing of the derivative claims.  Because they declined to make or attempt to excuse a pre-litigation demand on Chesapeake's current board, Plaintiffs must demonstrate demand futility based on the complaints they filed in the Spring of 2012 (the "Original Complaints").  The Original Complaints provide no basis for excusing a pre-litigation demand.

## BACKGROUND

### I.   THIS ACTION IS A TAG-ALONG TO *WEINSTEIN*

*Weinstein* was filed on April 26, 2012, and alleged that Chesapeake, Aubrey McClendon and three other Chesapeake senior officers – **not** the Outside Directors[1] – had violated federal securities laws by virtue of disclosure violations concerning the FWPP and McClendon's personal borrowing to finance his FWPP interests, and the Company's use of Volumetric Production Payments ("VPPs").  *See Weinstein v. McClendon*, 2013 WL 1457718, at *1 (W.D. Okla. April 10, 2013).

With the exception of the VPP allegations (which are not addressed), the Original Complaints parrot *Weinstein*'s allegations almost verbatim.  *Compare* Request for Judicial Notice Exhibit ("Exs.") 1 and 2, *with* Ex. 3.  Because this is a derivative action, the Original Complaints sought to hold the Outside Directors individually liable in connection with the same facts, events, media stories and alleged disclosure violations that are alleged in *Weinstein*.  Rather than making a pre-litigation demand, Plaintiffs

---

[1] The term "Outside Directors" refers to the non-employee members of Chesapeake's board at the time the Original Complaints were filed, *i.e.*, defendants Davidson, Eisbrenner, Hargis, Keating, Maxwell, Miller, Nickles and Simpson.

attempted to excuse a demand by pleading that a majority of the Outside Directors was not disinterested because it faced a substantial likelihood of liability based on the facts and circumstances alleged in *Weinstein*.

## II.   PLAINTIFFS STAYED THIS CASE PENDING RESOLUTION OF *WEINSTEIN*

Because the Original Complaints were based on the same allegations at issue in *Weinstein*, Plaintiffs' counsel asked the Court to stay this case pending final resolution of that case.  Dkt. No. 86 at 1.  Plaintiffs' motion asked the Court to stay this action because *Weinstein* was "based on similar facts and circumstances" and was therefore "informative to the litigation of" Plaintiff's claims, and cited, among others, *In re Groupon Derivative Litigation*, 882 F. Supp. 2d 1043 (N.D. Ill. 2012), as support.[2]  Dkt. No. 86 at 2.  On October 21, 2012, the Court granted Plaintiffs' request and ordered the case stayed pending resolution of the motion to dismiss in *Weinstein*.  Dkt. No. 87.

## III.   CHESAPEAKE'S BOARD OF DIRECTORS IS OVERHAULED IN JUNE 2012

On June 8, 2012, Charles Maxwell retired from Chesapeake's board, and on June 21, 2012, Richard Davidson, Frank Keating, Don Nickles and Kathleen Eisbrenner all resigned from the board.  Ex. 4 at 2-3.  The five outgoing Outside Directors were replaced by five new directors:  Archie Dunham, Bob Alexander, Vincent Intrieri, Brad Martin and Frederic Poses.  *Id.*  Thus, as of June 22, 2012, Chesapeake's board of directors consisted of Messrs. Alexander, Dunham, Hargis, Intrieri, Martin, Miller,

---

[2]*In re Groupon* also acknowledges that dismissal of the securities class action is normally fatal to tag-along derivative complaints.  *See* 882 F. Supp. 2d at 1048-49.

McClendon, Poses, and Simpson.[3]

## IV.   *WEINSTEIN* IS DISMISSED AND PLAINTIFFS REQUEST ANOTHER STAY

On April 10, 2013, this Court dismissed the *Weinstein* Complaint with prejudice. Although the securities claims alleged against the Chesapeake officers alleged to have committed the violations at issue was far more detailed than the Original Complaints against the Outside Directors, the Court ruled that it lacked the particularity necessary to plead intentional or reckless conduct because it relied on the officers' positions and involvement in Chesapeake's operations, and lacked references to meetings and documents.  2013 WL 14557718, at *4.

As this Court explained, the allegations against the officers, "taken collectively," did not give rise to a "cogent and compelling" inference that they "intentionally or recklessly concealed the loans McClendon took out to finance his participation in the FWPP."  *Id*. at *3.   Although Mr. McClendon knew the details of the financing transactions and was involved in the Company's disclosures, the Court held that the complaint failed to alleged facts sufficient to support the necessary inference that "McClendon knew that not disclosing his personal loans would somehow mislead investors."  *Id.* at *4.

After *Weinstein* was dismissed, Plaintiffs requested a second stay, apparently hoping that the Tenth Circuit would reverse dismissal of the complaint that formed the basis of this action.  Dkt. 93 at 2.  On June 4, 2013, the Court granted Plaintiffs the

---

[3] By June of 2013, the composition of Chesapeake's board changed further still, and has continued to change such that as of the time the Amended Complaint was filed, only one director, Mr. Miller, remains on the board.

additional stay.  Dkt. No. 94.  The Tenth Circuit affirmed the *Weinstein* dismissal on July 9, 2014.  *Weinstein v. McClendon*, 757 F.3d 1110 (10th Cir. 2014).  On October 31, 2014, more than **two years** after this action was filed, Plaintiffs decided to proceed with their tag-along claims despite the *Weinstein* dismissal and affirmance on appeal.

## V.  OKLAHOMA COURTS HAVE ALREADY REJECTED THE SAME INDEPENDENCE ALLEGATIONS AGAINST THE OUTSIDE DIRECTORS

Oklahoma state courts have twice rejected the Original Complaints' independence allegations against the Outside Directors.  *In re Chesapeake Shareholders Derivative Litigation* (the "*2009 Derivative Action*"), was a state court action that alleged Chesapeake's then Board of Directors – including six of the Outside Directors[4] – breached their fiduciary duties by virtue of their approval of the employment agreement and map collection purchase referred to in the Original Complaints.  *Compare* Ex. 1 ¶¶ 12-13 and Ex. 2 ¶ 38, *with* Ex. 10 ¶¶ 1-7.  The Oklahoma court held that the complaint's demand futility allegations – many of which are reprised in the Original Complaints in this case – were insufficient to show demand futility and dismissed the action, and the Oklahoma Court of Civil Appeals affirmed the dismissal.  *In re Chesapeake S'holders Deriv. Litig.*, 2011 WL 11066091 (Okla. Civ. App. Aug. 26, 2011).[5]

---

[4] The *2009 Derivative Action* named Messrs. McClendon, Maxwell, Nickles, Keating, Miller, Hargis and Davidson as defendants, and alleged that demand was futile as to all of them. Ex. 10 ¶¶ 19-27.

[5] After the court's dismissal was affirmed by the Oklahoma Court of Civil Appeals (and after plaintiffs filed their petition for certiorari with the Oklahoma State Supreme Court), the parties settled the case. *La. Mun. Police Ret. Sys. v. McClendon*, 307 P.3d 393, 396 (Okla. Civ. App. 2013).

The second derivative lawsuit, *Norris v. McClendon* (the "*Norris Derivative Action*"), was another state court action filed against the Outside Directors (one week after this case). Plaintiff alleged that the Outside Directors breached their fiduciary duties in connection with Chesapeake's policies regarding personal use of corporate aircraft and related disclosures. Ex. 11 ¶¶ 1-9. Like the Original Complaints, the *Norris* complaint alleged that demand was futile because, among other things, the directors were directors or officers at other entities that did business with or received charitable donations from Chesapeake, had relatives employed by Chesapeake, and were paid "extremely lavish compensation." The Oklahoma court dismissed the action for failure to allege demand futility, and the dismissal was affirmed by the Oklahoma Court of Civil Appeals, which held that the complaint "lack[ed] the particularized allegations sufficient to permit the shareholder to proceed with her action without first requesting the relief from Chesapeake." Ex. 12 at ¶ 1.

## THE LEGAL RULES GOVERNING DERIVATIVE LAWSUITS

**I.    THE DEMAND REQUIREMENT AND RULE 23.1'S PLEADING REQUIREMENTS**

It is a bedrock principle of corporate law that the affairs of a corporation are managed by its board of directors. *See* 18 Okla. Stat. § 1027(A). The requirement that a shareholder make or excuse a pre-litigation demand on the board of directors thus "implements 'the basic principle of corporate governance that the decisions of a corporation – including the decision to initiate litigation – should be made by the board of directors." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 101 (1991). It "protects the decision making authority of the corporate board, and the board's right to manage the

6

affairs of the corporation, which includes the authority to make decisions on whether to initiate litigation.'" *Egleston v. McClendon*, 318 P.3d 210, 215 (Okla. Civ. App. 2013).

