## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| | ) |
| **IN RE CHESAPEAKE ENERGY** | ) **Lead Case No. CIV-12-436-M** |
| **CORPORATION 2012** | ) |
| **SHAREHOLDER** | ) **Relating to:** |
| **DERIVATIVE LITIGATION** | ) **All Derivative Actions** |
| | ) |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO CHESAPEAKE
ENERGY CORPORATION'S MOTION TO DISMISS DERIVATIVE
<u>COMPLAINT PURSUANT TO FED. R. CIV. P. 23.1</u>**

## TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................................1

II.  FACTUAL BACKGROUND .................................................................................2

III. ARGUMENT ..........................................................................................................8

    A.   The Dismissal in *Weinstein* Does Not Impact This Case .........................8

    B.   The Amended Complaint is the Pertinent Pleading for this Motion......................13

    C.   Plaintiffs' Allegations of Continuous Ownership Satisfy Rule 23.1 ....................16

    D.   Legal Standards for Pleading Demand Futility.......................................19

    E.   Plaintiffs Have Adequately Alleged that Demand Would Be Futile ....................21

        1.   Each of the Director Defendants Face a Substantial Likelihood of Liability...................................................................................23

            a.   McClendon's Conflicted Related-Party Loans .............................25

            b.   McClendon's Conflicted Hedge ...................................28

            c.   McClendon's Termination and the Flawed Investigation.............28

            d.   The Board's Actions are Not Protected by Business Judgment .....................................................................31

        2.   The Audit and Compensation Committee Members Face a Substantial Likelihood of Liability for Abdicating Their Duties..............33

        3.   Collectively, the Allegations in the Amended Complaint Establish Demand Futility .......................................................37

    F.   Chesapeake's Exculpatory Clause Does Not Form a Basis for the Amended Complaint to Be Dismissed .................................................39

IV.  CONCLUSION......................................................................................................40

## TABLE OF AUTHORITIES

**Cases**

*Alidina v. Internet.com Corp.*, 2002 Del. Ch.
LEXIS 156 (Del. Ch. 2002)............................................................................... 40

*Arbit v. Makrides*, 2012 U.S. Dist. LEXIS 135424
(M.D. Fla. Sept. 21, 2012) ............................................................................... 23

*Beam v. Stewart*, 845 A.2d 1040 (Del. 2004) ...................................................... 1, 27

*Beard v. Love*, 173 P.3d 796 (Okla. Ct. App. 2007)..................................................... 19

*Belova v. Sharp*, No. 07-299, 2008 U.S. Dist.
LEXIS 19880 (D. Or. Mar. 13, 2008).............................................................. 18

*Braddock v. Zimmerman,* 906 A.2d 776 (Del. 2006)................................. 13, 14, 15, 16

*Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ........................................................... 19

*Brenner v. Albrecht*, No. 6514, 2012 Del. Ch.
LEXIS 20 (Del. Ch. Jan. 27, 2012)..................................................................... 9

*Brody v. Chemical Bank.*, 517 F.2d. 932 (2d Cir. 1975) ............................................ 14

*Brown v. Brewer*, 2010 U.S. Dist. LEXIS
60863(C.D. Cal. June 17, 2010)....................................................................... 32

*Cal. Pub. Emps. Ret. Sys. v. Coulter*, No. 19191, 2002 Del. Ch.
LEXIS 144 (Del. Ch. Dec. 18, 2002)............................................ 16, 37, 38, 40

*Canadian Commercial Workers Industry Pension Plan*, No. 1184-N,
2006 Del. Ch. LEXIS 42 (Del. Ch. Feb. 22, 2006)........................................ 27

*Crane Co. v. Harsco Corp.*, 511 F. Supp. 294 (D. Del. 1981) .................................... 18

*Cucci v. Edwards*, No. 07-532, 2007 U.S. Dist.
LEXIS 86832 (C.D. Cal. Oct. 31, 2007)............................................................. 9

*DiLorenzo v. Norton*, No. 07-144, 2009 U.S. Dist.
LEXIS 66862 (D.D.C. July 31, 2009) .............................................................. 18

*Emerald Partners v. Berlin*, 787 A.2d 85 (Del. 2001)................................................ 40

*FLI Deep Marine LLC v. McKim*, C.A. No. 4138-VCN,
2009 Del. Ch. LEXIS (Del. Ch. Apr. 21, 2009) ............................................. 11

*Galdi v. Jones*, 141 F.2d 984 (2d Cir. 1944)..................................................... 18, 19

*Garza v. Belton*, No. 08-1387, 2010 U.S. Dist.
    LEXIS 85828 (N.D. Ill. Aug. 13, 2010) ...................................................... 18, 19

*Guth v. Loft, Inc.*, 5 A.2d 503 (Del. 1939) ...................................................................... 23

*Haseotes v. Bentas*, 2002 Del. Ch. LEXIS 106
    (Del. Ch. Sept. 3, 2002) ...................................................................................... 38

*Hawaii Laborers Pension Fund v. Farrell*, No. 06-06935,
    2007 U.S. Dist. LEXIS 77777 (C.D. Cal. Aug. 22, 2007) ................................. 17

*In re Abbott Depakote S'holder Derivative Litig.*,
    2013 U.S. Dist. LEXIS 78841 (N.D. Ill. June 5, 2013) ...................................... 23

*In re Abbott Labs. Derivative S'holders Litig.*,
    325 F.3d 795 (7th Cir. 2003) ......................................................................... 23, 31

*In re Affiliated Computer Servs., Inc. S'holders Litig.*,
    No. 2821, 2009 Del. Ch. LEXIS 35 (Del. Ch. Feb. 6, 2009) ............................ 14

*In re Affymetrix Derivative Litig.*, No. 06-05353, 2008 U.S. Dist.
    LEXIS 86187 (N.D. Cal. Mar. 31, 2008) ........................................................... 18

*In re Atmel Corp. Derivative Litig.*, No. 06-4592, 2008 U.S. Dist.
    LEXIS 91909 (N.D. Cal. June 25, 2008) ........................................................... 15

*In re Baxter Int'l S'holders Litig.*, 654 A.2d 1268 (Del. Ch. 1995) .......................... 21

*In re Brown Sch.*, 368 B.R. 394 (Bankr. D. Del. 2007) ............................................... 40

*In re Caremark International Inc. Derivative Litigation*,
    698 A.2d 959 (Del. Ch. 1996) ........................................................................... 31

*In re Chesapeake S'holders Derivative Litig.*, No. 108146, 2011
    Okla. Civ. App. LEXIS 146 (Okla. Ct. App. Aug. 26, 2011) ........................... 13

*In re China Agritech, Inc. S'holder Derivative Litig.*, No. 7163,
    2013 Del. Ch. LEXIS 132 (Del. Ch. May 21, 2013) ................................ 16, 24, 29, 30, 36

*In re Citigroup S'holder Derivative Litig.*, No. 07 Civ. 9841,
    2009 U.S. Dist. LEXIS 75564 (S.D.N.Y. Aug. 25, 2009) ................................. 15

*In re Computer Scis. Corp. Derivative Litig.*, No. 06-05288,
    2007 U.S. Dist. LEXIS 25414 (C.D. Cal. Mar. 26, 2007) ................................ 18

*In re Countrywide Fin. Corp. Derivative Litig.*,
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) ....................................... 24, 27, 32, 36

*In re Fuqua Indus., Inc. S'holder Litig.*, No. 11974, 1997
   Del. Ch. LEXIS 72 (Del. Ch. May 13, 1997) .................................................. 16

*In re Gen. Instrument Corp. Sec. Litig.*,
   23 F. Supp. 2d 867 (N.D. Ill. 1998) .......................................................... 37

*In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103
   (10th Cir. 2015).......................................................................... 10, 12

*In re Groupon Derivative Litig.*, 882 F. Supp. 2d
   1043 (N.D. Ill. 2012)...................................................................... 9, 11

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
   667 F.3d 1331 (10th Cir. 2012) ................................................................ 12

*In re Maxim Integrated Prods., Inc. Derivative Litig.*, No. 06-03344,
   2007 U.S. Dist. LEXIS 70763 (N.D. Cal. July 25, 2007)................................. 18

*In re Merck & Co.*, 493 F.3d 393 (3d Cir. 2007) .......................................... 29

*In re Merck & Co., Inc. Derivative & ERISA Litig.*, MDL No. 1658,
   2006 U.S. Dist. LEXIS 27861 (D.N.J. May 5, 2006) ...................................... 29

*In re Nyfix, Inc. Derivative Litigation*,
   567 F. Supp. 2d 306 (D. Conn. 2008).......................................................... 15

*In re Pfizer Inc. S'holder Derivative Litig.*,
   722 F. Supp. 2d 453 (S.D.N.Y. 2010)................................................... 23, 31

*In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611
   (S.D.N.Y. 2007).......................................................................... 34

*In re Sandridge Energy S'holder Derivative Litig.*, No. 13-102,
   2014 U.S. Dist. LEXIS 132329 (W.D. Okla. Sept. 22, 2014) ................... 13, 22

*In re SFBC Int'l, Inc. Sec. & Derivative Litig.*,
   495 F. Supp. 2d 477 (D.N.J. 2007) ................................................. 24, 27, 28

*In re STEC, Inc. Derivative Litig.*, No. 10-667,
   2012 U.S. Dist. LEXIS 189167 (C.D. Cal. Jan. 11, 2012) ............................... 9

*In re TASER Int'l S'holder Derivative Litig.*,
   2006 U.S. Dist. LEXIS 11554 (D. Ariz. Mar. 17, 2006) ......................... 24, 27

*In re Tower Air, Inc.*, 416 F.3d 229 (3d Cir. 2005)................................... 40

*In re Veeco Instruments, Inc. Sec. Litig.*,
   434 F. Supp. 2d 267 (S.D.N.Y. 2006)................................... 19, 21, 31, 34

*In re Verisign, Inc. Derivative Litig.*,
    531 F. Supp. 2d 1173 (N.D. Cal. 2007) ........................................................ 18

*In re Walt Disney Co. Derivative Litig.*,
    825 A.2d 275 (Del. Ch. 2003).......................................................... 21, 32, 33

*Integrated Health Servs., Inc. v. Elkins*,
    2004 Del. Ch. LEXIS 122 (Del. Ch. Aug. 24, 2004)...................................... 33

*Janus Capital Grp. Inc. v. First Deriv. Traders*,
    131 S. Ct. 2296 (2011)................................................................................ 12

*Kamen v. Kemper Financial Services, Inc.*,
    500 U.S. 90 (1991)...................................................................................... 14

*Kebis v. Azzurro*, No. 650253/12, 2014 N.Y. Misc.
    LEXIS 260 (N.Y. Sup. Ct., N.Y. Cnty. Jan 21, 2014)................................... 18

*Kohls v. Duthie*, 791 A.2d 772 (Del. Ch. 2000) .......................................... 39

*Kreindler v. Marx*, 85 F.R.D. 612 (N.D. Ill. 1979)........................................ 18