For these reasons, a shareholder seeking to usurp the authority of the board must satisfy rigorous pleading requirements that are far more onerous than those that apply in other circumstances. "Allegations of demand futility under Rule 23.1 must comply with stringent requirements of factual particularity.'" *In re JP Morgan Chase & Co. Deriv. Litig.*, 2014 WL 1297824, at *2 (S.D.N.Y. Mar. 31, 2014); *see, e.g.*, *Swanson v. Weil*, 2012 WL 4442795, at *5 (D. Colo. Sept. 26, 2012) ("[P]leadings in derivative suits 'must comply with stringent requirements of factual particularity.'"). "If the derivative plaintiff fails to meet this pleading burden, the complaint must be dismissed, even if the claims asserted appear to have merit." *Ferre v. McGrath*, 2007 WL 1180650, at *3 (S.D.N.Y. Feb. 16, 2007).

## II.   THE LEGAL REQUIREMENTS FOR EXCUSING DEMAND

Under the Delaware decisions that are followed in Oklahoma,[6] shareholder demands are rarely excused: "Delaware precedents on demand futility make clear that the bar is high, the standards are stringent, and the situations where demand will be excused are rare." *Pirelli Armstrong Tire Corp. Ret. Med. Benefits Trust v. Raines*, 534 F.3d 779, 782-83 (D.C. Cir. 2008). The stringent standards regarding demand futility are applied within the framework of two tests. Only one is relevant here – the "*Rales* test."

---

[6] Oklahoma courts have repeatedly held in the context of shareholder derivative suits that the "decisions of the Delaware Courts are very persuasive" in construing and applying Oklahoma corporate law. *Beard v. Love*, 173 P.3d 796, 802 (Okla. Civ. App. 2007); *see, e.g.*, *Egleston*, 318 P.3d at 215-17; *Kurtz v. Clark*, 290 P.3d 779, 787-89 (Okla. Civ. App. 2012); *In re Chesapeake*, 2011 WL 11066091, at *1.

### A.   The *Rales* Tests For Demand Futility

The *Rales* test applies to claims that – like those asserted in the Original Complaints – do not challenge a conscious business decision by the board as whole, but instead challenge board inaction, such as a failure to monitor or oversee the company's affairs, or to prevent disclosure violations.  It requires a plaintiff to allege "particularized facts creating a reasonable doubt that a majority of the Board would be disinterested or independent in making a decision on a demand."  *Rales v. Blasband*, 634 A.2d 927, 930 (Del. 1993).

As the myriad of decisions dismissing derivative cases for failure to plead demand futility make clear, in this context "reasonable doubt" bears no resemblance to its use in criminal trials.  To establish that a director is "interested," a plaintiff must allege particularized facts showing that the director "will receive a personal financial benefit from a transaction that is not equally shared by the stockholders," or that "a corporate decision will have a materially detrimental impact on [the] director, but not the corporation and the stockholders."  *Id.* at 936.  To establish that a director lacks independence, a plaintiff must allege particularized facts showing that the director is "so 'beholden' to an interested director" that "his or her 'discretion [to consider a demand] would be sterilized.'"  *Beam v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004).

Directors are entitled to substantive and procedural **presumptions** that they are both disinterested and independent.  *Beam*, 845 A.2d at 1048-49; *Levine v. Smith*, 591 A.2d 194, 205-07 (Del. 1991).  To avoid dismissal, a shareholder seeking to usurp the

authority of the board and assert claims belonging to the corporation must rebut those presumptions by pleading highly particularized facts. *Beam*, 845 A.2d at 1048-49.

### B.      Whether Demand Was Futile Must Be Determined As Of The Date The Original Complaints Were Filed

The question of a board's capacity to fairly consider a demand must be "gauged by the circumstances at the commencement of a derivative suit." *Aronson v. Lewis*, 473 A.2d 805, 810 (Del. 1984); *see also* Stephen A. Radin, *The Business Judgment Rule* (Ex. 19), at 3969-76 (6th ed. 2009) (discussing the rationale behind the black-letter rule and collecting cases).

"[P]ost-complaint events are not relevant" because "the futility of making the demand required by Rule 23.1 must be gauged at the time the derivative action is commenced, not afterward with the benefit of hindsight." *Lewis v. Graves*, 701 F.2d 245, 250 (2d Cir. 1983). "When a plaintiff fails to make a pre-suit demand upon the board they must be aware, at the time of the filing of the complaint, of particularized facts which lead them to believe demand would be futile," and "may not rely on after-acquired information to bolster their allegations of demand futility." *In re Merck & Co. Deriv. & "ERISA" Litig.*, 2006 WL 1228595, at *18 (D.N.J. May 5, 2006), *rev'd on other grounds*, 493 F.2d 393 (3d Cir. 2007).

### C.      Demand Cannot Be Excused Merely Because The Directors Are Being Sued, Or On the Basis Of Superficial Entanglements

Courts have consistently rejected the panoply of boilerplate demand futility allegations that permeate the Original Complaints, including that the directors would

have to sue themselves, approved the transactions at issue, have financial ties to the

corporation, or were dominated or controlled by an interested party:

> [D]emand will not be excused merely because a majority of directors are
> named as defendants, approved the challenged transaction, are threatened
> with personal liability for approving the transaction, failed to take
> corrective action prior to the filing of the lawsuit, refused to reconsider a
> challenged transaction or rejected a prior demand, would have to sue
> themselves, are alleged in conclusory language to be dominated and
> controlled by those benefitting from the challenged conduct, or have
> financial ties to the corporation.

*Blasband v. Rales*, 971 F.2d 1034, 1052 n.18 (3d Cir. 1992) (quotations omitted); *see

also* Radin, *The Business Judgment Rule*, at 4413-74 (6th ed. 2009) (Ex. 19) (collecting

commonly rejected demand futility allegations included in the Original Complaints).

    If such allegations were sufficient to excuse a pre-litigation demand, the rule that

the board of directors has the authority to decide whether to pursue claims belonging to

the corporation would be meaningless.  Because plaintiffs almost always sue the

directors, "demand will be excused based on a possibility of director liability only **in the

rare case** when a plaintiff is able to show director conduct that is 'so egregious on its

face that . . . a **substantial** likelihood of director liability therefore exists.'"  *In re

Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 121 (Del. Ch. 2009) (emphases

added).  Similarly, "mere personal friendships or a mere outside business relationship"

are insufficient to challenge "a director's independence."  *Beam*, 845 A.2d at 1050.

## D.      To Allege A Substantial Likelihood Of Liability, Plaintiffs Must Overcome The "Exculpatory" Provision Of The Company's Charter

    Plaintiffs cannot excuse a demand by alleging that the Outside Directors were

negligent – or even grossly negligent or reckless – no matter how detailed the allegations

might be.   Pursuant to 18 Okla. Stat. § 1006(B)(7) (which is identical to 8 Del. C. § 102(b)(7)), Chesapeake's charter provides that directors cannot be liable to the corporation unless it is proven that they engaged in disloyal, bad-faith or intentional misconduct, or committed a knowing violation of law.  Ex. 16 at 6.

Accordingly, "a serious threat of liability may only be found to exist if the plaintiff pleads a **non-exculpated** claim against the directors based on particularized facts,'" which requires particularized facts showing that they engaged in "'fraudulent,' 'illegal' or 'bad faith' conduct," and "acted with scienter." *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008) (emphasis in original).   Negligent, grossly negligent or reckless conduct is insufficient. *McPadden v. Sidhu*, 964 A.2d 1262, 1274-75 (Del. Ch. 2008).

### E.   Plaintiffs Must Demonstrate Demand Futility Based On The Original Complaints

Special rules apply when – as in this case – the composition of the board changes after the lawsuit is filed.   Unless the plaintiff files a new lawsuit after making or attempting to excuse a demand as to the new board (which Plaintiffs have declined to do here), demand futility is judged solely on the basis of the original complaint.   If the original complaint cannot survive a motion to dismiss, the action must be dismissed. *Braddock v. Zimmerman*, 906 A.2d 776, 779 (Del. 2006).

More specifically:

Three circumstances **must exist** to excuse a plaintiff from making demand under Rule 23.1 when a complaint is amended after a new board of directors is in place: first, the original complaint was well pleaded as a derivative action; second, **the original complaint satisfied the legal test for demand excusal**; and third, the act or transaction complained of in the

amendment is essentially the same as the act or transaction challenged in
the original complaint.

*Id.* at 786 (emphases added).