*Lambrecht v. O'Neal*, 3 A.3d 277 (Del. 2010) ....................................... 11, 36

*Lane v. Page*, 581 F. Supp. 2d 1094 (D.N.M. 2008) ................................... 12

*Leslie v. Telephone Office Techs., Inc.*,
    1993 Del. Ch. LEXIS 272 (Del. Ch. 1993) .................................................. 40

*Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991)......................................... 21

*Malpiede v. Townson*, 780 A.2d 1075 (Del. 2001)....................................... 40

*Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309 (2011) .................. 10

*Norfolk County Retirement System v. Jos. A. Bank Clothiers, Inc.*,
    No. 3443-VCP, 2009 Del. Ch. LEXIS 20 (Del. Ch. Feb. 12, 2009)............... 12

*Orman v. Cullman*, 794 A.2d 5 (Del. Ch. 2002) ......................................... 39

*OTK Assoc., LLC v. Friedman*, 85 A.3d 696 (Del. Ch. 2014)...................... 15

*Pa. Ave. Funds v. Borey*, No. C06-1737RAJ, 2008 U.S. Dist.
    LEXIS 122310 (W.D. Wash. Feb. 13, 2008)................................................. 12

*Pirelli Armstrong Tire Corp. Ret. Med. Benefits Trust v. Stumpf*,
    No. 11-2369, 2012 U.S. Dist. LEXIS 16066 (N.D. Cal. Feb. 8, 2012) ........... 15

*Plymouth Cnty. Ret. Ass'n v. Schroeder*,
    576 F. Supp. 2d 360 (E.D.N.Y. 2008) ........................................................... 18

*Pogostin v. Rice*, 480 A.2d 619 (Del. 1984) ................................................ 20

*Rahbari v. Oros*, 732 F. Supp. 2d 367 (S.D.N.Y. 2010) ............................... 15

*Rales v. Blasband,* 634 A.2d 927 (Del. 1993) ................................... 20, 21, 24

*Rich v. Chong*, 66 A.3d 963 (Del. Ch. Apr. 25, 2013) ............................. 16, 29

*Rosenbloom v. Pyott*, 765 F.3d 1137 (9th Cir. 2014) ............................. 21, 23

*Rosky ex rel. Wellcare Health Plans, Inc. v. Farha*, 2009 U.S. Dist.
    LEXIS 107531 (M.D. Fla. Mar. 30, 2009) ..................................................... 36

*Ryan v. Gifford*, 2009 Del. Ch. LEXIS 261 (Del. Ch. Jan. 2, 2009) ............... 39

*Samuel M. Feinberg Testamentary Trust v. Carter*,
    652 F. Supp. 1066 (S.D.N.Y. 1987) ............................................................... 37

*Sanders  v.  Wang*, 1999 Del.  Ch.
    LEXIS  203 (Del.  Ch.  Nov. 8, 1999) ............................................................ 39

*Scimeca v. Kim*, No. 06-0562, 2007 U.S. Dist.
    LEXIS 99308 (D. Ariz. Aug. 28, 2007) .......................................................... 18

*Seminaris v. Landa*, 662 A.2d 1350 (Del. Ch. 1995) .................................... 20

*Stone v. Ritter*, 911 A.2d 362 (Del. 2006) ................................................... 31

*Strougo v. BEA Associates*, No. 98-3725, 2000 U.S. Dist.
    LEXIS 346 (S.D.N.Y. Jan. 19, 2000) .............................................................. 14

*Taylor v. Kissner*, 893 F. Supp. 2d 659 (D. Del. 2012) ................................ 16

*TVI Corp. v. Gallagher*, No. 7798, 2013 Del. Ch.
    LEXIS 260 (Del. Ch. Oct. 28, 2013) .............................................................. 16

*Weinstein v. McClendon*, No. 12-465, 2012 U.S. Dist.
    LEXIS 101147 (W.D. Okla. July 20, 2012) ................................ 9, 10, 11, 12, 13

*Westmoreland Cnty. Emp. Ret. Sys. v. Parkinson*,
    727 F.3d 719 (7th Cir. 2013) ......................................................................... 23

*Wiley v. Stipes,* 595 F. Supp. 2d 179 (D.P.R. 2009) ..................................... 18

**Other Authorities**

15 U.S.C. §77 p(f)(2)(B) ........................................................................................................... 11

15 U.S.C. §78u-4(b)(3)(B) ......................................................................................................... 10

7C Federal Practice & Procedure § 1828 (3d ed. 1998) ............................................................ 18

**Rules**

Fed. R. Civ. P. 23.1 ....................................................................... 1, 10, 13, 17, 18, 19

Fed. R. Civ. P. 12(b)(6) ............................................................................................................. 19

Plaintiffs Jacob Shochat and Norman Spiegel ("Plaintiffs") respectfully submit this memorandum of law in opposition to Defendant Chesapeake Energy Corporation's ("Chesapeake" or the "Company") Motion to Dismiss the Verified Amended Shareholder Derivative Complaint (the "Amended Complaint")[1] pursuant to Federal Rule of Civil Procedure 23.1 ("Rule 23.1") (the "MTD").

## I.        INTRODUCTION

Plaintiffs bring this shareholder derivative action on behalf and for the benefit of nominal defendant Chesapeake to recover substantial damages the Company has sustained due to the Director Defendants'[2] willful disregard of Defendant McClendon's conflicted, wrongful activities that violated corporate policies and his fiduciary duties and their waste of corporate assets.   The Director Defendants' wrongdoing resulted in substantial harm to the Company, including, *inter alia*, a collapse in the Company's market capitalization, a reduction in the Company's debt rating, increased costs of borrowing and inability to raise equity, misappropriation of corporate assets by McClendon, and loss of goodwill and harm to the reputation of the Company.

Chesapeake seeks to dismiss this case on the ground that Plaintiffs did not issue a pre-suit demand to the Board or adequately plead particularized allegations that making such a demand would have been futile.  However, demand in this case is excused because

---

[1] Citations in the form of "¶__" are to the Amended Complaint.

[2] When this suit was filed, the Chesapeake Board was comprised of nine members: Defendants McClendon, Davidson, Eisbrenner, Hargis, Keating, Maxwell, Miller, Nickles, and Simpson (the "Director Defendants").  ¶297.  To prove demand futility, Plaintiffs need only show a reasonable doubt that at least half of the Board, or five or more of the Director Defendants, are not disinterested or independent. *Beam v. Stewart*, 845 A.2d 1040, 1046 n.8 (Del. 2004).

Plaintiffs have pleaded sufficient, particularized facts to establish that the Director Defendants face a substantial likelihood of liability in this case and/or are interested and incapable of considering demand.

## II.      FACTUAL BACKGROUND

### A.      McClendon's $1.2 Billion of Related-Party and Conflicted Finance Deals

On April 18, 2012, *Reuters* published a report that revealed that Defendant McClendon—who served as Chairman of the Board and Chief Executive Officer ("CEO") of Chesapeake, a domestic natural gas producer that regularly engaged in the exploration and production of natural gas and oil reserves, during the relevant period— had borrowed between $1.1-$1.3 billion in loans in the prior three years in order to finance his participation in a corporate incentive program called the Founders Well Participation Program ("FWPP").  The FWPP allowed McClendon to invest up to 2.5% in every well drilled by the Company in any given year in return for up to 2.5% of the revenue generated from each new well.   ¶94.  McClendon financed his participation through massive non-recourse personal loans secured by his share of future revenues from drilling operations, which were obtained from a group of related Company partners including: (i) EIG Global Energy Partners, a private equity firm that had entered into $2.5 billion of very favorable off-balance-sheet loan deals with Chesapeake; (ii) BOK Financial ("BOK"), a financial institution that counts as a board member Defendant Hargis, Chairman of the Audit Committee of the Board of Chesapeake during the relevant period; and (iii) Wells Fargo, which had been engaged as a financial advisor to Chesapeake on 10 transactions between 2005 and 2012 valued at $9.8 billion.  ¶82.

2

In responding to the report, Company spokesperson and then General Counsel, Henry Hood acknowledged there could be "some theoretical possibility of a conflict of interest" with the Company and its CEO borrowing from the same lender(s), but that the Board did not believe there was "an actual conflict of interest."  ¶91.  The report stated that Chesapeake's board of directors was aware that McClendon had borrowed against his share of company wells, but "the board did not review or approve the transactions.  Nor did the Board vet the loan terms for possible conflicts."  ¶92 (quotation omitted).

By 2009 the Board knew, or was reckless or grossly negligent in not knowing, that McClendon did not have the assets or creditworthiness to support such large loans to finance his exploding obligations under the FWPP.  Because McClendon had to elect to participate in the FWPP on an all-or-nothing bases and he directed the Company to embark on a drilling frenzy, his FWPP participation costs grew to $457 million by 2011.  ¶¶18, 62.  Moreover, as the Company was caused to buy more land and spend more on drilling, Chesapeake became totally dependent upon its ability to raise money from its lending partners.[3]  ¶76.  In fact, the Board was well aware of McClendon's strained financial condition after the end of 2008,[4] because in 2009 the Board awarded him a

---

[3] When McClendon began participation in the FWPP in 1993 the Company drilled only a couple of dozen wells a year.  ¶62.  In 2011, however, McClendon directed Chesapeake to drill 1,700 wells.  ¶62.  From 2008 to the end of 2012, Chesapeake had entered into approximately 600,000 leases covering approximately 9 million acres of land, paying out $9 billion in lease bonuses to landowners and piling on $10 billion in long term debt in the process.  ¶69.  By the third quarter of 2012, Chesapeake's debt had increased 53% over the prior year, and reached $16.2 billion by September.  ¶69.  By the middle of 2011 the Company's debt to equity ratio was 40%—the highest in its peer group.  ¶70.

[4] As oil fell by more than 75% between July and December 2008 and natural gas futures dropped almost 60%, Chesapeake's stock price halved.  ¶61.  McClendon was hit with

massive bonus that included a one-time $75 million "Well Cost Incentive Award," the purpose of which was to bail him out so that he could meet his obligations and make payments under the FWPP through the end of 2009.  ¶18.

On April 26, 2012, about a week after the *Reuters* report, Standard & Poor's made a significant downgrade and cut Chesapeake's debt rating to 'BB' from 'BB+', placed the Company on CreditWatch with "negative implications," citing to corporate governance deficiencies and conflicts of interest.  ¶¶13, 100.  The shocking nature of the existence of McClendon's loans from Company partners also drew the attention of the Securities and Exchange Commission ("SEC"), which commenced an investigation.  ¶104.

McClendon voluntarily terminated his participation in the FWPP as soon as his secret sources of financing were belatedly exposed by *Reuters*, which indicated that McClendon could not meet his payment obligations nor continue to participate in the FWPP absent his ability to secure preferential financing from companies related to Chesapeake.  ¶154.  Thus, on April 26, 2012, the Board announced that it would not extend the FWPP beyond its expiration in 2015, and also stated that the Board and McClendon had committed to negotiate an early termination of the FWPP, which was announced on May 1, 2012 as terminating a year early, on June 30, 2014.  ¶154-55.