If the original complaint does not adequately plead demand futility, the plaintiff

must make or excuse a demand on the new board.   Plaintiff cannot evade those

requirements by filing an amended complaint; the original pleading is controlling.  *See,*

*e.g.*, *In re Affiliated Computer Sciences, Inc. Shareholders Litig.*, 2009 WL 296078 (Del.

Ch. Feb. 6, 2009); *In re Nyfix, Inc. Deriv. Litig.*, 567 F. Supp. 2d 306, 310-11 (D. Conn.

2008).[7]

The *Braddock* rule is derived from the core principle that directors be vested "with

the power to manage the business affairs of corporations."   906 A.2d at 786; *see also Lou*

*v. Belzberg*, 728 F. Supp. 1010, 1017-18 (S.D.N.Y. 1990) ("To deprive the newly

constituted Board the opportunity to decide whether [the company] would best be served

by instituting its own suit on behalf of the majority of shareholders is to ignore the policy

considerations behind Rule 23.1.").   If (as in this case) the shareholder wants to deprive

the new board of the opportunity to make the decision whether to pursue the litigation,

---

[7] In *Affiliated Computer*, a majority of the board was replaced between the time plaintiffs
originally filed their derivative claims in a first amended complaint, and the filing of a
second amended complaint.  *Id.* at *6-7.  As in this case, the subsequent pleading did not
allege that a demand on the new board was futile.  Accordingly, to survive dismissal,
plaintiffs had to show that the first amended complaint pled demand futility as to the old
board.  *Id.* at *8.  The court "analyz[ed] the first amended complaint to determine if it
adequately ple[d] demand futility with respect to the board as it existed at the time it was
filed," and determined that it did not.  *Id.* at *9-10.  Plaintiffs were therefore required to
make or excuse a demand on the new board.  Because (as is true here) they failed to do
so, the case was dismissed for failure to plead demand futility.  *Id.* at *11.

the shareholder must demonstrate that the complaint filed when the original board was in place was sufficient to excuse the making of a demand.

Notably, the *Braddock* rule is a departure from, and more plaintiff-friendly than, the rule that federal courts apply when Delaware law does not govern.  Under the non-Delaware rule, a demand on the new board is **mandatory**, irrespective of whether the first complaint adequately pled demand futility.  *See, e.g.*, *Brody v. Chem. Bank*, 517 F.2d 932, 934 (2d Cir. 1975).

## ARGUMENT

### I.   WEINSTEIN EFFECTIVELY DISPOSES OF PLAINTIFFS' CLAIMS

Although Plaintiffs' derivative claims rest on a different legal foundation, they are merely repackaged versions of claims asserted – and dismissed – in *Weinstein*.  That is readily apparent from a comparison of the Original Complaints to the complaint filed in *Weinstein*.

Plaintiffs' counsel have acknowledged that fact, and that the adjudication of *Weinstein* would determine the fate of their tag-along claims, through their actions in this case.  Rather than diligently prosecuting the derivative claims, as counsel of their caliber would normally do, they stayed their cases for more than two years awaiting the result in *Weinstein* – first pending a ruling on the motion to dismiss the *Weinstein* Complaint, and a second time while hoping that the dismissal would be reversed on appeal.

After the *Weinstein* dismissal was affirmed, Plaintiffs declined to dismiss the tag-along case, as they should have done, and instead sought to evade the decisive impact of the *Weinstein* ruling by filing a new complaint based on a new allegations and facts

that occurred after the Original Complaints were filed.  As noted at pages 9 and 11-13 above, that tactic is unavailing because demand futility must be judged on the basis of allegations of the Original Complaints, and the facts that existed at the time Plaintiffs made their decision not to make a demand on Chesapeake's board of directors.

If Plaintiffs do not want to make or attempt to excuse a demand on the current board, they must sink or swim on the basis of their Original Complaints.  The *Weinstein* adjudication that Plaintiffs awaited for years sinks their claims, for a series of reasons discussed below.

### A.    The Claims Asserted In The Original Complaints Mirror Claims Dismissed In *Weinstein*

Following a well-established pattern, the plaintiffs' securities bar filed nine tag-along derivative cases based on allegations set forth in a securities class action arising out of the same events.   The Original Complaints are constructed from the core allegations set forth in the *Weinstein* Complaint, which is somewhat broader and considerably more detailed.

As this Court noted in its June 16, 2012 order consolidating the derivative cases, the essence of Plaintiffs' claims is that Chesapeake's directors breached fiduciary duties by failing to prevent the disclosure violations alleged in *Weinstein*:  "The Derivative Actions all allege that various officers and directors of Chesapeake **breached their fiduciary duties to Chesapeake and its shareholders in permitting material disclosure violations**."  Dkt. No. 61 at 11 (emphasis added).

The Original Complaints reprise *Weinstein*'s allegations regarding the FWPP, the loans and transactions Mr. McClendon used to finance his FWPP holdings, and conflicts of interest between McClendon and the Company, financing transactions, and claim that Chesapeake omitted information regarding the FWPP and loans and made a variety of false or misleading statements regarding the FWPP and alignment of interests between Chesapeake and McClendon.

In so doing, the Original Complaints cite and quote the same documents and media stories cited and quoted in the *Weinstein* Complaint. They also rely on the same background facts and allegations.

For example, the *Weinstein* Complaint dismissed by this Court alleged background facts regarding the forced sale of McClendon's Chesapeake stock in 2008, McClendon's 2008 compensation, and the purchase of McClendon's antique map collection. Ex. 3 ¶¶ 1, 38-39. It cited and quoted from the terms of the FWPP and various statements regarding the manner in which the FWPP operated and served to align McClendon's interests with the interests of Chesapeake and its shareholders. *See, e.g., id.*, ¶¶ 4, 41-45, 53, 133-39.

Citing articles from *Reuters*, *Forbes* and other media sources, the *Weinstein* Complaint made extensive allegations regarding McClendon's personal loans and financing transactions and the fact that the loans were secured by wells in which Chesapeake owned an interest. *See, e.g., id.* ¶¶ 5-9, 46, 54, 84, 87. It also contained repeated allegations that the existence, size, terms and conditions of the loans were not disclosed in Chesapeake's SEC filings. *See, e.g., id.*, ¶¶ 7-9, 46-47, 54, 132, 142.

The *Weinstein* Complaint claimed that various statements regarding the FWPP and alignment of interests were incomplete, false and misleading because the FWPP and McClendon's personal loans allegedly created incentives for McClendon to cause Chesapeake to acquire extensive leaseholds (engage in a "land grab strategy") contrary to the best interests of the corporation, because under the FWPP he purportedly only paid expenses related to good acreage (*id.* ¶¶ 6, 82, 92, 132, 142), that McClendon had "no skin in the game" because he financed the FWPP interests with non-recourse loans (*id.* ¶¶ 5, 46, 54, 78, 132, 142), that McClendon arranged personal loans with Chesapeake's lenders, thereby creating conflicts with the Company for capital and credit (*id.* ¶¶ 7, 55, 88-89, 132, 142), and that the terms of the loans might require McClendon to take actions that would be contrary to Chesapeake's interests (*id.* ¶¶ 7, 55, 79, 132, 142). The *Weinstein* Complaint also cited and quoted Chesapeake's publicly disclosed Code of Business Conduct and Ethics and alleged that it was violated by the FWPP, McClendon's FWPP financing transactions and alleged conflicts of interest. *Id.* ¶¶ 37, 166-69.

As a review of the documents quickly demonstrates, the Original Complaints are based on these **exact same** allegations – including the backgrounds facts from 2008, the description of the FWPP, Chesapeake's statements regarding the FWPP and alignment of interests between McClendon and the Company, the loans and transactions McClendon used to finance his FWPP holdings, the Code of Business Conduct and Ethics, the reasons why McClendon's loans and the FWPP purportedly created conflicts of interest, the nondisclosure of McClendon's loans, and the specific reasons why Chesapeake's statements regarding the FWPP and aligned of interests were false and materially

misleading – based on the same documents and media reports. *See*, *e.g.*, Ex. 1 ¶¶ 60-68; Ex. 2 ¶¶ 30-40. After reprising those various allegations, the Original Complaints assert that Chesapeake's directors violated their fiduciary duties by failing to monitor the underlying conduct and prevent the alleged disclosure violations.