**B.    McClendon Ran a Massive Commodities Hedge Fund Out of the Office of the CEO, While Managing the Company's $17 Billion Hedge Facility**

On May 2, 2012, *Reuters* published a follow-up report that revealed that, from 2004 to 2008, McClendon had actively managed a hedge fund he co-founded, Heritage

---

margin calls on loans he had taken out to purchase further Chesapeake shares, forcing him to liquidate 30 million of his shares (90% of his holdings).  ¶¶19, 57.

Management Company LLC ("Heritage"), out of the offices of the Company's CEO and Chairman at the same time he was solely responsible for managing Chesapeake's $17 billion hedge facility and running Chesapeake. ¶164. Not only was McClendon's fund open to outside investors, but it also traded in the same commodities that Chesapeake produced and traded in its hedge account. ¶165. Since McClendon and Chesapeake were trading the same commodities, it was also possible that they were counter-parties to the exact same trades. ¶¶11, 164-65. McClendon engaged in "near daily" communications regarding the fund and received management fees and a cut of profits. ¶166. Indeed, the fund's "chief financial officer" was listed as John D. Garrison, an accountant and "executive business manager" for Chesapeake and an employee since 2004. ¶166.

On May 8, 2012, *Reuters* also reported that the Board had apparently known that McClendon was operating his hedge fund unchecked and out of the Company's offices since at least 2004, and that the Board had given its "blessing" and took no action to either stop or supervise McClendon in this regard. ¶¶12, 178. Indeed, rather than disclose or foreclose McClendon's fund, the Board acquiesced in a series of contract amendments between 2001 and 2009 that made it easier and easier for McClendon to operate Heritage within Chesapeake. ¶181. McClendon's 2009 employment contract was the first to include a specific mention of hedge funds or commodity market investments, as part of a new sub-section governing the types of investments McClendon could pursue; it also said that McClendon was allowed to trade a range of financial instruments such as commodities. ¶179. It also stated that McClendon could put cash into a "passive investment entity," including a hedge fund, provided it "does not actively

engage in (exploration and production) activities," and "for which the executive does not directly or indirectly provide input, advice or management."  ¶179.  But at no time did the Board take any action to supervise this activity, nor did they cause it to be disclosed to shareholders in the Company's many interim or yearly SEC filings.  ¶¶177-89.

## C.    The Board Allows McClendon to be Terminated "Without" Cause and Conducts a Conflicted Investigation

Only two weeks after the first *Reuters* report, on May 1, 2012, McClendon announced he would step down as Chairman of the Board of the Company.  ¶¶241, 272. By June of 2012, it appears that McClendon had begun "engineering" his full departure from Chesapeake in a manner that classified his departure as a "termination without cause," which allowed McClendon to collect approximately $35 million in severance payments, as opposed to having to pay back $15 million in claw-back payments if he "retired" or was "terminated for cause."  ¶¶243, 247, 306.  While it is obvious that the Board could and should have terminated McClendon for cause, or at best let him retire from the Company, instead they conspired and/or acquiesced in allowing McClendon to barter control over the Chesapeake board to activist investors (as described *infra*) in exchange for McClendon getting $50 million in severance—including the waiver of about $15 million in payments otherwise due under the 2009 employment agreement claw-back provision tied to the $75 million well participation bonus payment.  ¶¶242-45.

On May 23, 2012, the Company announced that the same Audit Committee that had stewarded Chesapeake to the corporate governance disaster it then found itself, was in charge of conducting the purported "independent" review into McClendon—but not

the Board itself—for breaches of fiduciary duty, waste and fostering conflicts of interest. ¶202.  The Board conducted their investigation so as to virtually guarantee that no liability would be apportioned.  ¶34.  First, the Board limited the scope of the investigation to McClendon's actions alone, instantly absolving themselves of all liability.  ¶¶34, 202.  Second, the Board narrowed the scope to review only McClendon's "intentional conduct," thereby absolving him of all liability for reckless and grossly negligent conduct.[5]  ¶34.  When the results were finally announced, no liability was found for any of McClendon's intentional conduct.  ¶254.  The results simply reflected the statements made a year earlier by the Board which indicated then that they had already decided McClendon had done nothing wrong.  The Board stated: "we believe there are no conflicts of interest arising from the mere existence of the loans."  ¶¶35, 338.

**D.    The Director Defendants are Replaced on the Board**

In June 2012, Defendants Hargis and Davidson were up for reelection and the shareholders overwhelmingly voted against them—Hargis only received 26% of the shareholder vote and Davidson only received 27% of the vote, the highest opposition vote against directors in an uncontested election at an S&P 500 Company.[6]  ¶204.  According to the Company's new majority voting bylaw,[7] the shareholder vote required defendants

---

[5] The outside counsel hired to assist with the investigation was also conflicted due to his business ties and financial entanglements with Defendant Miller.  ¶¶34, 225-26, 260.

[6] Just weeks before the June 8, 2012 shareholder Proxy vote, the Company all but admitted that its directors and CEO's compensation were wildly out of line with Chesapeake's performance and took steps to reduce the compensation paid to outside directors by 20%, and to reduce McClendon's CEO compensation.  ¶203.

[7] According to a June 4, 2012 release, the resolution that majority voting was required in director elections would be (and was) applied immediately upon ratification.  ¶205.

Hargis and Davidson to tender their resignations. ¶204. Remarkably, however, the Board did not immediately accept their resignations, but instead stated that the Board would merely "review the resignations in due course." ¶205. Thereafter, the Board refused to accept Hargis' resignation until he completed the investigation into McClendon's wrongdoings, in violation of the Company's bylaws. ¶¶202, 258, 343.

At the same time, McClendon negotiated in private with Carl Icahn and Southeastern Asset Management, the Company's largest shareholders who then owned 7.6 percent and 13.9 percent of Chesapeake's outstanding shares, respectively, and with them, hand-picked 4 new replacement directors (who then ratified the non-executive chairman that McClendon and the Board had previously selected *without* a shareholder vote). ¶217. Chesapeake's directors—3 of whom comprised the entire Compensation Committee (Eisbrenner, Nickles and Keating)—were able to "retire" from the Board, instead of being terminated for cause as they should have been, collect their final payments for the first half of 2012, and escape with no liability for their breaches of duty. ¶218. After ceding control and after having again hand-picked the replacement directors, McClendon was able to avoid termination for cause (and even a "retirement" designation) and was able to reap over $50 million in unearned severance payments. ¶218.

## III.     <u>ARGUMENT</u>

### A.    **The Dismissal in *Weinstein* Does Not Impact This Case**

Throughout the MTD, Chesapeake argues that this action is a mere "tag-along" derivative action to the securities class action filed against the Company, Defendant McClendon, and other individuals, *Weinstein v. McClendon*, No. 12-465, 2012 U.S. Dist.

LEXIS 101147 (W.D. Okla. July 20, 2012), and, as such, the dismissal of the *Weinstein* action purportedly justifies the dismissal of this action. *See, e.g.*, MTD at 2-3, 4-5, 13-24. Chesapeake's argument is simply wrong. First, in support of their argument, Chesapeake points to the fact that Plaintiffs agreed to stay this action pending final resolution of the motion to dismiss the *Weinstein* action as if that is somehow an admission that this derivative action is a mere tag-along. MTD at 3. What Chesapeake ignores, however, is that courts routinely stay derivative actions when there is a related securities class action because the concurrent prosecution of a derivative case with a securities case arising from similar factual allegations could undermine a company's defense in the securities action and "divert financial and management resources."[8]  *See In re STEC, Inc. Derivative Litig.*, No. 10-667, 2012 U.S. Dist. LEXIS 189167, at *10-17 (C.D. Cal. Jan. 11, 2012).

That is the case even if the parties and claims are not identical. *STEC*, 2012 U.S. Dist. LEXIS 189167, at *19.[9]  In line with these cases, Plaintiffs sought to act in the best interest of Chesapeake, on whose behalf this action is brought, and voluntarily agreed to a stay to avoid any conflict in Chesapeake's defense in and/or diversion of "financial and management resources" away from the *Weinstein* action, and to avoid requiring

---

[8] A derivative plaintiff has to impugn the credibility of defendant officers and directors that could be "important witnesses for the company in the securities class action," *STEC*, 2012 U.S. Dist. LEXIS 189167, at *11-13, and has to "prove allegations that would seriously undermine [the company's] defense of the class action." *Cucci v. Edwards*, No. 07-532, 2007 U.S. Dist. LEXIS 86832, at *5 (C.D. Cal. Oct. 31, 2007).

[9] *See also In re Groupon Derivative Litig.*, 882 F. Supp. 2d 1043, 1048 (N.D. Ill. 2012) (staying derivative action even where derivative case presents issues that are "not dependent on the outcome of the class claims"); *Brenner v. Albrecht*, No. 6514, 2012 Del. Ch. LEXIS 20, at *22 (Del. Ch. Jan. 27, 2012) (staying derivative action in favor of class action where relief sought by the derivative plaintiffs was only "partially contingent on the outcome of the Securities Class Action")

Chesapeake to waste resources in arguing the issue. This concession was not an admission that this action was in any way dependent on the *Weinstein* plaintiff's success.

In addition to the foregoing, because the legal issues in *Weinstein* were vastly different from those here, the court's analysis in *Weinstein* does not address the legal issues applicable to this case. *Weinstein* was governed by Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), which makes it unlawful for any person "to use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device." 15 U.S.C. §78j(b); *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317 (2011).[10] The Private Securities Litigation Reform Act of 1995 ("PSLRA") is applicable to Section 10(b) claims, and the PSLRA imposes a heightened pleading standard for alleging falsity and scienter in securities class actions.[11] *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1108-09 (10th Cir. 2015).

The legal standards here are much different from those in *Weinstein*. Here, Plaintiffs must "allege with particularity efforts, if any, made by plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Rule 23.1;

---

[10] To state a claim for securities fraud under Section 10(b), a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant [falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx*, 131 S. Ct. at 1317.

[11] The PSLRA also imposes an automatic stay on discovery in securities fraud class actions pending resolution of a motion to dismiss. 15 U.S.C. §78u-4(b)(3)(B). Accordingly, discovery that proceeds in a derivative action could undermine the stay of discovery and motion to dismiss practice in a related securities class action, another reason why derivative actions are routinely stayed pending motions to dismiss in related securities class actions.

*Lambrecht v. O'Neal*, 3 A.3d 277, 282 n.11 (Del. 2010).  Accordingly, a plaintiff in a derivative suit who has not made a demand on a company's board of directors must state with particularity the reasons why demand is futile and therefore excused.  *FLI Deep Marine LLC v. McKim*, C.A. No. 4138-VCN, 2009 Del. Ch. LEXIS, at *6-7 (Del. Ch. Apr. 21, 2009).  The strict pleading requirements for falsity and scienter under the PSLRA do not apply to derivative cases.  Indeed, derivative cases are specifically exempted from the PSLRA.  15 U.S.C. §77 p(f)(2)(B).