For example, the *Shochat* Complaint alleges the Outside Directors sued derivatively "knew that the adverse facts specified herein had not been disclosed to any were being concealed from the public and that the positive representations being made were materially false and misleading." Ex. 1 ¶ 44. It asserts that the Outside Directors "were responsible in part for disclosing to shareholders material financial transactions involving Chesapeake" (*id.* ¶ 75), and that they were responsible for "the wrongful conduct and issuance of improper statements, including the failure to present shareholders and the investing public with the amount of loans secured by wells in which Chesapeake had an interest and which present a conflict of interest" (*id.* ¶¶ 30-37). The *Shochat* Complaint claims that the Outside Directors were responsible for concealing that "McClendon had taken out $1.1 billion in loans secured upon wells which were jointly operated with Chesapeake," and that McClendon was borrowing funds from an entity which also lent funds to Chesapeake" (*id.* ¶ 56), and alleges that they "abdicated their responsibility to oversee the Company's operations and instead directed and encouraged management . . . to engage in illegal and/or improper conduct that rendered the Company's disclosures to shareholders and regulatory agencies deceptively misleading" (*id.* ¶ 79).

In similarly conclusory fashion, the *Spiegel* Complaint alleges that the Outside Directors breached fiduciary duties by "failing to require full disclosure of the terms and conditions of McClendon's personal loans," and that they "made and/or caused the Company to disseminate improper, materially false and misleading public statements concerning the Company's financial arrangements," when they "knew or should have known of the conflicts of interest created by McClendon's personal loans from certain of the same lenders financing Chesapeake Energy's operations." Ex. 2 ¶¶ 45, 47.  It claims that the Outside Directors "should have been aware that McClendon's personal borrowing would create a major conflict of interest," and failed to require the Company "to fully disclose the conflicts created by McClendon's personal loans and the Company's own financial arrangements."  *Id.* ¶ 50.  The *Spiegel* Complaint alleges that the Outside Directors "authorized and/or permitted the issuance of various false and misleading statements" (*id.* ¶ 61), that they "owed a fiduciary duty to supervise the issuance of press releases and public filings to ensure that they were truthful and accurate" (*id.* ¶ 69), and that they "failed to prevent and correct the dissemination of the Company's false and misleading statements" (*id.* ¶ 53).  It accuses the Outside Directors of "causing or permitting the Company to disseminate material misrepresentations to the investing public and abdicating his or her oversight responsibilities to the Company" (*id.* ¶ 71), and tacitly approving "the Company's misrepresentations and omissions concerning McClendon's personal loans," and "the dissemination of improper public statements which failed to disclose the full extent of the conflicts of interest" (*id.* ¶ 48).

### 1.      Courts Routinely Dismiss Tag-Along Actions in the Circumstances Presented Here

Tag-along derivative cases that mirror the allegations of the securities complaint are normally dismissed voluntarily following dismissal of the securities case, particularly when the tag-along case has been stayed pending a ruling on the motion to dismiss. When plaintiffs decline to dismiss the case, courts do not hesitate to do so on the company's motion to dismiss.  The reasons are both obvious and directly applicable here.

As one of the cases cited in support of Plaintiffs' motion to stay their claims noted in something of an understatement, "if [the company] is exonerated in the securities class action, then it is unclear what, if anything, would be left of the derivative action."  *In re Groupon Deriv. Litig.*, 882 F. Supp. 2d 1043, 1048-49 (N.D. Ill. 2012) (quotations omitted).  Numerous other cases have underscored this obvious point.[8]

The reasons tag-along derivative actions not voluntarily dropped are dismissed as a matter of course following dismissal of the securities class action are even more powerful when – as in this case – the outside directors on whom no demand was made were not named as defendants in the securities class action.  *See, e.g.*, *Rist v. Stephenson*, 2007 WL 2914252, at *8 (D. Colo. Oct. 1, 2007) ("The Court further notes . . . that none

---

[8] *See, e.g.*, *Rosenblum v. Sharer*, 2008 WL 9396534, at *8 (C.D. Cal. July 28, 2008) ("If Amgen is exonerated in the securities class action, then it is unclear what, if anything, would be left of the derivative action."); *Baca v. Insight Enterprises, Inc.*, 2010 WL 22219715, at *5 (Del. Ch. June 3, 2010) (the granting of a motion to dismiss in a parallel securities class action undercuts "the rationale for the derivative action in the first place"); *Brudno v. Wise*, 2003 WL 1874750, at *4 (Del. Ch. Apr. 1, 2003) ("[I]f the Federal Securities Action were to lead in the exoneration of El Paso and the other defendants on the grounds that the company did not in fact engage in any type of securities violation . . . it is not apparent what, if anything, would be left of this Action.").

of the Outside Directors are named as defendants in the pending securities class action complaint, which "mirror[s] the present complaint  . . . . 'This further undermines plaintiffs' assertion that [these directors] face a substantial likelihood of liability in the present action.'" (quoting *Kenney v. Koenig*, 426 F. Supp. 2d 1175, 1184 (D. Colo. 2006)); *Jones v. Jenkins*, 503 F. Supp. 2d 1325, 1340 (D. Ariz. 2007); ("[N]one of the outside Directors has been named as a defendant in the pending federal securities class action suit.  This fact is relevant when determining whether Directors face a threat of personal liability."); *Guttman v. Huang*, 823 A.2d 492, 504 (Del. Ch. 2003) ("[I]t is important to note that none of these five [outside director] defendants is even named as a defendant in the pending federal securities suits.  The complaints in those suits . . . were the primary source of information used by the plaintiffs in this action.").

It is difficult (to say the least) for plaintiffs' lawyers to show that outside directors are liable in a tag-along action when the shareholder lawyers who filed the securities case did not think there was even a basis to sue them, and the securities case is then dismissed as to the "culpable" defendants.

### 2.    The *Weinstein* Adjudication Eviscerates Plaintiffs' Attempt To Excuse A Demand On The Outside Directors

Plaintiffs cannot rely on the allegations from *Weinstein* as a basis for excusing demand by alleging that the Outside Directors face a substantial likelihood of liability, as the Original Complaints attempt to do.  *See*, *e.g.*, Ex. 1 ¶¶ 75, 79; Ex. 2 ¶¶ 49-53.  The Outside Directors do not face **any prospect** of liability – much less a substantial

likelihood – "for permitting materials disclosure violations" (Dkt. No. 61 at 11) that did not occur.

Moreover, the fact that this Court dismissed the *Weinstein* claims because the allegations were insufficient to allege intentional or reckless misconduct flatly precludes liability for any breach of fiduciary duty.  "Plaintiffs cannot claim that the [Outside] [D]irectors face a 'substantial likelihood' of personal liability when [this Court] determined, based only on the pleadings, that the statements at issue were not fraudulent and would not support federal liability." *In re Discovery Labs. Deriv. Litig.*, 242 F.R.D. 333, 336 (E.D. Pa. 2007) (dismissing tag-along derivative action); *see also In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 596-97 (S.D.N.Y. 2007) (agreeing with defendants that dismissal of securities action largely disposed of tag-along derivative action).

Putting aside the fact that the Outside Directors were not even sued in *Weinstein*, the scienter standard applicable to the federal securities fraud claims  asserted against McClendon and other Chesapeake officers in *Weinstein* is **easier** to satisfy than the one applicable to the disclosure-related claims asserted in the Original Complaints.  *See, e.g.*, *Norfolk Cnty. Ret. Sys. v. Jos. A. Bank Clothiers, Inc.*, 2009 WL 353746, at *12 n.104 (Del. Ch. Feb. 12, 2009) (noting that under federal securities laws, "a plaintiff may meet the scienter requirement by showing that the defendant acted intentionally *or recklessly*," whereas under fiduciary duty law, "recklessness by itself only amounts to gross negligence, which is not sufficient to demonstrate the state of mind necessary for finding a breach of the duty of loyalty" (italics in original)).

Moreover, the *Weinstein* Complaint alleged that Chesapeake's officers **engaged** in the alleged misconduct and **committed** the purported disclosure violations, based on allegations that were far more specific and detailed than those set forth in the Original Complaints. Those allegations were insufficient, even as to McClendon, who obviously knew the details of his personal loans and was actively involved in Chesapeake's public disclosures.

In sharp contrast, the Original Complaints allege **no facts whatsoever** suggesting that the Outside Directors committed the alleged disclosure violations that this Court determined did not occur. They allege bare conclusions to the effect that the Outside Directors permitted, failed to prevent or otherwise "caused" the statements claimed to be false or misleading. That is **never** sufficient to allege a breach of fiduciary duty or excuse a pre-litigation demand: "[P]leading that the director defendants 'caused' or 'caused or allowed' the Company to issue certain statements is not sufficient particularized pleading to excuse demand under Rule 23.1." *In re Citigroup*, 964 A.2d at 133 n.88; *see also Wood*, 953 A.2d at 142.

Moreover, the rationale and findings that required dismissal of the *Weinstein* Complaint underscore some of the reasons that the adjudication disposes of Plaintiffs' attempt to go forward with their tag-along case. In dismissing the *Weinstein* Complaint, this Court analyzed whether allegations against the individuals who allegedly committed the disclosure violations, and ran Chesapeake's day-to-day operations, were sufficient to plead that they acted with scienter, and held that the allegations were insufficient because they were based on the officers' positions and involvement in the Company's operations,

and lacked particularity. That analysis applies with much greater force to Plaintiffs' tag-along claims.