Although Chesapeake devotes a large portion of the MTD attempting to illustrate that the facts alleged in *Weinstein* are similar to the facts alleged here (MTD at 15-18), Plaintiffs do not dispute that there is some factual overlap.  The legal issues, however, are vastly different.  And Chesapeake even admits that "Plaintiffs' derivative claims rest on a different legal foundation ...."  MTD at 13.  Indeed, unlike in *Weinstein*, Plaintiffs here do not have to demonstrate that Defendants committed fraud—merely that they breached their fiduciary duties to the Company.  For instance, in a case cited by Defendants, the court held that "the derivative action presents issues related to [the company's] loss of market capital and goodwill that are not dependent on the outcome of the class claims." *Groupon*, 882 F. Supp. 2d at 1049.  The same is true here.  Thus, because the court in *Weinstein* evaluated the facts under a much different legal analysis, the decision in *Weinstein* does not bear upon the propriety of the claims alleged here.

Moreover, contrary to Chesapeake's assertion (MTD at 21), the pleading standard applicable to securities actions is far more stringent than the pleading standard applicable to derivative actions.  "The PSLRA pleading requirements for state of mind are more

11

stringent than rule 9(b), so the 'PSLRA supersedes [the] part of Rule 9(b)' allowing for general allegations of mental states." *Lane v. Page*, 581 F. Supp. 2d 1094, 1119 (D.N.M. 2008).[12]  As a result—as is the case here—facts that can be insufficient for purposes of pleading fraud can nevertheless suffice for pleading a breach of fiduciary duties.[13]

Finally, Chesapeake asserts that "[i]t is difficult (to say the least) for plaintiffs' lawyers to show that outside directors are liable in a tag-along action when the shareholder lawyers who filed the securities case did not think there was even a basis to sue them, and the securities case is then dismissed as to the 'culpable' defendants." MTD at 20.  Chesapeake is again ignoring the fact that the legal issues in securities class actions and derivative actions differ substantially.  In securities class actions, defendants are subject to liability if they were responsible for making a false or misleading statement that misled investors.  *Janus Capital Grp. Inc. v. First Deriv. Traders*, 131 S. Ct. 2296, 2304-05 (2011).  Thus, plaintiffs' counsel in *Weinstein* could have made a determination that the outside directors were not involved in making the Company's public statements

---

[12] *See also Pa. Ave. Funds v. Borey*, No. C06-1737RAJ, 2008 U.S. Dist. LEXIS 122310, at *7 (W.D. Wash. Feb. 13, 2008) (The PSLRA "goes well beyond the pleading requirements of the Federal Rules of Civil Procedure, imposing onerous burdens on a plaintiff seeking to plead violation of federal securities law.").

[13] In attempting to assert that the pleading standards under the PSLRA are "easier" to satisfy than those applicable here, Defendants cite to *Norfolk County Retirement System v. Jos. A. Bank Clothiers, Inc*., No. 3443-VCP, 2009 Del. Ch. LEXIS 20 (Del. Ch. Feb. 12, 2009).  The *Norfolk* court, however, does not accurately articulate the standard for pleading state of mind in securities fraud actions.  The court in *Norfolk* suggests that recklessness within the context securities fraud actions may encompass gross negligence. *Id*. at *12 n.104. Courts, however, do not permit gross negligence to suffice for pleading securities fraud.  "Negligence, even gross negligence, is not sufficient; something similar to 'conscious disregard' is required."  *Gold*, 776 F.3d at 1113; *see also In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1343 (10th Cir. 2012) (same).

to a sufficient extent to assert claims against them in light of *Janus*. This determination, however, does not affect Plaintiffs' claims here because the directors are liable for breaching their fiduciary duties to the Company ***regardless*** of whether or not they were involved in making public statements to subject them to liability under the Exchange Act. Accordingly, because the legal issues in *Weinstein* were vastly different from those here and implicated the PSLRA's heightened pleading standards that are inapplicable, the dismissal in *Weinstein* does not impact this case.[14]

## B. The Amended Complaint is the Pertinent Pleading for this Motion

A plaintiff is not required to re-plead demand as to a new board prior to filing if an amendment or supplement to a complaint that merely "elaborates upon facts relating to acts or transactions alleged in the original pleading, or asserts new legal theories of recovery based upon the acts or transactions that formed the substance of the original pleading. . . ." *Harris v. Carter*, 582 A.2d 222, 231 (Del. Ch. 1990).[15] Indeed, the existence of a substantially new board, as here, is relevant to a Rule 23.1 demand inquiry *only* as to derivative claims in the amended complaint that are ***not*** already "validly in litigation." *Braddock*, 906 A.2d at 786. In the MTD, Chesapeake does not argue—and

---

[14] Likewise, the decisions in previous derivative actions filed on behalf of Chesapeake do not provide for dismissal here. MTD at 5-6. As the Oklahoma Court of Civil Appeals noted, demand futility "depends on the facts and circumstances of each case." *In re Chesapeake S'holders Derivative Litig.*, No. 108146, 2011 Okla. Civ. App. LEXIS 146, at *4 (Okla. Ct. App. Aug. 26, 2011). The factual circumstances in this action are vastly different and, as such, distinguishable.

[15] *See also Braddock v. Zimmerman,* 906 A.2d 776, 786 (Del. 2006) (demand need not be re-pled on a new board of directors if the act or transaction complained of in the amendment is essentially the same as what is challenged in the original complaint); *accord In re Sandridge Energy S'holder Derivative Litig.*, No. 13-102, 2014 U.S. Dist. LEXIS 132329, at *44-45 n.33 (W.D. Okla. Sept. 22, 2014) (following *Braddock*).

therefore concedes—that any of the claims asserted in the Amended Complaint were not already "validly in litigation," making the pertinent Board for analyzing demand futility the original board at the time the first consolidated derivative action was filed.

Moreover, Chesapeake compounds its erroneous position by relying on a sole rouge Delaware Chancery opinion that misinterprets the Delaware Supreme Court's holding in *Braddock*, and states that the Court must ignore the Amended Complaint and instead analyze only the assertions made in the "original complaints" to determine whether Plaintiffs have adequately pled demand futility. MTD at 11-13 (relying on *In re Affiliated Computer Servs., Inc. S'holders Litig.*, No. 2821, 2009 Del. Ch. LEXIS 35 (Del. Ch. Feb. 6, 2009) (evaluating the complaint filed before the board changed for demand futility)).[16] This argument is not correct and is procedurally untenable.

First, this position is procedurally impossible and too ambiguous to enforce. The Amended Complaint amalgamated the claims originally asserted in thirteen related derivative actions, which were consolidated pursuant to the Court's July 13, 2012 Order (Docket No. 22). Accordingly, there are not just one or two "original complaints," but rather ***thirteen*** separate and distinct complaints that were initially filed before the makeup of the Board changed. Requiring the Court to analyze thirteen different complaints in

---

[16] Chesapeake's citation to *Brody v. Chemical Bank.*, 517 F.2d. 932, 924 (2d Cir. 1975), for the proposition that this Court can hold that demand on a new board is mandatory is inapposite. MTD at 13. *Brody*'s holding relied exclusively on federal law and was decided before the pivotal U.S. Supreme Court case *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 108-09 (1991), which held that when considering a motion to dismiss based on Rule 23.1, the law of the state of incorporation controls. As recognized in *Strougo v. BEA Associates*, No. 98-3725, 2000 U.S. Dist. LEXIS 346, at *11 (S.D.N.Y. Jan. 19, 2000), the U.S. Supreme Court's holding in *Kamen* superseded *Brody*.

order to determine whether demand was adequately pled as futile would be an inefficient and wasteful exercise that would defeat the purpose of filing a consolidated complaint— an outcome that the *Braddock* court certainly did not intend.  Indeed, the MTD, which purportedly evaluates both of Plaintiffs' "original complaints" for demand futility highlights the absurdity of this argument.  Chesapeake's decision that the named Plaintiffs' complaints apply undermines the consolidation of all of related actions.

Second, courts universally evaluate the later-filed, operative consolidated and/or amended complaint when evaluating demand futility allegations, even when the board changed before the operative complaint was filed, and Plaintiffs' research revealed no other court that has interpreted *Braddock* to hold that the original complaint must be evaluated for demand futility.[17]  *See Harris*, 582 A.2d 222 (citing complaint filed after the board changed to evaluate whether demand was futile).[18]

---

[17] Chesapeake also cites to *In re Nyfix, Inc. Derivative Litigation*, 567 F. Supp. 2d 306 (D. Conn. 2008), in support of its argument that the original complaint should be analyzed for demand futility.  MTD at 12.  *In re Nyfix* is inapposite.  In *In re Nyfix*, the plaintiff's first complaint could not survive a motion to dismiss because the plaintiff was not a company shareholder at the time of the alleged backdating of stock option grants that the plaintiff challenged in the initial complaint, making those claims not validly in litigation because the plaintiff had no standing to challenge the grants.  567 F. Supp. 2d at 310-11.  Accordingly, the court held that the plaintiff was required to make demand on the new board in place at the time the new complaint was filed.  *Id.* at 312.  Here, Plaintiffs satisfy the continuous ownership requirement, *see infra*, and Chesapeake concedes that Plaintiffs' claims are validly in litigation and that demand must be evaluated as to the board in place at the time this action was initially filed.

[18] *See also Pirelli Armstrong Tire Corp. Ret. Med. Benefits Trust v. Stumpf*, No. 11-2369, 2012 U.S. Dist. LEXIS 16066 (N.D. Cal. Feb. 8, 2012); *Rahbari v. Oros*, 732 F. Supp. 2d 367 (S.D.N.Y. 2010); *In re Citigroup S'holder Derivative Litig.*, No. 07 Civ. 9841, 2009 U.S. Dist. LEXIS 75564 (S.D.N.Y. Aug. 25, 2009); *In re Atmel Corp. Derivative Litig.*, No. 06-4592, 2008 U.S. Dist. LEXIS 91909 (N.D. Cal. June 25, 2008); *OTK Assoc., LLC v. Friedman*, 85 A.3d 696 (Del. Ch. 2014); *TVI Corp. v. Gallagher*, No. 7798, 2013 Del.

In fact, recent Delaware decisions have cited to factual allegations that occurred *after the board changed*, and which accordingly could only be asserted in the amended pleading filed after the change, to support a finding of demand futility. *See In re China Agritech, Inc. S'holder Derivative Litig.*, No. 7163, 2013 Del. Ch. LEXIS 132, at *60 (Del. Ch. May 21, 2013) (considering board members' resignations as additional fact supporting a finding that demand was futile); *Rich v. Chong*, 66 A.3d 963, 970 (Del. Ch. Apr. 25, 2013) (same). Moreover, in at least one instance, the complaint in effect before the change in the board did not even allege derivative allegations and, accordingly, made no assertions at all that demand would be futile—and yet the court evaluated whether demand would be futile, citing to the later-filed complaint. *See Harris*, 582 A.2d at 224 ("The amended complaint for the first time purported to aset claims derivatively on behalf of Atlas.").[19] Accordingly, here the Amended Complaint is the operative pleading that the Court must evaluate for determining whether demand would have been futile.