As the *Weinstein* dismissal order emphasized, reliance on positions was wholly insufficient to plead that McClendon and Chesapeake's **officers** "intentionally or recklessly concealed the loans McClendon took out to finance his participation in the FWPP." 2013 WL 1457718, *3-4. The Court ruled that "defendants' management positions and involvement in the operations of Chesapeake" were insufficient to plead intentional or reckless misconduct, and that the complaint further failed because it was based on "generalized conclusory allegations" "without any specific corroborating details." *Id.*

The *Shochat* Complaint alleges that the Outside Directors face liability because they held positions on Chesapeake's Board (*see, e.g.*, Ex. 1 ¶¶ 30-37, 46-54, 79), and asserts that they "abdicated their responsibility to oversee the Company's operations" and "were directly involved in the misconduct challenged in this action, **by virtue of their positions on the Board**" (*id.* ¶79, emphasis added). The *Spiegel* Complaint similarly relies on Defendants' positions as directors, and on that basis asserts that they were aware, or "should have been" aware of the alleged misconduct, and "permitted" or "failed to prevent" it. *See, e.g.*, Ex. 2 ¶¶ 24-28, 47, 50, 52.

In contrast to McClendon and the officers sued in *Weinstein*, the Outside Directors had no "management positions" and had no "involvement in the operations of Chesapeake." They were officers at **other** companies, and merely attended Chesapeake's quarterly board of directors meetings. While the *Weinstein* Complaint lacked **sufficient**

specificity and detail, the Original Complaints have **no** specificity or detail.  Plaintiffs rely solely on Defendants' positions and naked conclusions.  If the *Weinstein* allegations were insufficient to allege recklessness on the part of the individuals who **engaged in** the alleged misconduct, the allegations in the Original Complaints are **necessarily** insufficient to allege reckless or intentional misconduct in **monitoring or failing to prevent** the misconduct.

## II.   PLAINTIFFS FAIL TO SATISFY THE REQUIREMENTS FOR ALLEGING A DERIVATIVE CLAIM

Even if Plaintiffs' claims could survive the dismissal of *Weinstein* (and they cannot), they would have to be dismissed because the Original Complaints are not properly plead as derivative actions, nor do they allege facts sufficient to excuse the requisite pre-litigation demand.  As Plaintiffs' recent amendment concedes, the Original Complaints do not satisfy Rule 23.1's requirement that Plaintiffs specifically allege their continuous ownership of Chesapeake stock.  Nor do they begin to allege particularized facts demonstrating that a pre-litigation would have been futile.

### A.   This Case Must Be Dismissed Because the Original Complaints Were Not Well Pleaded Derivative Actions

As discussed at pages 11-12 above, Plaintiffs are not permitted to proceed with this action without making or excusing a demand on the new board unless their Original Complaints were well-pleaded as derivative actions at the time they were filed.

"Three circumstances must exist to excuse a plaintiff from making demand under Rule 23.1 when a complaint is amended after a new board of directors is in place." *Braddock*, 906 A.2d at 786.  The first of those circumstances is that "the original

complaint was well pleaded as a derivative action."  *Id.*  Plaintiffs' Original Complaints were not well pleaded as derivative actions because they failed to satisfy Rule 23.1's "continuous ownership" pleading requirement.

Rule 23.1 requires derivative plaintiffs to allege that they owned stock in the corporation at the time of, and throughout the course of, the alleged wrongful conduct.  *See* Fed. R. Civ. P. 23.1(b)(1); *In re Bank of N.Y. Deriv. Litig.*, 320 F.3d 291, 297-98 (2d Cir. 2003); *Lewis v. Chiles*, 719 F.2d 1044, 1047 (9th Cir. 1983).  "General allegations that [a] Plaintiff 'is, and was during the relevant period,' or 'is, and was at all times relevant to,' a shareholder" do not satisfy this requirement.  *Hawaii Laborers Pension Fund v. Farrell*, 2007 WL 5255035, at *8 (C.D. Cal. Aug. 23, 2007).  A plaintiff must unambiguously allege **when** he first purchased stock in the corporation.  *In re Verisign, Inc. Deriv. Litig.*, 531 F. Supp. 2d 1173, 1202 (N.D. Cal. 2007).

The Original Complaints undeniably fail to satisfy this requirement.  The *Shochat* Complaint merely states that "Plaintiff . . . is presently a shareholder of Chesapeake, and has been a shareholder at all times pertinent to the claims asserted herein."  Ex. 1 ¶ 31.  The *Spiegel* Complaint merely avers that "Plaintiff is, and was at all times during the Relevant Period, a Chesapeake Energy shareholder."  Ex. 2 ¶ 12.

As numerous courts have held, such allegations cannot survive a motion to dismiss.[9]  "[I]n this post-*Twombly* era, [] a mere allegation of ownership during an

---

[9] *See, e.g.*, *In re Capital One Deriv. S'holder Litig.*, 952 F. Supp. 2d 770, 795 (E.D. Va. 2013); *DiLorenzo v. Norton*, 2009 WL 2381327, at *3 (D.D.C. July 31, 2009); *In re Accuray, Inc. S'holder Deriv. Litig.*, 757 F. Supp. 2d 919, 926 (N.D. Cal. 2010); *Travis v. Mittelstaedt*, 2008 WL 755842, at *1-2 (E.D. Cal. Mar. 19, 2008); *Scimeca v. Kim*, 2007

unspecified 'Relevant Period' will [not] suffice." *Smith v. Stevens*, 957 F. Supp. 2d 466, 469 (S.D.N.Y. 2013).   Plaintiffs' counsel tacitly conceded as much when they sought leave to amend the previous amended complaint to rectify that pleading's defective stock ownership allegations in response to Chesapeake's first motion to dismiss.

Because the Original Complaints would have been subject to dismissal for failure to satisfy Rule 23.1's continuous ownership pleading requirement, they were not "well pleaded as [] derivative action[s]." *Braddock*, 906 A.2d at 786; *see, e.g.*, *In re Nyfix*, 567 F. Supp. 2d at 10-12 (holding that under *Braddock*, plaintiff had to make or excuse a demand on the new board because the original complaint would have been subject to dismissal for failure to satisfy Rule 23(b)(1)'s continuous ownership requirement). Accordingly, Plaintiffs had to make or excuse a demand on the current board.   Because they did not, the Amended Complaint must be dismissed.

**B.    This Case Must Also Be Dismissed Because the Original Complaints Did Not Allege Demand Futility**

Making or excusing a demand on the current board was further required – and thus dismissal of the Amended Complaint is further required – because the Original Complaints do not come close to pleading facts sufficient to excuse the making of a pre-litigation demand.   *See Braddock*, 906 A.2d at 786 ("Three circumstances must exist to

---

WL 7087065, at *11 (D. Ariz. Aug. 29, 2007); *In re Am. Apparel, Inc. S'holder Deriv. Litig.*, 2012 WL 9506072, at *37 (C.D. Cal. July 31, 2012); *In re Affymetrix Deriv. Litig.*, 2008 WL 5050147, at *8 (N.D. Cal. Mar. 31, 2008); *Belova v. Sharp*, 2008 WL 700961, at *3 (D. Or. Mar. 13, 2008); *In re Computer Sciences Corp. Deriv. Litig.*, 2007 WL 1321715, at *15 (C.D. Cal. Mar. 26, 2007); *In re Maxim Integrated Prods., Inc. Deriv. Litig.*, 2007 WL 2745805, at *3 (N.D. Cal. July 25, 2007); *In re Sagent Tech., Inc. Deriv. Litig.*, 278 F. Supp. 2d 1079, 1096 (N.D. Cal. 2003).

excuse a plaintiff from making demand under Rule 23.1 when a complaint is amended after a new board of directors is in place: . . . second, the original complaint satisfied the legal test for demand excusal").

As discussed at page 8 above, when a derivative complaint is predicated on a board's alleged violation of oversight and monitoring duties, including with respect to public disclosures, the *Rales* test governs the demand futility analysis. *See, e.g.*, *In re Am. Int'l Grp., Inc. Deriv. Litig.*, 700 F. Supp. 2d 419, 431 (S.D.N.Y. 2010) ("The *Rales* test applies to Plaintiff's claims regarding the Board's alleged failures of oversight and failures of disclosure."), *aff'd*, 415 F. App'x 285 (2d Cir. 2011).   Accordingly, to establish demand futility, the Original Complaints were required to allege highly particularized facts rebutting the presumption that a majority of the board would be disinterested and independent in making a decision on a demand. *Rales*, 634 A.2d at 927. The Original Complaints make no such showing.