## C.  Plaintiffs' Allegations of Continuous Ownership Satisfy Rule 23.1

Chesapeake argues that the Amended Complaint should be dismissed because, among other reasons, Plaintiffs fail to satisfy Rule 23.1's continuous ownership

---

Ch. LEXIS 260 (Del. Ch. Oct. 28, 2013); *Cal. Pub. Emps. Ret. Sys. v. Coulter*, No. 19191, 2002 Del. Ch. LEXIS 144 (Del. Ch. Dec. 18, 2002); *In re Fuqua Indus., Inc. S'holder Litig.*, No. 11974, 1997 Del. Ch. LEXIS 72 (Del. Ch. May 13, 1997).

[19] Indeed, since under *Braddock* an amended complaint can assert new claims, as long as those claims relate to "the acts or transactions that formed the substance of the original pleading," and still be subject to a demand analysis under the initial board, 906 A.2d at 785, and demand futility is analyzed on a claim-by-claim basis, *Taylor v. Kissner*, 893 F. Supp. 2d 659, 666 (D. Del. 2012), the only way to evaluate whether demand is futile as to any new claims is to review the allegations of the amended complaint. To hold otherwise would render the new claims without review—another absurd result.

requirement, because Plaintiffs did not allege the specific date when they first purchased their Chesapeake stock in their original complaints. *See* MTD at 25-26. This argument should be rejected. As discussed above, the Amended Complaint, in which Plaintiffs allege the specific dates when they first purchased their Chesapeake shares, is the operative complaint for evaluating whether Plaintiffs satisfy Rule 23.1. *See* ¶¶40-41.

Moreover, Plaintiffs are not now and never were required to allege with specificity when they purchased Chesapeake shares. Rule 23.1(b)(1) specifically states that the complaint must simply "***allege*** that the plaintiff was a shareholder … at the time of the transaction complained of." (Emphasis added.) Plaintiffs' allegations[20] clearly satisfy the plain language of the rule. Furthermore, while there are some court decisions that hold that general allegations regarding continuous ownership are insufficient, none of these decisions are from an appellate court or even a district court within the Tenth Circuit. *See* MTD at 25-26 & n.9. In fact, Plaintiffs' research reveals no cases from the Tenth Circuit that have even considered this issue. Accordingly, the holding of these cases is not binding on the Court.[21] Moreover, other courts, including the Second Circuit—the

---

[20] Plaintiffs allege in their original complaints that Shochat "is presently a shareholder of Chesapeake, and has been a shareholder at all times pertinent to the claims asserted" (MTD Ex. 1 ¶31) and that Spiegel "is, and was at all times during the Relevant Period" a shareholder (MTD Ex. 2 ¶12).

[21] Additionally, many of the cases cited by Chesapeake in support of its argument are factually distinguishable from this action, as those cases involved backdated stock options, which require that the shareholder plaintiff held the company stock on the date that each stock option was granted in order to assert claims regarding the grant, rather than here over the period of an ongoing wrongdoing. *See Hawaii Laborers Pension Fund v. Farrell*, No. 06-06935, 2007 U.S. Dist. LEXIS 77777, at *31 (C.D. Cal. Aug. 22, 2007) (involving backdated stock options) ("a plaintiff may not maintain derivative claims based on backdated stock options granted before they acquired their stock"); *see*

only court of appeals that has ever delivered a ruling on this issue—considering similar arguments have expressly rejected such claims.  *See, e.g., Galdi v. Jones*, 141 F.2d 984, 992 (2d Cir. 1944) (holding that an allegation that follows the precise language of the rule is sufficient on a motion to dismiss); *Garza v. Belton*, No. 08-1387, 2010 U.S. Dist. LEXIS 85828, at *28-31 (N.D. Ill. Aug. 13, 2010) (holding that specific allegations regarding dates of purchase and ownership are not required under Rule 23.1 and declining to follow cases holding otherwise); *Kebis v. Azzurro*, No. 650253/12, 2014 N.Y. Misc. LEXIS 260, at *8-11 (N.Y. Sup. Ct., N.Y. Cnty. Jan 21, 2014) (same) (acknowledging split of authorities).[22]

In holding that Rule 23.1 does ***not*** require that a plaintiff plead with specificity when he first purchased his shares, the court in *Garza v. Belton* reasoned that:

---

also *DiLorenzo v. Norton*, No. 07-144, 2009 U.S. Dist. LEXIS 66862 (D.D.C. July 31, 2009) (involving backdated stock options); *In re Affymetrix Derivative Litig.*, No. 06-05353, 2008 U.S. Dist. LEXIS 86187 (N.D. Cal. Mar. 31, 2008) (same); *Belova v. Sharp*, No. 07-299, 2008 U.S. Dist. LEXIS 19880 (D. Or. Mar. 13, 2008) (same); *In re Verisign, Inc. Derivative Litig.*, 531 F. Supp. 2d 1173 (N.D. Cal. 2007) (same); *Scimeca v. Kim*, No. 06-0562, 2007 U.S. Dist. LEXIS 99308 (D. Ariz. Aug. 28, 2007) (same); *In re Maxim Integrated Prods., Inc. Derivative Litig.*, No. 06-03344, 2007 U.S. Dist. LEXIS 70763 (N.D. Cal. July 25, 2007) (same); *In re Computer Scis. Corp. Derivative Litig.*, No. 06-05288, 2007 U.S. Dist. LEXIS 25414 (C.D. Cal. Mar. 26, 2007) (same).

[22] *See also Wiley v. Stipes,* 595 F. Supp. 2d 179, 185 (D.P.R. 2009) (holding plaintiff's allegations that he "is, and was at time relevant hereto, an owner and holder of W Holding common stock" was sufficient); *Plymouth Cnty. Ret. Ass'n v. Schroeder*, 576 F. Supp. 2d 360 (E.D.N.Y. 2008) (holding a plaintiff is not required to indicate the specific dates during which he acquired stock at the motion to dismiss); *Kreindler v. Marx*, 85 F.R.D. 612, 616 (N.D. Ill. 1979) (holding that an allegation that plaintiff was a "shareholder of [the] Corporation at the time of the transactions complained of" and that he was "at all relevant times a shareholder" satisfied demand futility requirements); *Crane Co. v. Harsco Corp*., 511 F. Supp. 294, 304-305 (D. Del. 1981) (same); *accord* Charles Alan Wright, et al., 7C Federal Practice & Procedure § 1828 (3d ed. 1998) (an allegation tracking the language of Rule 23.1(b)(1) is sufficient.  Notably, Chesapeake fails to acknowledge this split of authorities in its MTD.

> Specific allegations regarding dates of purchase and ownership may be the "best practice," but the court cannot agree that Rule 23.1(b)(1) requires pleading with particularity (or, alternatively, that Rule 23.1(b)(1)'s notice pleading requirement requires pleading specific dates of stock ownership). ***The rule's drafters knew how to require that elements of a derivative action be pleaded with particularity and chose not to require that the contemporaneous stock ownership requirement be so pleaded.*** While Rule 23.1(b) (3) mandates that the plaintiff "state with particularity" his reasons excusing demand on the corporation, Rule 23.1(b)(1) requires only that the plaintiff "allege" contemporaneous stock ownership. Therefore, the court agrees with the authority from the Second Circuit [*Galdi*] enforcing general notice pleading standards with respect to allegations of contemporaneous stock ownership.

2010 U.S. Dist. LEXIS 85828, at *30-31 (emphasis added) (internal citations omitted).

Plaintiffs respectfully urge the Court to find the reasoning of the *Garza* court persuasive and reject Defendants' argument that a more detailed allegation is required.

## D.     Legal Standards for Pleading Demand Futility

Shareholders seeking to vindicate the interests of a corporation through a derivative suit need not make a demand on a board of directors before filing suit when such a demand would be futile.  Rule 23.1; *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled in part on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).[23] In contrast to a motion to dismiss pursuant to Rule 12(b)(6), a Rule 23.1 motion to dismiss is not intended to test the legal sufficiency of the plaintiff's substantive claims, but to determine who is entitled, as between the corporation and its shareholders, to assert the plaintiff's underlying substantive claim on the corporation's behalf. *In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 273 (S.D.N.Y. 2006).

---

[23]  As Chesapeake acknowledges, Oklahoma follows decisions interpreting Delaware corporate law for shareholder derivative actions.  MTD at 7 (citing *Beard v. Love*, 173 P.3d 796, 802 (Okla. Ct. App. 2007)).

A plaintiff is excused from making a pre-suit demand on a board with respect to an affirmative action of the board, or a decision not to take *any* action, if there is reason to doubt that: (i) a majority of its directors are independent or disinterested; *or* (ii) the challenged acts are a valid exercise of business judgment.  *See Aronson*, 473 A.2d at 812. Under the first prong of *Aronson*, two kinds of allegations allow a court to infer a reasonable doubt regarding director disinterestedness.  First, "[d]irectorial interest exists whenever divided loyalties are present, or a director has received ... a personal financial benefit from the challenged transaction ... not equally shared by the stockholders." *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984).  Second, reasonable doubt is raised where the allegations show a "substantial likelihood" of liability for the misconduct at issue.  *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995).  To implicate the second prong of *Aronson*, a plaintiff must challenge a board decision where it exercised business judgment or made a "conscious decision to refrain from acting."  *Id.* at 813.

When the challenged misconduct does not constitute a business decision by the board, however, *Rales v. Blasband,* 634 A.2d 927 (Del. 1993)*,* applies.  *Rales* addresses demand futility when the wrongdoing arose out of *unconscious* inaction—for example, failure to oversee or have a system of control procedures.  Under *Rales*, courts evaluate whether the allegations create "a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."  *Id.* at 934.  The *Rales* test, like *Aronson*, also focuses on whether directors face a "substantial likelihood" of liability for the wrongs complained of, so a finding that a majority of directors face a substantial

likelihood of liability satisfies both tests. *In re Baxter Int'l S'holders Litig.*, 654 A.2d 1268, 1269 (Del. Ch. 1995); *see also Rosenbloom v. Pyott*, 765 F.3d 1137, 1150 (9th Cir. 2014) ("Under either approach, demand is excused if Plaintiffs' particularized allegations create a reasonable doubt as to whether a majority of the board of directors faces a substantial likelihood of personal liability for breaching the duty of loyalty.").