The   Original   Complaints'   assertion   that   the   Outside   Directors   lack "disinterestedness" because they face a substantial likelihood of liability fails on multiple grounds – irrespective of how Plaintiffs' claims might be characterized.  As discussed at pages 13-24 above, the *Weinstein* adjudication eliminates any likelihood of liability, and the result would be the same even if *Weinstein* had not been dismissed.  The Outside Directors would still be fully protected by the "exculpatory" provision of Chesapeake's charter, which eliminates liability for breaches of their duty of care – with respect to Chesapeake's public disclosures and more broadly.

Plaintiffs' attempt to rebut the presumption that the Outside Directors lack independence is based on boilerplate assertions that have been repeatedly rejected by the courts. Indeed, most of the Original Complaints' allegations on that point have been specifically adjudicated in prior derivative cases filed against Chesapeake and its directors.

> **1.    The Original Complaints Fail To Allege That Any Outside Director Faces Any Threat Of Liability Based On Alleged Disclosure Violations**

The Original Complaints' claim that the Outside Directors face a substantial likelihood of liability suffers from layers of fatal defects. The *Weinstein* adjudication effectively disposes of Plaintiffs' tag-along claims, which are based on purported disclosure violations related to the FWPP and the loans McClendon utilizes to finance his FWPP interests. *See* pages 13-24 above. Even if there had been no *Weinstein* adjudication, the Outside Directors would face no risk of liability because the Original Complaint allege **no** acts, much less highly particularized facts, that might take Plaintiffs' claims outside the protections of Chesapeake's charter.

As discussed at pages 10-11 above, Article V of the Charter immunizes the Outside Directors from liability based on anything other than bad faith, intentional, intentional misconduct and knowing violations of law. Ex. 16 at 6. Accordingly, the Outside Directors cannot be held liable to the corporation for negligence, gross negligence, or even recklessness. *See, e.g.*, *McPadden*, 964 A.2d at 1274-75 ("[P]laintiff has ably pleaded that the Director Defendants . . . acted with gross negligence or else reckless indifference. Because such conduct breaches the Director Defendants' duty of

care, this violation is exculpated by the Section 102(b)(7) provision in the Company's charter").  To establish liability, Plaintiffs would have to show (1) that the Outside Director **committed** disclosure violations, and (2) that the "disclosure violation was made in bad faith, knowingly or intentionally." *In re Citigroup*, 964 A.2d at 132.

The Original Complaints allege no facts suggesting that the Outside Directors committed the alleged disclosure violations, which this Court determined did not occur. That is fatal: "When a Plaintiff does not allege facts suggesting that the Individual Defendants prepared the [company's] statements or that they were directly responsible for the misstatements or omissions then [a] Court cannot reasonably conclude that the Individual Defendants face a substantial likelihood of liability." *Strong v. Taylor*, 877 F. Supp. 2d 433, 448 (E.D. La. 2012); *In re Hecla* [10]

"[P]leading that the director defendants 'caused' or 'caused or allowed' the Company to issue certain statements is not sufficient particularized pleading to excuse demand under Rule 23.1." *In re Citigroup*, 964 A.2d at 133 n.88; *Wood*, 953 A.2d at 142; *see, e.g.*, *In re Hecla Min. Co. Deriv. Litig.*, 2014 WL 689036, at *11 (D. Idaho Feb. 20, 2014) ("What is left, then, are generalized allegations that Hecla's board made (or consciously permitted Hecla to make) false and misleading statements.  This is just not enough.").  Similarly, alleging that directors served on the audit committee or other board committees is woefully insufficient.  "Plaintiff[s'] lengthy recitation of the duties and

---

[10] *See, e.g.*, *Campbell v. Weihe Yu*, --- F. Supp. 2d ---, 2014 WL 2599856, at *6 (S.D.N.Y. June 10, 2014); *In re JP Morgan Chase*, 2014 WL 1297824, at *7; *In re Bank of N.Y. Mellon Corp. Transactions Litig.*, 991 F. Supp. 2d 457, 462 (S.D.N.Y. 2013); *In re HP Deriv. Litig.*, 2012 WL 4468423, at *12 (N.D. Cal. Sept. 25, 2012); *In re Accuray*, 757 F. Supp. 2d at 934.

responsibilities enumerated in those committees' charters does not supply the requisite particularity," or plead a substantial likelihood of liability. *La. Mun. Police Ret. Sys. v. Pandit*, 2009 WL 2902587, at *10 (S.D.N.Y. Sept. 10, 2009). The argument "that certain board members faced a substantial likelihood of liability because they served on either the auditing committee or the compensation committee, through which they knew or should have known that certain public statements were false and misleading . . . has [] been routinely rejected by Delaware courts." *Playford v. Lowder*, 635 F. Supp. 2d 1303, 1309-10 (M.D. Ala. 2009); *see, e.g.*, *Wood*, 953 A.2d at 142; *In re Citigroup*, 964 A.2d at 127-28; *Desimone*, 924 A.2d at 942-43.

Nor do the Original Complaints plead any particularized facts that so much as suggest that any Outside Director had knowledge that any of the alleged misstatements or omissions was false or misleading, which would be essential to any demonstration that they face a substantial likelihood of liability. *See, e.g.*, *In re Citigroup*, 964 A.2d at 134. Like the more detailed claims asserted against Chesapeake's officers in *Weinstein*, the allegations in the Original Complaints do "not reference any meeting attended by any defendant, any internal report he received or reviewed, any internal email, or any other information that would tend to show that the particular defendant knew the 'truth' about the facts that were purportedly misstated and knew that its non-disclosure would likely mislead investors." 2013 WL 1457718, *4. They merely allege the conclusions that, based on their positions, the Outside Directors knew, consciously disregarded, should have known, or were negligent or reckless in not knowing about the alleged misconduct. Ex. 1 ¶¶ 33-37, 41, 43, 44; Ex. 2 ¶¶ 56-58.

### 2. The Original Complaints Fail To Allege That Any Outside Director Faces Any Threat of Liability Based On An Alleged Failure to Monitor McClendon's Personal Activities

Nor would it matter if the Original Complaints alleged that the Outside Directors faced a substantial likelihood of liability for failing to monitor McClendon's conduct in connection with the FWPP, and related loans. Even if that allegation could be severed from *Weinstein* and isolated from the disclosure-based claims, it would still be barred by Chesapeake's charter. Moreover, as a matter of law, the Outside Directors had no duty to monitor McClendon's personal activities.

For the reasons discussed above, Chesapeake's charter would eliminate liability for claims that the Outside Directors were negligent, grossly negligent or reckless in connection with any duty of care that extended to McClendon's activities. *See, e.g.*, *Production Res. Grp., L.L.C. v. NCT Grp., Inc.*, 863 A.2d 772, 798 (Del. Ch. 2004); *McPadden*, 964 A.2d at 1274-75.

Moreover, as a matter of law, directors "have no duty to monitor the personal affairs of other directors." *Canadian Commercial Workers Indus. Pension Plan v. Alden*, 2006 WL 456786, at *7 (Del. Ch. Feb. 22, 2006); *Beam v. Stewart*, 833 A.2d 961, 971-72 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del. 2004). That is true even when the personal activities are undertaken by persons closely associated with the corporation (*e.g.*, Martha Stewart), and have an adverse impact on the company. "[A] board of directors has no duty to monitor the personal affairs of its employees, including the personal affairs of the company's founder with whom it is closely associated." *David B. Shaev Profit Sharing Account v. Armstrong*, 2006 WL 391931, at *5 n.13 (Del. Ch. Feb. 13, 2006).

The plaintiff in *Alden* alleged that the director defendant breached his duty of loyalty by "fail[ing] to prevent" another director "from investing his own money in lines of business similar to those pursued by [the company]," and "fail[ing] to stop" other directors and officers "from running other businesses out of their [company] offices." 2006 WL 456786, at *7.  The court dismissed the claim because directors "have no duty to monitor the personal affairs of other directors and officers."  *Id.*

Similarly, the plaintiffs in *Beam* claimed that the directors of Martha Stewart Omnimedia breached their fiduciary duties by "failing to ensure that Stewart would not conduct her personal, financial, and legal affairs in a manner that would harm the Company, its intellectual property, or its business."  833 A.2d at 971.  In rejecting that argument, the court emphasized that, notwithstanding Stewart's central role at the company, the board was not "required to monitor, much less control, the way Stewart handles her **personal** financial and legal affairs."  *Id.* at 971 (emphasis in original).  Thus, the board had "no duty to monitor Stewart's personal actions" even if it had reason to suspect she had engaged in wrongdoing, "regardless of Stewart's importance to MSO," because "she is not the corporation."  *Id.* at 971-72.  The court further noted that "it is neither legitimate nor feasible" to impose such an obligation on boards of directors.  *Id.* at 971.