Pleading demand futility does not require that Plaintiffs plead evidence, a smoking gun, or a confession. *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Aronson*, 473 A.2d at 816. Instead, the complaint need only raise a "reasonable doubt" as to the disinterestedness or independence of a majority of directors. Aronson, 473 A.2d at 814. Plaintiffs are not required to plead facts sufficient to sustain a judicial "finding." *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 289 (Del. Ch. 2003). "[N]or must plaintiff demonstrate a reasonable probability of success on the merits." *McCall v. Scott*, 239 F.3d 808, 816, *amended on denial of rehearing*, 250 F.3d 997 (6th Cir. 2001). Plaintiff need only make a "threshold showing, through the allegation of particular facts, that [his] claims have some merit." *Rales*, 634 A.2d at 934.

In conducting this analysis, the Court must review the Amended Complaint in its entirety, must assume the truth of the allegations, and must draw all reasonable inferences in favor of the plaintiff. *Rales*, 634 A.2d at 931. Further, the Court must **read all of Plaintiffs' allegations as a whole**, not relying on any one factor but examining the totality of the circumstances. *Harris*, 582 A.2d at 229; *Veeco*, 434 F. Supp. 2d at 274.

## E.     Plaintiffs Have Adequately Alleged that Demand Would Be Futile

Demand upon the Chesapeake Board that was in place at the time this action was

originally filed to institute this action in the Company's name would have been entirely futile, and is therefore excused.  Each of the Director Defendants abdicated his or her responsibilities to Chesapeake and its shareholders and there is significant doubt that these Defendants are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duties that allowed McClendon to abscond with hundreds of millions of corporate assets, which corresponded to hundreds of millions of dollars in corporate waste.  As such, the Director Defendants are neither disinterested nor independent, and are not capable of responding adequately to a demand.  As held recently by another court in this district, having "implemented corporate reporting and information systems and controls through their various committees and governing documents which should have ensured that" the CEO's activities were performed in accordance with Company agreements and policies and that the CEO "did not engage in competitive, conflicted and self-dealing activities," when the Board "nevertheless consciously disregarded certain 'red flags' … that would put the Directors on notice of [the CEO's] alleged misappropriation of" Company opportunities, demand is futile. *Sandridge*, 2014 U.S. Dist. LEXIS 132329, at *19, *23-24 ("[T]he Directors, by ignoring [the CEO's] problematic activities … and failing to investigate further related party transactions, which created conflicts that were and are inconsistent with [his] duty of loyalty to [the Company, the Defendants] knew they were not fulfilling their fiduciary duties, thereby demonstrating a conscious disregard for their responsibilities.") (quotations and citations omitted).

1.    **Each of the Director Defendants Face a Substantial Likelihood of Liability**

Corporate officers and directors act in bad faith and face a substantial likelihood of liability where they have actual knowledge of wrongful activity that damages a company, yet take no steps to prevent or remedy the situation. *In re Abbott Labs. Derivative S'holders Litig.*, 325 F.3d 795, 806, 809 (7th Cir. 2003).[24]   Long-established corporate law principles require directors to take action once they have information indicating that they should; directors are affirmative duty-bound to act if they are on notice. *See, e.g., Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939) ("A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, [which includes acting] affirmatively to protect the interests of the corporation committed to his charge…").

Thus, once a director has knowledge of serious problems within a corporation, he or she is required to act.  Demand is regularly excused when, based on the facts alleged, it is reasonable to infer that directors turned a blind eye and failed to take such action.  *See,*

---

[24] *See also Rosenbloom*, 765 F.3d at 1151-54 (demand futile when plaintiffs alleged adequate facts that the board condoned illegal actions at the company involving one of its most important products); *Westmoreland Cnty. Emp. Ret. Sys. v. Parkinson*, 727 F.3d 719, 726-29 (7th Cir. 2013) (demand futile where board failed to ensure that company complied with a previous consent decree); *In re Abbott Depakote S'holder Derivative Litig.*, 2013 U.S. Dist. LEXIS 78841, at *23-39 (N.D. Ill. June 5, 2013) (demand futile where board had knowledge of illegal conduct and failed to stop it); *Arbit v. Makrides*, 2012 U.S. Dist. LEXIS 135424, at *10-12 (M.D. Fla. Sept. 21, 2012) (demand futile where majority of directors failed to respond to red flags); *In re Pfizer Inc. S'holder Derivative Litig.*, 722 F. Supp. 2d 453, 461-62 (S.D.N.Y. 2010) (demand futile because directors knew but  deliberately disregarded illegal practices).

*e.g., In re TASER Int'l S'holder Derivative Litig.*, 2006 U.S. Dist. LEXIS 11554, at *53 (D. Ariz. Mar. 17, 2006) ("the alleged facts, taken together, lead to 'reasonable inferences' that the Board was aware of Taser's safety issue problems"); *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1081 (C.D. Cal. 2008) (same); *In re SFBC Int'l, Inc. Sec. & Derivative Litig.*, 495 F. Supp. 2d 477, 485-86 (D.N.J. 2007) (same).

Here, Plaintiffs provide particularized facts that the Director Defendants **knew or were recklessly negligent in not knowing** about McClendon's systematic actions related to the FWPP and running of the Company's hedge facilities that were in direct conflict with the interests of the Company and its shareholders and in violation of Company policies and that McClendon's misconduct resulted in substantial harm to the Company.. ¶¶28, 108-63, 177-200, 206, 272-79. Yet, despite that knowledge, the Director Defendants failed to take any action to prevent or remedy the issues in a timely fashion. And once the issues came to light, instead of holding McClendon to account for his misdeeds, the Director Defendants allowed McClendon to exit from the Company "without" cause, leading to further financial losses to Chesapeake.[25]

---

[25] McClendon continuously breached his fiduciary duties, subjecting him to liability herein. ¶301-07. A director is also deemed "interested" when he "has received, or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by shareholders." *China Agritech*, 2013 Del. Ch. LEXIS 132, at *47-48. McClendon received numerous financial benefits from the challenged transactions herein, making him interested. Further "there is a reasonable doubt that [an employee-director] can be expected to act independently considering his substantial financial stake in maintaining his current offices." *Rales*, 634 A.2d at 935-37. Accordingly, McClendon, as a director and CEO of the Company at the time when this suit was filed, was beholden to the Board and incapable of considering demand. *Id.*

### a. McClendon's Conflicted Related-Party Loans

The non-recourse nature of McClendon's FWPP loans evidenced that these loans were: (i) not the result of arms-length negotiations; (ii) not provided on terms available to other, independent third-parties as required by the terms of the FWPP; and (iii) were nothing more than the misappropriation of corporate opportunity. ¶153. These loans placed McClendon in competition with the Company for financing and also violated the Company's Compensation Philosophy which stated that the purpose of the FWPP was purported to place McClendon's interests in line with the interests of the Company and its shareholders; because the only collateral for McClendon's loans was future revenues from drilling operations and there were no personal guarantees securing the loans. Accordingly, if the bet on the wells paid off, McClendon would make tens or hundreds of millions of dollars in profits, but if the wells lost money McClendon could simply default on the loan with no threat of personal recourse. ¶¶6,147-48.

Oversight and management of McClendon's participation in the FWPP was charged to the full Board through the Company's Code of Conduct, which specifically prohibited employees from usurping Corporate Opportunities that were developed through the use of Chesapeake's resources, and prohibited transactions with Vendors of the Company, including soliciting or accepting loans. ¶¶133-38. Chesapeake's Code of Conduct also imposed reporting requirements for potential conflicts of interest. ¶139.

McClendon's participation in the FWPP was purportedly on terms no better than those available to independent third parties (¶112), which is contradicted by the non-recourse nature of his loans with related parties. Not only were these loans provided on a

preferential basis because McClendon did not have the creditworthiness or liquidity to qualify for them, but McClendon was actually competing with the Company to obtain these loans from the same lending partners that Chesapeake was attempting to get funding. ¶156. The loans also required McClendon "to take all commercially reasonable action" to ensure that other owners and operators of the wells—including Chesapeake—comply with "covenants and agreements" of the loans, which required McClendon to place the interest of his lenders ahead of the interests of the Company and its shareholders. ¶¶9, 87. Moreover, it is impossible that the Board did not know that McClendon lacked the financial assets or creditworthiness to finance his FWPP obligations, since in 2009 the Board awarded him a $75 million "Well Cost Incentive Award" so that he could make his payments under the FWPP. ¶18.

The Director Defendants adopted the position that McClendon's loans from related partners did not create a conflict of interest and were not even related party loans despite the fact that the McClendon loans: (i) were made by Company partner entities doing business with Chesapeake; (ii) were negotiated and enacted during the time that McClendon was both Chairman of the Board and CEO; (iii) were granted by at least one entity that was involved in billions of dollars in transactions with the Company and a second company whose director, Hargis, served as Chairman of Chesapeake's Audit Committee; (iv) created an immediate duty to subjugate the interests of Chesapeake shareholders to the interests of the lenders who financed McClendon's loans; (v) created liens on Company property, including the wells and ancillary property associated therewith; and (vi) were used entirely to finance McClendon's purchase of assets from

the Company, through a compensation program that was run by, and monitored by two Board committees and the full Chesapeake Board.  ¶93.

Chesapeake's argument that the loans were simply McClendon's personal activities, over which the Board had no oversight should be rejected, as that position is inconsistent with its Policy on Transactions with Related Persons.[26]  ¶127.  Clearly, the Company was "a participant" in the transaction to the extent that the majority of wells were controlled by the Company.  Additionally, every well in which McClendon invested he did so as Chairman and CEO of the Company.  Thus, even though McClendon was personally liable for his investments, his participation in the FWPP was tied to his position(s) at Chesapeake.

Once the loans came to light, the Board expressed that it was only generally aware that McClendon had pledged his interests in the FWPP.  ¶¶157, 159-60, 194, 197, 199. This was clearly not sufficient in order for the Board to have satisfied their fiduciary duties, supporting a finding that demand is futile.  *TASER*, 2006 U.S. Dist. LEXIS 11554, at *53; *Countrywide*, 554 F. Supp. 2d at 1081; *SFBC*, 495 F. Supp. 2d at 485-86.

---

[26] The cases Chesapeake cites in support of this argument are misplaced.  In *Beam*, the court held that "***absent cause for suspicion*** there is no duty upon the directors to install and operate a corporate system of espionage to ferret out wrongdoing which they have no reason to suspect exists."  833 A.2d at 971 (emphasis added).  Here, there was plenty of suspicion (and/or actual knowledge) of McClendon's conflicted activities, as well as multiple layers of oversight which were not followed.  Further, the wrongdoings herein are not purely personal in nature, but are intimately connected with McClendon's role as CEO and Chairman of Chesapeake, versus in *Beam* where the derivative action arose from the CEO's alleged insider trading in a non-company stock that she held personally and which harmed the company solely due to the bad publicity that resulted.  *Id.*; *accord Canadian Commercial Workers Industry Pension Plan*, No. 1184-N, 2006 Del. Ch. LEXIS 42, at *27 (Del. Ch. Feb. 22, 2006) (directors "***generally*** have no duty to monitor the personal affairs of other directors and officers.") (emphasis added).