As Chesapeake repeatedly disclosed, McClendon's FWPP holdings are his personal property, and the transactions he undertook to finance those interests were personal transactions.  Ex. 8 at 6.  His personal financing arrangements were expressly permitted under the terms of the FWPP (*id.*; Ex. 5 at 10; Ex. 9 at 5), and were with third

parties – not Chesapeake. Accordingly, the Outside Directors had no duty to monitor, review, approve or prevent the FWPP financings, and had no duty to disclose the "details" of such transactions.

**Even if** the Outside Directors had such a duty, and were not protected by the charter provision, the Original Complaints would fail to demonstrate a substantial likelihood of liability under such a theory, because they allege no particularized facts that might support it. A duty to monitor claim, also known as a *Caremark* claim, is "the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996). "At the demand futility stage, the requirement of particularized allegations in support of this theory of *Caremark* liability imposes a weighty burden on plaintiffs." *In re SAIC Inc. Deriv. Litig.*, 948 F. Supp. 2d 366, 382 (S.D.N.Y. 2013).

To establish a "substantial likelihood of liability" based on a *Caremark* theory, a plaintiff must allege particularized facts showing that "(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006). "In either case, imposition of liability requires a showing that the directors **knew** that they were not discharging their fiduciary obligations." *Id.* (emphasis added).

As a review of the Original Complaints quickly reveals, Plaintiffs do not come close to making such a showing, even in conclusory fashion. In addition to lacking any

semblance of particularized facts, they repeatedly allege that the Outside Directors

"should have known" or "should have been aware" of the alleged problems. *See, e.g.*,

Ex. 1 ¶¶ 3-37, 43; Ex. 2 ¶¶ 47, 50.

Nor do Plaintiffs allege any facts showing that the Outside Directors "utterly failed

to implement any reporting or information system or controls," or "any specific

deficiencies of the Company's . . . internal [] controls," or any Outside Director's

"knowledge of any 'red flags.'" *In re China Automotive*, 2013 WL 4672059, at *8 (Del.

Ch. Aug. 30, 2013); *South v. Baker*, 62 A.3d 1, 8, 18 (Del. Ch. 2012). Again, they

"offer[] only conclusory allegations concerning the Outside Directors' general oversight

duties and presumed knowledge of" wrongdoing, which "[n]umerous courts have

summarily rejected." *Talley v. Mann*, 2012 WL 946990, at *12 (C.D. Cal. Feb. 14,

2012).

**3.    The Original Complaints Allege Nothing That Demonstrates That The Outside Directors Lacked Independence**

The Original Complaints also fall **far** short of alleging facts that might rebut the

presumption of independence. Each of the Outside Directors was certified independent

under the Sarbanes Oxley and the NYSE corporate governance rules. Ex. 14 at 2. The

NYSE rules governing director independence are aligned with legal decisions in

Delaware and elsewhere, and are persuasive in evaluating litigation claims that directors

lack independence. *See, e.g.*, *In re MFW S'holders Litig.*, 67 A.3d 496, 510 (Del. Ch.

2013); *DiRienzo v. Lichtenstein*, 2013 WL 5503034, at *23 (Del. Ch. Sept. 30, 2013).

The Original Complaints allege no facts that would cast doubt on the certifications, or the

independence of **any** of the eight Outside Directors.  Plaintiffs' attempts to plead a lack of independence based on the assertion that they received "lavish" or "extraordinary" compensation for serving on the Chesapeake Board (Ex. 1 ¶ 81; Ex. 2 ¶ 59), epitomizes their inability to rebut the presumption of independence.

First, the **exact same** allegation against the **same** Directors was made in the *Norris* and *2009 Derivative Actions* (Ex. 11 ¶¶ 102-104; Ex. 10 ¶¶ 104-108).  In both cases, the Oklahoma state court rejected it (and other demand futility allegations reprised in the Original Complaint), and the dismissals were affirmed on appeal.  *See* pages 5-6 above.

Second, even if the specific allegations had not already been adjudicated, it is well-settled that the mere "fact that directors receive substantial remuneration for their service" does not suggest a lack of independence.  *Jacobs v. Young*, 2004 WL 1728521, at *4 (Del. Ch. Aug. 2, 2004), *aff'd*, 867 A.2d 902 (Del. 2005); *see, e.g.*, *Freedman v. Adams*, 2012 WL 1345638, at *7 (Del. Ch. Mar. 30, 2012) (rejecting allegation that directors whose compensation "ranged from $678,555 to $792,198" lacked independence), *aff'd*, 58 A.3d 414 (Del. 2013).

Third, a director's compensation is relevant only if there are particularized allegations suggesting that it was **subjectively** material to the director in light of his personal circumstances, **and** the individual whose actions are the focus of the lawsuit had the power to remove the director and thereby deprive him of the compensation.  *See, e.g.*, *MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *20 (Del. Ch. May 5, 2010); *In re Sanchez Energy Deriv. Litig.*, 2014 WL 6673895, at *6 (Del. Ch. Nov. 25, 2014).  The Original Complaints are devoid of any such allegation, even in conclusory form.

35

The law is equally "clear that mere allegations that directors are friendly with, travel in the same social circles, or have past business relationships with the proponent of a transaction or the person they are investigating, are not enough to rebut the presumption of independence." *In re MFW*, 67 A.3d at 509. Allegations "that do not detail the extent of the friendship [or other relationship] are insufficient to support a reasonable inference that a director lacked independence." *In re Sanchez Energy*, 2014 WL 6673895, at *5.

Similarly, conclusory allegations regarding political ties – such as the *Shochat* Complaint's claim that Keating and Nickles lacked independence "because of significant ties with" McClendon "through the Republican Party," and because McClendon "contributed to the House campaign" of "Keating's wife," and Nickles "regularly solicits contributions" from McClendon "for Republican causes" (Ex. 1 ¶¶ 82-83) – provide no basis for disqualifying a director on the ground that he is not independent. *See, e.g.*, *In re Sanchez Energy*, 2014 WL 6673895, at *5 ("allegation that Jackson donated $12,500 to Sanchez Jr.'s Texas gubernatorial campaign in 2002" did not suggest lack of independence); *Parker v. Riggio*, 2012 WL 3240837, at *4 (S.D.N.Y. Aug. 6, 2012) (allegation that directors "contribute to the same political candidates" shows only that they prefer the same candidates, not lack of independence).[11]

The *Shochat* Complaint's assertion that Keating lacked independence because his "son and daughter-in-law work for Chesapeake, and are thus dependent upon the

---

[11] *See also La. Mun. Police Emps. Ret. Sys. v. Wynn*, 2014 WL 994616, at *6 (D. Nev. Mar. 13, 2014) ("[P]laintiffs have not alleged a campaign contribution of such a significant magnitude to plausibly claim that Miller lacks independence"); *Fink v. Weill*, 2005 WL 2298224, at *2-3 (S.D.N.Y. Sept. 19, 2005) (allegation that defendants "were acquainted in various social and political settings" did not suggest lack of independence).

goodwill" of McClendon "for their livelihood" (Ex. 1 ¶ 82), has been adjudicated twice. The **exact same** allegation was made in the *2009 Derivative Action*, and again in the *Norris Derivative Action*.   Ex. 10 ¶ 94(d); Ex. 11 ¶ 100.   Both cases dismissed the complaints for failure to excuse a pre-litigation demand.  Both were affirmed on appeal. *See* pages 5-6 above.   Nor would the allegation advance Plaintiffs' attempt to plead demand futility if it had not already been adjudicated.  *See, e.g.*, *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 823 (Del. Ch. 2005) (fact that director's son was employed by company did not suggest lack of independence because his son, like Keating's son and daughter-in-law, was employed in a non-executive position, the complaint, like the *Shochat* Complaint, did not allege that director and son lived in same household, and like Keating, the director satisfied NYSE rules, and his son's employment with company was disclosed), *aff'd*, 906 A.2d 766 (Del. 2005); *see also* Ex. 18 at 3-5.

The *Shochat* Complaint's conclusory allegation that Nickles lacks independence because he "is a director of Valero," "with which Chesapeake, at the direction of" McClendon, "is considering a partnership on various natural gas projects" (Ex. 1 ¶ 83), and the *Spiegel* Complaint's conclusory allegation that Miller lacks independence because he is the Chairman and CEO of National Oilwell, a company that "has a business relationship" with Chesapeake (Ex. 2 ¶ 55), are equally unavailing.  A director's mere "association with businesses that transact with [the corporation] does not establish that [the director] was not independent." *Kaplan v. Wyatt*, 499 A.2d 1184, 1189 (Del. 1985); *see also Jacobs*, 2004 WL 1728521, at *6 ("[T]he existence of contractual relationships

with companies that directors are affiliated with . . . does not sterilize the board's ability to decide.'").