### b.  McClendon's Conflicted Hedge

McClendon's secret running of his $200 million private hedge fund from his office that traded in the same commodities that Chesapeake produced also created a host of complex conflicts of interest, including: (i) whether McClendon profited off of non-public information about Chesapeake's trades; (ii) whether McClendon was front-running Company trades; and (iii) whether the hedge fund paid rent to Chesapeake for being allowed to operate from a Chesapeake building.  ¶¶11, 70.  Despite these conflicts, not only did the Director Defendants turn a blind eye to McClendon's activities, but they acquiesced in a series of revisions to McClendon's employment contract that allowed him more and more latitude to run the hedge fund.  ¶¶177-88.  Accordingly, they face a substantial likelihood of liability and demand is futile.  *TASER*, 2006 U.S. Dist. LEXIS 11554, at *53; *Countrywide*, 554 F. Supp. 2d at 1081; *SFBC*, 495 F. Supp. 2d at 485-86.

### c.  McClendon's Termination and the Flawed Investigation

McClendon could have been terminated for cause for, in part, the following: (i) for running a hedge fund out of the Company's offices while managing billions of dollars of Chesapeake's hedge positions and while competing with the Company for natural gas commodities trading profits; (ii) by taking loans from Company partners on preferential terms and violating the terms of the FWPP and Code of Conduct; (iii) for repeatedly failing to disclose material information to the Board; (iv) by failing to disclose to the Audit Committee the terms of his FWPP loans and having these loans vetted for Related Party Transaction review; and (v) by failing to disclose on the year end Related Party Transaction Disclosure Form the existence of over a billion dollars in loans from entities

that were entangled in business relationships with Chesapeake. ¶248. Instead, the Director Defendants allowed McClendon to be terminated "without cause," costing the Company $50 million. ¶¶26, 218, 245, 249. All of the Director Defendants except for Miller followed suit, further evidencing that demand would have been futile. ¶322.

Chesapeake argues that these allegations are irrelevant for the demand futility analysis because they occurred after the original complaints were filed and/or after the Director Defendants left Chesapeake. MTD at 9, 39-40 (relying on *In re Merck & Co., Inc. Derivative & ERISA Litig.*, MDL No. 1658, 2006 U.S. Dist. LEXIS 27861 (D.N.J. May 5, 2006)). But *Merck* is inapposite. There, the court addressed whether the plaintiff could amend his complaint to include information he had learned through discovery, not an amended complaint that rightfully included allegations concerning further factual developments, as here. *Id.* at *61. And the Third Circuit reversed the decision, holding that the lower court erred by refusing to consider the the discovery was obtained pursuant to a consensual stipulation. *In re Merck & Co.*, 493 F.3d 393, 402 (3d Cir. 2007).

Additionally, courts regularly consider further factual developments—including director resignations *en masse*—when evaluating demand futility, holding that director resignations once wrongdoing comes to light "further call into question their ability to consider a demand" because the resignation can "support a reasonable inference that" the director could not meaningfully supervise the CEO, "which in turn contributes to an inference that [the director] could not properly consider a litigation demand." *China Agritech*, 2013 Del. Ch. LEXIS 132, at *60-61; *Rich*, 66 A.3d at 970 (considering board members' resignations as additional fact supporting a finding that demand was futile).

29

Additionally, the Board also created an entirely conflicted and flawed investigation that was designed to assure that no liability would be assigned. First, the investigation was chaired by Hargis as Chair of the Audit Committee—the same director who was also a director of one of the finance companies exposed for giving loans to McClendon. ¶32. Second, Hargis, Davidson and Miller were all members of the Audit Committee that failed at every turn to investigate McClendon's source of financing for his participation in the FWPP. ¶32. Third, in the June 2012 shareholder vote Hargis received only 26% of the vote and was required to resign immediately. ¶¶32, 204. At that point, there was no unbiased, uninterested or non-conflicted reason to not accept Hargis's resignation. Moreover, the conflicted members of the Audit Committee selected a counsel that was not financially independent, but rather one that had financial entanglements with Miller that do not appear to have been disclosed or waived. ¶¶33, 264. These facts support a finding that demand was futile. *See China Agritech*, 2013 Del. Ch. LEXIS 132, at *62 (resignation of audit committee member after special committee tasked with reviewing potential wrongdoing "supports a reasonable inference that [the director] had washed his hands of the Company and its problems which in turns contributes to the inference that he could not properly consider demand).

Furthermore, Defendants Eisbrenner, Keating and Nickles also breached the duties owed to shareholders of Chesapeake by abandoning their positions before the delayed results of the Board investigation were complete. ¶¶220-21. It was inappropriate and clearly created a conflict of interest and a breach of duty for: (i) the Board to allow McClendon to hand-pick four Board members with investors without the appointment of

a special nominating committee or any independent oversight; (ii) allowing the replaced Board members to resign before the results of the investigation were completed and to escape liability for their breaches of duties; and (iii) allowing McClendon to engineer his own departure without cause. ¶¶220-22, 323, 329. Accordingly, demand is futile.

### d.  The Board's Actions are Not Protected by Business Judgment

It is well-established that condoning or consciously disregarding serious problems threatening a company's core business cannot constitute a legally protected business decision, and, as such, is not, and cannot be, a valid exercise of business judgment. *Aronson*, 473 A.2d at 814; *Veeco*, 434 F. Supp. 2d at 278; *Pfizer*, 722 F. Supp. 2d at 460. Contrary to the misguided argument of Chesapeake, this is not a case premised upon a complete absence of a corporate monitoring and reporting systems under *In re Caremark International Inc. Derivative Litigation*, 698 A.2d 959, 971 (Del. Ch. 1996), but rather, is premised upon "having implemented such a system or controls, [the Board] consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006); *see also Abbott*, 325 F.3d at 806 ("Where there is a corporate governance structure in place, we must then assume the corporate governance procedures were followed and that the board knew of the problems and decided no action was required."); *McCall*, 239 F.3d at 820 ("Plaintiffs contend that information provided by the audits about Columbia's reimbursement practices would have shown unmistakable signs that improper practices were being employed throughout the corporation."); *Pfizer*, 722 F. Supp. 2d at 461 (corporate integrity agreements "obligated Pfizer's chief Compliance Officer to report

31

directly to the board the allegations of misconduct here at issue . . . .  There is no reason to believe this reporting requirement was not fully complied with, thus guaranteeing that each member of the board was bombarded with allegations of continuing misconduct . . . ."); *Countrywide*, 554 F. Supp. 2d at 1060 (court found that "the idea that a Companywide culture that encouraged unchecked deviations from underwriting standards in a way which would fatally affect the Company's continued financial performance went unnoticed by a Board of Directors simply does not square with the specific and comprehensive monitoring duties assigned to the members of the Board").  Further, while "[f]ew Delaware cases attempt to define precisely what conduct reaches the level of actionable bad faith, [] there is agreement that 'adopting a 'we don't care about the risks' attitude concerning a material corporate decision' constitutes bad faith." *Brown v. Brewer*, 2010 U.S. Dist. LEXIS 60863, at *46-47 (C.D. Cal. June 17, 2010).

The Amended Complaint shows that the Board was knowingly indifferent to its responsibilities, adopting an "ostrich-like" attitude toward "a material corporate decision"—that of, *inter alia*, allowing McClendon to finance his FWPP participation with related-party non-recourse loans, allowing McClendon to run Heritage from the CEO's office, and terminating McClendon "without cause"—by doing so in a way that "cause[d] the corporation and its stockholders to suffer injury," including, among other things, the loss of financing opportunities, divorcing of McClendon's financial interests from the interests of the Company and its shareholders, and the loss of $50 million when McClendon left the Company.  ¶¶108-63, 177-89, 215-49; *Walt Disney*, 825 A.2d at 286, 289. The Board's failure to take reasonable and necessary measures to curb McClendon's

conflicted actions and terminating McClendon without cause, leading the Company to forfeit millions of dollars, clearly demonstrate their complete failure "to exercise [] any business judgment [or to] make any good faith attempt to fulfill the fiduciary duties they owed" to the Company. *Id.* at 287; *see also Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins*, 2004 Del. Ch. LEXIS 122, at *32 (Del. Ch. Aug. 24, 2004) (When "disinterested, independent directors 'knew that they were making material decisions without adequate information and without adequate deliberation, …' they have acted in a manner that cannot be said to be the product of sound business judgment and so cannot be protected by the presumption of the business judgment rule.") (quoting *Walt Disney*, 825 A.2d at 289).

The misconduct of each member of the Board alleged herein was not, and could not have been, the product of a valid or good faith exercise of business judgment. Each of the Board members were directly involved in the misconduct challenged in this action, by virtue of their respective positions on the Board. The members of the Board abdicated their responsibility to oversee the Company and instead directed and encouraged McClendon, in the service of his own personal gain, to engage in improper conduct. The Board's acts and omissions lacked any legitimate business purpose and were not a product of a valid exercise of business judgment. As such, demand is excused.

## 2. The Audit and Compensation Committee Members Face a Substantial Likelihood of Liability for Abdicating Their Duties

In addition to the above, the members of the Audit and Compensation Committees—themselves constituting a majority of the Board—face a substantial

likelihood of liability for abdicating their duties as committee members.  Allegations of committee membership give rise to an inference of demand futility when combined with specific allegations of "red flags" that "should have put [defendants] on notice."  *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007); *see also Veeco*, 434 F. Supp. 2d at 277-78 (holding that allegations that an audit committee failed to exercise appropriate attention to wrongful conduct demonstrates a substantial likelihood of liability that renders demand futile).

As members of the Audit Committee, defendants Hargis (chair), Davidson and Miller each were charged with specific oversight duties over McClendon's' participation in the FWPP.  ¶¶117-25, 309, 314-15, 320.  The members of the Audit Committee were each also charged with review of Related Party Transactions, including the review of each executives self-reporting requirement pursuant to review of their annual global Conflict of Interest Disclosure Form(s).  ¶16.  The Audit Committee was required to review related party transactions: (i) over $100,000; (ii) where the Company is a participant; and (iii) where directors, executive officers and greater than 5% shareholders and their immediate family members have or will have a direct or indirect interest.  ¶121.

The Audit Committee was tasked with reviewing and assessing ongoing relationships with related persons on at least an annual basis to consider whether they continue to be in compliance with the policy and remain appropriate, specifically ***including McClendon's participation in the FWPP*** (the day-to-day oversight of which is mandated to the Compensation Committee).  ¶122.  It purportedly "approves or ratifies only those transactions that it determines in good faith are in, or are not inconsistent with,

the best interests of the Company and its shareholders," but since it would be impossible to approve or ratify McClendon's participation in the FWPP or determine if his participation was in the best interest of the Company without knowledge of the existence and terms of his loans, they would necessarily be part of a proper Audit Committee review. ¶123. Thus, because the Audit Committee was *already* charged with oversight of the FWPP, it was also required to review and ratify the loans by Company's partners to McClendon, and McClendon was required to disclose those loans and to submit them for review. ¶123. Yet, these loans were never disclosed as Related Party Transactions as was required, and McClendon had never reported them on his annual self-report to the Audit Committee on his Related Party Transaction Review Form. ¶8.