The Original Complaints make no attempt whatsoever to allege any facts regarding the terms of any potential partnership between Chesapeake and Valero, or of Chesapeake's business relationship with National Oilwell, or how Nickles or Miller might receive a material personal financial benefit from Chesapeake's associations with those companies, or how receipt of such a benefit would render Nickles or Miller incapable of considering a demand.  Courts have rejected far more detailed allegations based on a director's association with entities that have business relationships with the corporation.  *See, e.g.*, *Jacobs*, 2004 WL 1728521, at *6; *Khanna v. McMinn*, 2006 WL 1388744, at *17 (Del. Ch. May 9, 2006).

The *Spiegel* Complaint's suggestion that Davidson, Hargis, Keating, Maxwell, Miller and Nickles lack independence because they were on the board when it approved a purchase from McClendon of a $12.1 million map collection from McClendon (Ex. 2 ¶ 55), is similarly wide of the mark.  The **exact same** allegation against the **same** Directors was made in the *2009 Derivative Action* (Ex. 10 ¶ 94(c)), which, again, was dismissed and affirmed on appeal by the Oklahoma Court of Civil Appeal.  *See* pages 5-6 above.

Finally, the *Shochat* Complaint's allegation that demand was futile because the Outside Directors purportedly "determined that no demand will entice them to act" because "Chesapeake's Board issued a statement" disagreeing with some of the media reports on which the Original Complaints are based (Ex. 1 ¶ 84), is founded on a patent misportrayal of the statement.  As a review of the statement immediately reveals, it was

issued by Chesapeake's General Counsel – not "Chesapeake's Board."  It is captioned "Chesapeake Energy Corporation General Counsel Henry Hood Issues a Statement," and begins: "Chesapeake Energy Corporation (NYSE:CHK) General Counsel Henry Hood issued the following statements."  Ex. 15.  The body of the statement underscores that it was not issued by or on behalf of "Chesapeake's Board."  And even **if** the statement **had** been made by the board, and were about the litigation itself, it would not have disabled the Outside Directors from considering a demand.[12]

### III.   THE AMENDED COMPLAINT UNDERSCORES PLAINTIFF'S FAILURE TO PLEAD DEMAND FUTILITY

Although the Amended Complaint is irrelevant to the demand futility analysis, its new allegations underscore Plaintiffs' inability to establish standing in this case. Plaintiffs  concede that futility must be determined with regard to the board at the time the litigation was filed (Am. Compl. ¶ 31), but the majority of the new allegations are premised on events that occurred **after** the Outside Directors left the board.  As but one example, the Amended Complaint alleges that the "Board"—a term that is never defined in the Amended Complaint—"waste[d] $50 million by conspiring with McClendon so that he could exit with his unearned severance."  *Id.* ¶ 28.  McClendon did not retire from

---

[12] *See, e.g.*, *Highland Legacy*, 2006 WL 741939, at *6 ("Public statements about the merits (or lack thereof) of derivative litigation are routinely made in SEC filings.  It would be unreasonable for this court to conclude that a board made up of a majority of independent directors could not be asked to pursue this litigation simply because the company expressed a belief in a public filing that the claims in a series of related litigations were unfounded.").

Chesapeake until **April 2013** (Ex. 17), almost **a year** after the Outside Directors had left the Company.[13]

Apart from the *Braddock* rule's requirement that demand futility must be demonstrated in the Original Complaints (*see* pages 11-13 above), it is black letter law that demand futility must be demonstrated on the basis of facts that "led [Plaintiffs] to believe demand would be futile" **at "the time of the filing of the complaint**." *In re Merck & Co.*, 2006 WL 1228595 at *18 (emphasis added).  The Amended Complaint nevertheless asserts that demand was futile on the basis of events – McClendon's termination without cause (Am. Compl. ¶¶ 215-19), the board's inquiry into McClendon's personal activities (*id.* ¶¶ 250-71) – that were not mentioned in the Original Complaints and could not have been part of Plaintiffs' decision not to make a demand because many of them occurred long after the Original Complaints were filed.  Plaintiffs "may not rely on after-acquired information to bolster their allegations of demand futility." *In re Merck & Co.*, 2006 WL 1228595, at *18.

## CONCLUSION

This tag-along action should have been voluntarily dismissed after the Tenth Circuit affirmed this Court's dismissal of *Weinstein*.  For the reasons set forth above, it should now be dismissed on this motion.

---

[13] The Amended Complaint asserts a variety of nefarious conclusions about McClendon's termination and severance, arguing that the "facts favor these conclusions."  Am. Compl. ¶ 229.  But Plaintiffs' conclusions are all refuted by the actual circumstances of McClendon's exit, which were disclosed in detail in Chesapeake's June 5, 2014 Schedule 14A.  *See* Ex. 17 (discussing the new board's reasoning for renegotiating McClendon's severance, which reduced his contractually defined severance by over 20%).

Dated:  February 23, 2015

**Orrick, Herrington & Sutcliffe LLP**
Robert P. Varian (Admitted Pro Hac Vice)
M. Todd Scott (Admitted Pro Hac Vice)
Alexander K. Talarides (Admitted Pro Hac Vice)


By:        */s/ Robert P. Varian*
         ROBERT P. VARIAN

The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: (415) 773-5700
Facsimile:   (415) 773-5759
rvarian@orrick.com
tscott@orrick.com
atalarides@orrick.com

Spencer F. Smith, OBA #20430
McAfee & Taft A Professional Corporation
211 North Robinson, Suite 1000
Two Leadership Square, 10th Floor
Oklahoma City, OK  73102
Telephone.:  (405) 552-2246
Facsimile:     (405) 235-0439
spencer.smith@mcafeetaft.com

*Attorneys for Nominal Defendant Chesapeake Energy Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 23, 2015, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing.   Based on the records currently on files, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Daniel M. Delluomo
monty@delluomo.com, jmoser4swcrow@yahoo.com, SWCrowesq@aol.com

Darren B. Derryberry
dderryberry@derryberrylaw.com, kreynolds@derryberrylaw.com

Don S. Strong
dss@strongmartin.com, sarah@strongmartin.com

G. Stephen Martin
gsm@strongmartin.com, njc@strongmartin.com, sarah@strongmartin.com

George C. Aguilar
notice@robbinsarroyo.com, rsalazar@robbinsarroyo.com

Gregg M. Fishbein
gmfishbein@locklaw.com, crbaehman@locklaw.com, ssmcneill@locklaw.com

Jeffrey H. Squire
squire@bragarwexler.com, hevia@bragarwexler.com, kuehn@bragarwexler.com

John Halebian
jhalebian@lshllp.com, amayes@lshllp.com

Justin A. Kuehn
kuehn@bragarwexler.com, bragar@bragarwexler.com, hevia@bragarwexler.com

Kenyatta R. Bethea
kbethea@hbolaw.com, cgreen@hbolaw.com, kellie@hbolaw.com

Lawrence Deutsch
ldeutsch@bm.net, ahickman@bm.net, rswitzenbaum@bm.net

Lawrence P. Eagel
eagel@bragarwexler.com, hevia@bragarwexler.com, kuehn@bragarwexler.com

Lewis S. Kahn
lewis.kahn@ksfcounsel.com

Matthew M. Houston
mhouston@hfesq.com, clowther@hfesq.com

Melinda A. Nicholson
melinda.nicholson@ksfcounsel.com, ecf.filings@ksfcounsel.com

Nancy Kaboolian
nkaboolian@abbeyspanier.com

Raymond A. Bragar
bragar@bragarwexler.com, hevia@bragarwexler.com, kuehn@bragarwexler.com

Richard A. Lockridge
ralockridge@locklaw.com, bmemmons@locklaw.com

Robin Switzenbaum
rswitzenbaum@bm.net, snoone@bm.net

Spencer F. Smith
spencer.smith@mcafeetaft.com, jane.dunagin@mcafeetaft.com,
keeli.gardner@mcafeetaft.com

Steven W. Crow
SWCrowesq@aol.com, alp1404@yahoo.com, CKYoung511@msn.com,
DelluomoCrow@msn.com, jmoser4swcrow@yahoo.com

Thomas C. Atmore
tatmore@losgs.com, lfischer@losgs.com

William R. McMahon
quimby15@att.net


                                        /s/ Robert P. Varian
                                        ROBERT P. VARIAN