During the Relevant Period, defendant Keating was Chairman of the Compensation Committee and defendants Eisbrenner and Maxwell constituted its other two members. ¶131. According to the Company's 2011 Proxy, "[t]he Compensation Committee reviews Mr. McClendon's participation in the FWPP on a quarterly basis." ¶¶129-32, 146. The Compensation Committee was also charged with achieving the goals of the Company's Compensation Design and Philosophy. ¶132. According to the 2011 Proxy, the primary goals were reflected in the purpose and intent of forming the FWPP (and as stated therein), and were purported to, *inter alia*, "align the interests of [McClendon] with the interests of our shareholders." ¶132. But the non-recourse nature of McClendon's loans, as well as his trading for his personal hedge fund, among his other fiduciary breaches, did not align his interests with that of the Company and its shareholders. ¶151, 164-76. Because the only collateral for the loans given to

McClendon by parties related to and with material financial entanglements with Chesapeake was future revenues from drilling operations, and because there were no personal guarantees securing the loans, McClendon never had "skin in the game," and his use of these loans consistently violated the purpose and intent of the FWPP. ¶147.

There is no question that McClendon violated his duties to the Company and engaged in conflicts of interest by borrowing over $1 billion from Chesapeake partners, and that the members of the Audit Committee and Compensation Committee abdicated their duties by not knowing, or by recklessly disregarding, the source of McClendon's financing. Accordingly, these Director Defendants are subject to a substantial likelihood of liability for failing in their duties as committee members and "knowingly disregarding their duty of oversight. These directors could not validly consider a litigation demand concerning the problems that occurred on their watch." *China Agritech*, 2013 Del. Ch. LEXIS 132, at *59.[27] Ultimately, these Director Defendants—constituting a majority of the Board—failed in their responsibilities and sat idly by and failed to take action to ensure that the Company was protected from McClendon's misconduct and, thus, face a substantial likelihood of liability for breaching their duties.[28]

---

[27] *See also Countrywide*, 554 F. Supp. 2d at 1064-65 (demand excused facts pled regarding directors' roles on committees and duties which required them to be informed about certain aspects of the company's practices which were "at the core" of the company's business); *Rosky ex rel. Wellcare Health Plans, Inc. v. Farha*, 2009 U.S. Dist. LEXIS 107531, at *3 (M.D. Fla. Mar. 30, 2009) (finding demand on audit committee members excused because of "sufficient factual details" contained in the complaint).

[28] Moreover, a "committee of the board, acting in good faith, would have communicated with each other concerning … problems ... and would have shared the information with the entire ... board of directors," making demand on the entire board futile. *Saito v.*

### 3. Collectively, the Allegations in the Amended Complaint Establish Demand Futility

It is well-established that demand futility allegations are to be viewed holistically or collectively, and cannot be individually scrutinized in isolation from one another. *In re Gen. Instrument Corp. Sec. Litig.*, 23 F. Supp. 2d 867, 875 (N.D. Ill. 1998) ("[w]hile none of these allegations standing alone may be sufficient to excuse demand, the totality of these allegations, if proven, plainly raises a reasonable doubt that a majority of the Directors were not independent when this suit was filed"); *see also Cal. Pub.,* 2002 Del. Ch. LEXIS 144 (plaintiffs' allegations collectively demonstrated that the defendant director lacked independence); *Harris*, 582 A.2d at 229 (Del. Ch. 1990) ("[T]he question is whether the accumulation of all factors creates the reasonable doubt to which *Aronson***Error! Bookmark not defined.** refers.").

Here, Plaintiffs have shown, among other things, that: (1) all of the Director Defendants are under a substantial threat of liability (*supra* §II(E)(1)); (2) Defendants Hargis, Davidson, Miller, Keating, Eisbrenner, and Maxwell (constituting a majority of the Board) are under a substantial threat of liability by virtue of their positions on corporate committees (*supra* §II(E)(2)); (3) Defendant Miller has an interest in maintaining his position as director and is thus incapable of considering demand (¶322; *Samuel M. Feinberg Testamentary Trust v. Carter*, 652 F. Supp. 1066, 1072-75 (S.D.N.Y. 1987) (demand was excused when directors took action to enable them to secure continued possession of their positions and remunerations)); (4) Defendant Hargis

---

*McCall*, 2004 Del. Ch. LEXIS 205, at *36 n.71 (Del. Ch. Dec. 20, 2004), *overruled on other grounds*, *Lambrecht*, 3 A.3d 277.

is incapable of objectively considering demand due to his ties with BOK, which does significant finance business with Chesapeake and also was one of the entities who make a secret loan to McClendon to fund the FWPP, and his personal ties with McClendon and Chesapeake through his position at Oklahoma State University (¶¶241, 317, 323; *Haseotes v. Bentas*, 2002 Del. Ch. LEXIS 106, at *13 (Del. Ch. Sept. 3, 2002) (a director's lack of independence may be demonstrated where the particularized facts establish conflicting "relationships"); *Cal. Pub.*, 2002 Del. Ch. LEXIS 144, at *29 (same)); (5) Defendant Davidson, Nickels and McClendon are incapable of objectively considering demand due to their financial ties related to Chesapeake Midstream Partners, L.P. (¶321; *Haseotes*, 2002 Del. Ch. LEXIS 106, at *13; *Cal. Pub.*, 2002 Del. Ch. LEXIS 144, at *29); (6) Defendant Miller is incapable of objectively considering demand due to his ties with the special counsel for the Company's investigation of McClendon and National Oilwell Varco, Inc., a company headed by Miller that has engaged in a significant amount of business with Chesapeake (¶328; *Haseotes*, 2002 Del. Ch. LEXIS 106, at *13; *Cal. Pub.*, 2002 Del. Ch. LEXIS 144, at *29); and (7) Defendants Keating and McClendon are incapable of objectively considering demand due to their political ties with another (¶328 ; *Haseotes*, 2002 Del. Ch. LEXIS 106, at *13; *Cal. Pub.*, 2002 Del. Ch. LEXIS 144, at *29).

Taken together—**as they must be**—these allegations paint a picture of a Board with intertwined relationships that knowingly allowed McClendon to engage in ongoing misconduct while putting the Company at risk and then finally took action to terminate McClendon in a way that further damaged the Company.  These allegations are more

than sufficient to establish a substantial threat of liability and the disinterestedness of all of the Director Defendants—even though Plaintiffs are only required to show that five of the Director Defendants are conflicted—and, thus, to excuse demand.

### F.     Chesapeake's Exculpatory Clause Does Not Form a Basis for the Amended Complaint to Be Dismissed

Chesapeake makes the baseless argument that the Individual Defendants are insulated from personal liability in connection with the wrongdoing because of an exculpatory provision in Chesapeake's certificate of incorporation.  MTD at 10-11.  A corporation cannot eliminate liability for "breaches of the duty of loyalty and acts or omissions not in good faith or which involve intentional misconduct."  *Ryan v. Gifford*, 2009 Del. Ch. LEXIS 261, at *23-24 n.27 (Del. Ch. Jan. 2, 2009).  To prevail on a motion to dismiss based on an exculpatory clause, the complaint must ***unambiguously*** state a claim only for a breach of the duty of care.  *See, e.g., Orman v. Cullman*, 794 A.2d 5, 41 (Del. Ch. 2002) (denying motion to dismiss based on exculpatory clause where allegations made it reasonable to question the independence and disinterest of a majority of the board); *Sanders v. Wang*, 1999 Del. Ch. LEXIS 203, at *35 (Del. Ch. Nov. 8, 1999) (denying motion to dismiss based on exculpatory clause, explaining "[a]t this stage of the proceedings, I cannot conclude as a matter of law that the Board acted in good faith and their actions constituted no more than mere carelessness").

Here, Plaintiffs have alleged not merely breaches of the fiduciary duty of care, but of the duties of loyalty and good faith, as well as waste of corporate assets.  ¶¶ 340-49; *Kohls v. Duthie*, 791 A.2d 772, 783 (Del. Ch. 2000) ("director's duty of loyalty may also

be implicated where directors who do not benefit from a transaction nevertheless act with 'indifference to their duty to protect the interests of the corporation and its minority shareholders.'").  There is, thus, no shield to be found in Chesapeake's exculpatory provision.  *Alidina v. Internet.com Corp.*, 2002 Del. Ch. LEXIS 156, at *28 (Del. Ch. 2002); *Emerald Partners v. Berlin*, 787 A.2d 85, 91 (Del. 2001); *Malpiede v. Townson*, 780 A.2d 1075, 1095 (Del. 2001).  Moreover, even when the company has an exculpatory provision, the duty of care is still applicable "to the extent plaintiffs seek equitable relief for any alleged breaches of the duty of care."  *Leslie v. Telephone Office Techs., Inc.*, 1993 Del. Ch. LEXIS 272, *30 (Del. Ch. 1993); *see also Cal. Pub.,* 2002 Del. Ch. LEXIS 144, at *59 (same).  Here, the remedies sought are not strictly monetary—Plaintiffs seek equitable remedies (*see* ¶¶ 350-53; § XI(C))—further rendering the exculpatory provision inapplicable.

Finally, the statutory liability shield provided by a certificate of incorporation such as Chesapeake's is in the nature of an affirmative defense and "affirmative defenses … will not form the basis for dismissal under Rule 12(b)(6)."  *In re Tower Air, Inc.*, 416 F.3d 229, 242 (3d Cir. 2005). At the pleading stage of a derivative action, courts routinely refuse to consider an affirmative defense based on an exculpatory provision.  *In re Brown Sch.*, 368 B.R. 394, 401 (Bankr. D. Del. 2007).  Therefore, the Court should disregard Chesapeake's exculpatory argument and conclude that demand is excused.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Chesapeake's motion to dismiss.

Date: March 20, 2015                By: /s/ Melinda A. Nicholson

KAHN SWICK & FOTI, LLC
Lewis S. Kahn (admitted *pro hac vice*)
lewis.kahn@ksfcounsel.com
Melinda A. Nicholson (admitted *pro hac vice*)
melinda.nicholson@ksfcounsel.com
206 Covington Street
Madisonville, Louisiana 70447
Telephone: (504) 455-1400
Fax: (504) 455-1498

*Lead Counsel for Plaintiffs*

STRONG, MARTIN & ASSOCIATES, PLLC.
Don S. Strong, OBA No. 13874
dss@strongmartin.com
G. Stephen Martin, OBA No. 17091
gsm@strongmartin.com
2700 First National Center
120 North Robinson Avenue
Oklahoma City, Oklahoma 73102
Telephone: (405) 604-7500
Facsimile: (405) 604-7503

*Liaison Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered, as denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non- CM/ECF participants indicated on the attached Manual Notice List.

/s/ Melinda A. Nicholson
MELINDA A. NICHOLSON